1  TERRI KEYSER-COOPER
2  Law Office of Terri Keyser-Cooper
3  Nevada Bar No. 3984
4  125 Edgewater Parkway
5  Reno, NV 89519
6  (775) 337-0323
7  Keysercooper@lawyer.com
8  *Attorney for Plaintiff Jason Killinger*
9
10                **UNITED STATES DISTRICT COURT**
11
12                     **DISTRICT OF NEVADA**
13
14
15
16  JASON KILLINGER,                          Case No.
17
18              Plaintiff,                    **COMPLAINT**
19
20         v.                                 (Jury Demand)
21
22  RENO POLICE OFFICER R. JAGER,
23
24              Defendant.
25  _____/
26
27                     **INTRODUCTION**
28

1.    On September 17, 2023, the Peppermill Casino in Reno telephoned the Reno Police Department to report that M.E., a trespasser, had unlawfully returned to the casino. The casino reported that their A.I. facial recognition software positively identified the man as M.E., a man they had barred from the casino months earlier for sleeping on the premises.

2.    The Peppermill's A.I. software was wrong. It mistakenly identified Plaintiff Jason KILLINGER ("KILLINGER") as M.E. KILLINGER is not and has never been M.E.

3.    Peppermill security officers accused KILLINGER, who had just spent several hours gaming at the casino, of being M.E. They handcuffed him, took him to their security office, and insisted he confess to being M.E. KILLINGER vehemently insisted his name was KILLINGER and he knew nothing about anyone named M.E.

1

4.      KILLINGER produced his current Nevada "real ID" driver's license establishing his name was KILLINGER, not M.E.

5.      Defendant RPD Officer R. JAGER arrived at the Peppermill security office at the request of Peppermill security.[1] Peppermill security officers told JAGER that their A.I. facial recognition software had provided a 100 percent match confirming that KILLINGER was M.E.

6.      JAGER was both impressed and convinced. KILLINGER protested he was not M.E. and pleaded with JAGER to look at his other forms of identification. JAGER ignored everything KILLINGER said, refused to look at KILLINGER's other forms of identification, and declined to investigate further even when it was obvious KILLINGER had substantial evidence he was not M.E. KILLINGER had:

- A Nevada issued valid "Real ID" driver's license in his name (Jason Killinger);

- A debit card from his credit union in his name (Jason Killinger);

- A player's card from the Peppermill in his name (Jason Killinger);

- A pay stub from his paycheck from United Parcel Service where he has been employed for nearly 20 years in his name, five of which has been in Reno in his name (Jason Killinger);

- A valid and current vehicle registration for his car in his name (Jason Killinger);

- A Department of Transportation medical card in his name (Jason Killinger);

- A Teamster's Local 533 union card in his name (Jason Killinger);

- A valid and current vehicle insurance card in his name (Jason Killinger); and

- Numerous player cards for various Reno casinos in his name (Jason Killinger).

7.      JAGER arrested KILLINGER and fabricated evidence in his arrest documents to create probable cause for the arrest. JAGER falsely stated KILLINGER had produced conflicting

---

[1] JAGER's body worn camera recorded everything JAGER said and all of his interactions with KILLINGER. Accordingly, here is no dispute as to what was said or what occurred.

identification as to who he was. By falsely asserting KILLINGER had "produced conflicting" identification, JAGER sought to deceive the prosecutors and the court into thinking KILLINGER was a con man trying to flimflam the police and the Peppermill with false identities. Nothing could be further from the truth. JAGER knew KILLINGER had not produced multiple identifications; JAGER knew that all of KILLINGER's identification was in KILLINGER's name only.

8.      JAGER also falsely asserted in his arrest documents that KILLINGER had "no documentation" to support his claim that he was in fact KILLINGER. Again, nothing could be further from the truth. JAGER knew KILLINGER had many pieces of identification in his pocket and in his nearby vehicle that would conclusively establish his identity as KILLINGER yet JAGER omitted these facts in his arrest documents. By omitting key facts, JAGER sought to mislead the prosecutors and the court, bolster the case against KILLINGER, and convict an innocent man.

9.      JAGER telephoned his supervisor and falsely asserted to his supervisor the preposterous fact that KILLINGER probably had a "hookup" at DMV who manufactured false IDs for him. JAGER's invention of this outrageous claim that KILLINGER had a DMV "hookup" creating false identities for him was ludicrous on its face and without a shred of evidence. It reveals JAGER's desire to "get" KILLINGER, to manufacture crazy facts to make Killinger look bad, and to persuade his supervisor that KILLINGER was a corrupt and wicked person who deserved arrest.

10.      Even more preposterous, JAGER made it clear that **if** KILLINGER had just admitted to being M.E., he would have received a citation and avoided arrest entirely. But because KILLINGER protested his innocence and truthfully protested he was not M.E., JAGER insisted he was **required** to arrest him as a "John Doe," a citation would not work, and take him to jail for the express purpose of determining his identity.[2]

---

[2] JAGER stated that if he had known who KILLINGER was, or if KILLINGER had admitted he was M.E., he would have given him a simple citation for trespassing but because KILLINGER insisted he was KILLINGER and strongly denied he was M.E. he had to go to jail. This means that JAGER arrested KILLINGER not because KILLINGER had committed a crime, but only because JAGER refused to accept KILLINGER's valid forms of identification.

11.     Finally, while JAGER was convinced the right course of action was to arrest KILLINGER, he also admitted multiple times that he "didn't know what to think" and he "kinda believed KILLINGER." Both M.E. and KILLINGER had legitimate active driver's licenses. Both had no criminal record. While their faces were similar everything else about them was different. JAGER was confused but he didn't want his confusion to be clarified by facts or further investigation. Nope. His mind was made up, he would take KILLINGER to jail and let the jail sort it out. Yet, if he was confused and didn't know what to think, the obvious solution was to investigate further, look at KILLINGER's multiple forms of identification, go out to his car and look at his government issued vehicle registration and his insurance papers, or go to the Peppermill gaming office and check if KILLINGER had a player's card indicating he was a regular player and how often he played. All of these avenues of exploration could have, and should have been explored, before making the disastrous mistake of arresting a clearly innocent person.

12.     KILLINGER was taken to the Washoe County Detention Facility ("jail"). His fingerprints were submitted to WINS for analysis. While KILLINGER remained at the jail, the fingerprint analysis conclusively established that he was KILLINGER, not M.E. or anyone else. **While at the jail**, KILLINGER's name on his arrest papers was changed from 'John Doe' to JASON KILLINGER. Now KILLINGER would be prosecuted for trespassing as KILLINGER not as "John Doe," but there was no evidence that anyone named KILLINGER had ever trespassed at the Peppermill and no evidence that KILLINGER had ever masqueraded as M.E.

