TERRI KEYSER-COOPER
Law Office of Terri Keyser-Cooper
Nevada Bar No. 3984
125 Edgewater Parkway
Reno, NV 89519
(775) 337-0323
Keysercooper@lawyer.com
*Attorney for Plaintiff Jason Killinger*

# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

|  |  |
|---|---|
| JASON KILLINGER, | Case No. 3:25-cv-388-MMD-CSD |
| Plaintiff, | **PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT** |
| v. | |
| RENO POLICE OFFICER R. JAGER, | |
| Defendant. | |
| _____/ | |

## I.    NATURE OF THE CASE

Plaintiff Jason Killinger ("Killinger") loves to gamble, especially craps.  He indulges in his favorite leisure time activity when he can and is not working as a skilled, long-haul, veteran United Parcel Service, ("UPS") driver. On September 17, 2023, Killinger spent several hours playing craps at Reno area casinos and ended up at the Peppermill. When he cashed out his chips and attempted to leave, he was stopped by Peppermill security who handcuffed him, whisked him away, and insisted his name was Michael Ellis ("Ellis"), a man found sleeping on the premises months earlier and barred from the casino. Security informed Killinger that their new A.I. facial recognition software had identified him as Michael Ellis.

Peppermill security telephoned the Reno Police Department ("RPD") to report that a known

trespasser had returned to the casino. (Exh. 6) Defendant Reno Police Officer R. Jager ("Jager") responded to the call.

Killinger protested he was not Michael Ellis, did not know Michael Ellis, and had never represented to anyone that he was Michael Ellis. Killinger produced his Nevada Real ID driver's license. Jager looked at Killinger's license and compared it to that of Michael Ellis. The two men had a definite resemblance, but their driver's licenses were significantly different. Jager took the position that if the facial recognition software said Killinger was Ellis, then Killinger was Ellis, end of story. He did not have to look at other forms of identification Killinger had or listen to anything Killinger said, his mind was made up. It was as if Moses descended from the holy mount with a blindfold on and decreed that Killinger was Ellis.

Killinger repeatedly said he was not Ellis, and what's more he was a regular patron at the Peppermill and had never been trespassed. Killinger had **seven** separate pieces of identification **in addition to** his Nevada Real ID driver's license, all identifying him as Jason Killinger, three of which were government issued. Jager refused to look at them. Killinger had no identification in the name of anyone other than himself. Jager persisted: Killinger was Ellis, Ellis was Killinger, and the two were one and the same. Jager called his RPD supervisor and lied to him. He told his supervisor that Killinger had "fake IDs" when Killinger had no fake IDs.[1] He explained to his supervisor his preposterous theory that Killinger was a criminal mastermind with a mysterious "DMV hookup" who manufactured fake licenses for him. (Exh. 1, BWC 06:12:55)

While there was a facial resemblance between Killinger and Ellis, almost everything else about the two men was different: Killinger's date of birth was listed as 1983; Ellis's date of birth was 1976, making him seven years younger than Ellis. Killinger's height was listed as 6'1"; Ellis's height was 5'9". Killinger had blue eyes, Ellis had hazel eyes. Killinger and Ellis had different driving endorsements and different driving restrictions. Both had different addresses, different

---

[1] Everything that Jager said and did was recorded on his Body worn Camera "(BWC)".

license numbers, and different signatures. The most striking discrepancy between the two men was a fifty-pound difference in their weights: Killinger weighed 285 pounds; Ellis 235 pounds.

While Jager was convinced the right course of action was to arrest Killinger, he also admitted multiple times that he "didn't know what to think" and he "kinda believed Killinger." Jager told another officer, "This poor guy might legitimately be somebody else, I don't know. It's a freaking weird call. I'll be honest, I don't know what to think." [2] (Exh. 1, BWC 06:32:11). Jager was confused. The obvious solution to Jager's confusion was to investigate further, to ask questions, and to offer Killinger the opportunity to present all of his identification. Jager refused to bother.

Jager arrested Killinger as "John Doe," a fictional non-existent person and charged him with "trespass." Jager could not arrest Killinger under the name on his ID, Jason Killinger, because "Jason Killinger" was *not* the man who was earlier trespassed by the Peppermill. That man was Michael Ellis. There was no evidence that anyone named Killinger had ever been trespassed from the casino. Jager could not arrest Killinger under the name of Michael Ellis because he had no evidence beyond Killinger's facial similarity to Ellis that Killinger was Michael Ellis. Jager repeatedly admitted he "didn't know" who Killinger was and for that reason he arrested him—not because he had committed a crime—but because he didn't know who he was. Jager arrested Killinger as "John Doe," saying he would leave it to the jail determine who he really was.

Killinger's fingerprints were taken at the jail. Long before he left the jail, he was "positively" identified as Jason Killinger. He was not Michael Ellis. There was no evidence that anyone named Killinger had committed a crime. There was no probable cause to prosecute Killinger for trespass because there was no evidence that Killinger had trespassed. There was no evidence that Killinger, who had no arrest record, was a criminal mastermind working hand in glove with a dishonest "DMV hookup" to run around with multiple false driver's licenses. The case should have

---

[2] Jager's statements of "I don't know" and "this poor guy might legitimately be someone else" does not make for probable cause.

been dismissed. Yet Killinger's prosecution continued because Jager fabricated evidence in his arrest documents, falsely stating that Killinger had "produced" conflicting identities and "had" conflicting identities—both of which were bald faced, blatant, and obvious lies. Killinger had not produced any conflicting identities nor did he have any conflicting identities on his person.

As a result of Jager's fabrications, outright lies, mischaracterizations and crucial omissions, the reviewing magistrate found probable cause that Killinger committed the crime of trespass. Killinger was bound over for trial. Even after Killinger's identity was positively confirmed, even after his court papers were changed to reflect the name Killinger instead of John Doe, the prosecution against him continued. There was no reason, biometric or otherwise, to believe the Killinger was Ellis. While Killinger's criminal case was eventually dismissed, the Reno prosecutor refused to dismiss it with prejudice. The Reno prosecutor insisted that the RPD was still investigating Killinger for fraud and insisted on the right to re-open the charges against Killinger at a future date. Killinger's nightmare continued for months.

## II.    SUMMARY JUDGMENT STANDARD

"The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the facts before the court." *Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.,* 18 F.3d 1468, 1471 (9th Cir. 1994) (citation omitted). Summary judgment is appropriate when the pleadings, the discovery and disclosure materials on file, and any affidavits "show there is no genuine issue as to any material fact and that the movement is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).

## III.    NON-DISPUTED FACTS

1.    Killinger is employed by United Parcel Service, ("UPS") as a feeder driver. He has a commercial driver's license with multiple endorsements allowing him to pull tankers and double and triple trailers. (Exh. 3, Killinger Decl. ¶ 2).

2.    Killinger was a regular customer at the Peppermill Casino in Reno. Killinger

estimates that prior to September 17th, 2023, he had gambled hundreds of times at the Peppermill without incident, he has always been treated as an honored guest. He has frequently been given "comps" for free chips and "free dollars" to spend in the casino.  (Exh. 3, Killinger Decl. ¶ 5).

3.    On the evening of September 17, 2023, Killinger had just finished playing craps at the Peppermill. He was in the process of leaving when Peppermill security approached and called him "Mike" and requested to see his ID. (Exh. 3, Killinger Decl. ¶ 10). Security informed Killinger that his name was Michael Ellis, a man barred months earlier for sleeping on the premises. (Exh. 3, Killinger Decl. ¶ 11).

