TERRI KEYSER-COOPER
Law Office of Terri Keyser-Cooper
Nevada Bar No. 3984
125 Edgewater Parkway
Reno, NV 89519
(775) 337-0323
Keysercooper@lawyer.com
*Attorney for Plaintiff Jason Killinger*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

JASON KILLINGER,

                Plaintiff,

        v.

RENO POLICE OFFICER R. JAGER,

             Defendant.

_____/

Case No. 3:25-cv-00388-MMD-CSD

**PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON EXCESSIVE FORCE**

## NATURE OF THE CASE[1]

    While few plaintiffs make motions for partial summary judgment on excessive force claims, this case is different. There is no dispute of material fact as to what occurred between Plaintiff Jason Killinger ("Killinger") and Defendant Jager ("Jager") because their entire interaction was recorded on Jager's Body Worn Camera ("BWC"). The video is sharp and the sound is clear.

    **A.  Killinger Told Jager More Than 20 Times Of Severe Pain Caused By Handcuffs**

    Killinger, an entirely innocent man, was mistakenly identified by Peppermill Casino A.I. facial recognition software as "Michael Ellis" a man who had been barred by the casino nearly six months earlier for sleeping on the premises. Based on the inaccurate A.I. software, Killinger was

---

[1] Killinger has filed a Motion for Partial Summary Judgment based on Jager's fabrication of evidence, failure to investigate when investigation was obviously required, and malicious prosecution. (ECF No. 7, filed August 12, 2025).

1

wrongfully arrested by Jager. Killinger was not Michael Ellis and had voluminous identification to prove his identity, most of it was government issued, but Jager refused to look at it. Jager was unduly impressed by the A.I. software, which he admitted he knew nothing about. Jager was so awe-struck by the "fancy" software, he concluded he was not required to conduct further investigation. But Killinger was not Michael Ellis and had never been Michael Ellis.

Killinger's arrest was a mistake, easily avoidable by any reasonably competent police officer conducting a reasonable investigation. A.I. facial recognition software is a tool, but without corroboration or further investigation, by itself it is insufficient to establish identity. Basic police work, as any reasonable officer knows, must involve investigation—for starters, looking at the abundant identification Killinger had in his name, on his person, and in his vehicle, that would conclusively establish he was Jason Killinger and not Michael Ellis. If Jager had done even routine, ordinary, gumshoe police investigative work, he would have immediately learned there was abundant proof that Plaintiff was who he claimed to be and not Michael Ellis.

Killinger, a large man weighing 285 pounds, requested relief from his extreme distress by asking for reprieve from the handcuff pain more than **20 times**, explaining to Jager that the handcuffs were "killing" him and causing him great pain.  He repeatedly requested a "break" from the handcuffs or a "loosening" of the handcuffs, but Jager ignored him. Pursuant to the Reno Police Department General Order P-312-04 and POST training, Jager had discretion to loosen the handcuffs, or to remove them, but refused to consider it, apparently deciding either that handcuff pain was unimportant or that Killinger should just "man up" and take the pain. Any reasonable police officer hearing a suspect complain about pain that was "killing him" from handcuffs should pay attention and should know that handcuff pain can cause very serious injury.

**B.  Killinger Immediately Sought Medical Help After Release**

Jager arrested Killinger, charging him as "Joe Doe" because he insisted he "did not know" who he was. Jager was presented by Killinger with his Nevada Real ID and Killinger had multiple forms of identification in his name in his pocket and in his nearby vehicle but Jager refused to look at it. Jager was like a horse with blinders, he had a narrow focus and an inability to see the bigger picture. Jager admitted that if he had known Killinger's name, Killinger would have received only a citation, but because he did not know Killinger's name, he had to be arrested. But Jager's inability to identify Killinger was solely Jager's own fault. He refused to look at Killinger's identification, or to even ask even one question regarding what identification Killinger had. Killinger was taken to jail. At the jail, Killinger was immediately identified as Killinger and released on his own recognizance. After his release, he went to Renown Urgent Care in Reno where he was examined by Brion R. Hill, M.D., and found to have bilateral wrist and bilateral shoulder pain with soft tissue swelling and bruising.

**C. <u>Killinger's Injuries Interfered With Ability to Perform His Job</u>**

Killinger sought medical care immediately after release from the jail. He learned that other than icing his wrists and taking over the counter pain medication there was not much he could do. Killinger is a teamster, long-term commercial "feeder" truck driver for United Parcel Service, driving double and triple trailers on long hauls. It is physically difficult, arduous, highly skilled and, at times, dangerous work requiring his wrists, arms, and shoulders to be in good working order.

Killinger's job requires him to daily lift items 51-80 pounds and push/pull items one hundred pounds or more while working up to 10 hours per day, five days per week, often with required additional hours of overtime. He is also required to sit up to 10 hours per day as well as bend, stoop, crouch, squat, walk, turn/pivot intermittently throughout the day in tasks such as lifting and closing the truck hood, pulling open and closing the truck doors, and loading packages.

## II.     SUMMARY JUDGMENT STANDARD

"The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the facts before the court." *Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.,* 18 F.3d 1468, 1471 (9th Cir. 1994) (citation omitted). Summary judgment is appropriate when the pleadings, the discovery and disclosure materials on file, and any affidavits "show there is no genuine issue as to any material fact and that the movement is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).

## III.     NON-DISPUTED FACTS

1.     Prior to the incident with Officer Jager, Killinger had a clean criminal record. He was never accused of a crime, arrested, or taken to jail. (Exh. 1, Killinger Decl. ¶3)

2.     On September 16, 2023, Killinger went to the Peppermill to gamble. (Exh. 1, Killinger Decl. ¶4). He arrived at the Peppermill at about 11:30 p.m. (Exh. 1, Killinger Decl. ¶5).

3.     When Killinger arrived at the Peppermill, he gave the craps dealer his player's card and money to begin playing. He played for a few hours, managing to get ahead $200.00 and decided to leave to leave and move on to the Atlantis Casino.  (Exh. 1, Killinger Decl. ¶8)

4.      On his way out, Killinger stopped to play a blackjack machine. As he was playing, he was approached by a security guard who said, "Hi Mike, how are you?" He told the security guard he was "not Mike." The guard said, "I need to see your ID." He gave the security guard his Nevada Real ID driver's license with the gold star in the upper right corner. The guard said, "I'm sorry to bother you Mr. Killinger" and backed off. (Exh. 1, Killinger Decl. ¶10)

5.      Killinger walked to the exit, within moments, he was surrounded by security guards and handcuffed. He was told his name was Michael Ellis and he was under arrest for "trespassing." He told security he was not Michael Ellis but security insisted he was Michael Ellis. He was taken to the security office in handcuffs. (Exh. 1, Killinger Decl. ¶11).

