1  KARL S. HALL
   Reno City Attorney
2  ALICE K. HERBOLSHEIMER
3  Deputy City Attorney
   Nevada State Bar No. 6389
4  Post Office Box 1900
   Reno, Nevada 89505
5  Tel: (775) 334-2050
6  Email: Herbolsheimera@reno.gov
   *Attorneys for Defendant Reno Police*
7  *Officer R. Jager*

8

9  UNITED STATES DISTRICT COURT

10  DISTRICT OF NEVADA

11

| | |
|---|---|
| 12  JASON KILLINGER, | CASE NO.: 3:25-cv-00388-MMD-CSD |
| 13              Plaintiff, | **OPPOSITION TO PLAINTIFF'S** |
| 14        vs. | **MOTION FOR PARTIAL** |
| | **SUMMARY JUDGMENT** |
| 15  RENO POLICE OFFICER R. JAGER, | |
| 16              Defendant. | |

17

18  Defendant, Reno Police Officer Richard Jager ("Officer Jager"), by and through his

19  attorneys, Reno City Attorney Karl S. Hall and Deputy City Attorney Alice K. Herbolsheimer,

20  hereby opposes Plaintiff's Motion for Partial Summary Judgment ("MPSJ" - ECF No. 7), filed on

21  August 12, 2025.

22  This Opposition is made and based upon Federal Rules of Civil Procedure ("FRCP") 56,

23  the attached Memorandum of Points and Authorities in support hereof, the attached declarations

24  and exhibits, and all of the records, papers and pleadings on file in the above-entitled action, as

25  well as such other evidence, oral or documentary, as may be accepted by the Court at oral

26  arguments on this motion.

27  / / /

28  / / /

DATED this  26th  day of September, 2025.

                            KARL S. HALL
                            Reno City Attorney

By: */s/ Alice K. Herbolsheimer*
     ALICE K. HERBOLSHEIMER
     Deputy City Attorney
     Nevada State Bar No. 6389
     Post Office Box 1900
     Reno, Nevada 89505

                *Attorneys for Defendant Officer Richard Jager*

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.  INTRODUCTION**

This was an unfortunate, but honest, case of mistaken identity, which Plaintiff is now attempting to distort into a fictional tale of a "lazy" cop who "lied" and "fabricated evidence" to frame an innocent man for no apparent reason whatsoever. Despite being 30 pages in length and citing to no less than 24 cases from various jurisdictions, a careful analysis of Plaintiff's MPSJ (including a thorough review of all 24 cases) reveals that ***not a single case*** cited by Plaintiff supports the unprecedented relief that Plaintiff is seeking at this early stage in litigation[1]—namely, entry of summary judgment in favor of a plaintiff in a civil rights action alleging claims of intentional misconduct against a police officer. More importantly, Plaintiff failed to cite a single case from any jurisdiction which held that it is a constitutional violation for a police officer to rely on AI facial recognition technology to identify a suspect or make an arrest.[2] The vast majority of the cases cited by Plaintiff merely held that the plaintiff's complaint was sufficiently pled to survive a motion to dismiss (which is subject to an entirely different legal standard than a motion for summary judgment), or that issues of fact precluded entry of summary judgment. Indeed, several of the cases cited by plaintiff actually held that ***the defendant was entitled to summary***

---

[1] Plaintiff's MPSJ was filed on August 12, 2025, a mere 13 days after the filing of Plaintiff's Complaint (on July 30, 2025), before Officer Jager had even had a chance to file an appearance and respond to the Complaint. No discovery occurred before the filing of Plaintiff's MPSJ.

[2] Defense counsel has researched this issue and has not been able to find any such authority.

1  *judgment* based on qualified immunity or other defenses,[3] thereby completely undermining
2  Plaintiff's requested relief.
3        Plaintiff's Complaint and MPSJ are based on nothing more than Plaintiff's gross and unfair
4  mischaracterization of the evidence. Plaintiff's Complaint and Motion contain incredible
5  allegations of malicious intent, bad faith, and deception, all of which Officer Jager vehemently
6  denies. The instant MPSJ is the epitome of a frivolous motion that should never have been filed
7  considering the obvious factual issues in dispute, the complete absence of any discovery, and the
8  burden of proof that Plaintiff must carry to prevail on his claims. Defendant Jager respectfully
9  requests that Plaintiff's MPSJ be denied in its entirety.

