# EXHIBIT  1

## Declaration Richard Jager

# EXHIBIT  1

## Declaration Richard Jager

## DECLARATION OF RICHARD JAGER IN OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

I, RICHARD JAGER, declare:

1.     I am over the age of eighteen (18) and am competent to testify to the matters set forth in this Declaration and will do so if called upon to testify.

2.     I am an officer of the Reno Police Department, employed by the City of Reno. I joined the Reno Police Department on January 13, 2020.

3.     I have never been the subject of any disciplinary action as a police officer.

4.     On September 17, 2023, at approximately 0546 hours, I responded to the Peppermill Casino ("Peppermill") on the report of a repeat trespasser who had been taken into custody by Peppermill Security as a citizen's arrest.

5.     Upon arrival, I observed a male suspect ("John Doe") seated in the Peppermill security office with his hands cuffed behind his back. I did not know what time John Doe was taken into custody or how long he had been in handcuffs.

6.     I met with Peppermill Security, who told me that John Doe's face was detected by their surveillance facial recognition software matching a person who had previously been barred from the Peppermill, with 100% confidence. Peppermill Security informed me that the suspect was last trespassed on 03/26/2023, at which time, he identified himself as Michael Phillip Ryan Ellis ("Ellis") by presenting a Nevada Driver's License with that name.

7.     When John Doe was detained by Peppermill Security on September 17, 2023, however, he identified himself as Jason James Killinger and presented a Nevada Commercial Driver's License with that name. He also stated that he had never been barred from the Peppermill, and he had no idea who Michael Ellis is.

8.     I looked at John Doe's face and compared it to the photo on Killinger's driver's license, as well as the photo on Ellis' driver's license. I honestly thought they all looked like the same person, except that the photo on Killinger's driver's license shows a man with a goatee.

9.     There was a vertical tape measure on the wall of Peppermill's security office. When we stood John Doe up against the tape measure to determine his height, John Doe measured at somewhere between 5'9" and 5'10", which was a closer match to Ellis' driver's license (indicating

1   a height of 5'9") than to Killinger's driver's license (indicating a height of 6'1").

2          10.    A routine wants and warrants check on both Ellis and Killinger was negative, and

3   neither Ellis nor Killinger had any prior arrest history with additional information to assist in

4   positive identification.

5          11.    In the years prior to September 17, 2023, I had responded to numerous trespass

6   calls from the Peppermill, ranging anywhere from two to six calls per week. It was a very common

7   occurrence, and in most instances, the suspect would claim they were *not* the person identified by

8   Peppermill's facial recognition software.

9          12.    My understanding of Peppermill's procedure is that when a person is barred from

10  the casino, the Peppermill would take a photograph of that person and scan it into their AI software

11  at the time the barring notice is issued. Accordingly, the photo taken by the Peppermill and scanned

12  into their software may be more current than what appears on a person's driver's license. For this

13  reason, I believed that the photograph of the suspect in Peppermill's AI software may be more

14  reliable than the photograph on the driver's license, which could be many years out of date.

15         13.    Prior to September 17, 2023, I had never encountered or even heard of a situation

16  where Peppermill's facial recognition software turned out to be wrong. Indeed, Peppermill's facial

17  recognition software was believed to be so reliable that RPD would, at times, request Peppermill's

18  assistance in locating criminal suspects. RPD would provide Peppermill with photos of suspects

19  to input into their AI software and ask the Peppermill to contact RPD if a suspect is spotted in the

20  casino. Based on my prior experience and knowledge of Peppermill's AI software as of September

21  17, 2023, I had no reason to doubt the accuracy of the system.

22         14.    Peppermill Security showed me that their AI software had captured John Doe's face

23  at five (5) different times at five (5) different angles while he was in the casino on September 17,

24  2023. Two of the photos matched the prior trespasser with 99.8% certainty. Two more photos

25  matched the prior trespasser with 99.9% certainty. The fifth and final photo matched the prior

26  trespasser with 100% certainty.

