1  TERRI KEYSER-COOPER
Law Office of Terri Keyser-Cooper
2  Nevada Bar No. 3984
125 Edgewater Parkway
3  Reno, NV 89519
(775) 337-0323
4  Keysercooper@lawyer.com
5  *Attorney for Plaintiff Jason Killinger*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| JASON KILLINGER, | Case No. 3:25-cv-388-MMD-CSD |
| Plaintiff, | **PLAINTIFF'S REPLY TO DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT (ECF No. 7)** |
| v. | |
| RENO POLICE OFFICER R. JAGER, | |
| Defendant. | |

**I.   DEFENDANT JAGER DEMONSTRATES A HOPELESS FAILURE TO UNDERSTAND WHAT THIS CASE IS ABOUT AND ITS GRAVITY**

   **A.  Fabrication of Evidence Is A Serious Violation of the Public Trust**

Defendant's Opposition states, "Not a single case from any jurisdiction has held it is a constitutional violation for a police officer to rely on AI facial recognition technology to identify a suspect or to make an arrest." (Df. Bf., 2:16-21). Jager misconstrues what this case is about. This case is **not** about false arrest or lack of probable cause. It is **not** about police officer's reliance on a new and unreliable technology. This case is about a police officer's deliberate fabrication of evidence, of his lying and his presentation of his lies to a prosecutor as true facts in his Declaration. Such shocking conduct spits in the face of the fundamental fairness and decency the public expects from police officers. The public rightfully expects police officers to be honest—not to lie in their reports to bolster shaky arrests, not to plant guns at crime scenes, and not to commit perjury on the

1

stand. An officer's arrest reports are extremely important because they are provided to prosecutors. The prosecutors then use those reports to evaluate cases, to convict people, and to deprive them of their liberty. Such police reports must never be based on fabricated facts and critical omissions.

## B. It Is Undisputed That Jager Lied In His Police Report

Jager wrote twice in his Declaration that Killinger had "conflicting identification" which he presented to the Peppermill. In his lengthy Declaration Jager does not deny that he wrote this, he just ignores it. (Df. Exh. 1, Jager Decl.)

Jager wrote in his Declaration in support of his arrest of Killinger:

*On 9/17/2023 at approximately 0546 hours I (Officer Jager) responded to the Peppermill Casino ...on the report of a repeat trespasser in custody. Peppermill was attempting to issue a citation, but the subject/defendant of the call who was never properly identified, who will be henceforth referred to as JOHN DOE **"presented" Peppermill Security with conflicting identification**.* (Exh. 7, p. 3, ¶ 1)

Jager *repeats* the same falsehood again in paragraph four of his declaration:

*Peppermill Security signed a criminal complaint against John Doe for trespassing based on the video surveillance facial recognition software matching a returned trespasser with 100% confidence who had previously identified himself as Michael Ellis. Due to John Doe **"having" conflicting identification**, he lacked satisfactory evidence to reasonably assure me that he was who he claimed to be...* (Exh. 7, p. 3, ¶ 4)

The court may review Jager's BWC 12 times or 1200 times and will not hear any mention of Killinger presenting "conflicting identification." Because there was none. Killinger never "presented" Peppermill Security with conflicting identification or "had" conflicting identification. All his identification, 16 pieces of identification, were all in his own name, Jason Killinger. Plaintiff invites the Court to review Jager's BWC, Exh. 1, to confirm that Killinger never presented "conflicting identification" or that he was ever accused of having conflicting identification.

The significance of Jager's fabricated evidence is that if Killinger had such conflicting identification, which he undisputably did not, it would support Jager's claim that he did not know

2

who Killinger was and was unable to properly identify him, thus requiring his arrest. It also creates the inference that Killinger was an imposter and a con artist as innocent people do not run around with conflicting identification. It placed Killinger in a bad light to prosecutors, faulting Killinger as a fraud, a cheat, and a charlatan when no such fault whatsoever was deserved.

