# Exhibit 13

# Collection of Identification Killinger Had at time of Arrest

Exhibit 13

NEVADA USA 1864

COMMERCIAL DRIVER LICENSE

4d DL NO. 1007291590
3 DOB 07/28/1983
1 KILLINGER
2 JASON JAMES
8 600 NEWPORT LN D-10
RENO, NV 89506-8607

9 CLASS A
12 REST JM
9a END NPST

4a ISS
07/27/2022
4b EXP
07/27/2030

15 SEX M
16 HGT 6'-01"
17 WGT 285 lbs
18 EYES BLU
19 HAIR BLN

07/28/83

5 DD 000176244590728220855

DOB 07/28/1983 21 0020465499001
ISS 07/27/2022

CLASS: A-COMB VEHS GCWR > 26,000 LBS; TRAILER > 10,000 LBS

ENDORSEMENTS: N-Tankers, P-Passengers, S-School Bus, T-Double/Triple trailers

RESTRICTIONS: JU-Phys exam, M-No Class A Psngr veh

Card Version:
05/24/2021

Form MCSA-5876

1 of 10

OMB No: 2126-0006 Expiration Date: 03/31/2025

**Public Burden Statement**

A Federal agency may not conduct or sponsor, and a person is not required to respond to, nor shall a person be subject to a penalty for failure to comply with a collection of information subject to the requirements of the Paperwork Reduction Act unless that collection of information displays a current valid OMB Control Number. The OMB Control Number for this information collection is 2126-0006. Public reporting for this collection of information is estimated to be approximately one minute per response, including the time for reviewing instructions, gathering the data needed, and completing and reviewing the collection of information. All responses to this collection of information are mandatory. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden to: Information Collection Clearance Officer, Federal Motor Carrier Safety Administration, MC-RRA, 1200 New Jersey Avenue, SE, Washington, D.C. 20590.

U.S. Department of Transportation
Federal Motor Carrier
Safety Administration

# Medical Examiner's Certificate
(for Commercial Driver Medical Certification)

I certify that I have examined [Last Name] Killinger [First Name] Jason in accordance with *(please check only one)*:

- [x] the Federal Motor Carrier Safety Regulations (49 CFR 391.41-391.49) and, with knowledge of the driving duties, I find this person is qualified, and, if applicable, only when *(check all that apply)* OR
- [ ] the Federal Motor Carrier Safety Regulations (49 CFR 391.41-391.49) with any applicable State variances (which will only be valid for intrastate operations), and, with knowledge of the driving duties, I find this person is qualified, and, if applicable, only when *(check all that apply)*:

- [ ] Wearing corrective lenses
- [ ] Wearing hearing aid
- [ ] Accompanied by a ______ waiver/exemption
- [ ] Accompanied by a Skill Performance Evaluation (SPE) Certificate
- [ ] Driving within an exempt intracity zone (49 CFR 391.62) *(Federal)*
- [ ] Qualified by operation of 49 CFR 391.64 *(Federal)*
- [ ] Grandfathered from State requirements *(State)*

The information I have provided regarding this physical examination is true and complete. A complete Medical Examination Report Form, MCSA-5875, with any attachments, embodies my findings completely and correctly, and is on file in my office.

Medical Examiner's Certificate Expiration Date: 7/12/26

Medical Examiner's Signature: Sarah Zalaznik [signature]

VALIDATED
FIELD SERVICES DIVISION
JUL 16 2024
STATE OF NEVADA
DMV

Medical Examiner's Telephone Number: 775 982 5000

Date Certificate Signed: 7/12/24

Medical Examiner's Name *(please print or type)*: Sarah Zalaznik

( ) MD ( ) DO (x) Physician Assistant ( ) Chiropractor ( ) Advanced Practice Nurse ( ) Other Practitioner *(specify)* ______

Medical Examiner's State License, Certificate, or Registration Number: PA1048

Issuing State: NV

National Registry Number: 1668013598[2]

Driver's Signature: Jason [signature]

Driver's License Number: 1007291590

Issuing State/Province: NEVADA

Driver's Address

Street Address: 600 Newport Ln D-10 City: RENO State/Province: NV Zip Code: 89506

CLP/CDL Applicant/Holder: (x) Yes ( ) No

**This document contains sensitive information and is for official use only. Improper handling of this information could negatively affect individuals. Handle and secure this information appropriately to prevent inadvertent disclosure by keeping the documents under the control of authorized persons. Properly dispose of this document when no longer required to be maintained by regulatory requirements.**



DMV.NV.GOV

Department of Motor Vehicles
555 Wright Way
Carson City, NV 89711-0625
(775) 684-4368

**2026** EXPIRES 6/5/2026

| LICENSE NUMBER | YEAR | MAKE | TYPE | CYL | MSRP | FUEL | AXLE | DECLARED WEIGHT | UNLADEN WEIGHT |
|---|---|---|---|---|---|---|---|---|---|
| MM0631 | 2025 | NISS | P4D | 04 | 22290.00 | G | | 0 | 3038 |

| VEHICLE IDENTIFICATION NUMBER | MODEL NAME/LENGTH | COUNTY BASED |
|---|---|---|
| 3N1AB8CV2SY206095 | SENTRA SV | WASHOE |

| ISSUE DATE | FLEET NUMBER | UNIT NUMBER | FARM/RANCH VEHICLE | DECAL NUMBER | PLATE BACKGROUND |
|---|---|---|---|---|---|
| 6/5/2025 | | | N | MM0631 | MOB MUSEUM |

KILLINGER,JASON JAMES (REGD)

KILLINGER,JASON JAMES
2327 RUDDY WAY
SPARKS NV 89441-5887

Instructions for applying the decal to the rear license plate on the reverse of this form

PLATES AND REGISTRATION MUST BE RETURNED WHEN NOT OPERATING THE VEHICLE

Form NVREG04 188961533 - 3036 - 12497

NEVADA
AUTOMOBILE INSURANCE IDENTIFICATION CARD

Policy Number: 78-NV 8641429
Effective From: 05/23/2025
To: 11/23/2025 12:01 A.M.
Insured: JASON J KILLINGER
2327 RUDDY WAY
SPANISH SPRINGS NV 89441
Vehicle: 2025 NSSN SENTRA SV
3N1AB8CV2SY206095
Agency: JASON CANDLER & ASSOCIATES LLC
(775)823-5326
Company: PERMANENT GENERAL ASSURANCE CORPORATION
PO BOX 305054
NASHVILLE, TN 37230-5054
NAIC: 37648

This evidence of insurance has been approved by the Nevada Commissioner of Insurance. The above coverage meets the requirements as set forth in NRS 485.185.