13.     More importantly, there was no probable cause to continue KILLINGER's prosecution at all, yet it continued. The only person who had trespassed at the Peppermill was M.E. No one named KILLINGER had ever been trespassed at the Peppermill. KILLINGER was a completely innocent person, with a clean record. Until this incident, KILLINGER had never been arrested for anything and never been suspected of criminal activity. However, based on JAGER's fabricated arrest records, KILLINGER's prosecution continued.

1
2

## JURISDICTION AND VENUE

3

14.    This action arises under Title 42 of the United States Code (28 U.S.C. Sections 1983

4
5

and 1988). Jurisdiction is conferred upon this Court by Title 28 of the United States Code, Sections

6
7

1331, 1343 and 42 U.S.C. § 12188(a) and a pendant state claim.

8
9

15.    Venue is proper in the Northern District of Nevada pursuant to 28 U.S.C. § 1391(b)

10
11

because the unlawful acts and practices alleged herein occurred in Northern Nevada, which is

12
13

within this judicial district.

14
15

## PARTIES

16
17

16.    Plaintiff KILLINGER is a citizen of the United States residing in Washoe County,

18
19

Nevada.

20
21

17.    Defendant R. JAGER was at all times relevant employed by the Reno Police

22
23

Department as Officer # 16010. JAGER was personally involved in acts that deprived KILLINGER

24
25

of his constitutional rights and was at all times acting under color of state law.

26
27

## FACTUAL ALLEGATIONS

28

18.    KILLINGER, 41, was and is currently, a highly trained, skilled, and experienced

feeder driver for United Parcel Service ("UPS"). KILLINGER has been with UPS since

approximately 2006; he takes his work seriously and has a perfect safety record.  His job requires

him to pull and drive from one to three large tractor trailers weighing up to 100,000 pounds. He is

known as a "long combination vehicle" driver which requires special training. He has a commercial

driver's license with multiple endorsements.

19.    KILLINGER, prior to this arrest, had a clean criminal record. He had never been

accused of a crime, arrested, or taken to jail. Even though the charge was eventually dismissed, he

now has a criminal record.

### September 16, 2023

20.    On September 16, 2023, KILLINGER finished his shift, went to bed, and woke up in the early evening and decided to enjoy a night playing craps at local casinos. He did what he often does when he decides to gamble, he plays a loop of casinos, with a goal of winning $200 at one before moving on to the next. On September 16, 2023, KILLINGER played at the Legends Bay Casino, the Nugget Casino, the El Dorado Casino, and before midnight moved on to the Peppermill. He planned to visit the Atlantis Casino after the Peppermill.

21.    KILLINGER arrived at the Peppermill on or about 11:30 p.m. on September 16, 2023. He was a regular customer at the Peppermill. He had a Peppermill "Player's Card" in his name. KILLIINGER estimates that prior to September 16th, he had gambled hundreds of times at the Peppermill without incident. He liked the Peppermill, especially the friendly dealers, the low table minimums, and the food. The Peppermill had always treated him well, like an honored guest, often comping for "free chips" and "free dollars," to spend in the casino.

22.    While at the Peppermill KILLINGER had in his pocket: a) Nevada Real ID Driver's License identifying him properly as Jason Killinger; b) a Peppermill player's card identifying him as Jason Killinger; c) and a debit card from his credit union identifying him as Jason Killinger.

23.    KILLINGER also had in his vehicle, parked in the Peppermill parking lot: a) vehicle registration identifying him as Jason Killinger; b) vehicle insurance card identifying him as Jason Killinger; c) a pay stub from his employer, UPS, identifying him as Jason Killinger; d) a Department of Transportation medical card identifying him as Jason Killinger; e) a Teamsters Local 533 union card identifying him as Jason Killinger; and f) numerous players cards for various Reno casinos all identifying him as Jason Killinger.

24.    When KILLINGER arrived at the Peppermill, he went directly to a craps table. He gave the craps dealer his player's card and money to begin playing. He played for a few hours, managed to get ahead $200.00 and decided to leave to leave and move on to the Atlantis Casino.

25.    At or about 3:00 a.m. KILLINGER went to the Peppermill cashier's cage to turn in his chips for cash. Before going on to the Atlantis, KILLINGER decided to use the restroom. On exiting the restroom, he noticed a Peppermill security officer paying close attention to him. He made his way out of the casino and saw the same security guard following him. He ignored him and when he looked again, the security guard was gone.

26.    On his way out, KILLINGER stopped to play a blackjack machine. As he was playing, he was approached by another security guard who said, "Hi Mike, how are you?" KILLINGER told the security guard he was "not Mike." The guard said, "I need to see your ID." KILLINGER said, "For what?" KILLINGER produced his Nevada Real ID driver's license with the gold star in the upper right corner. The guard said, "I'm sorry to bother you Mr. KILLINGER," and backed off.

27.    To obtain a Nevada Real ID Driver's license a person must present themselves at the DMV with proof of identity. Documents accepted by the DMV as proof of identity include a birth certificate or a current U.S. passport or U.S. passport card, a social security card and two documents proving Nevada residence. KILLINGER's Real ID Driver's License was very specific, it stated he had a 1) commercial driver's license, Class A; 2) End NPST;  3) Rest JUM; 4) endorsements permitting him to drive tankers, passengers, school buses, and double/triple trailers; 5) birthday on July 28, 1983; 6) blue eyes; 7) height 6;1"; 8) weight 285 pounds; and his unique signature.

28.    KILLINGER thought the security guard's calling him "Mike" was strange. He casually walked to the exit, straightening his cash to put in his pocket, getting ready to leave.

**Peppermill Falsely Accuses Killinger of Being M.E.**

29.    Within moments, KILLINGER was surrounded by security guards and handcuffed. He was told that he was "M.E." and under arrest for "trespassing." KILLINGER was shocked. He vehemently protested, telling the guards he was not M.E. Once they arrived at the security office, the guards lost any pretense of civility, taunting him, trying every which way to force him admit he

was M.E. KILLINGER refused. He repeatedly insisted his name was JASON KILLINGER, not M.E., and he didn't know "anything" about anyone named M.E.

30.     KILLINGER, on being told a police officer was coming, thought, "Okay, good, the police will come and force the casino to do the right thing, remove the painful handcuffs, and let me go." KILLINGER, a large man, weighing 285 pounds, found the handcuffs behind his back too tight and extremely painful, hurting his wrists and shoulders.

### Jager Arrives At Peppermill

31.     JAGER arrived at the Peppermill at approximately 4:00 to 4:30 a.m. on September 17, 2023. He was wearing his body worn camera ("BWC"). Everything that JAGER did and said was recorded on his BWC.

32.     KILLINGER, seeing JAGER arrive at the Peppermill security office is heard on JAGER's BWC saying, "Thank God you're here!" (Axon 5:48:38)[3] KILLINGER was relieved to see JAGER, thinking JAGER would straighten out the misidentification and release him.