4.    Killinger protested he was not Michael Ellis. (Exh. 3, Killinger Decl. ¶ 11). Killinger told security he never represented himself as Michael Ellis anywhere, anytime, or any place and had no ID with the name of Michael Ellis. Killinger did have substantial ID identifying him as Jason Killinger.  (Exh. 3, Killinger Decl. ¶ 12).

5.    Killinger presented his Class A commercial Real ID Nevada Driver's License.[3] Security compared Killinger's ID to the ID it had on Michael Ellis and they did not match. Peppermill staff called the Reno Police Department ("RPD") to clear up the matter. Killinger was very pleased an RPD officer would be coming to clear up the matter. (Exh. 3, Killinger Decl. ¶ 12).

6.    Killinger, seeing Jager arrive at the Peppermill security office is heard on Jager's BWC saying, "Thank God you're here!" Killinger was relieved to see Jager, thinking Jager would straighten out the problem. (Exh. 1, BWC 05:48:38; Exh.. 3, Killinger Decl. ¶ 14).

7.    Security told Jager that Killinger was a match to Michael Ellis who had been barred from the casino. Security provided Jager with the driver's licenses of Michael Ellis and Jason Killinger and the photo of Ellis barring him from the casino. (Exh. 3, Killinger Decl. ¶ 15). Jager did not question the accuracy of the casino's unknown proprietary software. Instead, Jager fixated on a facial resemblance between the two men in their driver's license photos.

---

[3] In Nevada, a Real ID is signified by the star on the upper right corner. A Real ID is a form of identification sufficient to board an airplane for domestic travel in the United States. It is considered reliable because, to obtain one, a person needs to provide substantial documentation of their identity, including, e.g., a valid, unexpired United States Passport or Passport Card or a U.S. state-issued birth certificate (original or certified copy), proof of social security number, and proof of Nevada address. Any reasonable officer would recognize that a Real ID which is cleared by State of Nevada Records constitutes substantial proof of identity.

8.     Killinger protested saying, "I'm a driver for UPS, I am not Michael Ellis, I don't know who Michael Ellis is, I don't know nothing about Michael Ellis, I'm a taxpayer here." (Exh. 1, BWC 05:50:43;  Exh.. 3, Killinger Decl. ¶ 15).

9.     Killinger had ample identification in his pocket and in his vehicle parked in the nearby Peppermill parking lot, much of it government issued. In his pocket Killinger had:

- a Class A Nevada Real ID Driver's License identifying him as Jason Killinger;

- a Peppermill player's card identifying him as Jason Killinger;

- a debit card from his bank credit union identifying him as Jason Killinger. (Exh. 3, Killinger Decl. ¶ 6).

10. Killinger had in his vehicle:

- a government issued vehicle registration identifying him as Jason Killinger;

- a government issued United States Department of Transportation medical card identifying him as Jason Killinger;

- a vehicle insurance card identifying him as Jason Killinger;

- a pay stub from UPS, his employer, identifying him as Jason Killinger;

- a Teamsters Local 533 union card identifying him as Jason Killinger; and

- numerous players cards for various Reno casinos all identifying him as Jason Killinger. (Exh. 3, Killinger Decl. ¶ 7).

11.     Jager at no time did Jager examined Killinger's other ID in his pocket. At no time did he ask Killinger what other forms of ID he had. (Exh. 3, Killinger Decl. ¶ 22).

12.     Jager accepted the Peppermill's AI software as infallible. Jager was convinced Killinger and Ellis were the same man with Killinger presenting fake ID. Jager stared at Killinger driver's license, then he stared at Ellis driver's license and photo in the "Barring Notice." Jager knew both men had Nevada Real IDs. Jager knew that both men had to present substantial proof of identity to secure their licenses at DMV. Jager said, "That's really weird, that is super weird. The software is saying its legit so he (referring to Killinger) either presented a fake identification the

first time (when he was barred as Michael Ellis) or he's presenting it now." (Exh. 1, BWC 05:55:02). Both men had Real Nevada driver's licenses with gold stars (Exh. 2).[4]

    13.    Ellis's driver's license **differs** from Killinger driver's license in significant ways, at no time did Jager point out the differences in the ID's of the two men:

- Ellis does not have a commercial driver's license and Killinger does;

- Ellis has a Class C driver's license and Killinger has a Class A driver's license;

- Ellis has no endorsements on his driver's license while Killinger has multiple endorsements permitting him to drive tankers, passengers, school buses, double/triple trailers;

- Ellis, born in 1976, is seven years older than Killinger who was born in 1983;

- Ellis weighs 235 pounds and Killinger weighs 285 pounds, a 50 pound difference;

- Ellis stands 5' 9" and Killinger stands 6'1";

- Ellis has hazel eyes, Killinger has blue eyes;

- Their signatures are visibly different, Killinger's is tightly formed and tilts upward with an elongated twirl over both "L's" and Ellis's is more loping and does not tilt upward;

- The restrictions on their driver's licenses are different;

- Their addresses are different; (Exh. 4, Killinger driver's license; Exh. 5, Ellis driver's license, Exh. 5)

    14.    Jager went outside the Peppermill to obtain better internet reception and to call RPD records to check on the identities of Killinger and Ellis. Records confirm that both Ellis's and Killinger's driver's licenses were "clear in every way." Both men had no arrest record.

---

[4] Jager went outside to check the driver's licenses of Killinger and Ellis. He did not have the actual license of Ellis; he had only the picture of Ellis's driver's license from Peppermill records. Exhibit 2 shows Jager in his vehicle checking with RPD on the validity of both licenses. Jager is holding his cellphone with the photo of Ellis's license with the gold star and also holding the actual license of Killinger. As can be plainly seen, both licenses have gold stars in the upper right hand corner.

15.    Jager, talking to the RPD records clerk said, "That is super weird, do you see a resemblance?" (BWC 06:05:36). Jager said, "I have a **feeling** these are both the same guy, but he has different IDs." (Exh. 1, BWC 06:05:50). Jager added, "The software came back as a 100 percent match, definitely a weird one, I have the feeling he is somehow making some fake identification." (Exh. 1, BWC 6:06:20).

16.    Jager next telephoned his supervisor. Jager said, "Hey boss, very peculiar. Peppermill has this pretty sophisticated artificial intelligence software that analyzes faces of previous trespassers. They did a 100% match of this guy who presented an ID with a different name, checked ID of Michael Ellis, it's a valid ID and this guy (Killinger) now detained presents a different ID with different name. Photos are different photos but they look like the same exact guy, but definitely super weird." (Exh. 1, BWC 06:11:36).

17.    Jager's supervisor said, "My thought process is we're going to have to arrest this guy and do a WIN'S check…"[5] (Exh. 1, BWC 06:12:33). Jager responded, "At this point both driver's licenses are both valid, so either he is who he says he is and he has not ever actually been trespassed, which I doubt because their software is pretty cool and the fact that he's acting super suspicious" and two, I just have a feeling he's got a **hookup with the DMV** where he's got two different driver's licenses that are registered with DMV with different names and different dates of birth, so I'll arrest him on that. I'll list him as a John Doe and have him booked in for a WINS check. I'm just doing it for the trespass; I'm not going to do it for O & R because just in case he is the name he presented." (Exh. 1, BWC 06:12:50).