6.      Killinger was told a police officer was coming to the Peppermill to look into this matter he was pleased. He thought the police would come and force the casino to do the right thing, remove the painful handcuffs, and let me go." He is a large man, weighing 285 pounds. He found the handcuffs behind his back too tight and extremely painful, hurting his wrists and shoulders. (Exh. 1, Killinger Decl. ¶12)

7.      Officer Jager arrived at the Peppermill at approximately 4:00 to 4:30 a.m. on September 17, 2023. He was wearing his body worn camera ("BWC"). Everything that Jager did and said was recorded on his BWC. (Exh. 1, Killinger Decl. ¶13)

8.      When Jager arrived, Killinger said, "Thank God you're here!" He had faith Jager would straighten out the misidentification and release him. **The first thing he said to Jager is "could he 'please' get him 'out of these cuffs.**" Killinger was surprised that Jager did not seem interested in the fact that he was in pain,. Jager ignored him. (Exh. 1, Killinger Decl. ¶14)

9.      Peppermill security told Jager that Killinger was a match to Michael Ellis, someone who had been barred from the casino. The match was based on the Peppermill's facial recognition

5

software. Jager said, "You guys have this fancy software." Killinger interrupted to say, "I'm a driver for UPS, I am not Michael Ellis, I don't know who Michael Ellis is, I don't know nothing about Michael Ellis, I'm a taxpayer here." life. (Exh. 1, Killinger Decl. ¶15)

10.    Killinger told Jager,  "I need a break, **my shoulder is killing me**, can you please take off these cuffs? He was surprised that Jager ignored him again, saying "Just sit there for a minute, man." **Killinger repeated myself, "I need a break, my shoulder is killing me.**" Jager ignored him again. (Exh. 1, Killinger Decl. ¶16)

11.    Killinger saw Jager stare at his driver's license and also stare at the Peppermill's "Barring Notice" of Michael Ellis and the Peppermill's copy of Michael Ellis's driver's license. Jager said: "The software is saying its legit." Jager said that Killinger had either presented a fake identification by presenting himself as Michael Ellis or that he was presenting a fake identification now by identifying himself as Jason Killinger. (Exh. 1, Killinger Decl. ¶18)

12.    Jager did not ask Killinger what other forms of ID he had. Jager was not interested in anything he said and seemed completely convinced he was Michael Ellis and had somehow pulled a fast one. (Exh. 1, Killinger Decl. ¶21

13.    Jager told Killinger, "So right now I can't identify you, it's weird, because essentially it looks like you have two different names. I don't know man, so I can't identify you and unfortunately that means they can't cite you which they would normally do. You can't be cited, so you're going to be arrested." (Exh. 1, Killinger Decl. ¶23)

14.    Killinger was shocked. He had not committed a crime, but because Jager couldn't identify him, he was going to jail. Jager told Killinger, he would have only cited him and not arrested him if I admitted to being Michael Ellis.  (Exh. 1, Killinger Decl. ¶23)

15.    Jager said, "I'm not a joker man." "You'll get arrested, you'll get fingerprinted up at

the jail and they'll be able to discern your identity and see what this mix-up is with this stuff." (Exh. 1, Killinger Decl. ¶25)

16.    But there was no mix-up. Killinger consistently denied he was anyone other than Jason Killinger and he had multiple forms of identification to prove who he was. (Exh. 1, Killinger Decl. ¶26)

17.    Killinger pleaded with Jager to look at the specifics of his driver's license. He knew it was highly unlikely that Ellis would have the same unique endorsements he had or was capable of driving the kinds of vehicles he was licensed to drive. He pleaded, "Can you look at the endorsements on the two driver's licenses." Jager did look at them but he disregarded it.  (Exh. 1, Killinger Decl. ¶27)

18.    Killinger said, "What is it going to take to prove to you that is not me?" Killinger hoped Jager would go out and walk less than five minutes to his car and look at all his government issued ID. Or look at his debit card from his bank, or go talk to the Peppermill office and get a record of how often he was a paying customer at the Peppermill which the casino tracks by using player cards. Or call his employer to verify his identity. Killinger had have been with UPS nearly 20 years, he believed UPS would have verified his identity. Jager refused, he told Killinger he had to go to jail. (Exh. 1, Killinger Decl. ¶29)

19.    Jager said, "Unfortunately you got to go to jail, they'll pull your fingerprints, that's the way to determine it." Killinger said, "Then what happens when they find out that that's not me? Then what happens?" Jager said, "Then once they find out its not you, then that's something else, but at this point our hands are tied because a reasonable and prudent person based off the software, based off the pictures, would make the reasonable conclusion that all three are the same person with two different IDs." (Exh. 1, Killinger Decl. ¶30)

20.     Killinger was under the impression that once his fingerprints were taken he would be released. He reasoned he couldn't be Michael Ellis if his fingerprints showed he was Jason Killinger. He reasonably believed the whole thing was about identifying me and once he was identified the whole thing would go away and be dismissed.

21.     Killinger asked Jager again, "Did you look at the back of the IDs, because I have all of the endorsements except for motorcycle and HazMat." Jager said, "Either someone else is using your stuff or you're using somebody else's stuff, and unfortunately you look too much like the guy in that picture, so much so that the fancy computer that does all the fancy software makes the same determinations that my feeble human brain does." (Exh. 1, Killinger Decl. ¶32)

22.     Jager took off the Peppermill handcuffs and put Killinger in RPD handcuffs. Killinger again mentioned the pain of the handcuffs, "**<u>Can I have a little bit of a break when you get them off?</u>**" "Unfortunately, can't, it's against policy, sorry pal." (Exh. 1, Killinger Decl. ¶33)

23.     Reno Police Department policy allows for exceptions to the handcuffing policy. It states: "Arrestees and individuals taken into protective custody by department personnel will be handcuffed behind the back prior to transport. Exceptions to this procedure will be on an individual basis and based on extenuating circumstances." (Exh. 2, General Order .