10  **II.    STATEMENT OF FACTS**

11        On September 17, 2023, at approximately 0546 hours,[4] Officer Jager responded to the
12  Peppermill Casino ("Peppermill") on the report of a repeat trespasser who had been taken into
13  custody by Peppermill Security as a citizen's arrest. *Exhibit 1 – Declaration of Richard Jager,* ¶
14  4. Upon arrival, he observed a male suspect ("John Doe") seated in the Peppermill security office
15  with his hands cuffed behind his back. *Exh. 1* at ¶ 5. Officer Jager did not know what time John
16  Doe was taken into custody or how long he had been in handcuffs. *Id.*

17        Officer Jager met with Peppermill Security, who informed Jager that John Doe's face was
18  detected by their surveillance facial recognition software matching a person who had previously
19  been barred from the Peppermill, with 100% confidence. *Exh. 1* at ¶ 6. Peppermill Security
20  informed Jager that the suspect was last trespassed on 03/26/2023, at which time, he identified
21  himself as Michael Phillip Ryan Ellis ("Ellis") by presenting a Nevada Driver's License with that
22  name. *Exh. 1* at ¶ 6; *Exhibit 2 – Peppermill Barring Notice dated 3/26/2023; Exhibit 3 – Ellis*
23  *Driver's License.*

24        When John Doe was detained by Peppermill Security on September 17, 2023, however, he

---

[3] Defendant Jager intends to file a Motion for Summary Judgment at the appropriate time, after Plaintiff has had a full and fair opportunity to conduct relevant discovery to support of his claims in accordance with the Federal Rules of Civil Procedure.

[4] Plaintiff's Complaint erroneously alleges that Jager arrived at the Peppermill at approximately 4:00 to 4:30 a.m. *Complaint* at ¶ 31. The body cam footage clearly shows Jager arriving at 05:46.

1  identified himself as Jason James Killinger ("Killinger") and presented a Nevada Commercial
2  Driver's License with that name. *Exh. 1* at ¶ 7; *Exhibit 4 – Killinger Driver's License.* John Doe
3  stated that he had never been barred from the Peppermill, and he had no idea who Michael Ellis
4  is. *Exh. 1* at ¶ 7.

5        Officer Jager looked at John Doe's face and compared it to the photo on Killinger's driver's
6  license, as well as the photo on Ellis' driver's license. Jager honestly thought they all looked like
7  the same person, except that the photo on Killinger's driver's license shows a man with a goatee.
8  *Exh. 1* at ¶ 8; *Exhibit 5 - Photo of John Doe taken on 9/17/2023; Body Cam Video* at 06:07:00 –
9  06:07:10, 06:11:50 – 06:12:18, 07:05:47, 07:06:37, 07:07:36. [5]

  

18        There was a vertical tape measure on the wall of Peppermill's security office. When Jager
19  and Peppermill Security stood John Doe up against the tape measure to determine his height, John
20  Doe measured at somewhere between 5'9" and 5'10", which was a closer match to Ellis' driver's
21  license (indicating a height of 5'9") than to Killinger's driver's license (indicating a height of
22  6'1"). *Exh. 1* at ¶ 9; *Body Cam Video* at 06:19:55 – 06:20:25. Jager conducted a routine wants and
23  warrants check on both Ellis and Killinger, which was negative, and neither Ellis nor Killinger had
24  any prior arrest history that would offer additional information to assist in positive identification.
25  *Exh. 1* at ¶ 10.

---

[5] Officer Jager's Body Cam Video was manually filed by Plaintiff as Exhibit 1 to Plaintiff's MPSJ. To avoid duplication of exhibits, Defendant Jager will simply refer to the Body Cam Video submitted by Plaintiff by noting the relevant time stamp.

1  In the years prior to September 17, 2023, Jager had responded to numerous trespass calls from the Peppermill, ranging anywhere from two to six calls per week. *Exh. 1* at ¶ 11. It was a very common occurrence, and in most of those instances, the suspect would claim they were *not* the person identified by Peppermill's facial recognition software. *Exh. 1* at ¶ 11. Jager's understanding of Peppermill's procedure is that when a person is barred from the casino, the Peppermill would take a photograph of that person and scan it into their AI software at the time the barring notice is issued. *Exh. 1* at ¶ 12. Accordingly, the photo taken by the Peppermill and scanned into their software may be more current than what appears on a person's driver's license. *Exh. 1* at ¶ 12. For this reason, Jager believed that the photograph of the suspect in Peppermill's AI software may be more reliable than the photograph on the driver's license, which could be many years out of date. *Exh. 1* at ¶ 12.

Prior to September 17, 2023, Jager had never encountered or even heard of a situation where Peppermill's facial recognition software turned out to be wrong (despite suspects always claiming they got the wrong person). *Exh. 1* at ¶ 13. Indeed, Peppermill's facial recognition software was believed to be so reliable that RPD would, at times, request Peppermill's assistance in locating criminal suspects. *Id.* RPD would provide Peppermill with photos of suspects to input into their AI software and ask the Peppermill to contact RPD if a suspect is spotted in the casino. *Exh. 1* at ¶ 13. Based on Jager's prior experience and knowledge of Peppermill's AI software as of September 17, 2023, he had no reason to doubt the accuracy of the system. *Exh. 1* at ¶ 13.

Peppermill Security showed Jager that their AI software had captured John Doe's face at five (5) different times at five (5) different angles while he was in the casino on September 17, 2023. *Exh. 1* at ¶ 14; *Exhibit 6 - Peppermill's AI Facial Recognition Software Results*. Two of the photos matched the prior trespasser with 99.8% certainty. Two more photos matched the prior trespasser with 99.9% certainty. The fifth and final photo matched the prior trespasser with 100% certainty. *Exh. 1* at ¶ 14; *Exh. 6*.