27         15.    As I was trying to reconcile the information in front of me, several possibilities

28  came to mind (some of which I voiced out loud, as captured on my body worn camera):

                (a)    John Doe (the person identified by Peppermill's AI software) is, in fact,

1  Killinger, but he could have presented Michael Ellis' ID when he was

2  previously trespassed on March 26, 2023;

3  (b)  John Doe is, in fact, Michael Ellis, but he could have presented Killinger's

4  ID on September 17, 2023;

5  (c)  John Doe is neither Ellis nor Killinger, but had a hookup at the DMV who

6  provided him with two Real ID's in other people's name; or

7  (d)  Killinger was telling the truth, and Peppermill's AI software erroneously

8  identified him as Michael Ellis.

9      16.  In my experience, I have encountered situations where "Real IDs" were fake or

10  obtained by fraudulent means. A person who has obtained a fake ID will often have other

11  documents or additional forms of identification that match the fake ID. Accordingly, the fact that

12  a person may have multiple forms of ID bearing the same name does not necessarily mean that the

13  IDs are legitimate. I deal with criminal elements and people who lie to me on a daily basis.

14  Therefore, I have been trained to carefully scrutinize information that is presented to me by a

15  suspect.

16      17.  In my experience, I have also encountered people using another person's valid ID.

17  It is not difficult to obtain a duplicate, valid Real ID. The Nevada DMV will issue a duplicate ID

18  to a person who reports that his or her ID was lost or stolen. That duplicate ID can then be given

19  to another person to use for improper purposes.

20      18.  Additionally, if someone is in possession of a stolen vehicle and/or a stolen wallet,

21  that person could also possess multiple forms of identification and documents with the same name.

22      19.  Because I was not able to reconcile the conflicting evidence, I called my supervisor,

23  Sergeant Carl DeSantis, to seek additional guidance. Sgt. DeSantis told me his thought process

24  was that we would have to arrest John Doe and do a WINS check. I concurred with Sgt. DeSantis'

25  suggestion, because if John Doe's fingerprints were on file, a WINS check would confirm his

26  identity.

27      20.  I did not feel I could issue a citation to John Doe for trespass, because I could not

28  determine his identity (i.e., I could not determine whether he was Jason Killinger or Michael Ellis).

RPD has a General Order which provides that a person can be issued a citation in lieu of an arrest

**Reno City Attorney**
**P.O. Box 1900**
**Reno, NV 89505**

-3-

1  if he presents satisfactory evidence of his identity. Although John Doe presented a valid driver's

2  license under the name of Jason Killinger with a photo that resembled him, he was three to four

3  inches shorter than the height indicated on the driver's license. This significant discrepancy in

4  height created uncertainty as to whether John Doe was, in fact, Jason Killinger, particularly since

5  his height closely matched the height of Michael Ellis, whom he also resembled.

6       21.    Additionally, I was aware that if I issued a citation to the wrong person, and that

7  person does not appear in court, a warrant would be issued for his arrest for failure to appear. In

8  other words, if I had issued a citation in Killinger's name, but the person I was dealing with on

9  9/17/2023 was actually Ellis (according to Peppermill's AI software), and Ellis subsequently failed

10  to appear in court as required by the citation, the court would then issue a warrant for Killinger's

11  arrest, even though he would have had no knowledge of the trespass or citation. The converse is

12  also true. If I was dealing with Killinger on 9/17/2023, who may have misidentified himself as

13  Ellis when he was initially trespassed on 3/26/23, the issuance of a citation in Ellis' name would

14  result in the issuance of a warrant for Ellis' arrest if Killinger failed to appear in court for the

15  citation, even though Ellis may not have been aware that he was ever trespassed by the Peppermill.

16  Therefore, the issuance of a citation in either name on 9/17/2023 would have: (a) violated RPD

17  policy, (b) failed to resolve the conflicting evidence I was confronted with at that moment, and (c)

18  potentially created a new problem for person who was completely unaware of what occurred on

19  9/17/2023.