### C. It Is Undisputed That Jager Omitted Critical Information In His Police Report

Jager also wrote in his Declaration:

*Peppermill Security signed a criminal complaint against John Doe for trespassing based on the video surveillance facial recognition software matching a returned trespasser with 100% confidence who had previously identified himself as Ellis. Due to John Doe "**having**" conflicting identification, he lacked satisfactory evidence to reasonably assure me that he was who he claimed to be* (Exh. 7, p. 3, ¶ 4)

This too is untrue. Killinger had 16 pieces of identification in his name either on his person or in his nearby vehicle at the time of his arrest: (1) Real Nevada Driver's licenses;  (2) U.S. Department of Transportation Medical Examiner's Certificate; (3) DMV registration; (4) Nevada Insurance Identification Card; (4) Visa debit visa card; (5) Pay stub from his employer UPS; (6) a UPS Air Recovery ID card; (5) Anthem Blue Cross card; (6) Northern California General Teamsters Health Card; (7) Teachers Identification Card; (8) Player's card for the Nugget; (9) Player's card for Terrible's at Fernley; (10) Players card for Peppermill; (11) Player's card for Best Bet Club; (12) Player's card for Caesars; (11) Player's card for J's Resort; (12) Player's card for Bonanza; (13) Player's card for Legends Bay Casino; (14) Player's card for Penn Play; (15) Player's card for Monarch Rewards; and  (16) Player's card for Boyd . (See Exh. 13, a collection of Killinger's identification at the time of his arrest). Killinger's evidence undisputably establishes his identity. Three of his readily available pieces of identification were government issued: Killinger's Real Nevada driver's license, his U.S. Department of Transportation Medical Certificate, and his DMV registration,

3

Killinger's abundant identification in his name was exculpatory evidence. It directly contradicts Jager's statement that Killinger "lacked satisfactory evidence to assure him he was who he said he was. It is undisputed from Jager's BWC that Jager never asked to see what other forms of identification Killinger had and refused to review identification that Killinger asked him to review. Which begs the question, how could Killinger present satisfactory proof of identification if Jager refused to look at what identification he possessed?

For example, Killinger told Jager he worked at UPS, he asked Jager to look at his pay stub in his vehicle. (Exh. 1, BWC 06:23:10-12). Killinger gave Jager the location of his vehicle in the Peppermill parking lot, its year, make, model, and color making it easy for Jager to find it. (Exh. 1, BWC, 06:15:55). UPS is an international company, the pay stub in Killinger's name in addition to his other many pieces of identity would be proof position to any reasonable police officer of his identity. But Jager refused to go to Killinger's vehicle. Jager insisted Killinger must go to jail, to be identified. "Unfortunately, you gotta go to jail," he told Killinger,  they'll pull your fingerprints, that's the way to determine it." (Exh. 1, BWC 06:17:19).

### D. Jager Fabricated Evidence to Bolster A Shaky Arrest

Jager admits in his Opposition that told the Reno prosecution he "honestly had no idea if Killinger was telling the truth, or whether he had a doppelganger." (Df. Bf. 18:13-14). Jager told a Reno police officer arriving at the Peppermill as Jager was taking Killinger to jail: "This poor guy might legitimately be somebody else, **I don't know**." Jager added, **"I'll be honest, I don't know what to think."** (Exh. 1, BWC 6:33:51). Jager told Killinger, "**I'll be 100% honest you may have a doppelganger.**" (Exh. 1, BWC 6:16:38). At the jail Jager told a jail employee, "It **might be a legitimate doppelbanger** situation, it's super weird. It's one of those situations where I genuinely kinda believe him." (Exh. 1, BWC 7:08:07). If Jager did not know what to think, further

4

investigation was required—simple questions like asking Killinger, "What proof of identity do you have?" Where is your proof of identity? This case cried out for further investigation. Killinger told Reno prosecutor Jill Drake he "had no idea" whether Killinger was who he claimed to be. (Exh 16, Drake Decl, 2:4-5). If so, why didn't ask to see Killinger's abundant identification, why didn't he investigate further, why did he rush to arrest?

II.     **CRITICAL FACTS JAGER DOES NOT DISPUTE**

     A. **Killinger had no conflicting identification**

     B. **Peppermill's AI facial recognition software was inaccurate**

     C. **Killinger had ample identification to prove he was not Ellis**

     D. **Jager never asked Killinger for his proof of identification**

     E. **Jager refused to investigate Killinger's identification**

     F. **Jager omitted in his Declaration that Killinger possessed exculpatory identification**

     G. **Jager would disprove any proof Killinger offered based on his belief all suspects lie**

     H. **Jager had time and opportunity to investigate Killinger's proof of identity because there were no exigent circumstances and no emergency in progress, but he refused**