THIS EVIDENCE OF INSURANCE MUST BE CARRIED IN THE INSURED MOTOR VEHICLE FOR PRODUCTION UPON DEMAND

To report a claim: **1-800-280-1466**

When an accident occurs, collect the following information and notify us immediately:

- Name and address of each driver, passenger and witness.
- Name of Insurance Company and policy number for each driver / vehicle involved.

Visit our self service website:
www.thegeneral.com/mypolicy

2 of 10

COMMERCIAL
DRIVER LICENSE
4d DL NO. 1007291590
3 DOB 07/28/1983
1 KILLINGER
2 JASON JAMES
8 2327 RUDDY WAY
SPARKS, NV
9 CLASS A
12 REST JM
9a END NPST
4a ISS 02/21/2025
4b EXP 07/27/2030
15 SEX M
16 HGT 6'-01"
17 WGT 285 lbs
18 EYES BLU
19 HAIR BLN
07/28/83

DEBIT
VISA

ups
0389
JASON
KILLINGER
AIR
RECOVERY
NO Gateway Access

This card is the property of UPS and must be returned upon request or termination of employment. If found drop in any mailbox. Postage is guaranteed.

UPS
Security Technology Group
P.O. Box 34760
Louisville, KY 40232-4760

AUTHORIZED SIGNATURE - NOT VALID UNLESS SIGNED
891
4154 9100 0026 7167
GOOD THRU 07/29
JASON J KILLINGER

DOB 07/28/1983
ISS 02/21/2025

CLASS: A-COMB VEHS GCWR > 26,000 LBS; TRAILER > 10,000 LBS
ENDORSEMENTS: N-Tankers, P-Passengers, S-School Bus, T-Double/Triple trailers
RESTRICTIONS: JU-Phys exam, M-No Class A Psngr veh

Card Version: 05/24/2021



| | | | |
|---|---|---|---|
| Employee Name | JASON J KILLINGER | Pay Date | 08/28/2025 |
| Employee # | 2010262 | Pay Period | 08/17/2025 - 08/23/2025 |
| Employee Tax ID | XXX-XX-6680 | Check/Advice # | V114768084 |
| Employee Address | 520 5th<br>sparks, NV 89431 | Fed Status | HoH |
| | | Fed Exemptions | 0 |
| Work Location | 10_19_NVRNO_FDR_8959_5 | State Status | |
| | | State Exemptions | |

United Parcel Service
55 Glenlake Parkway NE
Atlanta, GA 30328
1-855-877-4772

**EARNINGS**

| Description | Hours/Units | Rate | Amount |
|---|---|---|---|
| REGULAR | 40 | 46.84 | 1,873.60 |
| OVERTIME | 19.13 | 70.26 | 1,344.07 |
| *LEGAL SVS | | | 17.30 |
| TOTAL HOURS WORKED | 59.1300 | | |
| CURRENT TOTAL | | | 3,217.67 |
| Y-T-D TOTALS | | | 59,994.63 |

**TAXES & DEDUCTIONS**

| Description | Current | YTD |
|---|---|---|
| PRE TAX DEDUCTIONS | | |
| PRU 401K 5% | 160.88 | 1,989.36 |
| TOTAL PRETAX DED | 160.88 | 1,989.36 |
| TAXES | | |
| Fed W/H | 462.94 | 7,166.88 |
| FICA EE | 200.57 | 3,714.74 |
| MEDICARE EE | 46.91 | 868.77 |
| TOTAL TAXES | 710.42 | 11,750.39 |
| DEDUCTIONS | | |
| PRU POST-401K 2% | 64.35 | 1,002.27 |
| DESPP REG | 75.00 | 1,950.00 |
| DRIVE | 1.00 | 26.00 |
| TOTAL DEDUCTIONS | 140.35 | 3,958.47 |

TOTAL NET PAY 2,206.02

**ACCRUALS & BALANCES**

| | | | |
|---|---|---|---|
| Other Days Balance : | 9.00 | Option Day Days Balance : | 4.00 |
| Option Week Hours Balance : | 64.00 | | |
| Birthday Days Balance : | 4.00 | | |
| Vacation Days Balance : | -6.66 | | |

REMOVE DOCUMENT ALONG THIS PERFORATION

United Parcel Service
636 E SANDY LAKE ROAD
COPPELL, TX 75019

| EMPLOYEE ID | DATE | CHECK NO. |
|---|---|---|
| 2010262 | 08/28/2025 | V114768084 |

PAY TO THE ORDER OF JASON J KILLINGER

CHECK AMOUNT $*****2,206.02

PAY EXACTLY TWO THOUSAND TWO HUNDRED SIX AND 02/100 DOLLARS

VOID

Void After 180 Days

By ____________

**DEPOSIT ADVICE - NON NEGOTIABLE**



United Parcel Service
636 E SANDY LAKE ROAD
COPPELL, TX 75019

JASON J KILLINGER
1019_NVRNO_FDR_8959_5 5
520 5th
sparks NV 89431



Anthem
BlueCross

NORTHERN CALIFORNIA GENERAL TEAMSTERS SECURITY FUND

**JASON J KILLINGER**
**ANTHEM SUBSCRIBER ID : QNC07630193D**

Rx Bin: 008878
Processor: Nel Card Systems
DHS Healthcare ID #: 07630193D
BC Group #: 280630M008
Plan Code: 040 Medical and Prescription

Please verify the patient's identification

PPO

NORTHERN CALIFORNIA GENERAL TEAMSTERS SECURITY FUND

DELTA HEALTH SYSTEMS

**HEALTHCARE ID: 076-30193D**

JASON J KILLINGER

network

Plan: Dental and Vision

For eligibility, claims and customer service:
Delta Health Systems
800.417.8923
www.deltahealthsystems.com

Send Dental claims to:
Cypress Dental
7510 Shoreline Drive
Stockton, CA 95219
888.951 7771
www.cypressadmin.com