33.     KILLINGER asked JAGER if he could "please" get him "out of these cuffs." (Axon 5:49:13) JAGER ignored him. JAGER's BWC video shows JAGER holding KILLINGER's driver's license with the Real ID gold star in his hand. (Axon 5:49:14). The Peppermill security officers explained to JAGER that KILLINGER had presented a driver's license with the name Jason KILLINGER but he looked exactly like M.E., a man trespassed from the Peppermill months earlier. KILLINGER asked JAGER again, "Can you please get me out of these cuffs." (Axon 5:49:47). JAGER continued ignoring him, responding, "One second pal."

34.     Peppermill security told JAGER that KILLINGER was a match to M.E., trespassed months earlier. The match was based on the Peppermill's facial recognition software. JAGER, obviously impressed, said, "You guys have this fancy software." (Axon 5:50:11). KILLINGER interrupted saying, "I'm a driver for UPS, I am not M.E., I don't know who M.E. is, I don't know

---

[3] Jager's BWC cites the exact time in the upper right-hand corner.

nothing about M.E. I'm a taxpayer here." (Axon 5:50:41). KILLINGER added, "I need a break, my shoulder is killing me, can you please take off these cuffs? JAGER ignored him again, "Just sit there for a minute, man." (Axon 5:50:54). KILLINGER repeated his request, "I need a break, my shoulder is killing me." (Axon 5:52:40). JAGER didn't bother to even look at him.

### Jager Erroneously Concludes Killinger Is M.E.

35.    JAGER stared at KILLINGER's driver's license. Then JAGER stared at the Peppermill's "Barring Notice" of M.E. Then JAGER stared at the Peppermill's copy of M.E.'s driver's license, saying: "That's really weird, that is super weird. The software is saying its legit (facial recognition match between M.E. and KILLINGER) so he (referring to KILLINGER) either presented a fake identification the first time (identifying himself as M.E.) or he's presenting it now." (Axon 5:54:69 - 50-55:06). JAGER took the position that both KILLINGER and M.E. were the same person. It didn't dawn on JAGER, not for a millisecond, that the Peppermill's software was inaccurate. And JAGER ignored the obvious fact that KILLINGER and M.E. were different in every way other than a facial resemblance.

36.    While simply looking at M.E.'s face there is a similarity, however M.E.'s driver's license differs from KILLINGER's driver's license in significant ways: 1) M.E. does not have a commercial driver's license and KILLINGER does; 2) M.E. has a Class C driver's license while KILLINGER has a Class A; 3) the restrictions on both driver's licenses are different, 4) M.E. has no endorsements while KILLINGER has multiple endorsements permitting him to drive tankers, passengers, school buses, double/triple trailers; 5) M.E. is five years older than KILLINGER; 6) M.E. has hazel eyes, KILLINGER has blue eyes; 7) M.E. weighs 50 pounds less than KILLINGER; 8) their signatures are different; 9) their addresses are different; 10) their heights are different; and their eye colors are different.

9

37.    JAGER at no time asked KILLINGER what other forms of identification he might have on his person or in his vehicle. JAGER did not explore or investigate anything that KILLINGER said.

**Jager Exits the Security Office To Call RPD to Check the Licenses of Killinger and M.E.**

38.    Leaving KILLINGER handcuffed inside the Peppermill security office, JAGER went outside the Peppermill to obtain better internet reception and to call the Reno Police Department for a records check on both Killinger and M.E. M.E.'s driver's license came back as "legit" and showed M.E. had never been arrested. (Axon 6:01:29).

39.    JAGER also asked RPD run a check on KILLINGER's driver's license. (Axon 6:03:03). KILLINGER's driver's license also came back as valid, showing that KILLINGER had never been arrested.

**Jager Expresses Hunch That M.E. and Killinger Are Same Person**

40.    JAGER in talking to RPD outside the Peppermill said, "That is super weird, do you see a resemblance?" (Axon 5:05:36). JAGER explained his hunch that M.E. and KILLINGER are the same person. "I have a **_feeling_** these are both the same guy, but he has different IDs." (Axon 5:05:53). JAGER added, "The software came back as a 100 percent match, definitely a weird one, I have **the feeling he is somehow making some fake identification.**" (Axon 6:06:18). JAGER said again, "This is super weird."

41.    JAGER next telephoned his supervisor. JAGER said, "Hey boss, very peculiar. Peppermill has this pretty sophisticated artificial intelligence software that analyzes faces of previous trespassers. They did a 100% match of this guy who presented an ID with a different name, checked ID of M.E., it's a valid ID and this guy now detained presented different ID with different name. Photos are different photos but they look like the same exact guy, but definitely super weird." (Axon 06:11:25).

42.    JAGER's supervisor said, "My thought process is we're going to have to arrest this guy and do a WIN'S check…" (Axon 06:12:33). JAGER responded, "At this point both driver's licenses (M.E.'s license and Killinger's license) are both valid, so either he is who he says he is and he has not ever actually been trespassed, which I doubt because their software is pretty cool and the fact that he's acting super suspicious"[4] and two, **I just have a feeling he's got a hookup with the DMV where he's got two different driver's licenses that are registered with DMV with different names and different dates of birth, so I'll arrest him on that** and list him as a John Doe and have him booked in for a WINS check. I'm just doing it for the trespass; I'm not going to do it for O & R because just in case he is the name he presented." (Axon 06:12:35).

43.    JAGER's supervisor did not ask JAGER whether he had requested, looked at, or considered whether KILLINGER had any other forms of identification to establish his identity. JAGER's supervisor accepted JAGER's absurd and preposterous "feelings" and "hunch" that M.E. and KILLINGER were the same person with a "DMV hookup" who manufactured false identifications for him so if he was ever caught trespassing, he could evade arrest.

**Killinger Is Arrested Solely Because Jager Falsely Claimed He Could Not Identify Him**

44.    On JAGER's return to the Peppermill security office he told KILLINGER, "So right now I can't identify you, it's weird, because essentially it looks like you have two different names. I don't know man, so I can't identify you and unfortunately that means they can't cite you which they would normally do. You can't be cited, so you're going to be arrested." (Axon 06:14:45).

45.    KILLINGER was shocked, "I'm going to jail? Are you kidding me?" (Axon 06:15:15). His astonishment is heard in his voice captured by JAGER's BWC. More shocking was he was being arrested not because he had committed a crime, but because JAGER could not identify him. JAGER said it plainly, he would have only cited him and not arrested him if KILLINGER

---

[4] Jager at no time explained why he believed Killinger was "super suspicious."

admitted to being M.E., but because KILLINGER, an honest citizen, refused to admit he was M.E., he could not be cited but required formal arrest.

46.     "I'm not a joker man," JAGER said. "You'll get arrested, you'll get fingerprinted up at the jail and they'll be able to discern your identity and see what this mix-up is with this stuff." (Axon 06:15:17).