18.    Jager's supervisor did not question Jager as to whether he had requested, looked at, or considered whether Killinger had any other forms of identification to establish his identity.

---

[5] WINS stands for the Western Identification Network, Inc., a consortium of law enforcement agencies in the Western U.S. including Nevada that share a network and Automated Biometric Identification System ("ABIS") for searching criminal and civil fingerprint records. It enables law enforcement to identify unknown individuals between different agencies and jurisdictions. (Https://www.winid.org)

Jager's supervisor did not ask Jager why he believed Killinger was acting "super suspicious" nor did he question why Jager believed Killinger had a hookup at DMV manufacturing false IDs for him.

19.     Jager returned to the Peppermill security office. He told Killinger, "So right now I can't identify you, it's weird, because essentially it looks like you have two different names. I don't know man, so I can't identify you and unfortunately that means they can't cite you which they would normally do. You can't be cited, so you're going to be arrested." (Exh. 1, BWC 06:14:44; Exh. 3, Killinger Decl. ¶ 23).

20.     Killinger, in shock, said, "I'm going to jail? Are you kidding me?" (Exh. 1, BWC 06:15:12; Exh. 3, Killinger Decl. ¶ 24).

21.     Jager responded, "I'm not a joker man. You'll get arrested, you'll get fingerprinted up at the jail and they'll be able to discern your identity and see what this mix-up is with this stuff." (Exh. 1, BWC 06:15:15; Exh. 3, Killinger Decl. ¶ 25).

22.     Killinger pleaded with Jager to look at the differences on the two driver's licenses. "Can you look at the endorsements on the two driver's licenses." Killinger knew that as a feeder driver for UPS he had unique endorsements on his driver's license permitting him to drive double and triple trailers, tankers. Jager looked at both licenses and confirmed that Killinger had those special endorsements and Ellis did not but disregarded this information. (Exh, 1, BWC 06:17:09; Exh. 3, Killinger Decl. ¶ 27).

23.     Jager said: "It's one of those things, I'll be 100% honest, you may have a doppelganger, but they (the driver's license pictures) are strikingly similar and weird enough, their (Peppermill's) fancy AI technology says its 100 percent match." (Exh. 1, BWC 06:16:40; Exh. 3, Killinger Decl. ¶ 28).

24.     Killinger said, "What is it going to take to prove to you that is not me?" (Exh. 1, BWC 06:17:14; Exh. 3, Killinger Decl. ¶ 29). Jager said, "Unfortunately you got to go to jail, they'll pull your fingerprints, that's the way to determine it." (Exh. 1, BWC 06:17:18; Exh. 3, Killinger Decl. ¶ 30).

25.     Killinger asked, "Then what happens when they find out that that's not me?" Jager said, "Then once they find out its not you, that's something else…" (Exh. 1, BWC 06:17:31); Exh. 3, Killinger Decl. ¶ 30). Killinger reasonably inferred from Jager's statements, once it was established from the fingerprints that he was Killinger, it would all be over and the arrest would be dismissed. (Exh. 3, Killinger Decl. ¶ 31).

26.     Killinger remembered he had a check stub from his employer in his vehicle. He told Jager, "I have a check stub from my work would that prove it's not me?" (Exh. 1, BWC 06:23:08; Exh. 3, Killinger Decl. ¶ 35). Jager said, "A check stub?" (Exh. 1, BWC 06:23:11) Killinger said, "Would that prove it to you guys?" (Exh. 1, BWC 06:23120; Jager refused to consider it. Jager said, "Honestly man, the only way is going to get the fingerprints done." (Exh. 1, BWC 06:23:16; Exh. 3, Killinger Decl. ¶ 35).

27.     Killinger asked Jager once again, "Did you look at the back of the IDs, because I have all of the endorsements except for motorcycle and HazMat." (Exh. 1, BWC 06:17:57; Exh. 3, Killinger Decl. ¶ 32).    Jager said, "Either someone else is using your stuff or you're using somebody else's stuff, and unfortunately you look too much like the guy in that picture, so much so that the fancy computer that does all the fancy software makes the same determinations that my feeble human brain does." (Exh. 1, BWC 06:18:07; Exh. 3, Killinger Decl. ¶ 32).

28.     Jager arrested Killinger under the fictitious name of "John Doe" He arrested Killinger based facial resemblances between the two men and ignored all other distinguishing

features between them, their different heights, weights, eye color, ages, endorsements, restrictions, signatures, addresses, and that both had presented Nevada Real IDs. (Exh. 7, Arrest Report).

29.    Jager had many options to further confirm Killinger's identity without arresting him, sending him to jail, and having him bound over for trial. Killinger told Jager he worked at UPS as a commercial truck driver and asked him to check his check stub as further proof of his identity. Jager could have checked Killinger's vehicle registration and insurance card, but did not. Jager could have had the Peppermill pull Killinger's casino player's card and check how often Killinger had gambled at the casino, but did not. Jager could have asked Killinger what other forms of ID he had on his person or in his vehicle and available for him to review, but he did not.

30.    Jager placed Killinger in his patrol vehicle for a trip to the jail. Another RPD officer arrived at the scene. Jager explained to the officer, "This poor guy **might legitimately be somebody else, I don't know.** It's a freaking weird call." (Exh. 1, BWC 06:32:11; Exh. 3, Killinger Decl. ¶ 37). Killinger popped into the conversation, "It's not me in that picture." (Exh. 1, BWC 06:33:19); Exh. 3, Killinger Decl. ¶ 37). Jager continued: **"I'll be honest, I don't know what to think,** usually those systems are pretty good, we've used those systems in the past to catch homicide suspects, they are **fairly reliable**, it says that you're that guy." (Exh. 1, BWC 06:32:11); Killinger Decl. ¶ 37).  (Exh. 1, BWC 06:32:11).

31.    Jager further explained to the arriving officer, "It's super weird. He has an ID that matches, trespassed under the name of Michael Ellis, this is the ID that he presents, it's the exact same guy, name date of birth all that stuff is **different**, 100 percent match with their software that he is this guy that they trespassed on their facial thing. I'm booking him as a John Doe and get a WIN'S check, because he matches. He looks exactly like both pictures." (Exh. 1, BWC 06:29:25)

32.    As they were heading to jail, Jager expressed his opinion that Killinger was behaving

appropriately, he said to Killinger, "You seem like a **stand-up guy**, terrible case of mistaken identity, but end of the day, you're being cool, I'm going to be cool, there's an obligation to enforce that trespass, it's really a crappy situation." (Exh. 1, BWC 06:39:52; Exh. 3, Killinger Decl. ¶ 38).

33.     Yet Jager, uncertain who Killinger was, dismissed the event as a potential funny story for Killinger to be able to tell.  "Hopefully it's like a really **funny story**, like I got arrested because they thought I was somebody else, I have to write you as a John Doe, because we can't positively identify you. I'll be honest, it's someone who looks exactly like you with a different name and ID so its hopefully this in and out process so you can get a cab and get back down to the Peppermill and get your car." (Exh. 1, BWC 06:40:41; Exh. 3, Killinger Decl. ¶ 39).