24.     Numerous articles in medical journals have discussed the dangers of too tight handcuffing.

25.     Killinger again pleaded with the security officers to tell Jager that he had not given anyone a hard time and to give him a little bit of a break please from the handcuffs. Jager said, "Unfortunately man, that's the process man, not one of those things I'm able to flex on." Killinger said, "I might have to go to the bathroom." Jager said, "That will have to wait until we get to jail." Killinger pleaded again, "Can you loosen them a little please?" Jager refused. (Exh. 1, Killinger

Decl. ¶33)

26.    Killinger was put in Jager's police vehicle with his hands cuffed behind his back. (Exh. 1, Killinger Decl. ¶36).

27.    Killinger asked numerous times while in the police vehicle for a break with the handcuffs because they were causing him serious pain. Jager said, "Unfortunately, I can't. You seem like a stand-up guy, terrible case of mistaken identity, but end of the day, you're being cool, I'm going to be cool, there's an obligation to enforce that trespass, it's really a crappy situation." (Exh. 1, Killinger Decl. ¶38).

28.    Jager and Killinger arrived at the jail at approximately 6:20 a.m. Jager yelled out to jail staff, "He's cooperative." Killinger was put in a holding room. He asked Jager repeatedly when the handcuffs would come off. He said, "I can't stand these goddamned cuffs." Killinger was desperate to get the cuffs off or loosened. He pleaded with Jager, "Can they take the goddamned cuffs off when I'm in the holding room?" Jager told said, "Unfortunately, no, if all goes well you should be out of the cuffs in the next eight to ten minutes." Killinger asked Jager if he would "Promise" the cuffs would be off. Jager refused to promise. (Exh. 1, Killinger Decl. ¶41).

29.    Killinger kept on pleading, "Please take them off. Can you put in a good word for me? I need to get these goddamned cuffs off." Jager opened the door to a small holding cell saying, "Go through this door that's where you'll get the cuffs off."  Killinger said, "Thank God. All because some asshole was sleeping in the casino, it's not me!" "I just want these cuffs off!" The cuffs were still not taken off. (Exh. 1, Killinger Decl. ¶42).

30.    Killinger remained in handcuffs while in the holding cel. When he was taken out of the holding cell he was taken to a large room with multiple jail officers, still in handcuffs. After remaining in the large room for a while, Killinger was led out of the large room, again, still in

handcuffs. Killinger remained in handcuffs an additional twenty minutes after arriving at the jail. As Killinger was led out of the large room, he heard Jager shout, "Best of luck man." (Exh. 1, Killinger Decl. ¶43)

31.     Killinger was in handcuffs approximately four hours. He was first placed in handcuffs at approximately 3:00 a.m. at the Peppermill. He remained in handcuffs at the Peppermill security office until Jager arrived at approximately 4:45 to 5:00 a.m., thus making his time in handcuffs at the Peppermill before Jager arrived one hour and forty-five minutes to two hours. From the time Jager arrived at the Peppermill until he was taken to the jail was another one hour and twenty minutes, thus making the time he was in handcuffs three hours and twenty minutes. He remained in handcuffs an addition twenty minutes after being led away from Jager at the jail, thus making his total time in handcuffs just under four hours. (Exh. 1, Killinger Decl. ¶44, Footnote 1).

32.     Despite Killinger's repeated pleas for a break for the handcuff pain, Jager never mentioned Killinger's handcuff pain to anyone at the jail. (Exh. 1, Killinger Decl. ¶45)

33.     Killinger was positively identified as Jason Killinger at the jail. He was released on his own recognizance from the jail at approximately 4:10 pm on September 17, 2023. He was in custody with Jager for approximately one hour and twenty minutes and in custody at the jail for an additional nine and one-half hours for a total incarceration of **eleven hours**. He was in excruciating pain in his shoulders and wrists. (Exh. 1, Killinger Decl. ¶48)

34.     The next day, September 18, 2023, Killinger went to Renown Urgent Care Vista at 910 Vista Blvd., Sparks, NV to have a doctor examine his wrists and shoulders. He was seen by Brion R. Hill, M.D. who diagnosed a strain of both the right and left shoulder, and contusions (bruising) on both wrists. The doctor prescribed Motrin 200 MG every six hours as needed. Ice and nsaid as needed. Dr. Hill noted: "Onset 4 a.m. yesterday handcuffed behind his back for four hours.

He was arrested due to mistaken identify. Bilateral wrist pain 7/10 severity. Left wrist is worse. Bilateral should pain 7/10 severity. Right shoulder is worse. No prior injury or surgery." (Exh. 1, Killinger Decl. ¶49). He learned that other than icing his wrists and taking over the counter pain medication there was not much he could do.

35.    Dr. Hill noted: "**Right shoulder**: diffusely tender without deformity. Pain reproduced abduction and internal resistance. **Left shoulder**: no point bony tenderness or deformity. Pain reproduced with abduction (movement) against resistance. **Left wrist**: soft tissue swelling. Ecchymosis dorsal aspect (the medical term for a bruise, which is a discoloration of the skin caused by blood leaking from ruptured blood vessels under the skin). Range of motion intact. Pain reproduced with movement in all planes. Distal neuro/vascular intact. **Right wrist:** soft tissue swelling. Range of motion intact. Pain reproduced with movement in all planes. Distal neuro/vascular intact." (Exh. 1, Killinger Decl. ¶50)

36.    Killinger's  wrist pain subsided after a few days but it took two weeks or longer for the bruising to dissipate. The shoulder pain lasted for about **three months**, causing pain and difficulty for Killinger when driving. He is still experiencing residual pain. He experiences left shoulder "popping" when he rotates his arm. He now take aspirin on a regular basis for the occasional shoulder pain. (Exh. 1, Killinger Decl. ¶51).

37.    Killinger is a long-term commercial "feeder" truck driver for UPS, driving double and triple trailers on long hauls. His job requires him to lift items 51-80 pounds and push/pull items

one hundred pounds or more while working up to 10 hours per day five days per week often with required overtime. As a relief driver and sometimes he must work back to back shifts, whatever the company wants him to do. (Exh. 3, Killinger Suppl. Decl. ¶ 2)

38.    Killinger is also required to sit up to 10 hours per day as well as bend, stoop, crouch, walk, turn/pivot intermittently throughout the day, particularly when he is setting up the truck, inspecting the truck, ensuring the packages are loaded correctly, and hooking up the trailers.  (Exh. 3, Killinger Suppl. Decl. ¶ 3)

39.    Killinger is required to lift the hood of his truck at least once each day and generally more often. The hood weighs well over 350 pounds. While there are springs and shocks put into the hoods, what he must lift is between 35-50 pounds and the extreme weight and mass of the hood puts tension on his wrists and it can feel like "needles" in between the hand and forearm. It also triggers a strong burning sensation. Before this incident with Officer Jager, he had never had difficulty opening the hood of a truck. (Exh. 3, Killinger Suppl. Decl. ¶ 4)