As Officer Jager was trying to reconcile the information in front of him, several possibilities came to mind (some of which he voiced out loud, as captured on his body worn camera):

Reno City Attorney
P.O. Box 1900
Reno, NV 89505

(a) John Doe (the person identified by Peppermill's AI software) is, in fact, Killinger, but he could have presented Michael Ellis' ID when he was previously trespassed on March 26, 2023;

(b) John Doe is, in fact, Michael Ellis, but he could have presented Killinger's ID on September 17, 2023;

(c) John Doe is neither Ellis nor Killinger, but had a hookup at the DMV who provided him with two Real IDs in other people's name; or

(d) Killinger was telling the truth, and Peppermill's AI software erroneously identified him as Michael Ellis. *Exh. 1* at ¶ 15.

In Jager's experience as a police officer, he has encountered situations where "Real IDs" were fake or obtained by fraudulent means. *Exh. 1* at ¶ 16. A person who has obtained a fake ID will often have other documents or additional forms of identification that match the fake ID. *Id.* Accordingly, the fact that a person may have multiple forms of ID bearing the same name does not necessarily mean that the IDs are legitimate. *Id.* Officer Jager deals with criminal elements and people who lie to him on a daily basis. *Id.* Therefore, he has been trained to carefully scrutinize information that is presented to him by a suspect. *Id.*

In Officer Jager's experience, he has also encountered people using another person's valid ID. *Exh. 1* at ¶ 17. It is not difficult to obtain a duplicate, valid Real ID. *Id.* The Nevada DMV will issue a duplicate ID to a person who reports that his or her ID was lost or stolen. *Id.* That duplicate ID can then be given to another person to use for improper purposes. *Id.* Additionally, if someone is in possession of a stolen vehicle and/or a stolen wallet, that person could also possess multiple forms of identification and documents with the same name. *Exh. 1* at ¶ 18.

Because Officer Jager was not able to reconcile the conflicting evidence, he called his supervisor, Sergeant Carl DeSantis, to seek additional guidance. *Exh. 1* at ¶ 19. Sgt. DeSantis told Jager his thought process was that they would have to arrest John Doe and do a WINS check. *Id.* Officer Jager concurred with Sgt. DeSantis' suggestion, because if John Doe's fingerprints were on file, a WINS check would confirm his identity. *Id.*

Officer Jager did not feel he could issue a citation to John Doe for trespass, because he

could not determine John Doe's identity (i.e., Jager could not determine whether the person in custody was Jason Killinger or Michael Ellis). *Exh. 1* at ¶ 20. RPD has a General Order which provides that a person can be issued a citation in lieu of an arrest if he presents satisfactory evidence of his identity. *Id. and Exhibit 7 - RPD General Order P-280-17 Re: Citations, Section II(B)(c).* Although John Doe presented a valid driver's license under the name of Jason Killinger with a photo that resembled him, he was three to four inches shorter than the height indicated on the driver's license. *Exh. 1* at ¶ 20. This significant discrepancy in height created uncertainty as to whether John Doe was, in fact, Jason Killinger, particularly since his height closely matched the height of Michael Ellis, whom he also resembled. *Exh. 1* at ¶ 20.

Additionally, Officer Jager was aware that if he issued a citation to the wrong person, and that person does not appear in court, a warrant would be issued for his arrest for failure to appear. *Exh. 1* at ¶ 21. In other words, if Jager had issued a citation in Killinger's name, but the person he was dealing with on 9/17/2023 was actually Ellis (according to Peppermill's AI software), and Ellis subsequently failed to appear in court as required by the citation, the court would then issue a warrant for Killinger's arrest, even though Killinger would have had no knowledge of the trespass or citation. *Id.* The converse is also true. If Jager was dealing with Killinger on 9/17/2023, who may have misidentified himself as Ellis when he was initially trespassed on 3/26/23, the issuance of a citation in Ellis' name would result in the issuance of a warrant for Ellis' arrest if Killinger failed to appear in court for the citation, even though Ellis may not have been aware that he was ever trespassed by the Peppermill. *Id.* Therefore, the issuance of a citation in either name on 9/17/2023 would have: (a) violated RPD policy, (b) failed to resolve the conflicting evidence Jager was confronted with at that moment, and (c) potentially created a new problem for a person who was completely unaware of what occurred on 9/17/2023. *Id.*

Based on all of the foregoing, Officer Jager determined the proper course of action was to arrest John Doe, have him fingerprinted, and do a WINS check to confirm his identity as soon as reasonably possible. *Exh. 1* at ¶ 22. Jager's expectation was that if John Doe was telling the truth and is confirmed to be Jason Killinger after a WINS check, he would be released from jail in a relatively short period of time, and it would ultimately be up to the Court to determine whether

Peppermill's AI software was wrong, or whether Killinger may have misidentified himself as Ellis when he was previously trespassed on 3/26/2023. *Id.*

Officer Jager took John Doe into custody at approximately 0620 hours, when he removed the handcuffs Peppermill security had placed on him and replaced them with Jager's handcuffs. *Exh. 1* at ¶ 20. Jager granted John Doe's request to keep the handcuffs loose by "double-cuffing" him, meaning he used two pairs of handcuffs—one on each wrist, and then connected the handcuffs to each other. *Id.* Officer Jager did this to provide maximum comfort and range of motion for John Doe, while still complying with RPD's General Order regarding prisoner transport, which directs that arrestees will be handcuffed behind the back before transport. *Exh. 1* at ¶ 23; *Exhibit 8 – RPD General Order P-312-04 Re: Prisoner Transport,* at JAGER 000043.