20       22.    Based on all of the foregoing, I determined the proper course of action was to arrest

21  John Doe, have him fingerprinted, and do a WINS check to confirm his identity as soon as

22  reasonably possible. My expectation was that if John Doe was telling the truth and is confirmed to

23  be Jason Killinger after a WINS check, he would be released from jail in a relatively short period

24  of time, and it would ultimately be up to the Court to determine whether Peppermill's AI software

25  was wrong, or whether Killinger may have misidentified himself as Ellis when he was previously

26  trespassed on 3/26/2023.

27       23.    I took John Doe into custody at approximately 0620 hours, when I removed the

28  handcuffs Peppermill security had placed on him and replace them with my handcuffs. I granted

John Doe's request to keep the handcuffs loose by "double-cuffing" him, meaning I used two pairs

**Reno City Attorney**
**P.O. Box 1900**
**Reno, NV 89505**

-4-

1  of handcuffs—one on each wrist, and then connected the handcuffs to each other. I did this to

2  provide maximum comfort and range of motion for John Doe, while still complying with RPD's

3  General Order regarding prisoner transport, which directs that arrestees will be handcuffed behind

4  the back before transport.

5       24.    We arrived at the Washoe County Jail at approximately 0649 hours, and I

6  completely relinquished custody of John Doe at approximately 0707, after completing the arrest

7  report.

8       25.    The physical identifying information I put on the arrest report was based on my

9  personal observation and what John Doe told me. I noted that his height was 5'10" because that

10 was the measurement I obtained at the Peppermill security office when we stood him up against

11 the measuring tape. I asked him for his weight at the jail, and he told me 280 lbs. His eyes looked

12 like they were either blue or hazel. I initially did not put a date of birth on the arrest report, because

13 I had two different ID's with two different dates of birth. However, the woman at the jail who took

14 the report told me I had to put down a date of birth and to just estimate it if I did not know the

15 correct date. It was common practice to use January 1 when booking John Does, so that was the

16 date I used and estimated 1980 as the birth year.

17      26.    Contrary to Plaintiff's allegations, I did not lie and would never lie about a suspect

18 to justify an arrest or cause him to be wrongfully prosecuted.

19      27.    Contrary to Plaintiff's allegations, I did not fabricate any evidence in this case. The

20 evidence upon which I based the arrest was provided by Peppermill security, including the AI

21 facial recognition software results and the criminal complaint signed by a Peppermill

22 representative, which I believe established probable cause for the arrest.

23      28.    Contrary to Plaintiff's allegations, I harbored no ill will or malice against Mr.

24 Killinger and had absolutely no motive to "frame" him.

25      29.    Contrary to Plaintiff's allegations, I never wanted a reviewing prosecutor or

26 magistrate to believe that Plaintiff was "an evildoer, a bad person, a lawless scum who deserved

27 conviction for having multiple false identifications." I never felt this way about John Doe, who

28 was later confirmed to be Mr. Killinger following the WINS check.

        30.    Contrary to Plaintiff's allegations, I never subjected Mr. Killinger to any excessive

**Reno City Attorney**
**P.O. Box 1900**
**Reno, NV 89505**

-5-

1  force. I gently handcuffed him using double cuffs and escorted him to my patrol vehicle, where I

2  allowed him to seat himself inside the vehicle. He was in my physical custody for less than 50

3  minutes on September 17, 2023.

4        31.    I acted in utmost good faith with respect to my handling of the trespass call on

5  9/17/2023, consistent with my understanding of RPD policy and my duties as a police officer under

6  the facts, circumstances, and irreconcilable evidence that confronted me on that date. I had

7  absolutely no intention of causing any harm to Mr. Killinger.

8        I declare under penalty of perjury under the laws of the State of Nevada that the foregoing

9  is true and correct.

10       Executed on this __25nd__ day of ___SEPTEMBER___, 2025, in Reno, Washoe County, Nevada.

11

12       By _____

13          RICHARD JAGER

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Reno City Attorney**
**P.O. Box 1900**
**Reno, NV 89505**