     I. **Killinger had in his pocket his Nevada Real ID, a bank Visa card, and his Peppermill's Player's card all in the name of Jason Killinger**

     J. **Killinger had 13 other forms of identification in his vehicle in his name that he refused to review**

     K. **Killinger requested relief from handcuff pain more than 20 times**

     L. **Jager refused to give Killinger even a moment of relief from handcuff pain**

III.    **JAGER DEFENDS HIS FAILURE TO INVESTIGATE, STATING THERE WAS NO NEED TO INVESTIGATE BECAUSE ALL CRIMINAL SUSPECTS ARE LIARS**

Jager admits that Killinger was foreclosed from proving his identity because Jager believes all criminal suspects lie. According to Jager it is not necessary to believe anything a suspect says or

5

to investigate their possible protestations of innocence because they are all are liars.

Jager explains his justification for disregarding Killinger's Real ID because "he has encountered situations where "Real IDs" were fake or obtained by fraudulent means." He continues, "A person who has obtained a fake ID will often have other documents or additional forms of identification that match the fake ID. Accordingly, the fact that a person may have multiple forms of ID bearing the same name does not necessarily mean that the IDs are legitimate. I deal with criminal elements and people who lie to me on a daily basis. Therefore, I have been trained to carefully scrutinize information that is presented to me by a suspect. (Exh. 17, Jager Decl. 3:9-15). Jager added, "If someone is in possession of a stolen vehicle and/or a stolen wallet, that person could also possess multiple forms of identification and documents in the same name." (Exh. 17, Jager Decl. 3:20-21).

Jager's wholesale rejection of the need for police investigation flies in the face of long standing Ninth Circuit precedent. The Ninth Circuit has made clear for decades that police officers are not to cavalierly, without corroboration, accept the word of accusers. In *v. MG Jewelry*, 950 F.2d 1427, 1444 (9th Cir. 1991), the court held:

> We decline to adopt Appellees' argument that merely because citizen witnesses are presumptively reliable, the officers in this situation had no duty to examine further the basis of the witness' knowledge or talk with any other witnesses. We agree with the California Supreme Court that the general proposition that private citizen witnesses or crime victims are presumed reliable does not "dispense with the requirement that the informant ... furnish underlying facts sufficiently detailed to cause a reasonable person to believe a crime had been committed and the named suspect was the perpetrator.

See also, *Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 925 (9th Cir. 2001).

IV.   **WHAT JAGER GET'S WRONG**

   A. **Jager Insults The Court With A Ridiculous Argument**

Jager states in his Opposition that the "conflicting identification" statements were made by

6

John Doe, not Killinger. "To be clear, Jager never stated Killinger presented conflicting identification he stated 'John Doe' presented conflicting identification." (Df. Bf. 13:24). This is an absurd statement because it is undisputed that Jager arrested Killinger and gave him the name "John Doe." Killinger was taken to jail, booked, and photographed as John Doe. (Exh. 14). No one reading this brief is **stupid**. It is irrational for Jager to state he wrote and meant that John Doe, not Killinger, "presented" and "had" conflicting identification when Jager knew they were one and the same person. John Doe didn't exist; he was not a real person. When Jager is speaking of John Doe, he is speaking only of Killinger. By saying it was John Doe, not Killinger, who presented conflicting identification Jager insults the intelligence of the Court, Killinger, and Killinger's counsel.

### B. Killinger Never Admitted Jager Had to Probable Cause For His Arrest

Jager wrongly claims that because Killinger did not include a cause of action for wrongful arrest it is a 'implicit admission' that probable cause existed." (Df. Bf., Footnote 8, 13:27-28). Incorrect again. Killinger did not include a false arrest claim because there are no cases in the Ninth Circuit stating that it is "clearly established" that arrests made solely based on AI software, without other corroborating evidence, are constitutional violations. "Clearly established" means that at the time of the officer's conduct, the law was sufficiently clear such that all reasonable police official would understand that what he or she was doing was unconstitutional. *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). Where no such cases exist, the clearly established prong cannot be satisfied.

While no such specific cases present exist in the Ninth Circuit, there are such cases in other jurisdictions, namely Michigan, Louisiana, Texas, New Jersey, and Maryland that (Exh. 15, 14, p.5 of 8). In a Michigan case, Robert Williams spent 30 hours in a Detroit jail based on inaccurate AI

7

facial recognition software. Detroit then changed its policy to require that such software identifications must be corroborated by other means. (Exh. 15, p. 6 of 8). Lacking such cases in the Ninth Circuit, it would be futile for Killinger to bring a wrongful arrest claim. Even if the court were to find a constitutional violation, it would grant qualified immunity. The effort to have Killinger's arrest deemed unlawful, while possibly worthwhile, would result in a Pyrrhic victory.