Please verify patient's identification

**MEMBER IDENTIFICATION CARD**

Local Union No 533 (IBT)
Reno, NV 89512
0483002275 2020

Affiliated with the
International Brotherhood of Teamsters

**Killinger, Jason**

**Member since: 2020**

109 D Cook Sr. Treasurer

SIGNATURE AND TITLE

**MEMBER IDENTIFICATION CARD**

Local Union No. 483

Boise ID 83702
CITY STATE ZIP CODE

AFFILIATED WITH THE
INTERNATIONAL BROTHERHOOD OF TEAMSTERS

Jason Killinger
NAME

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 8/06
LEDGER NO. SOC. SEC. NO. INITIATED

Mark Briggs Sec-Tres
SIGNATURE AND TITLE

5 of 10



Anthem. BlueCross

anthem.com/ca

Eligibility & Benefits:
Delta Health Systems
deltahealthsystems.com

PROVIDERS: Please submit claims to your local Blue Cross and/or Blue Shield Plan. To ensure prompt claims processing, include the 3-digit alpha prefix that precedes the patient's identification number listed on the front of this card.

Send ALL Medical claims to:
Anthem Blue Cross, P O Box 60007
Los Angeles CA 90060-0007

Possession of this card does not guarantee eligibility or benefits

| | |
|---|---|
| Anthem Pre-Authorization: Coverage while traveling - | 800 274.7767 |
| BlueCard Provider Access | 800.810.BLUE |
| Provider Only Claims Inquiries: | 800.688.3828 |
| Delta Health Systems*: | 800.417.0923 |
| WellDyneRx Customer Service*: | 888.479.2000 |
| WellDyneRx Pharmacy Helpdesk*: | 888.886.5022 |
| TARP*: | 800.522.8277 |
| PlushCare* | 866.460.6205 |

*Contracts Directly with the Trust

Anthem Blue Cross Life & Health Insurance Company provides administrative services only and does not assume any financial risk or obligation with respect to claims. Blue Cross of California, using the trade name Anthem BlueCross, administers claims on behalf of Anthem Blue Cross Life and Health Insurance Company and is not liable for benefits payable. Independent licensees of the Blue Cross Association

This is your dental and vision plan identification card. Present it to the provider of health care when you or your eligible dependents receive services. See your Summary Plan Description (SPD) for a detail of the benefits, terms, conditions, limitations and exclusions of coverage. When submitting inquiries always include your healthcare ID from the face of this card. Possession or use of this card does not guarantee eligibility or benefits.

vsp
www.vsp.com
800.877.7195

Electronic Claims can be submitted through Change Healthcare, Tesia or Dental XChange under Payor ID TLZ04. Electronic attachments can be submitted through National Electronic Attachments (NEA) at www.nea-fast.com

OFFICIAL RECEIPT MUST BE CARRIED SHOWING MONTH PAID BY MEMBER

IN CASE OF ACCIDENT PLEASE NOTIFY

NAME Cobie Goff : Robie Leitch
STREET Linden : 4050 N. [illegible]
CITY Buhl, ID : Buhl, ID
TEL NO (208) 731-4883 : (208) 731-4762

[signature] (Proud to be a Teamster)

MEMBER SIGNATURE

6 of 10






SILVER
ZONE
JASON KILLINGER

DIAMOND

PLUS

CAESARS
REWARDS.

JASON KILLINGER
11701259468 Exp: 01/2026

THE CLUB
AT
TERRIBLE'S
FERNLEY CASINO
Jason J. Killinger
10037385

REWARDS
GOLD
Jason Killinger

PASSPORT REWARDS
JASON J. KILLINGER
013655494
GOLD
L
25

REAL TIME
REWARDS
SI220015018 EXP 12/25
JASON J KILLINGER
SILVER

INSERT
BEST BET
Club
PRIME
JASONKILLINGER
5001684193

BONANZA
CASINO
RENO
NEVADA
PRIVATE
Jason J. Killinger
1960393778



877-7-PLAYER caesars.com/myrewards

Cardholder agrees to all terms under which this card is issued. This card is non-transferable, property of Caesars and must be returned upon request. Reward Credits™ will expire unless at least 1 Reward Credit is obtained every six months. Visit the Caesars Rewards Center or our website for program rules.

Must be 21 or older to gamble (Must be 19 or older in Ontario). Must be 18 or older for pari-mutuel wagering in Indiana, Louisiana and Pennsylvania. Know When To Stop Before You Start™. CO, MS, NV or NC: Gambling Problem? Call 1-800-522-4700. CA, IL, NJ or PA: If you or someone you know has a gambling problem, crisis counseling, and referral services can be accessed by calling 1-800-GAMBLER (1-800-426-2537). AZ: 1-800-NEXT-STEP. LA: 1-877-770-STOP. MO: 1-888-BETSOFF. IA: 1-800-BETSOFF. IN: 1-800-9WITHIT. FL: 888-ADMIT-IT. OH: For help, call the Ohio Problem Gambling Helpline at 1-800-589-9966 or visit the Ohio for Responsible Gambling website at www.org.ohio.gov. MD: Please play responsibly, for help visit mdgamblinghelp.org or call 1-800-GAMBLER. Ontario: PlaySmart 1-866-531-2690. ©2021, Caesars License Company, LLC.

This card is the property of Terrible's Fernley Casino. It is non-transferable and must be surrendered upon demand. No cash value. Must be 21 years of age. Management reserves all rights. Complete rules available at Terrible's Fernley Casino. All earned or promised complementaries including, but not limited to, cash back, comps, and free play will be surrendered if cardholder is trespassed pursuant to Nevada Revised Statute 207.200.

480 TRUCK INN WAY · FERNLEY, NEVADA 89408

As a member of the Gold Dust West and J Resort Player's Club you can earn valuable complementaries when you use this card while you play. You must provide picture identification to receive complementaries. This card is intended for player tracking purposes and your use of this card indicates acceptance of the conditions of the Gold Dust West and J Resort. Gold Dust West and J Resort reserve the rights to alter or cancel this promotional program at any time. Must be 21 or older to gamble. Gambling Problem? Call 1-800-522-4700. ©2023 Jacobs Entertainment, Inc.