47.     But there was no mix-up. KILLINGER consistently denied he was anyone other than who he was and produced evidence to support his identity. That Jager refused to look at or consider KILLINGER's evidence does not mean there was a "mix-up." It means it was far from clear that KILLINGER was M.E. and before an arrest took place more investigation was required.

48.     KILLINGER pleaded with JAGER, "Can you look at the endorsements on the two driver's licenses." KILLINGER knew that as a feeder driver for UPS he had unique endorsements on his driver's license permitting him to haul double and triple trailers. JAGER looked at both licenses and confirmed that KILLINGER had those special endorsements and M.E. did not. (Axon 06:17:13). Yet, JAGER disregarded it, he didn't want to look at facts that did not conform to his belief that M.E. and KILLINGER were the same person. In JAGER's mind there was no reason to confuse his belief with contradictory facts.

49.     JAGER said: "It's one of those things, I'll be 100 percent honest you may have a doppelganger, but they (the driver's license pictures) are strikingly similar and weird enough, their (Peppermill's) fancy AI technology says its 100 percent match." (Axon 06:16:38).

50.     KILLINGER asked JAGER, "What is it going to take to prove to you that is not me?" (Axon 06:17:16). JAGER tells him he must go to jail.

51.     KILLINGER is arrested because JAGER feels he cannot identify him, not for any criminal act he has committed. JAGER said, "Unfortunately you got to go to jail, they'll pull your fingerprints, that's the way to determine it." (Axon 06:17:19). KILLINGER says, "Then what happens when they find out that that's not me? Then what happens?" (Axon 06:17:25).

52.    JAGER said, "Then once they find out its not you, then that's something else, that's an issue you can bring up with them civilly, but at this point our hands are tied because a reasonable and prudent person based off the software, based off the pictures, would make the reasonable conclusion that all three are the same person with two different IDs." (Axon 06:17:39).

53.    KILLINGER asked JAGER once again, "Did you look at the back of the IDs, because I have all of the endorsements except for motorcycle and HazMat." (Axon 06:17:57). JAGER said, "Either someone else is using your stuff or you're using somebody else's stuff, and unfortunately you look too much like the guy in that picture, so much so that the fancy computer that does all the fancy software makes the same determinations that my feeble human brain does." (Axon 06:18:08).

54.    JAGER removed the Peppermill handcuffs and put on his RPD handcuffs. KILLINGER again mentioned the pain of the handcuffs, "Can I have a little bit of a break when you get them off?" "Unfortunately, can't, it's against policy, sorry pal." (Axon 06:21:19). KILLINGER looks to the security guard, "Can you tell this guy (JAGER) that I didn't give you a hard time and to give me a little bit of a break please (from the handcuffs) (Axon 06:21:19) JAGER said, "Unfortunately man, that's the process man, not one of those things I'm able to flex on." (Axon 06:21:42). KILLINGER said, "I might have to go to the bathroom." JAGER replied, "That will have to wait until we get to jail." (Axon 06:21:53). "Can you loosen them a little please?" JAGER said, "This is as loose as they get." (Axon 06:22:03).

55.    KILLINGER remembered he had a check stub from his employer in his vehicle. He told JAGER, "I have a check stub from my work would that prove it to you guys? (Axon 06:23:10) JAGER disregarded that too. Nope, he wouldn't consider it. "Honestly man, the only way is going to get the fingerprints done." (Axon 06:23:18). JAGER explained to KILLINGER, "I know, it's one of those things, if it turns out it's you, call the director, your software has made a critical error and I

was a paying customer, got kicked out, maybe they'll take care of you. If it turns out the other,

you're trespassed." (Axon 06:25:46)

56.    KILLINGER asked, "How long are we going to be in jail for, can they get me in and

out please?" (Axon 06:26:16) "You probably won't be in there very long." (Axon 06:26:21).

KILLINGER asked, "How do I get back here to get my car. You guys are going to give me a ride

back to get my car?" JAGER said, "No, you won't be there very long, hopefully once they have it

all figured out." (Axon 06:27:37)

57.    KILLINGER is placed inside JAGER's patrol car, with his hands cuffed behind his

back. Another RPD officer arrived. JAGER explained to the arriving officer. "It's super weird. He

has an ID that matches, trespassed under the name of M.E., this is the ID that he presents, it's the

exact same guy, name date of birth all that stuff is different, 100 percent match with their software

that he is this guy that they trespassed on their facial thing. I'm booking him as a John Doe and get

a WIN'S check, because he matches. He looks exactly like both pictures. "(Axon 06:29:25)[5]

### Jager Explains His Uncertainty

58.    JAGER told the officer, "This poor guy **might legitimately be somebody else, I**

**don't know.** It's a freaking weird call." (Axon 06:32:12). KILLINGER popped into the

conversation, "It's not me in that picture." (Axon 06:33:21). JAGER continued: **"I'll be honest, I**

**don't know what to think,** usually those systems are pretty good, we've used those systems in the

past to catch homicide suspects, they are **fairly reliable**, it says that you're that guy." (Axon

06:33:51). "If it turns out that you are KILLINGER and that's who you are and not the person that

was trespassed, I'm not going to give you legal advice. You can talk to them about it. If it turns out

there is someone out there who has somehow been able to get a driver's license using your picture

---

[5] WINS is the Western Identification Network, Inc. It utilizes high-speed computer systems which digitize, store, and compare fingerprint data and images using sophisticated algorithms to exact unique characteristics from fingerprints and compare them with those in the data base. It can search through millions of fingerprints within seconds. It enables law enforcement to identify unknown individuals between different agencies and jurisdictions.

or likeness, maybe they'll be a complaint to DMV or some deeper investigation. I've seen weirder things..." (Axon 06:34:35)

59.    KILLINGER asked again for a break with the handcuffs. JAGER says, "Unfortunately, I can't." (Axon 06:36:19) "You seem like a stand-up guy, terrible case of mistaken identity, but end of the day, you're being cool, I'm going to be cool, there's an obligation to enforce that trespass, it's really a crappy situation." (Axon 06:39:54). "Hopefully it's like a really funny story, like I got arrested because they thought I was somebody else, I have to write you as a John Doe, because we can't positively identify you. I'll be honest, it's someone who looks exactly like you with a different name and ID so its hopefully this in and out process so you can get a cab and get back down to the Peppermill and get your car." (Axon 06:40:42).

60.    JAGER and KILLINGER arrived at the jail at approximately 6:20 a.m. Jager yelled out to jail staff, "He's cooperative." (Axon 06:47:27) KILLINGER was put in a holding room.