34.     Jager and Killinger arrived at the jail. Jager told a jail employee: "He's cooperative." (Exh. 1, 06:47:23). Jager continued, "It might be a legitimate doppelbanger situation, it's super weird. It's one of those situations where **I genuinely kinda of believe him**, but then there's this software that's no, every picture they've got is 100 percent match for the guy they trespassed and both pictures look like the same guy." (Exh. 1, BWC 07:08:04).

35.     On September 17, 2023, while at the jail, before release on his own recognizance, the WINS check was conducted. It "positively identified" Killinger as Jason Killinger. The "Pretrial Assessment Report" prepared at the jail dropped the name "John Doe" from Killinger's records and substituted in its place the name Killinger yet the criminal charge against Killinger was not dismissed. (Exh. 8, Pre-trial Assessment).

36.     On September 17, 2023, the "Own Recognizance" release form filled out at the jail made clear to Killinger that he was required to be present in Reno Municipal Court on October 17, 2023 at 2 p.m. (Exh. 11).

37.     Trespassing is a non-violent misdemeanor.

38.    Killinger showed no signs of intoxication.

39.    Killinger was not physically combative.

40.    Killinger had no wants and warrants and had a clean criminal record without arrests.

41.    Killinger did not present a reasonable likelihood of disregarding the requirement to appear in court.

42.    Killinger presented satisfactory evidence of identify pursuant to RPD General Order No. P-280-17 in that he presented a legitimate, active, and  current Nevada Real ID driver's license Real ID and therefore he should have received a citation rather than being taken to jail.

43.    On September 17, 2023, Jager submitted his arrest documents and declaration supplement. Jager knew that the documents would be provided to Reno prosecutors and form the basis for arresting Killinger and used to convict him. (Exh. 7). Jager declared that:

- He responded to the Peppermill on the report of a repeat trespasser (Exh, 7, p. 3, ¶ 1);

- Peppermill was attempting to issue a "citation" but subject was never properly identified, who would be referred to as John Doe, presented Peppermill Security with **conflicting identification** (Exh, 7, p. 3, ¶ 1);

- Peppermill reported that surveillance facial recognition software matched a returned trespasser with 100% confidence (Exh, 7, p. 2 ¶ 2);

- Peppermill reported the "individual" was last trespassed on 03/26/2023 where he identified himself as Michael Philip Ryan Ellis by presenting a valid Nevada Driver's License (Exh, 7, p. 2 ¶ 2);

- When John Doe was detained by security on 09/17/2023, John Doe presented a valid Nevada Commercial Driver's License belonging to Jason James Killinger. However, the photos on both driver's licenses visually matched John Doe  (Exh, 7, p. 3, ¶ 3);

- The associated demographics on each Driver's License were **fairly similar** with the only major difference that Ellis had hazel eyes and Killinger had blue eyes (Exh, 7, p. 3, ¶ 3);

- A routine wants and warrants check on both Ellis and Killinger was negative and neither Ellis nor Killinger had any prior arrest history with additional information to assist in positive identification (Exh, 7, p.3, ¶ 3);

- Peppermill signed a criminal complaint against John Doe for trespassing based on the video surveillance facial recognition software matching a returned trespasser with 100% confidence who had previously identified himself as Michael Ellis (Exh, 7, p. 3, ¶ 4);

- Due to John Doe having **conflicting identification**, **he lacked satisfactory evidence to reasonably assure me that he was who he claimed to be** thus in accordance with RPD G.O. P-280-17 John Do did not qualify for a criminal citation. (Exh, 7, p. 3, ¶ 4);

- Based on John Doe being on the property of the Peppermill after having been trespassed on 03/26/2023 he was trespassing in accordance with NRS 207.200. I arrested John Doe for trespassing and transported him to Washoe County Jail for booking and positive identification. (Exh, 7, p. 3, ¶ 5).

44.    Jager omitted from his arrest and declaration that he had failed to ask Killinger what other forms of identity he had and refused to follow up on Killinger's offers to provide additional proof of identity.

45.    On September 18, 2023, a day after Killinger was confirmed as Killinger and not John Doe or anyone else, Jager caused to be filed a criminal complaint against "John Doe" for trespassing at the Peppermill. Jager did not wait for Killinger's identity to be confirmed before filing his criminal complaint against him. (Exh. 9.)

46.    On September 18, 2023, the Reno Municipal Court opened its "Register of Actions." (Exh. 10). Killinger was charged with trespassing as Jason Killinger, not as John Doe, as the jail WINS check had positively confirmed his identity (Exh. 8). A bench trial was set. Reno prosecutors were set to argue that Killinger should be convicted of criminal trespass. (Exh. 10). Killinger hired an attorney to represent him. (Exh. 10; Killinger Decl. ¶ 59).

47.    On November 9, 2023, the bench trial was called before the Hon. Justin Champagne of the Reno Municipal Court. Reno prosecutors agreed to dismiss the charges but refused to dismiss with prejudice, they indicated that the RPD "fraud" unit was still looking into it and wanted to retain the ability to re-charge Killinger within the year. (Exh. 12;  Killinger Decl. ¶ 60).

## IV.    KILLINGER ESTABLISHES A FOURTEENTH AMENDMENT SUBSTANTIVE DUE PROCESS VIOLATION ARISING FROM FABRICATION OF EVIDENCE

It is well established that criminal suspects have a "due process right not to be subjected to criminal charges on the basis of false evidence that was deliberately fabricated by the government." *Devereaux v. Abbey*, 263 F.3d 1070, 1074-75 (9th Cir. 2001) (en banc); *Benavidez v. Cnty of San Diego*, 993 F.3d1134, 1146 (9th Cir. 2021). "When a police officer creates false information likely to influence a jury's decision and forwards that information to prosecutors, he violates the accused's constitutional right to a fair trial, and the harm occasioned by such an unconscionable action is redressable in an action for damages under 42 U.S.C. § 1983." *Betts v. Shearman*, 751 F.3d 78, 83-84 (2d Cir. 2014)

A plaintiff prevails on a due process fabrication of evidence claim if he establishes that: (1) the defendant official deliberately fabricated evidence and (2) the deliberate fabrication caused the plaintiff's deprivation of liberty. *Spencer v. Peters*, 857 F.3d 789, 898 (9th Cir. 2017); *Costanich v. Dep't of Soc. & Health Servs.,* 627 F.3d 1101, 1111 (9th Cir. 2010). Deliberate fabrication can be shown by either "direct evidence of fabrication or circumstantial evidence related to a defendant's motive." 889 F.3d 1105, 1112 (9th Cir. 2018).[6] Here, Killinger offers direct evidence of fabrication.

Killinger contends his Fourteenth Amendment rights were violated when Jager fabricated, omitted, and mischaracterized statements he made in his arrest documents to make it falsely appear that Killinger had no way to prove his identity, presented no credible evidence of his identity, and offered conflicting pieces of identification. Jager knew the statements he made in his arrest documents were false. Jager knew it would be presented to both Reno prosecutors and to a Reno court. Jager knew it would be used to convict Killinger of a crime. Under the totality of the

---

[6] For a complete discussion on the claim of fabrication of evidence in Nevada, please see the 2022 unpublished decision filed in *Lobato v. Las Vegas Metropolitan Police Department,* 2:19-cv-01273-RFB-EJY by the Hon. Richard F. Boulware, II. Judge Boulware's decision regarding fabrication of evidence was affirmed by the Ninth Circuit Court of Appeals in a memorandum decision on October 11, 2023

circumstances there can be no dispute that Jager mischaracterized and fabricated evidence or that his intentionally fabricated evidence was provided to Reno prosecutors. Further, Jager deliberately mischaracterized Killinger's statements and omitted certain important information in his investigative report, thereby constructing a theory of the case that painted Killinger as a flimflam artist, a con man, a swindler, someone who uses deception and trickery to cheat or defraud others, running around with multiple pieces of conflicting identification, out to deceive the Peppermill, the police, and the court.