40.    There are landing gears on every trailer that Killinger hooks and unhooks.  He is required to move a bar to raise or lower the land gears and it requires effort. Rolling the landing gear up or down caused pain in his shoulders and wrists—a burning sensation in his shoulder and

the pain of needles and pins in his wrist joints. (Exh. 3, Killinger Suppl. Decl. ¶ 5)



41.     Killinger must use dollys. A dolly is a piece of equipment that goes in between any two trailers. A dolly's registered weight is 2,880 pounds with the tongue weighing 80 pounds. It is counterweighted as it must be handled by hand. He is required to move the dolly anywhere from a few inches up to 50 feet. He experienced sharp pain in his shoulders going all the way to his ears, like a cluster of needles shooting up his shoulders and pain in his wrists, like "bone on bone," a cutting pain in both wrist joints. Before the incident with Officer Jager, he did not have this pain when using the dollys. (Exh. 3, Killinger Suppl. Decl. ¶ 6)



42.    The weight of UPS trailer doors is about 500 pounds. The doors have springs and a cable system to reduce the weight of the doors, bringing it down to the 50-80 range. To close the door, Killinger is required to pull down on a strap that is connected to the bottom of the door. This caused him great pain in his shoulders and wrists. Opening the door required flipping the latch up, but when there are upwards of 2,600 parcels in the trailer pushing up against the door it is quite difficult. The flipping of the latch irritated his wrists, and the pushing up the door caused great pain in his shoulders, a burning fiery pain with needle sharp pain shooting up towards his ears and down into his upper back. Prior to this incident with Officer Jager, Killinger did not have these pains when opening the doors. (Exh. 3, Killinger Suppl. Decl. ¶ 7)



43.    Killinger is required to chain up his truck during snow. One single tire chain weighs approximately 30 pounds. He must sometimes hang up to 10 separate sets of chains. This requires squatting, lifting multiple sets of chains, dragging the chains in snow and hooking the chains around

each tire. All of these activities caused him pain in his wrist, pain from his wrist up to his forearms, from his shoulder to under his ears, down his back, burning pains in his shoulders, needle like pain from his shoulders to his ears and sharp cutting pains in his wrists up to his forearms. Prior to this incident with Officer Jager, he had never experienced such pain in chaining up tires in snow. (Exh. 3, Killinger Suppl. Decl. ¶ 8)



44.    After the handcuffing Killinger also experienced pain with ordinary daily activities, washing his hair, opening the car door, and talking on a cell phone when placed against his ear, even when carrying a gallon of milk. (Exh. 3, Killinger Suppl. Decl. ¶ 9).

45.    A written use of force report is required by RPD officers following any use of force that results in an apparent or claimed injury. (Exh. 9, General Order No: P-400-05, page2-3)

## IV.    NON-DISPUTED FACTS FROM BWC CONFIRM KILLINGER'S NUMEROUS COMPLAINTS OF PAIN

At the time Jager arrived at the Peppermill, Killinger had already been in handcuffs for nearly two hours. He was handcuffed on the casino floor and taken to the Peppermill security office where he remained in handcuffs while harangued by security officers who insisted he admit to being Michael Ellis. Killinger was not Michael Ellis and refused to admit that he was. (Exh. 1, Killinger

Decl., ¶ 11).

Killinger was in pain from the handcuffs at the time Jager arrived at the Peppermill. Killinger was thrilled to see Jager. The first words out of Killinger's mouth when Jager walked into the Peppermill office was: "Thank God you're here!" (Exh. 4, BWC, 05:48:38). Killinger believed he was in a Kafkaesque "crazy land" with Peppermill security insisting he admit to being Michael Ellis when he was not. He reasonably believed a legitimate police officer would straighten out this mess. His second words to Jager, uttered seconds later, were: "Can you please get me out of these cuffs now please?" (Exh. 4, BWC,  05:48:38). The follow exchanges were recorded on Jager's BWC and establish the multiple times Killinger complained of pain from the handcuffs. At no time did Jager show the slightest interested in Killinger's pain. When Killinger complained of his pain, Jager either made dismissive remarks such as "One minute pal" or ignored him. At no time did he inquire of Peppermill security how long Killinger had remained in handcuffs or expressed even the most minimal human concern for Killinger's plight.

### While At the Peppermill in the Security Office:

1.  "Can you please get me out of these cuffs now? Please? Can you please get me out of these cuffs for a minute?" (Exh. 4, BWC 05:49:12) (Jager: No response)

2.  "Can you please get me out of these cuffs?" (Exh. 4, BWC 05:49:47) (Jager: "One second pal.")

3.  "My shoulders are killing me." (Exh. 4, BWC 05:50:54) (Jager: "You're going to sit there for a minute.") (Exh. 4, BWC 05:52:24) (Jager: "One second, you still keep bugging me").

4.  "I need a break my shoulder is killing me." (Exh. 4, BWC 05:52:39) (Jager: No response).

5.  "Can I please have a break, com'on," (Exh. 4, BWC 05:53:15) (Jager: no response). cuff"

6.  "Can I get a little bit of a break while you got them off please?" (Exh. 4, BWC 06:21:09) (Jager is putting his handcuffs on Killinger and taking off the handcuffs

16

belonging to the Peppermill and says, "Unfortunately not, sorry pal.")

7. Killinger, speaking to Peppermill security, "Can you tell this guy that I didn't give you a hard time and to give me a little bit of a break for a minute please?" (Exh. 4, BWC 06:21:36) "Unfortunately man, that's the process man, it's not one of the things I am able to flex on."

8. "I might have to go to the bathroom." (Exh. 4, BWC 06:21:50) (Jager: "That'll have to wait till we get to the jail.")

9. "Can you loosen them a little, please?" (Exh. 4, BWC 06:21:59) (Jager: "That's legitimately as loose as they get man).

**While driving on route to the jail:**

10. "My arm is killing me." (Exh. 4, 06:34:210). (Jager: No response).

11. Killinger asks about "a break." (Exh. 4, BWC 06:36:18) (Jager: "Unfortunately I can't.")

12. "I just want to get a break out of these cuffs." (Exh. 4, BWC 06:36:56) (Jager: No response).

13. "Can you put in a good word for me?

**When arriving at the jail:**

14. "I can't fucking stand these god damned cuffs." (Exh. 4, BWC 06:50:58)

15. "Can they take the goddamned cuffs off when I'm in the holding room please." (Exh. 4, BWC 06:53:00) (Jager: "Unfortunately, they won't, but if all goes well you should be out of those cuffs in the next 8-10 minutes.")

16. "Promise?" (Exh. 4, BWC 06:52:11) (Jager, "I can't promise but not more than 5.")