Officer Jager and John Doe arrived at the Washoe County Jail at approximately 0649 hours, and Jager completely relinquished custody of John Doe at approximately 0707, after completing the arrest report. *Exh. 1* at ¶ 24; *Body Cam Video* at 07:07. The physical identifying information Officer Jager put on the arrest report was based on his personal observation and what John Doe told him. *Exh. 1* at ¶ 25. Jager noted that his height was 5'10" because that was the approximate measurement he obtained at the Peppermill security office when we stood him up against the measuring tape. Jager asked him for his weight at the jail, and he told Jager he was 280 lbs. *Exh. 1* at ¶ 25; *Body Cam Video* at 06:58:08. His eyes looked like they were either blue or hazel. *Exh. 1* at ¶ 25. Officer Jager initially did not put a date of birth on the arrest report, because he had two different IDs with two different dates of birth. *Id.* However, the woman at the jail who took the report told Officer Jager he had to put down a date of birth and to just estimate it if he did not know the correct date. *Id.* and *Body Cam Video* at 07:01:51 – 07:02:08. It was common practice to use January 1 when booking John Does, so that was the date Officer Jager used, and he estimated 1980 as the birth year. *Exh. 1* at ¶ 25.

A WINS check was conducted at the Washoe County Jail, which confirmed John Doe's identity as Jason Killinger. *Exhibit 9 – Pretrial Assessment Report.* Mr. Killinger was released on his own recognizance later that same day. *Exhibit 10 – WCSO Own Recognizance Release Form.*

A criminal complaint for trespass was filed with the Reno Municipal Court on September

18, 2023, entitled City of Reno v. John Doe; RPD Case No. 23-17041. *Exhibit 11 – Criminal Complaint; Exhibit 12 – Declaration of Jill Drake* at ¶ 5. The criminal complaint was signed by a representative of the Peppermill, Luke Ely, and accompanied by a separate written statement signed by Luke Ely. *Id.* When a misdemeanor criminal complaint is filed with the Reno Municipal Court, the case is automatically set for an arraignment hearing. *Exh. 12,* at ¶ 4. Unlike felony cases in Reno Justice Court or Second Judicial District Court, no prosecutorial review or decision is made by a prosecutor before a misdemeanor case is set for arraignment in Reno Municipal Court. *Id.* In this case, John Doe's arraignment was set on October 17, 2023, at 2:00 p.m. *Exh. 12,* at ¶ 6.

On September 26, 2023, attorney Richard Salvatore, Esq. filed an *Authorization to Represent* Jason James Killinger (previously identified as John Doe), in Reno Municipal Court Case No. 23CR-11488, entitled City of Reno, Plaintiff vs. Jason James Killinger, Defendant. *Exh. 12,* at ¶ 7; *Exhibit 13 – Authorization to Represent.* In the *Authorization to Represent*, Killinger waived his arraignment and requested that the charges against him be set for trial. *Exh. 12,* at ¶ 8; *Exh. 13*. As a result, a trial date was set for November 9, 2023, at 1:00 p.m. *Exh. 12,* at ¶ 9; *Exhibit 14 – Notice to Set Hearing.* Again, no prosecutorial review or decision was made before the court set this case for trial. *Exh. 12,* at ¶ 9.

The trial of this case was assigned to a criminal prosecutor, Deputy Reno City Attorney Jill Drake, for handling on or about October 2, 2023. *Exh. 12,* at ¶ 10. Prior to the trial date, Ms. Drake reviewed the evidence, including but not limited to Officer Jager's body cam footage, the arrest report and supplement, the information from Peppermill's facial recognition software, and the driver's licenses for Jason Killinger and Michael Ellis. *Id.* at ¶ 11. Ms. Drake was not able to reach a conclusion as to whether Mr. Killinger was the person who was previously barred by the Peppermill, as indicated by Peppermill's AI software. *Id.*

As part of her investigation, she spoke with Officer Jager, who told her he had no idea whether Killinger was telling the truth, or whether he has a doppelganger. *Exh. 12,* at ¶ 12. Ms. Drake also spoke with Mr. Salvatore on or about November 8, 2023, who informed her that Mr. Killinger was not the person previously barred by the Peppermill and asked her to dismiss the case. *Exh. 12,* at ¶ 13. Ms. Drake told Mr. Salvatore she would need to discuss the case with Peppermill

Reno City Attorney
P.O. Box 1900
Reno, NV 89505

witnesses prior to making a decision, since the criminal complaint was signed by the Peppermill. *Exh. 12,* at ¶ 13. Ms. Drake then spoke with Jeffrey Marlow, a representative of the Peppermill, who informed her that he conducted the original barring notice on March 26, 2023, but he was not present for the trespass arrest on September 17, 2023. *Exh. 12,* at ¶ 14.