### C. Jager Is Not Entitled to Good Faith Immunity

Jager submits *Rivera v. Cnty of Los Angeles*, 745 F.3d 384 (9th Cir. 2014), for the proposition that police officers who mistakenly arrest the wrong person can be granted qualified immunity based on their good faith belief that were arresting the right person. (See Df. Bf 14:24-25; 15:1-11). This has nothing to do with this case; Killinger is alleging, direct intentional fabrication of evidence. There is **no** good faith defense to deliberate fabrication of evidence. There is no case that holds that there is and Jager submits none.

Nevada's good faith immunity will be denied because there is no good faith immunity under section 1983 for private parties who act under color of state law to deprive an individual of his or her constitutional rights. *Howerton v. Gabica*, 708 F.2d 380, 385 n.10 (9th Cir. 1983). Discretionary immunity pursuant to N.R.S. § 41.032 will also be denied because Nevada law has determined that a state official's actions are not protected by discretionary immunity in excessive force cases. "Since the Nevada Supreme Court adopted this standard, 'federal courts applying Nevada law have been reluctant to grant discretionary immunity to police officers accused of using excessive force because an officer's decisions regarding the amount of force to use are not the kind of decisions the discretionary function exception was designed to shield.'" Further, acts that violate the Constitution are not discretionary." *Correa v. Las Vegas Metropolitan Police Department,* 2:16-cv-01852-JAD-NJK (March 2018), pages 4-5.

8

Finally, the "public duty doctrine" codified in N.R.S. §42.0336, will also fail to protect Jager While it shields public entities like fire departments, officers, or public ambulance services, from liability on the basis that such entities should not be inhibited by their good faith efforts to service the public, even when the outcome of their emergency treatment is less than desirable, an exception exists for officers who affirmatively cause harm. *Porchia v. City of Las Vegas,* 504 P.3d 595, 518 (Nev. 2022). "An officer affirmatively causes harm within the meaning of N.R.S. §41.0336(2) when they 'actively create a situation which leads directly to the damaging result.'" *Coty v. Washoe Cnty.,* 839 P.2d 97, 98-99 (Nev. 1992). See also *Brizuela v. City of Sparks*, 3:19-cv-00692-MMD-VPD, page 57 (August, 2022). Here, Killinger alleges that Jager affirmatively caused him physical harm by refusing to give him a break from the painful handcuffs. There were no exigent circumstances, and no emergency in progress, there was ample time and opportunity to give Killinger some relief from the painful handcuffs. Killinger was charged with a minor misdemeanor, and was not intoxicated or combative. Killinger had no criminal record and Killinger had informed Jager, more than 20 times, of his pain from the handcuffing. There was no plausible reason to deny Killinger a modest break from the handcuffing other than pure malice.

### D. Jager Is Not Entitled To Qualified Immunity

Jager also submits the case of *Devereaux v. Abbey*, 263 F.3d 1070 (9th Cir. 2001) for the proposition that Jager is entitled to qualified immunity because the Defendants in *Devereaux* were granted qualified immunity. (Df. Bf., 15:12-28; 16:1-9). *Devereaux* stands for the proposition that criminal suspects have a "due process right not to be subjected to criminal charges on the basis of false evidence deliberately fabricated by the government." *Id.* at 1074-1075. This means if fabrication of evidence is proven, it is a constitutional violation. In *Deveraux*, unlike Killinger's case, the plaintiffs did not have direct evidence of fabricated evidence.

9

A police officer is not entitled to qualified immunity when genuine issues of material fact arise regarding fabrication of evidence in a police report. *Constanich v. Dep't of Soc. And Health Services*, 627 F.3d 1100, 1111 (9th Cir. 2009); see *McSherry v. City of Long Beach*, 560 F.3d 1125, 1130 (9th Cir. 2009).