(775) 348-2200
jresortreno.com

Gold Dust West
(775) 323-2211
gdwcasino.com

PEPPERMILL RESORTS PeppermillResorts.com

For information or reservations call:

| | | |
|---|---|---|
| Peppermill Reno, Reno, NV | 800.648.5555 | PeppermillReno.com |
| Western Village, Sparks, NV | 800.648.1170 | WesternVillageSparks.com |
| Resorts at Wendover | 800.537.0207 | WendoverFun.com |

Your Passport Rewards card can be used at Peppermill Reno and Western Village. For Passport Guidelines, visit the Passport Rewards Center. Must be 21. Management reserves all rights.

This card is property of Truckee Gaming, LLC. It must be returned upon request. All members must be 21 years of age or older. Visit the Guest Service Center for official rules.

SILVERADO

## USE THIS CARD EVERYTIME YOU PLAY!

Must be 21 or older to gamble and join the Best Bet Club. Club members agree to all terms under which this card was issued (Best Bet Club Rules). Full Best Bet Club rules available at the Best Bet Club. Management reserves all rights, including the right to revoke membership or offers at any time, with or without notice. Promotions issued in error are not valid. Non-transferable. This card is property of the Club Cal Neva and must be returned if requested. Exclusive promotions and benefits are issued based solely upon your tracked play. It is your responsibility to ensure this card is correctly inserted into slots or shown to your dealer each time you play. Freeplay must be used within 24 hours of redemption. Inactive accounts and all balances may be deleted at 12 months of inactivity. Must have valid government issued photo I.D. to gamble.

DOWNTOWN RENO, NEVADA | 38 EAST 2ND STREET
© 2025 CLUB CAL NEVA | WWW.CLUBCALNEVA.COM | 775-323-1046

Bonanza Casino (775) 323-2724
www.bonanzacasino.com

Use this card to earn valuable comps and free slot play. The Fort Reno Cavalry program recognizes slot, table, keno and restaurant patrons for their participation. Must be 21 years of age to participate and have a valid state or federal ID. Card is non-transferable; only the person named on the front may use it. Inactivity (no ratings) for a 12 month period will result in forfeiture of all benefits earned with club program. Club benefits are rewarded at the discretion of the Bonanza Casino, who reserves the right to cancel or modify the club at any time. This card is the property of the Bonanza Casino.

REWARDS
LEGENDS BAY CASINO
SELECT
Jason Killinger
236833

01/26
MONARCH REWARDS
EVERY PLAYER'S PARADISE
MONARCH REWARDS
RUBY
2706225
JASON KILLINGER

PENN
PLAY
ADVANTAGE
JASON KILLINGER, Advantage
IX102328781 05/26

50 TH
ANNIVERSARY
BOYD
BOYD Rewards
SAPPHIRE
Jason J Killinger
L7049143402 EXP 12/26

9 of 10

Cardholder agrees to all terms under which the card is issued and must be 21 years of age. This card is the property of Legends Bay Casino, must be returned upon request and is nontransferable. LB Rewards rules are available upon request at the LB Rewards counter. Legends Bay Casino is not responsible for improperly inserted cards. Management reserves all rights.

*Play with this card at Legends Bay Casino in Sparks, NV and at Casino Fandango in Carson City, NV.*

775.473.8000 | LEGENDSBAYCASINO.COM

10 of 10



# Exhibit 14

Mug shot of Killinger as John Doe

Exhibit 14

# Washoe County Sheriff's Office

911 Parr Blvd., Reno, NV 89512

# Mugshot Profile



**DOE, JOHN**

| | |
|---|---|
| **Nickname:** | , |
| **DOB:** | 01-01-1980 |
| **SSN:** | 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 |
| **Booking #:** | 2310668 |
| **JID:** | P00195083 |
| **MNI:** | 03043058 |
| **Arrest Date:** | 09-17-2023 |
| **Booking Date:** | 09-17-2023 |
| **Sex:** | MALE |
| **Race:** | WHITE |
| **Height:** | 510 |
| **Weight:** | 280 |
| **Eye Color:** | HAZEL |
| **Hair Color:** | BROWN |
| **Hair Length:** | SHORT ABOVE EAR |
| **Facial Features:** | |
| **Glasses:** | NO |

**Scars Marks & Tattoos:**

**Charges:**

| | |
|---|---|
| **Booking Last Name:** | DOE |
| **Booking First Name:** | JOHN |
| **Booking Middle Name:** | |

# Exhibit 15

## New York Times Article on Wrongful Arrest Caused By Facial Recognition Software

Exh. 15

The New York Times https://www.nytimes.com/2024/06/29/technology/detroit-facial-recognition-false-arrests.html

# *Facial Recognition Led to Wrongful Arrests. So Detroit Is Making Changes.*

The Detroit Police Department arrested three people after bad facial recognition matches, a national record. But it's adopting new policies that even the A.C.L.U. endorses.

▶ **Listen to this article · 9:18 min** Learn more

**By Kashmir Hill**
Kashmir Hill, who covers privacy and has written a book about facial recognition technology, traveled to Detroit to report this article.

June 29, 2024

**The DealBook Newsletter** Our columnist Andrew Ross Sorkin and his Times colleagues help you make sense of major business and policy headlines — and the power-brokers who shape them. Get it sent to your inbox.

In January 2020, Robert Williams spent 30 hours in a Detroit jail because facial recognition technology suggested he was a criminal. The match was wrong, and Mr. Williams sued.

On Friday, as part of a legal settlement over his wrongful arrest, Mr. Williams got a commitment from the Detroit Police Department to do better. The city adopted new rules for police use of facial recognition technology that the American Civil Liberties Union, which represented Mr. Williams, says should be the new national standard.

"We hope that it moves the needle in the right direction," Mr. Williams said.

Mr. Williams was the first person known to be wrongfully arrested based on faulty facial recognition. But he wasn't the last. The Detroit police arrested at least two other people as a result of facial recognition searches gone awry, including a woman who was charged with carjacking when she was eight months pregnant.

Law enforcement agencies across the country use facial recognition technology to try to identify criminals whose misdeeds are caught on camera. In Michigan, the software compares an unknown face to those in a database of mug shots or drivers' license photos. In other jurisdictions, the police use tools, like Clearview AI, that search through photos scraped from social media sites and the public internet.