61.    KILLINGER remained preoccupied with the pain of the handcuffs. "I can't stand these goddamned cuffs." (Axon 06:50:39) He pleaded with JAGER, "Can they take the goddamned cuffs off when I'm in the holding room?" "Unfortunately, no, if all goes well you should be out of the cuffs in the next eight to ten minutes." KILLINGER said, "Promise?" (Axon 06:52:01)

62.    KILLINGER, in horrific pain, begged again, "Please take them off. Can you put in a good word for me?" (Axon 06:52:56). "I need to get these goddamned cuffs off." (Axon 06:55:19) JAGER opened the door to a small holding cell saying, "Go through this door that's where you'll get the cuffs off." KILLINGER said, "Thank God." (Axon 06:57:28). KILLINGER is heard saying, "All because some asshole was sleeping in the casino, it's not me!" "I just want these cuffs off!" (Axon 07:05:07). The cuffs were still not taken off.

63.    KILLINGER remained in handcuffs when he was taken to a large room with multiple jail officers. (Axon 07:07:56) As KILLINGER is taken away, still in handcuffs, JAGER shouts at KILLINGER, "Best of luck man."

64.    JAGER is heard talking to a jail employee: **"It might be a legitimate doppelbanger situation, it's super weird. It's one of those situations where I genuinely kinda of believe him**, but then there's this software that's no, every picture they've go is 100 percent match for the guy they trespassed and both pictures look like the same guy." (Axon 07:08:07).

65.    KILLINGER was in handcuffs approximately four hours.[6] He notified Jager approximately 20 times during their interaction that the handcuffs were causing him great pain. KILLINGER is a large man weighing over 280 pounds, the handcuffs caused him excruciating wrist and shoulder pain.

66.    Despite KILLINGER telling JAGER 20 times that the handcuffs were causing him great pain, JAGER never said a single word to the jail staff that KILLINGER had complained of great pain. JAGER knew from KILLINGER's repeated statements that the handcuffs were "killing him" that he was in acute distress, yet he neglected to mention it to jail staff. KILLINGER remained in handcuffs an additional 20 minutes after being led away by jail staff.

**Jail Experience**

67.    KILLINGER was booked into the Washoe County Jail as "John Doe. While in booking, KILLINGER inquired as to when he was getting out. A deputy told him to "lose the fucking attitude."

68.    KILLINGER was put in a small room with about 25 other people. There was a toilet, a door, a three-inch lip of concrete, and a window. No chairs or television.

---

[6] KILLINGER was first placed in handcuffs at approximately 3:00 a.m. at the Peppermill. He remained in handcuffs at the Peppermill security office until JAGER arrived at approximately 4:45 to 5:00 a.m., thus making his time in handcuffs at the Peppermill before JAGER arrived one hour and forty-five minutes to two hours. From the time JAGER arrived at the Peppermill until KILLINGER was taken to the jail was another one hour and twenty minutes, thus making the time KILLINGER was in handcuffs three hours and twenty minutes. KILLINGER remained in handcuffs an addition twenty minutes after being led away from JAGER at the jail, thus making his total time in handcuffs just under four hours.

69.      While in custody, and before he was released on his own recognizance, the WINS check "positively identified" him as KILLINGER. The "Pretrial Assessment Report" prepared at the jail dropped the name "John Doe" from his records and substituted in its place KILLINGER.

70.      With the WINS check positively identifying KILLINGER, there was no probable cause to continue to prosecute him. A man named M.E., with a completely different driver's license and different characteristics and identifiers had had trespassed, not anyone named KILLINGER.

71.      KILLINGER was released on his own recognizance from the jail at approximately 4:10 pm on September 17, 2023. He was in custody with JAGER for approximately one hour and twenty minutes and in custody at the jail for an additional nine and one-half hours for a total incarceration of eleven hours.[7]

72.      KILLINGER obtained a taxi at 4:30 p.m. to take him to the Peppermill to retrieve his vehicle in the Peppermill parking lot. He was in great pain in his shoulders and wrists, drove away.

### Renown Urgent Care

73.      The day after his release, September 18, 2023, KILLINGER went to Renown Urgent Care Vista at 910 Vista Blvd., Sparks, NV to have a doctor look at his wrists and shoulders. He was seen by Brion R. Hill, M.D. who diagnosed a strain of both the right and left shoulder, and contusions (bruising) on both wrists. The doctor prescribed Motrin 200 MG every six hours as needed. Ice and nsaid as needed. Dr. Hill noted: "Onset 4 a.m. yesterday handcuffed behind his back for four hours. He was arrested due to mistaken identify. Bilateral wrist pain 7/10 severity. Left wrist is worse. Bilateral should pain 7/10 severity. Right shoulder is worse. No prior injury or surgery."

74.      Dr. Hill noted: "**Right shoulder**: diffusely tender without deformity. Pain reproduced abduction and internal resistance. **Left shoulder**: no point bony tenderness or deformity. Pain reproduced with abduction (movement) against resistance. **Left wrist**: soft tissue

---

[7] This does not include the time he was held by the Peppermill before Jager's arrival.

swelling. Ecchymosis dorsal aspect (the medical term for a bruise, which is a discoloration of the skin caused by blood leaking from ruptured blood vessels under the skin). Range of motion intact. Pain reproduced with movement in all planes. Distal neuro/vascular intact. **Right wrist:** soft tissue swelling. Range of motion intact. Pain reproduced with movement in all planes. Distal neuro/vascular intact."

75.    KILLINGER's wrist pain subsided after a few days but it took two weeks or longer for the bruising to dissipate. The shoulder pain lasted for about **three months**, causing pain and difficulty when driving. KILLINGER continues to experience left shoulder "popping" when he rotates his arm. He currently takes aspirin on a regular basis for the occasional shoulder pain.

### Jager's Fabrication of Evidence

76.    On September 17, 2023, JAGER submitted his "Arrest Report and Declaration Supplement." JAGER falsely stated that KILLINGER "**presented Peppermill Security with** "**conflicting identification**." This is false because Killinger never "presented" any conflicting identification nor did he ever identify himself as anyone other than KILLINGER. JAGER's false statement created the wrongful impression that KILLINGER had numerous forms of identification and presented conflicting identification. JAGER's deliberate fabrication of evidence was designed to create the false impression that probable cause existed for the arrest and to present KILLINGER as an unlawful con arrest worthy of arrest.

77.    JAGER added in his report that KILLINGER was "last trespassed on 03/26/2023 where he identified himself as M.E." This false statement is wholly the fabricated invention of JAGER as KILLINGER was never trespassed at the Peppermill and never identified himself as M.E. JAGER added, "neither M.E. nor KILLINGER had any prior arrest history **with additional information to assist in positive identification**." This false statement creates the impression that Killinger did not have any additional identification to aid in establishing his identity and JAGER had no choice but to arrest him.