### A.  <u>Fabrication—That Killinger Presented "Conflicting Identification"</u>

Jager states in paragraph one of his declaration:

*On 9/17/2023 at approximately 0546 hours I (Officer Jager) responded to the Peppermill Casino ...on the report of a repeat trespasser in custody. Peppermill was attempting to issue a citation, but* the subject/defendant of the call who was never properly identified, who will be henceforth referred to as JOHN DOE ***"presented" Peppermill Security with conflicting identification***. (Exh. 7, p. 3, ¶ 1)

Jager ***repeats*** the same falsehood again in paragraph four of his declaration:

*Peppermill Security signed a criminal complaint against John Doe for trespassing based on the video surveillance facial recognition software matching a returned trespasser with 100% confidence who had previously identified himself as Michael Ellis. Due to John Doe* **"having" conflicting identification**, *he lacked satisfactory evidence to reasonably assure me that he was who he claimed to be...* (Exh. 7, p. 3, ¶ 4)

These statements concerning Killinger either producing" or "having" conflicting identification were made **<u>twice</u>**. They were not the result of mere carefulness drafting errors. They were intentional misrepresentations repeated twice. The sole inference from these deliberately made false statements is that Jager wanted a reviewing prosecutor/magistrate to believe Killinger was an evildoer, a bad person, a lawless immoral scum who deserved conviction for having multiple false identifications. Jager knew Killinger did not "produce" or "have" conflicting identification. No where on Jager's BWC is there any discussion that Killinger had conflicting identification, because

Killinger did not have conflicting identification.

"Reporting that a witness said something he or she did not cannot reasonably be characterized as a recording error or a misstatement," but is instead fabricated evidence. *Reynolds v. County of San Diego*, 224, F. Supp. 3d 1034, 1055 (S.D. Cal. 2016) rev'd in part on other grounds sub nom). In the first instance Jager carefully states that John Doe (who he refers to as Killinger) "presented" Peppermill Security with "conflicting identification." The clear inference of the use of the word "presented" is that Killinger "gave" or "offered" or "handed over" separate pieces of identification that were in conflict. Or that he identified himself with a variety of names. The Peppermill called upon the RPD solely because Killinger was a match to a former trespasser, Michael Ellis, not because he presented them with conflicting identification.

Jager knew Killinger offered up legitimate, active, current DMV records in the form of a Nevada Real ID driver's license. Yet, despite this knowledge, Jager twice made intentional false statements that he knew would be provided to prosecutors to convict Killinger. Pursuant to RPD General Order P-280-17(B)(c) "Satisfactory proof of identity may be found in DMV records." (Exh. 12). It is undisputed that Jager telephoned RPD to check on the validity of Killinger's driver's license and RPD records confirmed it was legitimate, active, and valid. (Exh. 1, BWC 06:12:50). Accordingly, Killinger provided identification that RPD historically considered valid proof of identity.

As for Ellis, his license was also confirmed by RPD records as legitimate, active, and valid. Therefore, Jager was presented with evidence not that Killinger was masquerading as Ellis, or that Ellis was masquerading as Killinger, but two different men had two different and legitimate, active, licenses—and both were Nevada Real IDs. (Exh. 2). Jager knew that meant that both men had to have brought substantial proof of identity to DMV to obtain their individual licenses. Any

reasonable officer would know that two men with legitimate Real ID licenses, whose physical characteristics did not match, whose restrictions and endorsements as to their driving, did not match, were two separate individuals who happened to bear a facial similarity, like many people do.

There is no dispute that Jager knowingly provided false and fabricated evidence to Reno prosecutors and that false information was actively instrumental in causing the initiation of legal proceedings against Killinger. Jager's fabrication contributed to and caused Killinger injury in that he was arrested, jailed, deprived of his liberty, and ordered to stand trial with court appearances lasting months, when Jager knew or should have known that he was an innocent man.

**B. Fabrication—That Killinger and Ellis's Characteristics Were "Fairly Similar"**

Jager states in paragraph four of his declaration that:

*The associated demographics on each Driver's License [that of Killinger and Ellis] were* ***fairly similar*** *with the only major distinction being hazel and blue eyes…* (Exh. 7, p. 3, ¶ 3)

Jager's statement that the demographic distinctions established by the driver's licenses of Killinger and Ellis were "fairly similar" is another bald-faced lie. The distinctions are many and they each point to Killinger ***not*** being Ellis:

- Killinger's driver's license listed his date of birth as July 28, 1983; Ellis's date of birth was October 22, 1976—Killinger was nearly ***seven years*** than Ellis.

- Killinger's driver's license listed his weight as 285-pounds; Ellis's weight was 235 pounds—Killinger weighed ***fifty pounds more*** than Ellis.

- Killinger's driver's license listed his height as six-feet-one; Ellis's height was listed as five-feet-nine—Killinger was ***four inches taller*** than Ellis.

- The two men's driver's licenses showed **different Reno addresses**.

- The two men's driver's licenses showed **different classes**: Killinger's was Class A for commercial; Ellis's was Class C for standard non-commercial.

- The two men's driver's licenses showed **different restrictions**: Killinger's license had restrictions, including a physical exam required for a commercial license, whereas Ellis's had none.

- Finally, the two men's **signatures are distinct** from each other: to the casual eye, Killinger's is tightly formed and tilts upward with a backward slash going through both Ls of the name Killinger; Ellis's is more loping and does not tilt upward.

Jager's false statement that Killinger and Ellis were "fairly similar" in demographics created the false impression that Killinger and Ellis were the same man. Jager intentionally omitted and strategically misrepresented that both men were different in almost every respect, both physically and in their driving restrictions and endorsements. By omitting these disparities Jager knowingly intended to deceive and mislead Reno prosecutors and the court.

### C.  Critical Omission—That Both Men Had Nevada Real ID Driver's Licenses

Killinger had a constitutional right not just to be free from criminal charges based on fabricated evidence and false statements made in an investigative report, but also a right to be free from material **omissions** or mischaracterizations in investigative reports. *Liston v. City of Riverside,* 120 F.3d 965, 973 (9th Cir. 1997) (stating that fabrication may occur by "material false statements or material omissions"); see also *United States v. Stanert*, 762 f.2d 775, 781 (stating that "[b]y reporting less than the total story, an affiant can manipulate the inferences a magistrate will draw," causing the "magistrate to be misled in such a manner [as to] denude the probable cause requirement of all real meaning.")

Jager deviously omitted any reference to the plain fact that both Killinger and Ellis had Nevada Real IDs. In excluding this key information, Jager further contrived to deceive the prosecutors and the court into thinking there was no difference between the two men. If Jager had presented in his arrest documents the differences between the two men as revealed by their driver's licenses, or that both men had Nevada Real IDs, any reasonable prosecutor would have understood that both men had provided DMV officials with extensive proof of their identities. Any reasonable officer knows that to obtain Nevada Real IDs, persons must present certified birth certificates or passports, social security numbers, and other forms of proof as to their identities as well of proof by a minimum of two documents that they lived at the actual address provided. All such documents are carefully screened by DMV officials.