17. "I'm not going to do anything, just please take them off." (Exh. 4, BWC 6:52:20) (Jager: Once we get in here it's not on me to take them off it's on those guys)

18. "Can you put in a good word for me?" (Exh. 4, BWC 6:52:25) (Jager, "Yeah.")

19. "Can you please take the god damned cuffs off" (Exh. 4 BWC 06:55:18) (Killinger says to deputy with Jager standing there)

20. Jager puts Killinger in a holding cell, Killinger asks, "I have to be in there by myself?" (Jager: you're going to be in there 2-3 minutes) (Exh. 4, BWC 06:57: 31).

1

Killinger: "Now you aren't fucking lying to me because I haven't given you no shit."
(Jager: "No, scout's honor.") "Promise?" (Jager: "2-3 minutes.")

2

3

**When Killinger is taken into a larger room at the jail**

4

21. "I just want these cuffs off." (Exh. 4, BWC 07:05:06). Killinger is searched,
handcuffs remain on.

5

6

22. Killinger is lead out of the larger jail room, still in handcuffs.

7

23. Jager never mentioned to any jail staff Killinger's numerous complaints about pain
from the handcuffs. (Exh. 4, BWC 07:07:55). After arriving at the jail

8

9

**ARGUMENT**

10

**I.    IT IS WELL ESTABLISHED THAT PAINFUL HANDCUFFING MAY
CONSTITUTE  EXCESSIVE FORCE**

11

12

It is well-established that overly tight handcuffing can constitute excessive force. See

13

*Hansen v. Black*, 885 F.2d 642, 645 (9th Cir. 1989); *Wall v. County of Orange,* 364 F.3d 1107, 1112

14

(9th Cir. 2004); *LaLonde v. County of Riverside,* 204 F.3d 947, 960 (9th Cir. 2000); *Arias v. Amador,*

15

61 F.Supp.3d 960, 976 (2014), *Thompson v. Lake*, 607 F. App'x 624, 625-26 (9th Cir. 2015);

16

*Howard v. Kansas City Police Dep't,* 570 F.3d 984, 990 (8th Cir. 2009). "The mere fact that

17

handcuffing an arrestee is standard practice everywhere, has no bearing on whether an arrestee's

18

handcuffs are excessively tight." *LaLonde* at 964.

19

20

At the time of the search, July 10, 1998, it was not clearly established in this circuit
(or in any other circuit) that simply handcuffing a person and detaining her in
handcuffs during a search for evidence would violate her Fourth Amendment rights.
**Our decision today makes it clear that such conduct, absent justifiable
circumstances, will result in a Fourth Amendment violation.** *Meredith v. Erath,*
342 f.3d 1057, 1063 (9th Cir. 2003) (Emphasis added)

21

22

23

24

Under the Fourth Amendment, a police officer may use only such force as is "objectively

25

reasonable" under all of the circumstances. *Lombardo v. City of St. Louis*, 594 U.S. 464, 467

26

(2021), *County of Los Angeles v. Mendez*, 581 U.S. 420, 428 (2017), *Scott v. Harris*, 550 U.S. 372,

27

28

381-85 (2007), at 397, and *Tennessee v. Garner*, 471 U.S. 1, 7-12 (1985). The objective reasonableness of the conduct is assessed by balancing the nature and quality of the intrusion on the individual's Fourth Amendment rights against the government's countervailing interest in the force used. *Estate of Aguirre v. County of Riverside*, 29 F.4th 624, 628 (9th Cir. 2022) (quoting *Graham*, 490 U.S. at 396); see *Mendez*, 581 U.S. at 427. Intentionally causing pain, when on notice of the pain, is not objectively reasonable—especially to an arrestee accused of an extremely minimal crime.

In assessing "whether an officer's actions were objectively reasonable, the Ninth Circuit considers: "(1) the amount of force inflicted, (2) the government's interest in the use of force, and (3) the balance between the gravity of the intrusion on the individual and the government's need for that intrusion" *Williamson v. City of Nat'l City*, 23 F.4th 1146, 1151 (9th Cir. 2022) (quoting *Rice v. Morehouse,* 989 F.3d 1112, 1121 (9th Cir. 2021). "Our analysis must make 'allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.'" *Williamson*, 23 F.4th at 1151. "The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396; *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015). An officer's subjective intent or motivation is not relevant to the reasonableness inquiry. *Graham,* 490 at 397; *Singh v. City of Phoenix*, 124 F.4th 746, 751-754.

II.      **THE GRAHAM FACTORS STRONGLY TILT TOWARD KILLINGER**

*Graham* established three non-exclusive factors to utilize in assessing the government's interest in the use of force. The three *Graham* factors are: (1) the severity of the crime at issue; (2) whether the individual posed an immediate threat to the safety of the officers or others; and (3)

whether the individual was actively resisting arrest or attempting to evade arrest by flight. *Graham*, 490 U.S. at 396. The Ninth Circuit has repeatedly emphasized that "the most important Graham factor" is whether the individual posed an immediate threat to the safety of the officers or others." *Bernal v. Sacramento Cnty. sheriff's Dep't*, 73 F.4th 678, 692 (9th Cir. 2023).

A. <u>Severity of the Crime</u>

1. <u>A Gigantic Fiasco</u>

Killinger was accused of trespassing because he looked like Michael Ellis, a man trespassed by the Peppermill when found "sleeping" in the casino nearly six months earlier. (Exh. 5). Killinger was a completely innocent person. He had no affiliation, connection, or relationship to Michael Ellis.

Killinger was an excellent customer of the Peppermill, regularly playing and regularly receiving meals and free dollars to spend at the casino. (Exh. 1, Killinger Decl., ¶ 5). That very evening, hours before his seizure by Peppermill security, Killinger had spent several hours playing craps on the casino floor. (Exh. 1, Killinger Decl., ¶ 5). He was not sleeping like Michael Ellis had been sleeping; he was rolling dice and betting hundreds of dollars. He should never have been hassled, handcuffed, or detained by the Peppermill's Junior GI security force.

While the Peppermill claimed their A.I. facial recognition software matched Killinger to Ellis, once Killinger provided his name and Nevada Real ID, security should have immediately reviewed Killinger's, gambling records, all documented by his player's card, and found that Killinger was a real person with a substantial playing history. Or, in the alternative, the Peppermill should have requested to review Killinger's other forms of identification.

Facial recognition software is a tool, just a tool, and before an arrest or a seizure can be made exclusively based on facial recognition software any reasonable police officer should know to

corroborate it. Especially when Killinger had boatloads of identification on his person and in his vehicle. All of his identification was in his name and his name alone.[2] (Exh. 6, Identification). Killinger had no identification in the name of Michael Ellis or anyone else. Killinger's treatment by the Peppermill and his arrest by Jager was a gigantic fiasco from start to finish.