After reviewing the available evidence, Ms. Drake declined to prosecute Mr. Killinger, and instead, dismissed the case without prejudice prior to commencement of trial, as she was not certain that the burden of proof in a criminal case could be met without an AI expert to establish the accuracy of Peppermill's AI software. *Exh. 12,* at ¶ 15. She then referred the case to an RPD fraud detective to further investigate the possibility of whether Mr. Killinger may have used someone else's information at the DMV to obtain an ID with his photograph. *Exh. 12,* at ¶ 16. If such evidence were to be found, there was a possibility the City could refile the case. *Id.* However, she never received any additional information from RPD to further support the trespass claim against Mr. Killinger. *Exh. 12,* at ¶ 17. Accordingly, the City never refiled the case against Mr. Killinger. *Id.*

### III.    STATEMENT OF DISPUTED ISSUES OF FACT PRECLUDING SUMMARY JUDGMENT IN FAVOR OF PLAINTIFF

1. Whether Officer Jager lied or knowingly made false statements about Plaintiff to justify an arrest or cause him to be wrongfully prosecuted for trespass. *Exh. 1,* ¶ 26.

2. Whether Officer Jager fabricated any evidence to justify an arrest or cause Plaintiff to be wrongfully prosecuted for trespass. *Exh. 1,* ¶ 27.

3. Whether Offer Jager acted with malice toward Plaintiff or had any motive to "frame" him. *Exh. 1,* ¶ 28.

4. Whether Officer Jager wanted a reviewing prosecutor or magistrate to believe that Plaintiff was "an evildoer, a bad person, a lawless scum who deserved conviction for having multiple false identifications" as alleged by Plaintiff. *Exh. 1,* ¶ 29.

5. Whether Officer Jager used excessive force during his arrest of Plaintiff on 9/17/2023. *Exh. 1,* ¶ 30; *Body Cam Video* at 06:20:25 – 06:28:05.

1  6.  Whether Officer Jager acted in good faith with respect to his handling of the trespass call
2      at the Peppermill on 9/17/2023. *Exh. 1*, ¶ 31.
3  7.  Whether Officer Jager intended to harm Plaintiff. *Exh. 1,* ¶ 31.
4  8.  Whether and to what extent the injuries claimed by Plaintiff was caused by Peppermill
5      security officers, who initially arrested, handcuffed, and detained Plaintiff.[6] *Exh. 1* at ¶ 4
6      and 5.
7  9.  Whether Officer Jager proximately caused any harm or injury to Plaintiff.

## IV.  STANDARD FOR SUMMARY JUDGMENT

"The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the facts before the court." *Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994) (citation omitted). Summary judgment is appropriate when the pleadings, the discovery and disclosure materials on file, and any affidavits "show there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). An issue is "genuine" if there is a sufficient evidentiary basis on which a reasonable factfinder could find for the nonmoving party and a dispute is "material" if it could affect the outcome of the suit under the governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). "The amount of evidence necessary to raise a genuine issue of material fact is enough 'to require a jury or judge to resolve the parties' differing versions of the truth at trial.'" *Aydin Corp. v. Loral Corp.*, 718 F.2d 897, 902 (9th Cir. 1983) (quoting *First Nat'l Bank v. Cities Service Co.*, 391 U.S. 253, 288-89 (1968)). In evaluating a summary judgment motion, a court must view all facts and draw all inferences in the light most favorable to the nonmoving party. *Kaiser Cement Corp. v. Fishbach & Moore, Inc.*, 793 F.2d 1100, 1103 (9th Cir. 1986) (citation omitted).

The moving party bears the burden of showing that there are no genuine issues of material fact. *See Zoslaw v. MCA Distrib. Corp.*, 693 F.2d 870, 883 (9th Cir. 1982). Once the moving party satisfies Rule 56's requirements, the burden shifts to the party resisting the motion to "set forth

---

[6] Plaintiff Killinger has already reached a confidential resolution of his claim against the Peppermill.

specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248 (internal quotations and citation omitted). The nonmoving party "may not rely on denials in the pleadings but must produce specific evidence, through affidavits or admissible discovery material, to show that the dispute exists," *Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1409 (9th Cir. 1991), and "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

V. **LEGAL AUTHORITIES AND ARGUMENT**

　　A. **Plaintiff is not entitled to judgment as a matter of law on his First Cause of Action for "Fabrication of Evidence."**

As a preliminary matter, it is important to identify what factual determination Officer Jager was tasked with making when he responded to the trespass call on September 17, 2023, and what charge Mr. Killinger was arrested on. Plaintiff's MPSJ wholly fails to correctly identify the relevant issue. As a result, the MPSJ conflates many issues and includes a convoluted jumble of facts that are not relevant to the issue at hand.

The Peppermill contacted RPD to report that a man they had previously barred from the casino had unlawfully returned to the property. The basis for the Peppermill's complaint was their AI facial recognition software, which identified the man who entered the casino on 9/17/2023 to be the same man Peppermill had previously trespassed on 3/26/2023. Based on the AI software, Peppermill security arrested this individual on a citizen's arrest and then detained and handcuffed him. The Peppermill was the complaining party (or "victim") as well as the arresting party.