## V. KILLINGER IS ENTITLED TO JUDGMENT AS A MATTER OF LAW ON HIS FABRICATION OF EVIDENCE CLAIM

Killinger is entitled to judgment as a matter of law on his fabrication of evidence claim. A plaintiff prevails on a due process fabrication of evidence claim if he establishes that: (1) the defendant official deliberately fabricated evidence and (2) the deliberate fabrication caused the plaintiff's deprivation of liberty. *Spencer v. Peters*, 857 F.3d 789, 898 (9th Cir. 2017); *Costanich v. Dep't of Soc. & Health Servs.,* 627 F.3d 1101, 1111 (9th Cir. 2010). Deliberate fabrication can be shown by either "direct evidence of fabrication or circumstantial evidence related to a defendant's motive." 889 F.3d 1105, 1112 (9th Cir. 2018).[1] Here, Killinger offers direct evidence of fabrication.

Killinger never presented or possessed conflicting evidence of his identity. Jager falsely wrote that he did. This is a materially untrue statement and direct evidence of fabrication of evidence. It is not a harmless drafting error. The clear inference of the use of the word "presented" is that Killinger "gave" or offered" or "handed over" separate pieces of identification that were in conflict. The clear inference that Killinger "had" conflicting identification is that he possessed such conflicting identification on his person. Again, this is undisputably untrue. Jager seeks to fool the court by saying he wrote only that "John Doe" had conflicting identification but since John Doe was Killinger, and Jager undisputably knew John Doe was Killinger, this also fails.

## VI. KILLINGER IS ENTITLED TO JUDGMENT AS A MATTER OF LAW ON HIS SUBSTANTIVE DUE PROCESS CLAIM

---

[1] For a complete discussion on the claim of fabrication of evidence in Nevada, please see the 2022 unpublished decision filed in *Lobato v. Las Vegas Metropolitan Police Department,* 2:19-cv-01273-RFB-EJY by the Hon. Richard F. Boulware, II. Judge Boulware's decision regarding fabrication of evidence was affirmed by the Ninth Circuit Court of Appeals in a memorandum decision on October 11, 2023

10

Killinger is entitled to judgment as a matter of law on his claim of failure to investigate further when further investigation was warranted. Jager repeatedly admitted he was uncertain of whether Killinger was truthful. Jager said, "[This] is one of those situations where I genuinely kinda" believe him. (Exh. 1, BWC 7:08:07). "I'll be honest, I don't know what to think." (Exh. 1, BWC 6:33:51). He told Jill Drake that he had "no idea" whether Killinger was telling the truth.

Jager had sufficient time to investigate further. There was no exigency in process, no emergency, the Peppermill was not burning down. Ther were no mass protests, swarms of meddling people interfering, or hindering a further investigation. Instead of looking at Killinger's abundant identification, or reasonably comparing the license differences between Ellis and Killinger—names, heights, weights, eye colors, ages, birthdays, driver's license class, restrictions, endorsements, signatures, and addresses—Jager just ignored it. Even a cursory, superficial examination would have indicated that further investigation was required. Jager repeatedly admitted he was confused yet rejected and refused to consider Killinger's proof of identity. This kind of police officer is a menace to the police force, rejecting anything a suspect says and firmly defending such rejection because of a belief they are all liars.

Jager does not dispute Ninth Circuit law, nor can he. "A mistaken incarceration violates the Due Process Clause if it fits at least one of two categories. Either (1) the circumstances indicated to the defendants that further investigation was warranted, or (2) the defendants denied the plaintiff access to the courts for an extended period of time." *Garcia v. County of Riverside,* 817 F.3d 635, 640 (9th Cir. 2016) There can be no reasonable dispute that here further investigation was required.

### 1. As a Matter Of Law Due Process Required Further Investigation

Jager challenges the legitimacy of "further investigation" cases cited by Killinger. Instead of recognizing that the many cases cited by Killinger establish the existence of such a constitutional

11

claim, Jager argues that many of the plaintiffs were granted summary judgment. (Df. Bf., 16:13-27; 17:1-25). This misses the point. A court's grant of summary judgment means only that the plaintiff failed to prove that further investigation was necessary, not that such a claim is invalid. In *Tatum v. Moody,* 768 F.3d 806, 817 (9th Cir. 2012) the police defendants, just like Jager, not only concealed exculpatory evidence but failed to investigate when further investigation was required. A jury verdict in favor of the Plaintiff in *Tatum* was affirmed on appeal.