One of the most important new rules adopted in Detroit is that the images of people identified via facial recognition technology can no longer be shown to an eyewitness in a photo lineup unless there is other evidence that links them to the crime.

"The pipeline of 'get a picture, slap it in a lineup' will end," said Phil Mayor, a lawyer for the A.C.L.U. of Michigan. "This settlement moves the Detroit Police Department from being the best-documented misuser of facial recognition technology into a national leader in having guardrails in its use."

The police say facial recognition technology is a powerful tool for helping to solve crimes, but some cities and states, including San Francisco; Austin, Texas; and Portland, Ore., have temporarily banned its use because of concerns about privacy and racial bias. Stephen Lamoreaux, head of informatics with Detroit's crime intelligence unit, said the Police Department was "very keen to use technology in a meaningful way for public safety." Detroit, he asserted, has "the strongest policy in the nation now."

## How It Goes Wrong

Mr. Williams was arrested after a crime that happened in 2018. A man stole five watches from a boutique in downtown Detroit, while being recorded by a surveillance camera. A loss prevention firm provided the footage to the Detroit Police Department.

A search of the man's face against driver's license pictures and mug shots produced 243 photos, ranked in order of the system's confidence it was the same person on the surveillance video, according to documents disclosed as part of Mr. Williams's lawsuit. An old driver's license photo for Mr. Williams was ninth on the list. The person running the search deemed him the best match, and sent a report to a Detroit police detective.

The detective included Mr. Williams's picture in a "six-pack photo lineup" — photos of six people in a grid — that he showed to the security contractor who had provided the store's surveillance video. She agreed that Mr. Williams was the closest match to the man in the boutique, and this led to the warrant for his arrest. Mr. Williams, who had been at his desk at an automotive supply company

Facial Recognition Led to Wrongful Arrests. So Detroit Is Making Changes. - The New York Times 5/30/25, 9:27 AM

Porcha Woodruff was wrongfully arrested for carjacking when she was eight months pregnant. Nic Antaya for The New York Times

## The New Rules

The Detroit police are responsible for three of the seven known instances when facial recognition has led to a wrongful arrest. (The others were in Louisiana, New Jersey, Maryland and Texas.) But Detroit officials said that the new controls would prevent more abuses. And they remain optimistic about the technology's crime-solving potential, which they now use only in cases of serious crimes, including assault, murder and home invasions.

https://www.nytimes.com/2024/06/29/technology/detroit-facial-recognition-false-arrests.html Page 5 of 8

James White, Detroit's police chief, has blamed "human error" for the wrongful arrests. His officers, he said, relied too heavily on the leads the technology produced. It was their judgment that was flawed, not the machine's.

The new policy, which is effective as of this month, is supposed to help with that. Under the new rules, the police can no longer show a person's face to an eyewitness based solely on a facial recognition match.

"There has to be some kind of secondary corroborating evidence that's unrelated before there's enough justification to go to the lineup," said Mr. Lamoreaux of Detroit's crime intelligence unit. Police would need location information from a person's phone, say, or DNA evidence — something more than a physical resemblance.

The department is also changing how it conducts photo lineups. It is adopting what is called a double-blind sequential, which is considered a fairer way to identify someone. Rather than presenting a "six-pack" to a witness, an officer — one who doesn't know who the primary suspect is — presents the photos one at a time. And the lineup includes a different photo of the person from the one the facial recognition system surfaced.

The police will also need to disclose that a face search happened, as well as the quality of the image of the face being searched — How grainy was the surveillance camera? How visible is the suspect's face? — because a poor quality image is less likely to produce reliable results. They will also have to reveal the age of the photo surfaced by the automated system, and whether there were other photos of the person in the database that did not show up as a match.

Franklin Hayes, Detroit's deputy chief of police, said he was confident that the new practices would prevent future misidentifications.

"There's still a few things that might slip up, for example, identical twins," Mr. [illegible]yes said. "We can never say never, but we feel that this is our best policy yet."

Arun Ross, a computer science professor at Michigan State University who is an expert on facial recognition technology, said that Detroit's policy was a great starting point and that other agencies should adopt it.

"We don't want to trample on the rights and privacy of individuals, but we also don't want crime to be rampant," Mr. Ross said.

## How Much Does It Help?

Eyewitness identification is a fraught endeavor, and the police have embraced cameras and facial recognition as more reliable tools than imperfect human memory.

Chief White told local lawmakers last year that facial recognition technology had helped "in getting 16 murderers off the street." When asked for more information, Police Department officials did not provide details about those cases.

Instead, to demonstrate the department's successes with the technology, police officials played a surveillance video of a man who splashed fuel inside a gas station and set it on fire. They said he had been identified with facial recognition technology and arrested that night. He later pleaded guilty.

Detroit's Police Department is one of the few that keep tabs on its facial recognition searches, submitting weekly reports about its use to an oversight board. In past years, it has averaged more than 100 searches a year, with around half of those searches surfacing potential matches.

The department keeps track only of how often it gets a lead, not whether the lead pans out. But as part of its settlement with Mr. Williams — who also received $300,000, according to a police spokesperson — it has to conduct an audit of its facial recognition searches dating back to when it first started using the technology in 2017. If it identifies other cases in which people were arrested with little or no other supporting evidence beyond a face match, the department is supposed to alert the relevant prosecutor.

Molly Kleinman, the director of a technology research center at the University of Michigan, said the new protections sounded promising, but she remained skeptical.

"Detroit is an extraordinarily surveilled city. There are cameras everywhere," she said. "If all of this surveillance technology really did what it claims to, Detroit would be one of the safest cities in the country."

Willie Burton, a member of the Board of Police Commissioners, an oversight group that approved the new policies, described them as "a step in the right direction," though he was still opposed to the use of facial recognition technology by the police.

"The technology is just not ready yet," Mr. Burton said. "One false arrest is one too many, and to have three in Detroit should sound an alarm to discontinue it."

**Kashmir Hill** writes about technology and how it is changing people's everyday lives with a particular focus on privacy. She has been covering technology for more than a decade.