78.     JAGER deliberately omitted from his arrest documents that KILLINGER had three forms of government issued identification to assist in establishing his identity, his Nevada Real ID, his vehicle registration, and his Department of Transportation medical card. In addition, he had in his pocket a debit card from his bank and his player's card from the Peppermill. In his vehicle he had not only his state issued vehicle registration, vehicle insurance cards, Department of Transportation medical card, Teamsters identification card, pay stub from his employer, and various players cards from the Reno casinos he frequently visited—all identifying him as Jason KILLINGER. Had JAGER sought to investigate further with the Peppermill he would have learned that KILLINGER was a regular Peppermill player who had been in the casino numerous times in the past months. Had JAGER gone to the Peppermill office and requested to view KILLINGER'S player records, he would have learned that KILLINGER was regularly a gambler at the Peppermill and had played many time in the last few months, even recently, without problem or incident.

79.     JAGER unreasonably refused to examine any of the identification KILLINGER had, preferring to take him to jail instead of spending five minutes inspecting the identification in KILLINGER's pocket, or walking to KILLINGER's nearby parked vehicle to examine the additional identification it contained, or considering the glaring differences between KILLINGER and M.E. from their two driver's licenses.

80.     M.E. and KILLINGER both had "Real IDs, which means that both KILLINGER and M.E. had to have personally gone to a Nevada DMV with their individual social security cards, birth certificates, or passports in addition to two forms of proof of residence. Yet JAGER refused to consider any of this **even after** being assured that neither M.E. nor KILLINGER had criminal records and both had valid driver's licenses.

81.     JAGER added, "Due to John Doe having '**conflicting identification**,' he lacked satisfactory evidence to reasonably assure me that he was who he claimed to be thus in accordance

with Reno Police Department General Order P-280-17 JOHN DOE did not qualify for a criminal citation.…"

82.    KILLINGER was taken to jail not because he had trespassed but only because JAGER believed he was M.E., who had been trespassed. JAGER unreasonably relied solely on the inaccurate Peppermill facial recognition software wildly known to be inaccurate by police departments across the country and not used for criminal investigations without other proof of identity.[8]

83.    On September 18, 2023, JAGER caused to be issued a criminal complaint against "John Doe" for trespassing at the Peppermill.

84.    On September 18, 2023, the Reno Municipal Court opened its "Register of Actions." Since KILLINGER had been positively identified as KILLINGER, not John Doe, and not M.E., he was charged with trespassing as Jason KILLINGER. No one by the name of Jason KILLINGER had ever been trespassed from anywhere at any time, certainly not the Peppermill. The Reno Municipal Court and Reno prosecutors went forward against KILLINGER, not M.E. and not John Doe.

---

[8] Facial Recognition software has led to many wrongful arrests. The Peppermill's facial recognition software did not account for the fact that KILLINGER weighed 50 pounds more than M.E., had different endorsements on his driver's license, different descriptions, different signatures, different numbers, and represented different classifications of driver's—all of which should have been a glaring red flag for JAGER that there was substantial evidence KILLINGER was not M.E. and more investigation was required before an arrest.

Detroit, Michigan, is one of several cities that has arrested three people based on faulty facial recognition forcing the city to adopt new rules mandating that people identified via facial recognition technology can no longer be shown to an eyewitness in a photo lineup unless there is other evidence that links them to the crime. Facial recognition has also led to wrongful arrests in Louisiana, New Jersey, Maryland, and Texas. These cities now use facial recognition software only in cases of serious crimes, including assault, murder and home invasions. Other cities are now using facial recognition software as a tool, but not the sole tool, in making identifications. Many cities now conclude that for an arrest there has to be some kind of secondary corroborating evidence that's unrelated before there can be sufficient justification to arrest based solely on a facial recognition match.

85.    KILLINGER retained Richard A. Salvatore as his attorney and paid him approximately $1,800.00 to represent him. A bench trial was set with Reno prosecutors set to argue for KILLINGER's conviction.

86.    On November 9, 2023, the bench trial was called before the Hon. Justin Champagne of the Reno Municipal Court. Even though there was zero evidence that anyone named KILLINGER had ever been trespassed at the Peppermill, and zero evidence that KILLINGER had ever presented himself as anyone other than KILLINGER, a prosecutor for the City of Reno was unwilling to dismiss the case with prejudice, indicating that the RPD "fraud" unit was still looking into it and wanted to retain the ability to re-charge KILLINGER within the year. After discussions with the judge, the case was dismissed without prejudice. The judge indicated the City had one year to bring additional charges or re-open the case.

## FIRST CAUSE OF ACTION
### Fabrication of Evidence
### A Violation of Section 1983 Fourteenth Amendment Substantive Due Process

87.    KILLINGER alleges and incorporates by reference herein the allegations above contained.

88.    It is well established that criminal suspects have a "due process right not to be subjected to criminal charges on the basis of false evidence deliberately fabricated by the government. A plaintiff prevails on a due process fabrication of evidence claim if he establishes that (1) the defendant official deliberately fabricated evidence and (2) the deliberate fabrication caused the plaintiff's deprivation of liberty.

89.    KILLINGER at all times had the right not to be seized and deprived of liberty as a result of manufactured probable cause.

90.    The false statements made in JAGER's "Declaration Supplement" are direct evidence of fabrication of evidence. JAGER wholly fabricated that KILLINGER **presented conflicting identification** to him which at all times knew to be untrue. This false statement was

intentionally made to legitimize KILLINGER's arrest and mislead the prosecution into believing there was probable for the arrest.

91.    JAGER omitted from his arrest documents that KILLINGER consistently maintained he was KILLINGER and not M.E. JAGER omitted from his arrest documents that the driver's licenses of KILLINGER and M.E. were different in every respect other than they had similar faces and were both blond. JAGER omitted that:

- KILLINGER had a commercial driver's license, M.E. did not;

- KILLINGER had a Class A driver's license, M.E. did not;

- KILLINGER had endorsements for driving tankers, passengers, school buses, double and triple trailers, and M.E. did not;

-  KILLINGER was seven years younger than M.E.;

- KILLINGER weighed 50 pounds more than M.E.;

- KILLINGER's eyes are blue, M.E's eyes are hazel;

- KILLINGER had a different driver's license numbers than M.E.;

- KILLINGER had a different signature than M.E.

92.    JAGER's intentional omission of these crucial details was made to legitimize KILLINGER's arrest and mislead the prosecution into believing there was probable for the arrest.

93.    JAGER fabricated in his arrest documents that KILLINGER "**lacked satisfactory evidence to reasonably assure him that he was who he claimed to be**." This is false and JAGER knew it to be false. JAGER refused to look at KILLINGER'S other forms of identification, insisting he would not consider anything that KILLINGER offered.