Jager also **omitted** another important distinction between Killinger and Ellis. Killinger had a

commercial driver's license and Ellis did not. To obtain a Nevada commercial driver's license applicants must pass required knowledge and skills tests. They must also obtain a medical certificate from the FMCSA and, if applying for a "Class A" commercial driver's license they must complete a special entry-level driver training. Jager knew Killinger had a commercial driver's license. Jager knew or should have known that specific skills and examinations are required to obtain a commercial driver's license. Jager knew Killinger was a union teamster and worked for UPS.[7] Jager knew that Killinger's license allowed him to driver tankers, passengers, school buses, and double/triple trailers. By contrast, Ellis had none of that. Ellis had an ordinary license that allowed him to drive only passenger cars.

Had Jager provided this critical information in his report, that the men's "demographic" characteristics and licenses were substantially different and both had Nevada Real IDs, it would have substantiated Killinger's claim that he was not Ellis.

### D.    Misdirection—Jager Fabricated a Non-Existent John Doe

Misdirection is a magician's trick. It is the action of making people pay attention to the wrong thing, usually intentionally so that they will not notice something else. Jager took misdirection to the next level by referring to Killinger as John Doe, a non-existent fictional person.

> …. *JOHN DOE presented a valid Nevada Commercial Driver's License belonging to Jason James Killinger 1007291590. However, **the photos on both Driver's Licenses visually matched JOHN DOE**.* (Exh. 7, p. 3, ¶ 3)

Here, Jager represents that there are **three people** involved, Killinger, Ellis, and John Doe. Jager states the mythical John Doe presented a valid license and the photos on both driver's licenses visually matched "John Doe." Jager is saying John Doe, **who did not exist**, matched the identities of Killinger and Ellis. This is classic misdirection because **there was no "John Doe**." Jager created a fictionalized John Doe, as if Mr. Doe were a real person. Then Jager linked the fictional non-existent Mr. Doe to the photos of both Killinger and Ellis, as if Mr. Doe were a real person. The creation of the fictional John Doe enabled Jager to bamboozle, hoodwink, and pull the wool over the prosecutor's eyes and trick the prosecutor/magistrate into thinking there were three people

---

[7] On the drive to the jail, Jager commented on Killinger's teamster's shirt and the two discussed the union.

involved and not just two.[8] This fiction persists through both page 1 and 2 of Jager's arrest report and declaration. Jager fabricates a fictional date of birth for John Doe, falsely stating in his Arrest Report that John Doe's Date of Birth is "01-01-80," a date that corresponds to neither Killinger or Ellis. (Exh. 7, pages 1-2)). Killinger's date of birth is July 28, 1983, and Ellis's date of birth is October 22, 1976. The fictional date of John Doe's birth, "01-01-80," ignores seven years of difference between the Killinger's and Ellis's ages.

Jager also states John Doe is age is 43 which is neither the age of Killinger or Ellis. Jager states John Doe is 5'10 which is neither the height of Killinger or Ellis, Killinger is 6'1" and Ellis is 5'9." Jager states John Doe's hair color is brown which is neither the hair color of Killinger or Ellis, both are blonde. Jager states John Doe's weight is 280 which is neither the weight of Killinger or Ellis. Killinger's license states his weight as 285 and Ellis's states his weight is 235, a difference of fifty pounds.

**E.  Misleading—To Conflate Both Killinger and Ellis As The Same Person**

In his arrest and declaration documents, Jager referred to both Killinger and Ellis as the same person. Jager stated:

> On scene I met with Peppermill Security who told me that JOHN DOE's face was detected by their video surveillance facial recognition software matching a returned trespasser with 100% confidence. Peppermill Security informed me that **the individual was last trespassed on 3/26/23 where he identified himself as Michael Phillip Ryan Ellis** by presenting a valid Nevada License 2102040224. (Exh. 7, p. 3, ¶ 2)

The only one who was the subject of the Peppermill's A.I. facial recognition software on September 17, 2023, was Killinger. Jager states the A.I. software on September 17, 2023 matched a "returned trespasser" and that individual was last trespassed on 3/26/23 where he identified himself

---

[8] The photos of the two men's faces bear passing similarity, but had Jager really looked at them, he would have noticed not so subtle differences. The two photos are similar in that they show two heavyset white men with blonde hair, similar noses, and double chins. But the similarities end there. Their brows are set differently: Killinger's brow is set close above his eyes; by contrast, Ellis's brow is set high above his eyes. Their eyebrows have different shapes: Killinger's eyebrows curve upward; by contrast, Ellis's eyebrows are flat. Their heads have different shapes: Killinger's head and jawline are narrower and somewhat angular in shape; Ellis's head and jawline are broader and rounder in shape. On close inspection, the photos are not a visual match. It is questionable that Jager noted these visual differences—he was so bent on framing Killinger as Ellis—but once seen, they cannot be unseen.

as Ellis. It is true that on March 26, 2023, Ellis was a trespasser and that on that date Ellis did identify himself as Michael Phillip Ryan Ellis.

Then Jager complicates, conflates, and confuses the issue by falsely stating "the individual" (who he is now referring to as Killinger on September 17, 2023) was "last trespassed" on March 26, 2023. He has no evidence to support that Killinger was last trespassed on March 26, 2023. There is only evidence that a man who identified himself as Michael Ellis was trespassed on March 26, 2023. Jager has by a magician's misdirection transformed Killinger into the "individual" who was last trespassed on March 26, 2026. Killinger was certainly not a trespasser on September 17, 2023. The only activity that Killinger engaged in at the Peppermill on September 17, 2023, was to play his favorite casino game of craps and (for a short time) to also play slot machine blackjack. These are wholly legitimate activities at a casino.

## V.    KILLINGER ESTABLISHES A FOURTEENTH AMENDMENT VIOLATION FOR FAILING TO INVESTIGATE FURTHER WHEN FURTHER INVESTIGATION WAS WARRANTED

"Our cases holding that a mistaken incarceration violates the Due Process Clause fit at least one of two categories. Either (1) the circumstances indicated to the defendants that further investigation was warranted, **or** (2) the defendants denied the plaintiff access to the courts for an extended period of time." *Garcia v. County of Riverside,* 817 F.3d 635, 640 (9th Cir. 2016) (emp. added). Killinger alleges only the first prong. Killinger contends that under the circumstances, especially with Jager's repeated declarations of confusion, further investigation was required before Jager's took the drastic step of making an arrest he was not sure about.

These further investigation cases involve "circumstances that could and should have alerted the defendant officer to a misidentification, including differences in driver's licenses and biometric data." See *Lee v. City of Los Angeles,* 250 F.3d 668, 684 (9th Cir.2001); *Rivera v. County of Los Angeles,* 745 F3d 384, 387 (9th Cir. 2014); *Fairley v. Luman,* 281 F.3d 913, 915 (9th Cir. 2002); *Gant v. County of Los Angeles,* 772 F.3d 608, 622-23 (9th Cir. 2014); *Soler v. Cnty of San Diego,*

No. 17-56270 Page 6-7 (9th Cir. Feb. 26, 2019)

In *Garcia,* the court focused on whether the investigation into the identity of the plaintiff was so superficial, that it ignored a duty to investigate and thus offended due process." *Garcia v. County of Riverside,* 817 F.3d at 641. Here, Jager was presented with multiple red flags that should have alerted him the A.I. facial recognition was in error.  No reasonable officer could have ignored the difference in names, heights, weights, eye colors, ages, birthdays, driver's license class's, restrictions, endorsements, signatures, and addresses between Killinger and Ellis. Even a cursory, superficial, examination should have indicated to Jager that further investigation was required. This is compounded by the fact that both Killinger and Ellis had Nevada Real IDs, meaning that each of them had brought to DMV substantial documents to prove their identities. Jager was implicitly stating, especially by his comment to his supervisor, that the Real IDs also meant nothing as Killinger had effectively conned DMV officials into giving him a false ID with the assistance of an imaginary, make-believe, "DMV hookup."