### 2.  A Very Minor Crime

The crime of trespassing is considered a very minor crime in the Ninth Circuit. *Tsao v. Desert Palace Inc.,* 698 F.3d 1128, 1133 (9th Cir. 2012); *Santiago v. Streeval,* 36 F.4th 700, 710 (7th Cir. 2022). It does not involve violence, threats of violence, fraud, or theft. The *Graham* factor of "severity of the crime" strongly tilts in Killinger's favor.

### B.  Threat to Officer

### 1.  Killinger Was Never A Safety Threat to Jager

Killinger at no time threatened Officer Jager. He did not bully him, harm him, or threaten to harm him. He did not assume a fighting stance or a violent position. Killinger's first words to Jager when Jager arrived at the Peppermill were, "Thank God you're here." (Exh. 4, BWC 05:48:38). Killinger was joyous to see Jager. He knew he was not Ellis and expected Jager to quickly determine he was not Ellis. Killinger reasonably believed he could explain to Jager that he was wrongfully held, unlawfully handcuffed, and illegally detained. Killinger believed any reasonable police officer would listen to him, look at his identification, take steps to corroborate his innocence and release him. The ultimate goal of any criminal investigation is the successful prosecution of the

---

[2]  Killinger had the following documents on his person or in his nearby vehicle, all in the name of Jason Killinger, all at the time of his arrest: (1) Real Nevada Driver's licenses; (2) U.S. Department of Transportation Medical Examiner's Certificate; (3) DMV Registration; (4) Nevada Insurance Identification Card; (4) Debit visa card; (5) Paystub from his employer UPS; (6) a UPS Air Recovery ID card; (5) Anthem Blue Cross card; (6) Northern California General Teamsters Health Card; (7) Teachers Identification Card; (8) Player's card for the Nugget; (9) Player's card for Terrible's at Fernley; (10) Players card for Peppermill; (11) Player's card for Best Bet Club; (12) Player's card for Caesars; (11) Player's card for J's Resort; (12) Player's card for Bonanza; (13) Player's card for Legends Bay Casino; (14) Player's card for Penn Play; (15) Player's card for Monarch Rewards; and  (16) Player's card for Boyd . (See Exh. 6)

guilty and the exoneration of the innocent. That was Jager's duty. Jager was not to be a kneeling supplicant to what he termed the Peppermill's "fancy" A.I. facial recognition software. Jager was not indebted to the Peppermill, he was not on the Peppermill's payroll. Jager had a legal duty and responsibility to conduct a reasonable investigation. At bare minimum, Jager had the duty to inquire into what other forms of identification Killinger had.

### 2.  Jager Never Considered Killinger a Threat to His Safety

Jager called Killinger "cool" and a "stand-up guy." Jager said, "You seem like a **stand-up guy**, [this may be]  a terrible case of mistaken identity, but the end of the day, **you're being cool**." (Exh. 4, BWC 06:39:54). When Jager arrived with Killinger at the jail, one of the first things he shouted out to the jailors about Killinger, "**He's cooperative**!"

The factor of "threat to officer" was nonexistent and  strongly clearly mediates in Killinger's favor. (Exh. 4, BWC 06:47:28).   If Jager considered Killinger a "stand-up guy," "cool," and "cooperative" Killinger could not remotely be considered a "threat" to Jager's safety. The *Graham* factor of "treat to officer" strongly tilts in Killinger's favor.

### C.  Actively Resisting

Peppermill security approached Killinger in the casino, accused him of being Michael Ellis, handcuffed him and took him to their security office. At no time did he try to evade Peppermill staff or flee. Killinger never tried to evade or flee from Jager. The factor of "actively resisting" is nonexistent.

## III.    THE KINGSLEY FACTORS STRONGLY SUPPORT KILLINGER

### A.  Jager's Lack of Basic Competence Caused Killinger Harm

In *Kingsley*, the Supreme Court listed several additional factors relevant to an excessive force inquiry. *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015). The *Kingsley* factors delve more

deeply into the danger to an officer from various perspectives and the need for force. The *Kingsley* factors are: (1) The relationship between the need for the use of force and the amount of force used; (2) The extent of the plaintiff's injury; (3) Any effort made by the officer to temper or to limit the amount of the force; (4) The severity of the security problem at issue; (5) The threat reasonably perceived by the officer; (6) and whether the plaintiff was actively resisting. *Kingsley,* 576 U.S. at 397.

**B.  Jager's Excessive Force Was Completely Unnecessary**

Here, there was no need for force whatsoever. There was no need for continuous hours long handcuffing when Killinger made clear he was in agony from the handcuffs. The alleged crime was exceedingly minor and Killinger had sufficient sources of identification to establish his identity. But Jager was so completely mesmerized by the Peppermill's A.I. facial recognition software, which he plainly knew nothing about, that he lost all sense of reason. Reasonable jurors would be frightened to think facial recognition software, known to be inaccurate, could impress a police officer so strongly that he or she could abandon reason altogether, refuse to look at their proof of identity, refuse to investigate, and merrily cart them off to jail.

The Ninth Circuit has made clear for decades that police officers are not to cavalierly, without corroboration, accept the word of accusers. In *v. MG Jewelry*, 950 F.2d 1427, 1444 (9th Cir. 1991), the court held:

> We decline to adopt Appellees' argument that merely because citizen witnesses are presumptively reliable, the officers in this situation had no duty to examine further the basis of the witness' knowledge or talk with any other witnesses. We agree with the California Supreme Court that the general proposition that private citizen witnesses or crime victims are presumed reliable does not "dispense with the requirement that the informant ... furnish underlying facts sufficiently detailed to cause a reasonable person to believe a crime had been committed and the named suspect was the perpetrator.

See also, *Arpin v. Santa Clara Valley Transp. Agency,* 261 F.3d 912, 925 (9th Cir. 2001)

Here, the crime was minor, there was no officer safety threat, no domestic violence, no exigent circumstances, no threat to the public, no urgency, and no effort by Killinger to flee. It was a "citable" offense. Jager knew Killinger had no criminal record. There was absolutely no reason Jager could not have loosened Killinger's handcuffs as any humane officer would have done. Jager had all the time in the universe to loosen Killinger's handcuffs cuffs once on notice by Killinger, repeatedly, of the pain they were causing. Jager could have taken off Killinger's handcuffs while Killinger sat in the Peppermill security office. Jager could have given Killinger a break from the handcuff pain when he  went outside the security office to conduct a wants and warrants check from his police vehicle. Jager could have loosened the handcuffs when he took off the Peppermill's handcuffs to put on his own RPD handcuffs. Jager could have removed the handcuffs altogether before driving off to the jail.