When Officer Jager arrived on scene, he had a victim who claimed that the man in custody had committed trespass, and a suspect who claimed that he did not commit trespass. At that point, Officer Jager's job was to determine whether probable cause existed for him to arrest the person in custody for trespass.[7] Typically, when a victim provides a statement that another person has

---

[7] Officer Jager's comments about John Doe possibly having a hook up at the DMV who provided him with two IDs are irrelevant to the issue of whether he had probable cause to arrest Plaintiff for trespass. Those comments were simply made in the context of exploring possible explanations for how the same person could have two different IDs. Officer Jager did not arrest Plaintiff for identity theft nor obtaining IDs under false pretenses, and no such criminal charges were ever brought against Plaintiff.

committed a crime against him, that would establish probable cause for an arrest. *Betts v. Shearman*, 751 F.3d 78, 82 (2d Cir. 2014) (probable cause exists if a law enforcement officer received information from some person, normally the putative victim or eyewitness, unless the circumstances raise doubt as to the person's veracity). It is not an officer's job to play the role of judge and jury by weighing the evidence and deciding which party is correct or telling the truth. "Even in the absence of probable cause, a police officer is entitled to qualified immunity where "(1) [her] conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known, or (2) it was 'objectively reasonable' for [her] to believe that [her] actions were lawful at the time of the challenged act." *Betts v. Shearman*, 751 F.3d at 82-83.

In this case, Peppermill provided not only a written statement in support of the trespass claim, but also the results of their AI software, which captured the suspect's face at five different angles at five different times while he was inside the casino, and identified him to be the same person who was previously barred with 99.8 – 100% certainty. Under the circumstances, probable cause for the arrest clearly existed.[8] What is also clear is that that the evidence Officer Jager relied upon to make the arrest was **information provided by Peppermill Security**—namely, the results of the AI technology and the written statement of Luke Ely. None of this evidence was "fabricated" by Officer Jager.

Because the evidence supporting the arrest was clearly not fabricated by Officer Jager, Plaintiff had to find other, irrelevant evidence that Officer Jager allegedly "fabricated" or "lied" about to support his Complaint. What Plaintiff came up with is that Officer Jager "lied" about Mr. Killinger presenting conflicting identification. *Plaintiff's MPSJ,* at 16:9 – 17:11. The irony here is that Plaintiff, himself, misrepresented the content of Officer Jager's arrest report in the same breath that he accuses Jager of "lying" about him presenting conflicting identification. To be clear, Officer Jager **never** stated that **Killinger** presented conflicting identification. Throughout Jager's report,

---

[8] It is important to note that Plaintiff's Complaint does not contain a cause of action for wrongful arrest based on lack of probable cause. This is an implicit admission that probable cause existed. Moreover, Plaintiff has failed to cite any case law which held that it is a constitutional violation to rely, in whole or in part, on AI facial recognition technology to establish probable cause for an arrest.

he stated that **John Doe** (i.e., the person who was flagged by the AI software) presented Peppermill Security with conflicting identification. *Plaintiff's Exhibit 7.* Jager made this statement because based on his own personal observation (relying on what he referred to as his "feeble mind"), the person in custody looked exactly like the photos on both driver's licenses. Moreover, his personal observation matched what the AI software was telling him.

Plaintiff also criticizes Officer Jager for "deviously" omitting the fact that both Ellis and Killinger had Real IDs. *Plaintiff's MPSJ,* at 19:8 – 20:9. It is unclear how this is relevant to the issue of whether John Doe committed trespass, considering that Jager freely informed the Peppermill, his supervisor, and the Washoe County Jail that he ran both IDs and confirmed that they were both "valid." *Body Cam Video,* at 6:12:40, 07:07:31. The fact that he did not use the term "Real ID" is irrelevant. As Officer Jager personally attested, he has encountered situations where Real IDs turned out to be fake, were obtained by fraudulent means, or were being used by another person. *Exh. 1*, at ¶16 and ¶17.

Finally, Plaintiff claims that Officer Jager fabricated evidence by creating a non-existent "John Doe" and conflating Killinger and Ellis as the same person. In this regard, Plaintiff is essentially criticizing Jager for not having a perfect and flawless sense of visual perception. Officer Jager repeatedly stated throughout the body cam footage that the person detained by Peppermill Security looks exactly like the photos on both driver's licenses. *Body Cam Video* at 06:07:00 – 06:07:10, 06:11:50 – 06:12:18, 07:05:47, 07:06:37, 07:07:36. Officer Jager honestly believed they were the same person. *Exh. 1*, at ¶8. The fact that Plaintiff may subjectively disagree that he looks anything like Michael Ellis is irrelevant, as the law does not permit him to substitute his judgment in place of Officer Jager's good faith judgment. *Exh. 1*, at ¶8. Moreover, the fact that Jager turned out to be mistaken does not establish liability.