## 2. Jager Rejected What RPD Historically Accepted As Proof Of Identification

Jager was presented with multiple red flags that should have alerted him the Peppermill's software was in error: plain undisputable differences in the driver's licenses of both Killinger and Ellis, differences in names, heights, weights, eye colors, ages, birthdays, driver's license class, restrictions, endorsements, signatures, and addresses between Killinger and Ellis. Both had Nevada Real ID driver's licenses and both had clean records with valid, current active licenses. (Exh. 17, Jager Decl., 2:2-4). Jager felt however this was worthless, irrelevant, information he was free to ignore because all suspects, including Killinger, are liars. (Exh. 17, Jager Decl., 3:9-21).

## 3. RPD's General Order On Citation Release

Killinger's arrest should never have happened. At worst, he was eligible for a citation, with a date to appear in court, and not a trip to the jail and 10 hours of miserable underserved incarceration. RPD General Order P-280-17(B) discusses persons eligible for citation release. (Exh. 12). The primary requirements for citation release are whether the suspect is accused of a non-violent misdemeanor and whether the suspect presents satisfactory evidence of identity, such as police and DMV records.[2] Killinger met **all** the requirements for citation and release. The crime he was suspected of was trespass, a known minor misdemeanor. Trespassing is considered a very

---

[2] The list goes on with other requirements, the person must sign the citation, is not physically combative; does not have a warrant for a violent crime; does not have a warrant that mandates arrest; and does not present a reasonable likelihood of disregarding the requirements to appear in court.

12

minor crime in the Ninth Circuit as it does not involve violence, threats of violence, fraud, or theft. *Tsao v. Desert Palace Inc.,* 698 F.3d 1128, 1133 (9th Cir. 2012); *Santiago v. Streeval*, 36 F.4th 700, 710 (7th Cir. 2022). Killinger was not combative or intoxicated, had no wants and warrants, and he had supplied a valid, active, and current driver's license.

## VII.    KILLINGER IS ENTITLED TO JUDGMENT AS A MATTER OF LAW ON HIS MALICIOUS PROSECUTION CLAIM

Killinger is entitled to judgment as a matter of law on his malicious prosecution claim because he meets the elements of the claim. Jager misunderstands the basis for Killinger's malicious prosecution claim. Jager contends he bears no responsibility for Killinger's arrest because he did not initiate the criminal proceeding, the Peppermill did.[3] (Df. Bf. 18:8-11). Next, Jager claims that he did not participate in the continuation of the criminal proceeding, his reports were submitted and he had nothing further to do with the case. Jager claims the prosecutor's actions were wholly separate from his own. (Df. Bf., 18:11-14).

However, Ninth Circuit case law holds to the contrary: "If a defendant knowingly provides fabricated evidence to a prosecutor or conceals exculpatory evidence, the prosecutor's actions cannot be considered independent, and do not break the causal chain." See. *Awabdy v. city of Adelanto*, 368 F.3d 1062, 1067-1068 (9th Cir. 2004). Jager argues the harbored no ill will or malice towards Killinger and had no motive to "frame him." (Exh. 17, Jager Decl., 5:23-24). and that he exerted no influence on Ms. Drake [the Reno prosecutor] or her decision-making, thus he possessed no malice whatsoever." (Df. Bf. 18:8-18)

Jager fails to understand that by providing fabricated evidence to the prosecutor, that suffices as malice. It caused Ms. Drake to refuse to dismiss the case with prejudice, and to "Refer the case to an RPD fraud detective to further investigate the possibility of whether Killinger may have used someone else's information at the DMV to obtain an ID with his photograph. If such

---

[3] However, Jager did sign a criminal complaint against Killinger and cause it to be filed in Reno Municipal Court (Exh. 9).

13

evidence were to be found, there was a possibility that the City could refile the case." (Exh. 16, Drake Decl., 2:17-20). In other words, Jager's information to Ms. Drake, that Killinger possibly had a DMV hookup that was manufacturing false identification for him, caused Ms. Drake to continue the case against Killinger even after it was dismissed and even after it was decisively established at the jail with a WINS check that Killinger was Killinger and not Ellis.