A version of this article appears in print on , Section B, Page 1 of the New York edition with the headline: Moves to Improve Police Use of Facial Recognition

Exh. 16

# Declaration of Jill Drake

Exh. 16

**DECLARATION OF JILL DRAKE IN OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

I, JILL DRAKE, declare:

1. I am a Deputy Reno City Attorney, and I am duly licensed to practice law in all federal and state courts in the State of Nevada.

2. I am over the age of eighteen (18) and am competent to testify to the matters set forth in this Declaration and will do so if called upon to testify.

3. I am employed in the Criminal Division of the Reno City Attorney's Office, and I have held this position for 20 years. I prosecute misdemeanor criminal complaints that fall within the jurisdiction of the City of Reno.

4. Based on my experience, when a misdemeanor criminal complaint is filed with the Reno Municipal Court, the case is automatically set for an arraignment hearing. Unlike felony cases in Reno Justice Court or Second Judicial District Court, no prosecutorial review or decision is made by a prosecutor before a misdemeanor case is set for arraignment in Reno Municipal Court.

5. A criminal complaint for trespass was filed with the Reno Municipal Court on September 18, 2023, entitled City of Reno v. John Doe; RPD Case No. 23-17041. The criminal complaint was signed by a representative of the Peppermill, Luke Ely.

6. The case was set for arraignment on October 17, 2023, at 2:00 p.m.

7. On September 26, 2023, attorney Richard Salvatore, Esq. filed an *Authorization to Represent* Jason James Killinger (previously identified as John Doe), in Reno Municipal Court Case No. 23CR-11488, entitled City of Reno, Plaintiff vs. Jason James Killinger, Defendant.

8. In the *Authorization to Represent* filed on September 26, 2023, Mr. Killinger waived his arraignment and requested that the charges against him be set for trial.

9. As a result, a trial date was set for November 9, 2023, at 1:00 p.m. Again, no prosecutorial review or decision was made before the court set this case for trial.

10. The trial of this case was assigned to me for handling on or about October 2, 2023.

11. Prior to the trial date, I reviewed the evidence, including but not limited to Officer Jager's body cam footage, the arrest report and supplement, the information from Peppermill's

Reno City Attorney
P.O. Box 1900
Reno, NV 89505

Case 3:25-cv-00388-MMD-CSD Document 26-12 Filed 09/26/25 Page 3 of 4

facial recognition software, and the driver's licenses for Jason Killinger and Michael Ellis. I was not able to reach a conclusion as to whether Mr. Killinger was the person who was previously barred by the Peppermill, as indicated by Peppermill's AI software.

12. As part of my investigation, I spoke with Officer Jager, who told me he had no idea whether Killinger was telling the truth, or whether he has a doppelganger.

13. I also spoke with Mr. Salvatore on or about November 8, 2023, who informed me that Mr. Killinger was not the person previously barred by the Peppermill and asked me to dismiss the case. I told Mr. Salvatore I would need to discuss the case with Peppermill witnesses prior to making a decision, since the criminal complaint was signed by the Peppermill.

14. I then spoke with Jeffrey Marlow, a representative of the Peppermill, who informed me that he conducted the original barring notice on March 26, 2023, but he was not present for the trespass arrest on September 17, 2023.

15. After reviewing the available evidence, I declined to prosecute Mr. Killinger, and instead, dismissed the case without prejudice prior to commencement of trial, as I was not certain that the burden of proof in a criminal case could be met without an AI expert to establish the accuracy of Peppermill's AI software.

16. I then referred the case to an RPD fraud detective to further investigate the possibility of whether Mr. Killinger may have used someone else's information at the DMV to obtain an ID with his photograph. If such evidence were to be found, there was a possibility the City could refile the case.

17. I never received any additional information from RPD to further support the trespass claim against Mr. Killinger. Accordingly, the City never refiled the case against Mr. Killinger.

18. Once a misdemeanor criminal complaint has been dismissed without prejudice, the complaint cannot be refiled after one year. Accordingly, the dismissal without prejudice on November 9, 2023, effectively became a dismissal *with* prejudice after one year (on November 9, 2024).

19. If Mr. Killinger is concerned about having a criminal record, he can file a request

Reno City Attorney
P.O. Box 1900
Reno, NV 89505

Case 3:25-cv-00388-MMD-CSD Document 26-12 Filed 09/26/25 Page 4 of 4

with the Reno Municipal Court to seal his criminal case, which the City would not oppose.

I declare under penalty of perjury under the laws of the State of Nevada that the foregoing is true and correct.

Executed on this 25 day of September, 2025, in Reno, Washoe County, Nevada.

By [signature]
JILL DRAKE

Reno City Attorney
P.O. Box 1900
Reno, NV 89505

Exh. 17

# Declaration of Richard Jager

Exhibit 17

**DECLARATION OF RICHARD JAGER IN OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

I, RICHARD JAGER, declare:

1. I am over the age of eighteen (18) and am competent to testify to the matters set forth in this Declaration and will do so if called upon to testify.

2. I am an officer of the Reno Police Department, employed by the City of Reno. I joined the Reno Police Department on January 13, 2020.

3. I have never been the subject of any disciplinary action as a police officer.

4. On September 17, 2023, at approximately 0546 hours, I responded to the Peppermill Casino ("Peppermill") on the report of a repeat trespasser who had been taken into custody by Peppermill Security as a citizen's arrest.

5. Upon arrival, I observed a male suspect ("John Doe") seated in the Peppermill security office with his hands cuffed behind his back. I did not know what time John Doe was taken into custody or how long he had been in handcuffs.

6. I met with Peppermill Security, who told me that John Doe's face was detected by their surveillance facial recognition software matching a person who had previously been barred from the Peppermill, with 100% confidence. Peppermill Security informed me that the suspect was last trespassed on 03/26/2023, at which time, he identified himself as Michael Phillip Ryan Ellis ("Ellis") by presenting a Nevada Driver's License with that name.

7. When John Doe was detained by Peppermill Security on September 17, 2023, however, he identified himself as Jason James Killinger and presented a Nevada Commercial Driver's License with that name. He also stated that he had never been barred from the Peppermill, and he had no idea who Michael Ellis is.

8. I looked at John Doe's face and compared it to the photo on Killinger's driver's license, as well as the photo on Ellis' driver's license. I honestly thought they all looked like the same person, except that the photo on Killinger's driver's license shows a man with a goatee.