94.    Jager deliberately mischaracterized facts within his knowledge, JAGER wrote:

- "John Doe presented a valid Nevada Commercial Driver's License belonging to Jason James Killinger… However, the photos on both driver's licenses visually matched John Doe." What  was true here was that KILLINGER presented a valid

driver's license. What was misleading her was that "John Doe," a fictional amalgam of KILLINGER and M.E. was depicted as a single individual based solely on the two men's facial resemblance. This misdirection freed JAGER to talk about KILLINGER, the legitimate patron, and M.E., the trespasser, as though there was no distinction between the two men, as though they were one and the same.

- "The associated demographics on each Driver's License were fairly similar with the only major distinction being hazel and blue eyes, which are by their very nature similar eye colors and are dependent on lighting." This is a bald faced lie as KILLINGER was nearly **seven years younger** than M.E., weighed **fifty pounds more** than M.E. and was **four inches taller** than M.E. The two men's driver's licenses showed **different Reno addresses, different classes,** and **different restrictions** and their **signatures were distinctly different**, KILLINGER"s is tightly formed and tilts upward, M.E.'s is more loping and does not tilt upward.

- "John Doe presented a valid Nevada Commercial Driver's License belonging to Jason James KILLINGER 1007291590. However, the photos on both Driver's Licenses visually matched John Doe." **<u>There was no John Doe</u>**. John Doe is a fiction that enabled JAGER confuse the magistrate and turn two men into one. There was only two men: KILLINGER and M.E. This fiction persists through both page 1 and page 2 of JAGER's arrest report and declaration.

95.    JAGER's arrest documents were also misleading in its assumption that the combined KILLINGER/M.E. character of his imagination was guilty of trespass. If KILLINGER was M.E., then he was guilty of trespass. If he was not M.E., then he was innocent. Here JAGER labeled KILLINGER as guilty of trespass by turning him into a composite with M.E., calling to the two of them as "the individual." Portraying KILLINGER and M.E. as one and the same, JAGER made it deceptively persuasive that KILLINGER committed trespass because KILLINGER was present at

the casino after M.E. was barred from returning. The whole issue of KILLINGER's guilt or innocence revolved around his identity. By conflating the two men's identities in his report, JAGER conveyed a strong message to the magistrate and the prosecutors that KILLINGER was previously trespassed under the name of M.E. and so was guilty.

96.    It is undisputed that JAGER's arrest documents were provided to Reno prosecutors. It is undisputed that these documents were the basis for arresting KILLINGER and his deprivation of liberty. It is undisputed that JAGER's arrest documents were presented to a magistrate at the Reno Municipal Court to establish that KILLINGER had insufficient evidence of his identity and could be M.E. masquerading as KILLINGER. JAGER's fabricated evidence, intentional omissions, and reckless indifference to KILLINGER's rights had a substantial impact on the prosecutor's evaluation of the case and desire to continue with the case even after KILLINGER's identity had been positively confirmed.

97.    It was clearly established in 2001 that criminal suspects had a constitutional right not to be subjected to criminal charges based on fabricated evidence, material omissions or mischaracterizations. That right was clearly established at the time JAGER submitted his report containing fabricated evidence and willful omissions. By reporting less than the total story, JAGER manipulated the inferences both a prosecutor and a magistrate would draw, causing both to be misled in such a matter as to denude the probable cause requirement of all real meaning. Because it was clearly established in 2001 that KILLINGER had a right not to be subjected to criminal charges based on fabricated evidence and willful omissions, qualified immunity will not apply.

98.    JAGER was recklessly indifferent to KILLINGER's due process right not to be deprived of his liberty on the basis of fabricated evidence JAGER knew to be fabricated.

99.    As a direct and proximate result of the aforedescribed willful and unlawful conduct by JAGER, committed under color of law and under his police authority, KILLINGER suffered deprivation of liberty, substantial physical pain and emotional distress, injury to his sense of self-

worth and personal integrity, as well as humiliation, shame and embarrassment. Further, KILLINGER required medical treatment and endured three months of acute shoulder pain making his work more difficult and painful. Accordingly, KILLINGER is entitled to compensatory and special damages for his past, present, and future pain and suffering and special and economic damages due to the prolonged prosecution of the case and his need to retain criminal counsel all in an amount to be determined at trial as well as equitable relief.

100.    The acts of the JAGER were intentional, wanton, malicious and oppressive and made with reckless and deliberate indifference to KILLINGER's right to be free from fabrication of evidence against him thus entitling KILLINGER to an award of punitive damages against JAGER.

### SECOND FIRST CAUSE OF ACTION
**Judicial Deception**
**A Violation of Section 1983 Fourteenth Amendment Due Process**

101.    KILLINGER alleges and incorporates by reference herein the allegations above contained.

102.    Ninth Circuit precedent makes clear that detention based on mistaken identity violates due process if "the circumstances indicated to the defendant that further investigation was warranted."

103.    KILLINGER alleges JAGER detained him even though a reasonable officer would have known there were substantial differences between him and M.E. such that further investigation was required before a disastrous arrest and deprivation of liberty took place. JAGER stated multiple times he was "confused," and "didn't know what to believe," and "kinda believed KILLINGER." If JAGER was unclear, which he was, he had an absolute duty and responsibility to investigate further.

104.    JAGER knew further investigation was required but was too lazy to do so, stating the "jail" would make the determination as to KILLINGER's identity.

105.    It would have taken JAGER mere moments to go to the Peppermill office and review KILLINGER'S player's card and bonuses from the casino for his frequent play. It would have taken mere moments for JAGER to review KILLINGER's bank debit card, player's card, and walk over to the nearby Peppermill parking lot to review KILLINGER's vehicle registration, vehicle insurance card, pay stub from his employer, Teamster's identification card, Department of Transportation medical car and other player's cards from other casinos where he also frequently gambled—all of which were in KILLINGER's name. It would have taken seconds for JAGER to compare KILLINGER's driver's license to M.E.'s driver's license and see all the conflicting information. The only similarity was facial, their faces bore a strong resemblance, but everything else was different, and KILLINGER had ample evidence of his identity sufficient for JAGER to understand KILLINGER was not M.E.

106.    JAGER repeatedly expressed doubt and uncertainty as to whether KILLINGER was M.E., stating plainly: "This poor guy might legitimately be somebody else, I don't know. It's a freaking weird call." (Axon 06:32:12). "I'll be honest, I don't know what to think." JAGER said, "It might be a legitimate doppelbanger situation, it's super weird. It's one of those situations where **I genuinely kinda of believe him**." (Axon 07:08:07). If JAGER "kinda" believed KILLINGER he had an obvious duty to investigate further before arresting, detaining, and causing serious harm.

107.    JAGER dismissed the serious problems created for KILLINGER that a wrongful arrest would cause. JAGER joked with KILLINGER on the drive to the jail, "Hopefully it's like a really **funny** story, like I got arrested because they thought I was somebody else…" (Axon 06:40:42). No reasonable officer uncertain about the identity of the person he was arresting would amuse himself with the idea the arrest was simply a "funny story" that a suspect would later have to amuse his friends.