A. **No Reasonable Officer Would Have Arrested Killinger Without Further Investigation While Repeatedly Admitting His Uncertainty That Killinger Was Ellis Or That Killinger Had Committed A Crime**

Jager repeatedly admitted he was uncertain of whether Killinger was truthful. Jager admitted he "kinda" believed Killinger when he protested he was not Ellis. Jager told an RPD officer arriving at the Peppermill, "This poor guy might legitimately be somebody else, **I don't know**." Jager added, **"I'll be honest, I don't know what to think."** (Exh. 1, BWC 6:33:51). Jager told Killinger, "**I'll be 100% honest you may have a doppelganger.**" (Exh. 1, BWC 6:16:38). At the jail Jager told a jail employee, "It **might be a legitimate doppelbanger** situation, it's super weird. It's one of those situations where I genuinely kinda believe him." (Exh. 1, BWC 7:08:07).

A doppelbanger is an unrelated look-alike. No reasonable police officer who admits he may

be arresting a doppelbanger, someone who just looks like someone who might be guilty of something, based exclusively on A.I software (known to be unreliable), and also admits he doesn't know what to think, would make an arrest of such a person without further investigation. Jager expressed uncertainty as to the reliability of A.I. facial recognition software. Referring to the A.I. facial recognition software, Jager said, "Those systems are pretty good, they are **fairly** reliable." (Exh. 1, BWC 6:33:51). The **only** rationale possible for Jager to arrest Killinger for the crime of trespass was the facial recognition software, yet Jager admitted they are only "fairly" reliable.

Jager had sufficient time to investigate further; it would have taken mere minutes. There was no emergency in progress; there was no violence occurring. Jager had many options to further confirm Killinger's identity. Killinger told Jager he worked at UPS as a commercial truck driver and asked him to check his paycheck stub in his vehicle as further proof of his identity. (Exh. 1, BWC 06:23:10-12). Jager could have checked Killinger's paystub; it is extremely unlikely that Killinger would have a phony pay stub from his employer, UPS, a national company.[9] Jager couldn't be bothered. Killinger repeatedly asked Jager to check his license endorsements, his ability to drive tankers and double and triple trailers. Most driver's do not have such endorsements. Jager could have attempted to reach Killinger's employer; could have looked at his insurance cards; could have checked Killinger's Peppermill's player's card to confirm with the Peppermill whether Killinger was a real person who gambled frequently at the Peppermill. That too would have substantiated Killinger's claim. At the very least, Jager could have asked Killinger to provide him with what other forms of identification he had available. Killinger had **eight** forms of identification, three of them government issued. But Jager did none of those things.

**B. No Reasonable Police Officer Arrests Someone Based On A Hunch**

---

[9] Or perhaps Jager thought that UPS was also in on the game of creating false paychecks for Killinger so he could run around and fool people who questioned his identity.

Arrests have consequences. Arrests are serious business. Arrest records can affect a person's the ability to find jobs or keep jobs. Arrests based on misleading hunches and illusory imagined conjecture are not allowed. Weight is not to be given to an officer's inchoate suspicion or hunch. *Terry v. Ohio,* 392 U.S. 1, 27 (1968). "While a hunch may provide the basis for solid police work; it may trigger an investigation that uncovers facts that establish reasonable suspicion, probable cause, or even grounds for a conviction. A hunch, however, is not a substitute for the necessary specific, articulable facts required to justify a fourth amendment intrusion." *U.S. v. Thomas*, 211 F.3d 1186, 1192 (9Th Cir. 2000).

Jager stated when talking about Killinger and Ellis, "I have a **<u>feeling</u>** these are both the same guy" (Exh. 1, BWC 5:05:53) and "I have the **<u>feeling</u>** he is **<u>somehow</u>** making some fake identification. (Exh. 1, BWC 6:06:18). Jager's "feeling" that "somehow" Killinger is "making some fake identification," without more, is not relevant. Jager's confrontation with A.I. software, which he deemed only "fairly reliable" certainly provides sufficient impetus to investigate further, but it is more akin to "reasonable suspicion" rather than to probable cause, a far more certain standard. Jager had every right to question, examine, and explore Killinger's identity, to ask for proof, and to examine the proof provided. But reliance on a new and unreliable software, coupled with hunches and feelings, was insufficiently trustworthy to form the basis of an arrest without further investigation.

## C. <u>Catch -22</u>

Jager outrageously stated that Killinger "lacked satisfactory evidence to reasonably assure me that he was who he claimed to be." (Exh. 7, p. 3, ¶ 4). How disingenuous! What more could Killinger have done when Jager refused to look at any identification that he had? Killinger was begging Jager to look at his evidence. He said, "What can I do to prove to you who I am?" Eight

pieces of identification, three of them government issued, should have been enough for a reasonable officer to consider the A.I. artificial intelligence software was inaccurate. But not Jager. He faulted Killinger for failing to provide satisfactory evidence of identity to him, while simultaneously refusing to look at anything Killinger offered. Jager put Killinger in an impossible catch-22.

Nothing prevented Jager from investigating further, it would have taken mere moments to look at all the identification Killinger had in his pockets and in his nearby vehicle. Killinger's having **_three_** forms of government issued identification (Nevada Real ID, government issued vehicle registration, and government issued DOT medical card) would be persuasive to a reasonable police officer that Killinger was who he said he was. But Killinger did not have just three pieces of identification, he also had five forms of additional ID (a debit card from his credit union, a Nevada proof of insurance card, a pay stub from his employer, a Teamster's Union identification card, and numerous casino player's cards) in his name to bolster his identification—if Jager would have only consented to look at them.

**D.      No Reasonable Police Officer Lies to His Supervisor to Legitimize an Arrest**

Jager also told his supervisor that Killinger was acting "super suspicious." (Exh. 1, BWC 06:12:50). Why did Jager volunteer that false description of Killinger when he later repeatedly vouched for Killinger's cooperation and described him as a "cool guy" and a "stand up guy." Killinger's conduct is available for review on Jager's BWC. Killinger was not cagey, violent, abusive, or loud-mouthed. He was not drunk or disorderly. He did not spew epithets or make offensive remarks. He was polite and appropriate, a model suspect. He readily gave forth his license and offered to provide more information. There is nothing remotely suspicious about any of that. The only explanation for Jager's lie to his supervisor, was to legitimize Killinger's arrest and to gain approval for the arrest.