The crime of trespassing, of looking like someone who had once been found sleeping on the casino premises was a citable offense. Jager confirmed this, admitting that if Killinger had simply admitted to being Michael Ellis he would not have been arrested but merely cited:

> So right now, because I can't identify you, it's weird, because it essentially looks like you have two names, I don't know man, so I can't identify you and unfortunately that means that they can't cite you, and you're going to be arrested. (Exh. 4, BWC 06:14:45)

Killinger was arrested solely because Jager refused to investigate who Killinger was, refused to look at Killinger's numerous forms of identification, and refused to make a reasonable judgment.

## IV.    JAGER HAD OPTIONS

All police officers are trained to know that too tight handcuffs can cause pain and physical damage. All police officers are trained to use only the force that reasonably appears necessary to effectively bring an incident under control. "The is the amount of effort required by police to compel compliance from a person." (Exh. 9, Use of Force General Order P-400-05, page 1). Any

reasonable officer acting in good faith would have done the following:

- Inquired of Peppermill security how long Killinger had been in handcuffs;

- Immediately on being told that Killinger had been in handcuffs well over one hour for an extremely minor crime had Killinger's handcuffs removed. Killinger could have remained in the Peppermill office and had time to flex his wrist, and soothe his painful shoulders while Jager investigated;

- Opted to cite and release Killinger and told him he would be investigated to determine his identity. According to Reno Police General  P-280-17 a person is eligible for citation release if they present satisfactory proof of identity such as DMV records to establish their identity. (Exh. 8, RPD general Order P-280-17, p. 1). Here, Jager would not even permit Killinger to provide him with his abundant proof of identity, the multitude of documents Killinger had in his possession with his name on each and every document. (Exh. 6).

- Opted to release Killinger, saying, "We are not sure who you are, it is a minor crime, I have discretion to allow you to go home, I am going to investigate, and if I determine you are Michael Ellis, I will come to your home for additional questioning or arrest;

- When going outside to his vehicle to check on whether Killinger or Ellis had a criminal record, Jager could have opted to have the Peppermill give Killinger a break from the handcuffs. The Peppermill had 2-3 security officers in their office. Killinger was polite, cooperative, and suspected of a most.

- After confirming that Killinger was going to be arrested, instead of taking off the Peppermill handcuffs and immediately putting on his own RPD handcuffs, he could have given Killinger an opportunity to have a break from the painful cuffs. But instead Jager took off the Peppermill cuffs and **immediately** put on his RPD cuffs, giving no break whatsoever to Killinger;

- After arriving at the jail, Jager could have immediately told jail staff that Killinger had been in painful cuffs for hours and immediately requested his cuffs be removed as soon as possible. Instead, despite being on notice that Killinger was in pain and misery, Jager said nothing to jail staff about the need to remove the cuffs as soon as possible;

- Demanded proof of the reliability of the Peppermill's A.I. facial recognition software, what type of A.I. software it was, what evidence existed that it was reliable, what percentage of false positives had been recorded, and how often it was serviced.

V.    **JAGER FAILED TO WRITE A USE OF FORCE REPORT AS REQUIRED**

25

RPD's General Order on Use of Force requires that any written use of force report is required following any use of force that results in an apparent or claimed injury. (Exh. 9, P-400-05, pages 2-3). Killinger complained of injury to his wrists and shoulders repeatedly. Jager intentionally failed to write a use of force report which would have properly given his superiors an opportunity to evaluate his conduct.

## VI.    KILLINGER'S PAIN WAS MADE WORSE BY THE PHYSICALLY ARDUOUS JOB THAT HE HAS

Killinger's job is a difficult, dangerous, highly skilled job for which he is very well paid. He drives double and triple UPS trailers through all kinds of roads in all kinds of conditions. His job requires him to lift items 51-80 pounds and push/pull items one hundred pounds or more while working up to 10 hours per day five days per week often with required overtime. As a UPS relief driver, he must often work back to back shifts, whatever the company wants him to do. (Exh. 3, Killinger Suppl. Decl. ¶ 2). He is also required to sit up to 10 hours per day as well as bend, stoop, crouch, squat, walk, turn/pivot intermittently throughout the day, particularly when he is setting up the truck, inspecting the truck, ensuring the packages are loaded correctly, and hooking up the trailers.  (Exh. 3, Killinger Suppl. Decl. ¶ 3)

Killinger's medical records, confirm Killinger was bruised and had tenderness in his wrists and shoulders. (Exh. 7). Dr. Hill noted: "Onset 4 a.m. yesterday handcuffed behind his back for four hours. He was arrested due to mistaken identify. Bilateral wrist pain 7/10 severity. Left wrist is worse. Bilateral should pain 7/10 severity. Right shoulder is worse. No prior injury or surgery." Dr. Hill noted: "**Right shoulder**: diffusely tender without deformity. Pain reproduced abduction and internal resistance. **Left shoulder**: no point bony tenderness or deformity. Pain reproduced with abduction (movement) against resistance. **Left wrist**: soft tissue swelling. Ecchymosis dorsal aspect (the medical term for a bruise, which is a discoloration of the skin caused by blood leaking from

ruptured blood vessels under the skin). Range of motion intact. Pain reproduced with movement in all planes. Distal neuro/vascular intact. **Right wrist:** soft tissue swelling. Range of motion intact. Pain reproduced with movement in all planes. Distal neuro/vascular intact." (See Exh. 7, pages 6-7).

Lifting the heavy hood of his truck caused Killinger to feel needle like pain between his hand and forearm. Before this incident with Officer Jager, he had never had difficulty opening the hood of a truck. (Exh. 3, Killinger Suppl. Decl. ¶ 4). Raising and lowering a bar between the landing gears and rolling the landing gear up or down caused pain in his shoulders and wrists—a burning sensation in accompanied by needle pain in his joints. (Exh. 3, Killinger Suppl. Decl. ¶ 5). Using the heavy dollys with a tongue weighing 80 pounds caused Killinger to experience sharp pain in his shoulders going all the way to his ears, like a cluster of needles shooting up his shoulders and pain in his wrists, like "bone on bone," a cutting pain in both wrist joints. Before the incident with Officer Jager, he did not have this pain when using the dollys. (Exh. 3, Killinger Suppl. Decl. ¶ 6)

Opening and closing the heavy UPS trailer doors required Killinger to pull down on a strap that is connected to the bottom of the door. This caused him great pain in his shoulders and wrists. Opening the door required flipping the latch up, but when there are upwards of 2,600 parcels in the trailer pushing up against the door it is quite difficult. The flipping of the latch irritated his wrists, and the pushing up the door caused great pain in his shoulders, a burning fiery pain with needle sharp pain shooting up towards his ears and down into his upper back. Prior to this incident with Officer Jager, Killinger did not have these pains when opening the doors. (Exh. 3, Killinger Suppl. Decl. ¶ 7).