In *Rivera v. Cnty. of Los Angeles*, 745 F.3d 384 (9th Cir. 2014),[9] the 9th Circuit affirmed a district court's order granting summary judgment in favor of defendants (sheriff deputies) based

---

[9] This is only one of several instances where Plaintiff cited a case in his MPSJ that supports Defendant's argument and is adverse to his own case. In *Reynolds v. Cnty. of San Diego*, 224 F. Supp. 3d 1034, 1056 (S.D. Cal. 2016), the Court also held that the defendants were entitled to summary judgment based on qualified immunity.

on qualified immunity where the deputies had a good faith belief that they were arresting the subject of an arrest warrant, but they actually arrested the wrong person due to a case of mistaken identity. In that case, the 9th Circuit stated:

> "The deputies had probable cause to arrest the true subject of the warrant but mistakenly believed that Rivera was that person. In such cases, the question is whether the arresting officers had a good faith, reasonable belief that the arrestee was the subject of the warrant. *See Hill v. California,* 401 U.S. 797, 804, 91 S.Ct. 1106, 28 L.Ed.2d 484 (1971) ("[S]ufficient probability, not certainty, is the touchstone of reasonableness under the Fourth Amendment and on the record before us the officers' mistake was understandable and the arrest a reasonable response to the situation facing them at the time.")… As the Supreme Court has expressly recognized, police are right to be wary when suspects claim mistaken identity."

*Rivera v. Cnty. of Los Angeles*, 745 F.3d at 389.

In another case cited by Plaintiff, the 9th Circuit affirmed a district court's order granting summary judgment in favor of the defendants based on qualified immunity, where law enforcement officials were alleged to have fabricated evidence against the plaintiff. *Devereaux v. Abbey*, 263 F.3d 1070 (9th Cir. 2001). In *Devereaux*, the plaintiff (a foster parent) alleged that defendants deliberately fabricated evidence, continued their investigation despite the fact that they knew or should have known he was innocent of sexually assaulting his foster children, or used coercive and abusive investigative techniques that they knew or should have known would yield false information. In that case, the Court clarified the two-step qualified immunity inquiry set forth in *Saucier v. Katz,* 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001):

> "To decide whether a defendant is protected by qualified immunity, a court must first determine whether, "[t]aken in the light most favorable to the party asserting injury, ... the facts alleged show the officer's conduct violated a constitutional right. *Id.* at 2156. If the plaintiff's factual allegations do add up to a violation of the plaintiff's federal rights, then the court must proceed to determine whether the right was "clearly established," *i.e.,* whether the contours of the right were already delineated with sufficient clarity to make a reasonable officer in the defendant's circumstances aware that what he was doing violated the right. *Id.* In essence, at the first step, the inquiry is whether the facts alleged constitute a violation of the plaintiff's rights. If they do, then, at the second step, the question is whether the defendant could nonetheless have reasonably but erroneously believed that his or her conduct did not violate the plaintiff's rights. *See id.* at 2158 ("The concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct.").

1   Devereaux v. Abbey, 263 F.3d at 1074.

2   In this case, Officer Jager had a good faith belief that the person in Peppermill's custody looked exactly like the photographs on both driver's licenses. Furthermore, he had a no reason to believe that he would violate Plaintiff's constitutional rights by relying on Peppermill's AI software to make an arrest for trespass. As previously discussed, Plaintiff has cited no "clearly established" legal authority holding that reliance on such technology would amount to a constitutional violation. Based on all of the foregoing, Plaintiff is clearly not entitled to summary judgment on his first cause of action for "fabrication of evidence." Rather, the facts and the existing law show that *Officer Jager* is likely entitled to summary judgment based on qualified immunity.

**B.  Plaintiff is not entitled to judgment as a matter of law on his Second Cause of Action for "Judicial Deception" or failure to further investigate.**

Plaintiff's MPSJ relating to his second claim for relief suffers from the same deficiencies highlighted above. Plaintiff has engaged in the unfortunate practice of cherry-picking "catch phrases" from various cases that appear to support his argument without showing how those cases are factually analogous to the case at hand or otherwise demonstrating that the same legal issues presented in this case were addressed in his cited cases. Simply stated, Plaintiff has failed to cite any case that is either factually or legally on point to support entry of summary judgment in his favor.

For example, *Lee v. City of Los Angeles*, 250 F.3d 668 (9th Cir. 2001), involved the alleged wrongful arrest, extradition, and incarceration of a mentally disabled Los Angeles resident, Kerry Sanders, who was extradited to New York and incarcerated *for two years* before law enforcement realized they had the wrong person. Meanwhile, Sander's mother repeatedly contacted LAPD regarding the whereabouts of her son, only to be informed that his whereabout are unknown, due to the fact that none of the defendants had ever compared Sander's fingerprints to those of the true suspect. Under these facts, the court simply held that plaintiff's complaint sufficiently pled a Section 1983 claim to survive defendants' motion to dismiss. *Lee* did not involve a summary judgment motion.

As already discussed in Section V(A), above, the court in *Rivera v. Cnty. of Los Angeles*, 745 F.3d 384 (9th Cir. 2014), concluded that the *defendants* were entitled to summary judgment based on qualified immunity. Therefore, *Rivera* does not support entry of summary judgment in favor of Plaintiff.