### 1. Nevada Law

In Nevada, malicious prosecution claims can be brought against police officers who cause criminal proceedings to be initiated **or** continued against a person without probable cause. *Catrone v. 105 Casino Corp.,* 414 P.2d 106, 108 (Nev. 1966); see also *Bonamy Zenoff,* 362 P. 2d 445, 446 (Nev. 1961) "Malice may be inferred from proof of want of probable cause." *LaMantia v. Redisi,* 38 P.3d 877, 879-80 (Nev. 2002). Even if probable cause is initially found it can be successfully rebutted by proof that the evidence presented to the prosecutor was fabricated. "A police officer's forwarding to prosecutors of known false evidence works an unacceptable **corruption** of the truth-seeking function of the trial process, and thus, if proven, would rebut the presumption of probable cause." *Manganiello v. City of New York,* 612 F.3d 149, 162 (2nd Cir. 2010) (Emp. added).

### 2. A Prosecutor's Actions Will Not Shield Officers Who Fabricate Evidence

A prosecutor's decision to proceed to trial will not shield a police officer who supplies known false information to influence the prosecutor. *Jones v. City of Chicago,* 856 F.2d 985, 995 (7th Cir. 1998). A police officer who supplies intentionally fabricated and/or misleading information to a prosecutor, causing the prosecutor to act on that information, cannot hide from liability by blaming prosecutors for the continued prosecution. *Id*. at 994.

Malice may also be implied if a defendant acts in willful disregard of a plaintiff's rights. *Ewish v. State,* 871 P.2d 306, 312 (Nev. 1994). The Ninth Circuit has held that, "Among the ways

that a plaintiff can rebut a prima facie finding of probable cause is by showing that the criminal prosecution was induced by fraud, corruption, perjury, fabricated evidence, or other wrongful conduct undertaken in bad faith." *Awabdy v. City of Adelanto*, 368 F.3d at 1067.

Killinger's prosecution continued for months after he was properly identified at the jail as Killinger. The case should have been dismissed with prejudice. Ms. Drake knew Killinger was absolutely identified as Killinger. Ms. Drake knew there was no evidence that Killinger had ever trespassed at the Peppermill. However, because Jager lied about Killinger having conflicting identification, the case falsely appeared to have merit. After dismissal, Ms. Drake continued to look for ways to continue to prosecute Killinger. Jager's false information caused Killinger's nightmare to continue. This would not have happened absent Jager's telling her he believed Killinger had a DMV hookup making false identifications for him at DMV[4] and submitting a Declaration attesting to the false fact that Killinger had "conflicting identification." (Exh. 1, BWC 06:12:50). Ms. Drake admits that she referred Killinger's case to an RPD fraud detective after she dismissed it, to further investigate that Killinger had fraudulently used someone else's information at the DMV. If such evidence could be found the City could "refile" the case. (Exh. 16, Drake Decl, 2:17-20).

Killinger was forced to retain an attorney, go to court, and worry for months that even after the dismissal, that the RPD fraud unit, a fraud detective, and Ms. Drake would refile the case.

## VIII. CONCLUSION

For all the above reasons, Plaintiff Killinger respectfully requests the Court grant his Motion for Partial Summary Judgment.

DATED: this 6th day of October, 2025

/s/Terri Keyser-Cooper
TERRI KEYSER-COOPER
*Attorney for Jason Killinger*

---

[4] Jager is captured on his BWC saying "I just have a feeling he's got a **hookup with the DMV** where he's got two different driver's licenses." (Exh. 1, BWC 06:12:50).

15

# CERTIFICATE OF SERVICE

I, Terri Keyser-Cooper, declare as follows:

On this date, I served a copy of the following documents on the parties as follows:

PLAINTIFF's REPLY TO DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT (EXF NO. 7)

[ ]    BY FED EX.  By placing a true copy of the above-referenced document(s) with FedEx in a sealed envelope with postage prepaid to the addressee(s) listed below.

[ ]    BY FACSIMILE TRANSMISSION.  By transmitting a true copy of the document(s) by facsimile transmission

[ ]    BY HAND-DELIVERY.  By delivering a true copy enclosed in a sealed envelope to the address(es) shown below.

[X]    BY ELECTRONIC SERVICE.  By electronically mailing a true copy of the document(s) to defendants at the following email addresses via the Court's electronic filing procedure:

KARL HALL
ALICE K. HERBOLSHEIMER
Reno City Attorney's Office
P.O. Box 1900
Reno, NV 89505
Herbolsheimera@reno.go

DATED this 6th day of October, 2025

    /s/ Terri Keyser-Cooper
TERRI KEYSER-COOPER
*Attorney for Plaintiff Jason Killinger*

16