9. There was a vertical tape measure on the wall of Peppermill's security office. When we stood John Doe up against the tape measure to determine his height, John Doe measured at somewhere between 5'9" and 5'10", which was a closer match to Ellis' driver's license (indicating

Reno City Attorney
P.O. Box 1900
Reno, NV 89505

a height of 5'9") than to Killinger's driver's license (indicating a height of 6'1").

10. A routine wants and warrants check on both Ellis and Killinger was negative, and neither Ellis nor Killinger had any prior arrest history with additional information to assist in positive identification.

11. In the years prior to September 17, 2023, I had responded to numerous trespass calls from the Peppermill, ranging anywhere from two to six calls per week. It was a very common occurrence, and in most instances, the suspect would claim they were *not* the person identified by Peppermill's facial recognition software.

12. My understanding of Peppermill's procedure is that when a person is barred from the casino, the Peppermill would take a photograph of that person and scan it into their AI software at the time the barring notice is issued. Accordingly, the photo taken by the Peppermill and scanned into their software may be more current than what appears on a person's driver's license. For this reason, I believed that the photograph of the suspect in Peppermill's AI software may be more reliable than the photograph on the driver's license, which could be many years out of date.

13. Prior to September 17, 2023, I had never encountered or even heard of a situation where Peppermill's facial recognition software turned out to be wrong. Indeed, Peppermill's facial recognition software was believed to be so reliable that RPD would, at times, request Peppermill's assistance in locating criminal suspects. RPD would provide Peppermill with photos of suspects to input into their AI software and ask the Peppermill to contact RPD if a suspect is spotted in the casino. Based on my prior experience and knowledge of Peppermill's AI software as of September 17, 2023, I had no reason to doubt the accuracy of the system.

14. Peppermill Security showed me that their AI software had captured John Doe's face at five (5) different times at five (5) different angles while he was in the casino on September 17, 2023. Two of the photos matched the prior trespasser with 99.8% certainty. Two more photos matched the prior trespasser with 99.9% certainty. The fifth and final photo matched the prior trespasser with 100% certainty.

15. As I was trying to reconcile the information in front of me, several possibilities came to mind (some of which I voiced out loud, as captured on my body worn camera):

(a) John Doe (the person identified by Peppermill's AI software) is, in fact,

Reno City Attorney
P.O. Box 1900
Reno, NV 89505

Case 3:25-cv-00388-MMD-CSD Document 20-1 Filed 09/26/25 Page 4 of 7

Killinger, but he could have presented Michael Ellis' ID when he was previously trespassed on March 26, 2023;

(b) John Doe is, in fact, Michael Ellis, but he could have presented Killinger's ID on September 17, 2023;

(c) John Doe is neither Ellis nor Killinger, but had a hookup at the DMV who provided him with two Real ID's in other people's name; or

(d) Killinger was telling the truth, and Peppermill's AI software erroneously identified him as Michael Ellis.

16. In my experience, I have encountered situations where "Real IDs" were fake or obtained by fraudulent means. A person who has obtained a fake ID will often have other documents or additional forms of identification that match the fake ID. Accordingly, the fact that a person may have multiple forms of ID bearing the same name does not necessarily mean that the IDs are legitimate. I deal with criminal elements and people who lie to me on a daily basis. Therefore, I have been trained to carefully scrutinize information that is presented to me by a suspect.

17. In my experience, I have also encountered people using another person's valid ID. It is not difficult to obtain a duplicate, valid Real ID. The Nevada DMV will issue a duplicate ID to a person who reports that his or her ID was lost or stolen. That duplicate ID can then be given to another person to use for improper purposes.

18. Additionally, if someone is in possession of a stolen vehicle and/or a stolen wallet, that person could also possess multiple forms of identification and documents with the same name.

19. Because I was not able to reconcile the conflicting evidence, I called my supervisor, Sergeant Carl DeSantis, to seek additional guidance. Sgt. DeSantis told me his thought process was that we would have to arrest John Doe and do a WINS check. I concurred with Sgt. DeSantis' suggestion, because if John Doe's fingerprints were on file, a WINS check would confirm his identity.

20. I did not feel I could issue a citation to John Doe for trespass, because I could not determine his identity (i.e., I could not determine whether he was Jason Killinger or Michael Ellis). RPD has a General Order which provides that a person can be issued a citation in lieu of an arrest

Reno City Attorney
P.O. Box 1900
Reno, NV 89505

if he presents satisfactory evidence of his identity. Although John Doe presented a valid driver's license under the name of Jason Killinger with a photo that resembled him, he was three to four inches shorter than the height indicated on the driver's license. This significant discrepancy in height created uncertainty as to whether John Doe was, in fact, Jason Killinger, particularly since his height closely matched the height of Michael Ellis, whom he also resembled.

21. Additionally, I was aware that if I issued a citation to the wrong person, and that person does not appear in court, a warrant would be issued for his arrest for failure to appear. In other words, if I had issued a citation in Killinger's name, but the person I was dealing with on 9/17/2023 was actually Ellis (according to Peppermill's AI software), and Ellis subsequently failed to appear in court as required by the citation, the court would then issue a warrant for Killinger's arrest, even though he would have had no knowledge of the trespass or citation. The converse is also true. If I was dealing with Killinger on 9/17/2023, who may have misidentified himself as Ellis when he was initially trespassed on 3/26/23, the issuance of a citation in Ellis' name would result in the issuance of a warrant for Ellis' arrest if Killinger failed to appear in court for the citation, even though Ellis may not have been aware that he was ever trespassed by the Peppermill. Therefore, the issuance of a citation in either name on 9/17/2023 would have: (a) violated RPD policy, (b) failed to resolve the conflicting evidence I was confronted with at that moment, and (c) potentially created a new problem for person who was completely unaware of what occurred on 9/17/2023.

22. Based on all of the foregoing, I determined the proper course of action was to arrest John Doe, have him fingerprinted, and do a WINS check to confirm his identity as soon as reasonably possible. My expectation was that if John Doe was telling the truth and is confirmed to be Jason Killinger after a WINS check, he would be released from jail in a relatively short period of time, and it would ultimately be up to the Court to determine whether Peppermill's AI software was wrong, or whether Killinger may have misidentified himself as Ellis when he was previously trespassed on 3/26/2023.