108.    As a direct and proximate result of the aforedescribed willful and unlawful conduct by JAGER, committed under color of law and under his police authority, KILLINGER suffered

26

deprivation of liberty, substantial physical pain and emotional distress, injury to his sense of self-worth and personal integrity, as well as humiliation, shame and embarrassment. Further, KILLINGER required medical treatment and endured three months of acute shoulder pain making his work more difficult and painful. Accordingly, KILLINGER is entitled to compensatory and special damages for his past, present, and future pain and suffering and special and economic damages due to the prolonged prosecution of the case and his need to retain criminal counsel all in an amount to be determined at trial as well as equitable relief.

109.    The acts of the JAGER were intentional, wanton, malicious and oppressive and made with reckless and deliberate indifference to KILLINGER's right to be free from a detention without sufficient evidence when the evidence to establish he was innocent was easily available to JAGER with further investigation, thus entitling KILLINGER to an award of punitive damages against JAGER.

### THIRD CAUSE OF ACTION
**Malicious Prosecution – A Violation of State Law**

110.    KILLINGER alleges and incorporates by reference herein the allegations above contained.

111.    An individual is liable for malicious prosecution in Nevada if he initiated, procured the institution of, or actively or maliciously participated in the **continuation** of a criminal proceeding against the plaintiff" without probable cause.

112.    On September 17, 2023, KILLINGER, while still at the jail, was determined positively by a WIN'S identification, to be KILLINGER. There was no probable cause to continue KILLINGER's prosecution for a trespass committed by M.E.

113.    Malice may be inferred from lack of probable cause to continue the prosecution of KILLINGER. Malice may also be implied if a defendant acted in willful disregard of the plaintiff's rights.

114.    A Reno prosecutor, relying on JAGER's fabricated arrest documents continued KILLINGER's prosecution, forcing him to retain counsel. Even while agreeing this was a "mistaken identity" and a "doppelganger situation" the prosecutor refused to dismiss the case with prejudice indicating that RPD's "fraud" unit would continue looking into it.

115.    As a direct and proximate result of the aforedescribed willful and unlawful conduct by JAGER, committed under color of law and under his police authority, KILLINGER suffered deprivation of liberty, substantial physical pain and emotional distress, injury to his sense of self-worth and personal integrity, as well as humiliation, shame and embarrassment. Further, KILLINGER required medical treatment and endured three months of acute shoulder pain making his work more difficult and painful. Accordingly, KILLINGER is entitled to compensatory and special damages for his past, present, and future pain and suffering and special and economic damages due to the prolonged prosecution of the case and his need to retain criminal counsel all in an amount to be determined at trial as well as equitable relief.

116.    The acts of the JAGER were intentional, wanton, malicious and oppressive and made with reckless and deliberate indifference to KILLINGER's right to be free a continued prosecution of the claim of trespassing when there was no probable cause to believe he was guilty of such an offense, thus entitling KILLINGER to an award of punitive damages against JAGER.

### FOURTH CAUSE OF ACTION
**Excessive Force**
**A Violation of Section 1983 Fourth Amendment**

117.    KILLINGER alleges and incorporates by reference herein the allegations above contained.

118.    KILLINGER had been in handcuffs for over an hour before JAGER arrived at the Peppermill. As soon as JAGER arrived, KILLINGER complained to him about the painful handcuffs, that they were "killing him," and causing him "great pain." JAGER ignored

KILLINGER's protestations that the handcuffs were painful. KILLINGER can be heard on JAGER's BWC complaining to JAGER **20 times** about his pain caused by the handcuffs.

119.    In analyzing the objective reasonableness of a use of force, the relevant issues are: (1) the severity of the crime at issue; (2) whether the suspected posed an immediate threat to the safety of the officers; (3) and whether the suspect was actively resisting arrest or attempting to evade arrest by flight.

120.    KILLINGER's sole alleged crime was trespassing. He was accused of being M.E. who had actually been trespassed by the Peppermill in March 2023 for "sleeping."  Trespassing is not a severe crime and sleeping is by itself not a crime.

121.    KILLINGER at no time posed an immediate threat to the safety of JAGER or anyone else. JAGER admitted at the jail that KILLINGER appeared to be a "stand-up guy" and was "cooperative." If JAGER felt no threat to his safety, and he "kinda" believed that KILLINGER was not lying, there was no objective reason for him to use force that caused KILLINGER continued pain and suffering. JAGER could have, and should have, taken whatever steps he could to loosen the handcuffs and to alert the jail KILLINGER was in extreme distress from the handcuffs.

122.    KILLINGER at no time attempted to evade arrest. KILLINGER expressed shock at his arrest but at no time did he get up and try to flee or evade arrest. He was cooperative in every respect. JAGER shouted out to the jail officials as KILLINGER was led away, "He's cooperative!"

123.    JAGER was recklessly indifferent to KILLINGER's rights when he refused to either loosen the handcuffs or find an alternative way to confine KILLINGER that did not cause him pain.

124.    As a direct and proximate result of the aforedescribed willful and unlawful conduct by JAGER, committed under color of law and under his police authority, KILLINGER suffered deprivation of liberty, substantial physical pain and emotional distress, injury to his sense of self-worth and personal integrity, as well as humiliation, shame and embarrassment. Further, KILLINGER required medical treatment and endured three months of acute shoulder pain making

his work more difficult and painful. Accordingly, KILLINGER is entitled to compensatory and special damages for his past, present, and future pain and suffering and special and economic damages due to the prolonged prosecution of the case and his need to retain criminal counsel all in an amount to be determined at trial as well as equitable relief.

125.    The acts of the JAGER were intentional, wanton, malicious and oppressive and made with reckless and deliberate indifference to KILLINGER's right to be free from excessive force, thus entitling KILLINGER to an award of punitive damages against JAGER.

<u>**RELIEF REQUESTED**</u>

WHEREFORE, Killinger prays for judgment against JAGER as follows:

(a)    For declaratory relief;

(b)    For equitable and/or injunctive relief, including but not limited to; 1) payment for the expungement and/or sealing of KILLINGER's arrest record; 2) reimbursement for the cost of KILLINGER'S defense attorney; 3) and a formal statement issued by the Reno Police Department to the Peppermill alerting them that all charges against KILLINGER have been dismissed and he is factually innocent.

(c)    For compensatory damages for his physical pain and suffering in an amount to be determined at trial relating to plaintiff's claims;

(d)    For economic damages including specific damages;

(e)    For punitive damages;

(f)    For attorneys' fees and costs incurred herein;

(g)    For leave to amend this complaint should the same become necessary;

(h)    For such other and further relief as this Court may deem appropriate.

Dated:  this 30th day of July 2025

/s/ Terri Keyser-Cooper
TERRI KEYSER-COOPER
*Attorney for Plaintiff Jason Killinger*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28