26

Jager told Killinger that he was "cool" and a "stand-up guy" and "cooperative." "You seem like a stand-up guy, a terrible cause of mistaken identity, but the end of the day, you're being cool, I'm going to be cool, it's really a crappy situation." (Exh. 1, BWC 6:39:52). Arriving at the jail, Jager told jail officials, "He's cooperative!" (Exh. 1, BWC 07:08:07). If Killinger was "cool" and "a stand-up guy" and "cooperative" it begs the question, why would he tell his superior officer that Killinger was "super suspicious?"

**D.  Jager Acting In Bad Faith, Was Recklessly Indifferent to Killinger's Rights**

Jager was lazy. He didn't want to bother with further investigation even though he was admittedly uncertain as to Killinger's identity.  He was arresting Killinger solely because he could not identify him, not because Killinger had committed a crime. He had no evidence that Killinger had committed trespass.

**1.  Arrest Based Not On A Crime, But On Jager's Failure To Identity**

Jager told Killinger, "So right now I can't identify you, it's weird, because essentially it looks like you have two different names, I don't know man, so I can't identify you and unfortunately that means they can't cite you which they would normally do. You can't be cited, so you're going to be arrested." (Exh. 1, BWC 6:14:45).

Jager had abundant time and opportunity to investigate further. There were no exigent circumstances ongoing, no emergency in progress, and no violence or threats of violence. Jager didn't want to be bothered. He wanted the jail to take Killinger's fingerprints and identify him. Killinger was cooperative in every regard. Killinger had readily produced his Nevada Real ID, had offered to produce other identifying information, and had pleaded with Jager, "What is it going to take to prove to you that is not me?" (Exh. 1, BWC 06:17:16). A reasonable police officer would have said, "What proof of your identity do you have? Show me your proof of identity, let me look at

it." Had Jager done that, Killinger would have promptly offered his eight forms of identity establishing he was Jason Killinger. A reasonable officer, acting in good faith, would have carefully examined Killinger's identification and come to the obvious conclusion that he was honest, straightforward, and the A.I. facial software was in error.

## 2. **Jager Dismisses Arrest As A Potential "Funny Story"**

On the drive to the jail, Jager expressed reckless indifference and a cavalier attitude towards Killinger's arrest. He knew it was quite likely that Killinger was Killinger and not Ellis. To him, the arrest was a joke. In discussing the likelihood that it was all a mistaken identity, Jager said, "Hopefully it's like a really **funny story**, like I got arrested because they thought I was somebody else." (Exh. 1, BWC 6:06:18).

A wrongful arrest is not a funny story. Ha ha, I was wrongfully arrested, had to hire a lawyer, had to spend 10 hours in jail, had to go to court, and now have a criminal record. Jager's cavalier dismissal of the predicament he had wrongfully placed Killinger in by his failure to investigate reveals Jager's state of mind. Jager was not in good faith. Jager had a constitutional obligation to be truthful in his report and to investigate further when he was obviously confused about Killinger's identity. He wrote a report that failed to mention all the proof Killinger had of his identity, omitted all the differences between Killinger and Ellis, and lied that Killinger was at fault for producing "conflicting identification."

## V.    **KILLINGER STATES A CLAIM FOR MALICIOUS PROSECUTION**

Under Nevada law, malicious prosecution claims can be brought against police officers who cause criminal proceedings to be initiated or continued against a person without probable cause. *Catrone v. 105 Casino Corp.,* 414 P.2d 106, 108 (Nev. 1966); see also *Bonamy Zenoff,* 362 P. 2d 445, 446 (Nev. 1961) "Malice may be inferred from proof of want of probable cause." *LaMantia v.*

1    *Redisi,* 38 P.3d 877, 879-80 (Nev. 2002).

2    At some point after a person is arrested, the question of whether his **continued** prosecution

3    is unconstitutional passes from the Fourth Amendment to the Due Process Clause. *Jones v. City of*

4    *Chicago,* 856 F.2d 985 at 994. A police officer who supplies intentionally fabricated and/or

5    misleading information to prosecutors, causing the prosecutors to act on that information, cannot

6    hide from liability by blaming prosecutors for the continued prosecution. *Id.* Jager cannot escape

7    liability by blaming Reno prosecutors for continuing to prosecute Killinger after his identity was

8    positively established by the WINS fingerprint analysis at the jail. (Exh. 8).

9

10    Malice may also be implied if a defendant acts in willful disregard of a plaintiff's rights.

11    *Ewish v. State,* 871 P.2d 306, 312 (Nev. 1994). The Ninth Circuit has held that, "Among the ways

12    that a plaintiff can rebut a prima facie finding of probable cause is by showing that the criminal

13    prosecution was induced by fraud, corruption, perjury, fabricated evidence, or other wrongful

14    conduct undertaken in bad faith." *Awabdy v. City of Adelanto*, 368 F.3d 1062, 1067 (9th Cir. 2004).

15

16    A prosecutor's decision to proceed to trial will not shield a police officer who supplies

17    known false information to influence the prosecutor. *Jones v. City of Chicago,* 856 F.2d 985, 995

18    (7th Cir. 1998). No reasonable officer could believe that it would be lawful to "misrepresent the

19    evidence to the prosecutor." "A police officer's forwarding to prosecutors of known false evidence

20    works an unacceptable **corruption** of the truth-seeking function of the trial process, and thus, if

21    proven, would rebut the presumption of probable cause." *Manganiello v. City of New York,* 612

22    F.3d 149, 162 (2nd Cir. 2010) (Emp. added).

23

24    Here, Jager induced the prosecution against Killinger with the filing of a declaration

25    containing fabricated evidence to induce prosecutors to proceed criminally against Killinger. Jager

26    insisted throughout his interaction with Killinger, that it was Killinger's identity that was the

27

28

problem—he did not know who Killinger was. Jager told Killinger that with the WINS fingerprint analysis, his identity would be confirmed. Yet when the WINS fingerprint analysis confirmed Killinger was Killinger, not Ellis, and not anyone else, the prosecution against Killinger wrongfully continued. It continued only because Jager's fabricated evidence convinced Reno prosecutors Killinger had "produced" "conflicting identification" and "had" conflicting identification.

## VI.    CONCLUSION

For all the above reasons, Plaintiff respectfully requests his Motion for Partial Summary Judgment be granted.

DATED this 12th day of August 2025

/s/ Terri Keyser-Cooper
TERRI KEYSER-COOPER
Attorney for Jason Killinger

# **CERTIFICATE OF SERVICE**

I, Terri Keyser-Cooper, declare as follows:

On this date, I served a copy of the following documents on the parties as follows:

Plaintiff's MOTION FOR PARTIAL SUMMARY JUDGMENT

[X]   BY FED EX.  By placing a true copy of the above-referenced document(s) with Fed Ex for delivery in a sealed envelope with postage prepaid to the addressee(s) listed below.

[ ]    BY FACSIMILE TRANSMISSION.  By transmitting a true copy of the document(s) by facsimile transmission

[ ]    BY HAND-DELIVERY.  By delivering a true copy enclosed in a sealed envelope to the address(es) shown below.

[x ]    BY ELECTRONIC SERVICE.  By electronically mailing a true copy of the document(s) to defendants at the following email addresses via the Court's electronic filing procedure:

Mark Hughes
Mark Dunagan
Reno City Attorney's Office
P.O. Box 1900
Reno, NV 89505
hughsm@reno.gov
dunaganm@reno.gov

DATED this 12 day of August 2025

/s/ terri Keyser-Cooper
TERRI KEYSER-COOPER
*Attorney for Plaintiff Jason Killinger*