Killinger is required to chain up his truck during snow. One single tire chain weighs approximately 30 pounds. He must sometimes hang up to 10 separate sets of chains. This requires squatting, lifting multiple sets of chains, dragging the chains in snow and hooking the chains around

each tire. All of these activities caused him pain in his wrist, pain from his wrist up to his forearms, from his shoulder to under his ears, down his back, burning pains in his shoulders, needle like pain from his shoulders to his ears and sharp cutting pains in his wrists up to his forearms. Prior to this incident with Officer Jager, he had never experienced such pain in chaining up tires in snow. (Exh. 3, Killinger Suppl. Decl. ¶ 8). After the handcuffing, Killinger also experienced pain with ordinary daily activities such  washing his hair, opening the car door, talking on a cell phone when up against his ear, even carrying a gallon of milk. (Exh. 3, Killinger Suppl. Decl. ¶ 9)

Killinger's acute wrist pain subsided after a few days but it took two weeks or longer for the bruising to dissipate. The shoulder pain lasted for about **three months**, causing pain and difficulty for Killinger when driving. He is still experiencing residual pain. He experiences left shoulder "popping" when he rotates his arm. He now take aspirin on a regular basis, at least two to three times a week for shoulder pain. (Exh. 1, Killinger Decl. ¶51).

## VII.    JAGER IS NOT ENTITLED TO QUALIFIED IMMUNITY.

State officials are entitled to qualified immunity from § 1983 claims unless they have violated a right protected under the U.S. Constitution that was clearly established at the time of the violation. *Saucier v. Katz,* 533 U.S. 194, 201 (2001). To be clearly established, the constitutional question confronted by the official must be "beyond debate." *Plumhoff v. Rickard,* 572 U.S. 765, 779 (2014). A case directly on point is not required in order for a right to be clearly established, but "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al–Kidd*, 563 U.S. 731, 741 (2011).

The law denying qualified immunity regarding handcuffs has been well-established for decades. The Ninth Circuit denied qualified immunity on an excessive force claim for too tight handcuffs and/or refusing to loosen handcuffs when on notice of handcuff pain in 1993. *Palmer v.*

28

*Sanderson,* 9 F.3d 1433, 1436 (9th Cir. 1993). In *Meredith v. Erath,* 342 F.3d 1057, 1061 (9th Cir. 2003), the court denied qualified immunity to an officer who had kept a suspect in handcuffs **for 30 minutes**. Of note, Killinger was kept in handcuffs for nearly **four hours.**

## VIII.   JAGER IS NOT ENTITLED TO STATE IMMUNITY

Nevada's good faith immunity will be denied because there is no good faith immunity under section 1983 for private parties who act under color of state law to deprive an individual of his or her constitutional rights. *Howerton v. Gabica*, 708 F.2d 380, 385 n.10 (9th Cir. 1983). Discretionary immunity pursuant to N.R.S. § 41.032 will be denied because Nevada law has determined that a state official's actions are not protected by discretionary immunity in excessive force cases. "Since the Nevada Supreme Court adopted this standard, 'federal courts applying Nevada law have been reluctant to grant discretionary immunity to police officers accused of using excessive force because an officer's decisions regarding the amount of force to use are not the kind of decisions the discretionary function exception was designed to shield.' Plus, acts that violate the Constitution are not discretionary." *Correa v. Las Vegas Metropolitan Police Department,* 2:16-cv-01852-JAD-NJK (March 2018), pages 4-5.

Finally, the "public duty doctrine" codified in N.R.S. §42.0336, shields public entities like fire departments, officers, or public ambulance services, from liability on the basis that such entities should not be inhibited by their good faith efforts to service the public, even when the outcome of their emergency treatment is less than desirable. *Porchia v. City of Las Vegas,* 504 P.3d 595, 518 (Nev. 2022). An exception to the doctrine exists when the conduct of the official affirmatively causes the harm. "An officer affirmatively causes harm within the meaning of N.R.S. §41.0336(2) when they 'actively create a situation which leads directly to the damaging result.'" *Coty v. Washoe Cnty.,* 839 P.2d 97, 98-99 (Nev. 1992). See also *Brizuela v. City of Sparks*, 3:19-cv-00692-MMD-

VPD, page 57 (August, 2022). Here, Killinger alleges that Jager affirmatively caused him physical harm by refusing to give him a break from the handcuffs when it was easily available to Jager to give him a break from the painful handcuffs, by putting on too tight handcuffs, by ignoring Killinger's pleas for relief from the handcuffs, and by failing to appreciate the known harm that can result when an arrestee is placed in handcuffs for nearly four hours.

## IX.    CONCLUSION

There is no genuine dispute of material fact in this excessive force claim. Accordingly, Plaintiff Killinger respectfully requests that summary judgment be granted in his favor on his excessive force claim and the matter be set as soon as practicable for a jury trial on damages.

DATED:  This 20th day of September 2025

/s/ Terri Keyser-Cooper
TERRI KEYSER-COOPER
*Attorney for Plaintiff Jason Killinger*

# **CERTIFICATE OF SERVICE**

I, Terri Keyser-Cooper, declare as follows:

On this date, I served a copy of the following documents on the parties as follows:

Plaintiff's MOTION FOR PARTIAL SUMMARY JUDGMENT RE EXCESSIVE FORCE

[ ]      BY FED EX.  By placing a true copy of the above-referenced document(s) with Fed Ex for delivery in a sealed envelope with postage prepaid to the addressee(s) listed below.

[ ]      BY FACSIMILE TRANSMISSION.  By transmitting a true copy of the document(s) by facsimile transmission

[ ]      BY HAND-DELIVERY.  By delivering a true copy enclosed in a sealed envelope to the address(es) shown below.

[x ]     BY ELECTRONIC SERVICE.  By electronically mailing a true copy of the document(s) to defendants at the following email addresses via the Court's electronic filing procedure:

KARL S. HALL
Reno City Attorney
ALICE K. HERBOLSHEIMER
Reno City Attorney's Office
P.O. Box 1900
Reno, NV 89505

DATED this 20th day of September 2025

                              __/s/ Terri Keyser-Cooper
                              TERRI KEYSER-COOPER
                              *Attorney for Plaintiff Jason Killinger*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28