*Fairley v. Luman*, 281 F.3d 913 (9th Cir. 2002), involved an arrestee who was detained by police and held for 12 days on outstanding warrants for the arrest of his twin brother. The case proceeded to a jury trial in which the jury found in favor of the defendant officers, but against the City that employed them. The City moved for judgment as a matter of law, which the trial court denied. The City appealed, but the jury verdict was affirmed on appeal. Again, *Fairly* does not support Plaintiff's request for summary judgment without a jury trial.

In *Garcia v. Cnty. of Riverside*, 817 F.3d 635, 637 (9th Cir. 2016), the court held that issues of fact precluded summary judgment in favor of the defendants. It does not support entry of summary judgment in favor of Plaintiff Killinger without a trial.

Finally, in *Soler v. Cnty. of San Diego*, 762 F. App'x 383, 386 (9th Cir. 2019), the court recognized a distinction between a field officer and a detective whose specific job was to conduct investigations. In *Soler*, the 9th Circuit affirmed the Court's entry of summary judgment in favor of the arresting officer, but reversed entry of summary judgment in favor of the detective who was assigned to look into the plaintiff's claim of mistaken identity. Applying *Soler* to the facts of this case, Officer Jager, as the field officer, did not have the same duty to investigate as a detective may otherwise have.

Clearly, none of the case law cited by Plaintiff entitles him to summary judgment on the issue of whether Officer Jager should have conducted additional investigation into his identity before arresting him. At best, Plaintiff's claim might survive a defense motion for summary judgment, which would entitle him to a jury trial on this issue. At worst, Jager may be entitled to summary judgment as a matter of law based on qualified immunity.

///

///

**C. Plaintiff is not entitled to judgment as a matter of law on his Third Cause of Action for Malicious Prosecution.**

The elements of a malicious prosecution claim are: (1) want of probable cause to initiate the prior criminal proceeding; (2) malice; (3) termination of the prior criminal proceedings; and (4) damage." *LaMantia v. Redisi*, 118 Nev. 27, 30, 38 P.3d 877, 879 (2002.) A malicious prosecution claim requires that the defendant initiated, procured the institution of, or actively participated in the continuation of a criminal proceeding against the plaintiff. *Id.* at 880.

In this case, the evidence supports a finding of probable cause for the trespass charge. Even assuming probable cause did not exist, Officer Jager nevertheless bears no liability because he did not initiate the criminal proceeding. It was Luke Ely, a representative of the Peppermill, who signed the Criminal Complaint and initiated the criminal proceeding. *Exh. 11*. Furthermore, Officer Jager did not participate in the continuation of the criminal proceeding in any way following the arrest. When the prosecutor called Jager to discuss the case, he honestly told her he had no idea if Killinger was telling the truth, or whether he had a doppelganger. *Exh. 12,* at ¶ 12. Additionally, Officer Jager provided a sworn declaration attesting that he harbored no ill will or malice against Mr. Killinger and had absolutely no motive to "frame" him. *Exh. 1,* at ¶26 - ¶29. He exerted no influence on Ms. Drake or her decision-making as to whether to prosecute the case. There is simply no evidence of malice, or at a minimum, the existence of malice is a question of fact which precludes summary judgment in Plaintiff's favor. Irrespective of the foregoing, Ms. Drake declined to prosecute Plaintiff after reviewing the evidence and dropped the case. *Exh. 12,* at ¶ 15. Accordingly, there simply is no factual or legal basis to support a claim of malicious prosecution against Officer Jager.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

## VI. CONCLUSION

Based on the foregoing, Defendant Jager respectfully requests that Plaintiff's Motion for Partial Summary Judgment be denied in its entirety.

DATED this  26th  day of September, 2025.

                                              KARL S. HALL
                                              Reno City Attorney

                                  By: */s/ Alice K. Herbolsheimer*
                                              ALICE K. HERBOLSHEIMER
                                              Deputy City Attorney
                                              Nevada State Bar No. 6389
                                              Post Office Box 1900
                                              Reno, Nevada 89505

                                              *Attorneys for Defendant Officer Richard Jager*

**CERTIFICATE OF SERVICE**

Pursuant to FRCP 5(b), I certify that I am an employee of the RENO CITY ATTORNEY'S OFFICE, and that on September 26, 2025, I served a copy of the foregoing document(s) on the party(s) set forth below by:

_____   Placing an original or true copy thereof in a sealed envelope placed for collection and mailing in the United States Mail, at Reno, Nevada, postage prepaid, following ordinary business practices, and:

_____   Personal delivery.

_____   Electronic Mail

\_\_X\_\_\_   CMECF electronic service.

_____   Federal Express or other overnight delivery.

_____   Reno/Carson Messenger Service.

addressed as follows:

Terri Keyser-Cooper
Law Office of Terri Keyser-Cooper
125 Edgewater Parkway
Reno, Nevada 89519
Keysercooper@lawyer.com
*Counsel for Plaintiff*

DATED this  26th  day of September, 2025.

                                           */s/ Jenny Sparks*
                                           Jenny Sparks
                                           Legal Assistant