23. I took John Doe into custody at approximately 0620 hours, when I removed the handcuffs Peppermill security had placed on him and replace them with my handcuffs. I granted John Doe's request to keep the handcuffs loose by "double-cuffing" him, meaning I used two pairs

Reno City Attorney
P.O. Box 1900
Reno, NV 89505

Case 3:25-cv-00388-MMD-CSD Document 26-1 Filed 09/26/25 Page 6 of 7

of handcuffs—one on each wrist, and then connected the handcuffs to each other. I did this to provide maximum comfort and range of motion for John Doe, while still complying with RPD's General Order regarding prisoner transport, which directs that arrestees will be handcuffed behind the back before transport.

24. We arrived at the Washoe County Jail at approximately 0649 hours, and I completely relinquished custody of John Doe at approximately 0707, after completing the arrest report.

25. The physical identifying information I put on the arrest report was based on my personal observation and what John Doe told me. I noted that his height was 5'10" because that was the measurement I obtained at the Peppermill security office when we stood him up against the measuring tape. I asked him for his weight at the jail, and he told me 280 lbs. His eyes looked like they were either blue or hazel. I initially did not put a date of birth on the arrest report, because I had two different ID's with two different dates of birth. However, the woman at the jail who took the report told me I had to put down a date of birth and to just estimate it if I did not know the correct date. It was common practice to use January 1 when booking John Does, so that was the date I used and estimated 1980 as the birth year.

26. Contrary to Plaintiff's allegations, I did not lie and would never lie about a suspect to justify an arrest or cause him to be wrongfully prosecuted.

27. Contrary to Plaintiff's allegations, I did not fabricate any evidence in this case. The evidence upon which I based the arrest was provided by Peppermill security, including the AI facial recognition software results and the criminal complaint signed by a Peppermill representative, which I believe established probable cause for the arrest.

28. Contrary to Plaintiff's allegations, I harbored no ill will or malice against Mr. Killinger and had absolutely no motive to "frame" him.

29. Contrary to Plaintiff's allegations, I never wanted a reviewing prosecutor or magistrate to believe that Plaintiff was "an evildoer, a bad person, a lawless scum who deserved conviction for having multiple false identifications." I never felt this way about John Doe, who was later confirmed to be Mr. Killinger following the WINS check.

30. Contrary to Plaintiff's allegations, I never subjected Mr. Killinger to any excessive

Reno City Attorney
P.O. Box 1900
Reno, NV 89505

Case 3:25-cv-00388-MMD-CSD Document 26-1 Filed 09/26/25 Page 7 of 7

force. I gently handcuffed him using double cuffs and escorted him to my patrol vehicle, where I allowed him to seat himself inside the vehicle. He was in my physical custody for less than 50 minutes on September 17, 2023.

31. I acted in utmost good faith with respect to my handling of the trespass call on 9/17/2023, consistent with my understanding of RPD policy and my duties as a police officer under the facts, circumstances, and irreconcilable evidence that confronted me on that date. I had absolutely no intention of causing any harm to Mr. Killinger.

I declare under penalty of perjury under the laws of the State of Nevada that the foregoing is true and correct.

Executed on this 25th day of SEPTEMBER, 2025, in Reno, Washoe County, Nevada.

By [signature] 16010
RICHARD JAGER

Reno City Attorney
P.O. Box 1900
Reno, NV 89505

Exhibit 18

# Declaration of Terri Keyser-Cooper

Exhibit 18

**DECLARATION OF COUNSEL**

I, TERRI KEYSER-COOPER, declare under penalty of perjury, the following assertions are true and correct and made with personal knowledge.

1. I am the attorney of record in the case of Killinger v. Jager. I represent Plaintiff Jason Killinger. I am licensed to practice law before all the Courts for the State of Nevada and the State of California, the United States District Court for the District of Nevada and California, the Ninth Circuit Court of Appeals, and the United States Supreme Court. I have direct and personal knowledge of the facts set forth in the following paragraphs and, if called and sworn as a witness, I would competently testify to these facts.

*2.* Attached to Plaintiff's Reply re Motion For Partial Summary Judgment filed October 6, 2025, are the following exhibits which I have personally compiled:

*(a)* Exhibit 1 is a true and accurate copy Jager's BWC depicting his interaction with Killinger;

*(b)* Exhibit 2 is a true and accurate copy of licenses of both Ellis and Killinger showing that both licenses were Nevada Real IDs;

*(c)* Exhibit 3 is a true and accurate copy of the Declaration of Killinger;

*(d)* Exhibit 4 is a true and accurate copy of Killinger's driver's license;

*(e)* Exhibit 5 is a true and accurate copy of Ellis' driver's license;

*(f)* Exhibit 6 is a true and accurate copy of Ellis' barring notice from Peppermill;

*(g)* Exhibit 7 is a true and accurate copy of Jager's Arrest Report of Killinger (in the false name of John Doe);

*(h)* Exhibit 8 is a true and accurate copy of Killinger's Pretrial Assessment;

*(i)* Exhibit 9 is a true and accurate copy of Jager's Criminal complaint against Killinger (listed as John Doe);

*(j)* Exhibit 10 is a true and accurate copy of Reno Municipal Court Register of Actions;

*(k)* Exhibit 11 is a true and copy of Killinger's Release on his own recognizance;

*(l)* Exhibit 12 is a true and accurate coy of RPD's General Order re Citation and Release;

*(m)* Exhibit 13 are true and accurate copies of the documents Killinger had on his person and in his vehicle at the time of his arrest. Some of them are copies of the actual documents because the original documents, available in 2023, have expired;

*(n)* Exhibit 14 is the true and accurate copy of a mugshot of Killinger at the jail identified as John Doe;

*(o)* Exhibit 15 is the true and accurate copy of a New York Times article on Facial Recognition Arrests;

*(p)* Exhibit 16 is the true and accurate copy of the Declaration of Reno Prosecutor Jill Drake;

*(q)* Exhibit 17, is the true and accurate Declaration of Defendant Richard Jager;

(r) Exhibit 18 is the true and accurate copy of the Declaration of Terri Keyser-Cooper

DATED: This 6th day of October, 2025

/s/ Terri Keyser-Cooper
TERRI KEYSER-COOPER
*Attorney for Plaintiff Jason Killinger*