KARL S. HALL
Reno City Attorney
ALICE K. HERBOLSHEIMER
Deputy City Attorney
Nevada State Bar No. 6389
Post Office Box 1900
Reno, Nevada 89505
Tel: (775) 334-2050
Email: Herbolsheimera@reno.gov
*Attorneys for Defendant Reno Police*
*Officer R. Jager*

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| JASON KILLINGER, | **CASE NO.: 3:25-cv-00388-MMD-CSD** |
| Plaintiff, | |
| vs. | **OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON EXCESSIVE FORCE** |
| RENO POLICE OFFICER R. JAGER, | |
| Defendant. | |

Defendant, Reno Police Officer Richard Jager ("Officer Jager"), by and through his attorneys, Reno City Attorney Karl S. Hall and Deputy City Attorney Alice K. Herbolsheimer, hereby opposes Plaintiff's Motion for Partial Summary Judgment on Excessive Force ("MPSJ" - ECF No. 17), filed on September 20, 2025.

This Opposition is made and based upon Federal Rules of Civil Procedure ("FRCP") 56, the attached Memorandum of Points and Authorities in support hereof, the attached declarations and exhibits, and all of the records, papers and pleadings on file in the above-entitled action, as well as such other evidence, oral or documentary, as may be accepted by the Court at oral arguments on this motion.

/ / /

/ / /

DATED this _21st_ day of October, 2025.

KARL S. HALL
Reno City Attorney

By: _/s/ Alice K. Herbolsheimer_
ALICE K. HERBOLSHEIMER
Deputy City Attorney
Nevada State Bar No. 6389
Post Office Box 1900
Reno, Nevada 89505

*Attorneys for Defendant Officer Richard Jager*

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    INTRODUCTION

As with Plaintiff's first Motion for Partial Summary Judgment (ECF No. 7), Plaintiff's second Motion for Partial Summary Judgment on Excessive Force (ECF No. 17) similarly fails to cite a single case that supports the Plaintiff's unprecedented request for summary judgment at the commencement of this action, without allowing Officer Jager any opportunity to conduct discovery and without allowing a jury to decide genuine issues of disputed material facts relating to the reasonableness of Officer Jager's conduct, the causation or extent of Plaintiff's claimed injuries, and whether the handcuffs that Officer Jager placed on Plaintiff were, in fact, "too tight." Indeed, many of the cases cited by Plaintiff merely held that disputed issues of fact precluded summary judgment in favor of the defendants. Indeed, some of the cases cited by Plaintiff held that the defendants were entitled to summary judgment based on qualified immunity because their use of force was objectively reasonable under the circumstances. Not surprisingly, none of the cases granted summary judgment in favor of the plaintiff.

In short, Plaintiff has presented no factual or legal basis upon which he would be entitled summary judgment as a matter of law. Accordingly, Defendant Jager respectfully requests that Plaintiff's MPSJ on Excessive Force be denied in its entirety.

/ / /

/ / /

## II.     **STATEMENT OF FACTS**

On September 17, 2023, at approximately 0546 hours,[1] Officer Jager responded to the Peppermill Casino ("Peppermill") on the report of a repeat trespasser who had been taken into custody by Peppermill Security as a citizen's arrest. *Exhibit 1 – Declaration of Richard Jager,* ¶ 4. Upon arrival, he observed a male suspect ("John Doe") seated in the Peppermill security office with his hands cuffed behind his back. *Exh. 1* at ¶ 5. Officer Jager did not know what time John Doe was taken into custody or how long he had been in handcuffs. *Id.*

Officer Jager met with Peppermill Security, who informed Jager that John Doe's face was detected by their surveillance facial recognition software matching a person who had previously been barred from the Peppermill, with 100% confidence. *Exh. 1* at ¶ 6. Peppermill Security informed Jager that the suspect was last trespassed on 03/26/2023, at which time, he identified himself as Michael Phillip Ryan Ellis ("Ellis") by presenting a Nevada Driver's License with that name. *Exh. 1* at ¶ 6; *Exhibit 2 – Peppermill Barring Notice dated 3/26/2023; Exhibit 3 – Ellis Driver's License.*

When John Doe was detained by Peppermill Security on September 17, 2023, however, he identified himself as Jason James Killinger ("Killinger") and presented a Nevada Commercial Driver's License with that name. *Exh. 1* at ¶ 7; *Exhibit 4 – Killinger Driver's License.* John Doe stated that he had never been barred from the Peppermill, and he had no idea who Michael Ellis is. *Exh. 1* at ¶ 7.

Officer Jager looked at John Doe's face and compared it to the photo on Killinger's driver's license, as well as the photo on Ellis' driver's license. Jager honestly thought they all looked like the same person, except that the photo on Killinger's driver's license shows a man with a goatee. *Exh. 1* at ¶ 8; *Exhibit 5 - Photo of John Doe taken on 9/17/2023; Body Cam Video* at 06:07:00 – 06:07:10, 06:11:50 – 06:12:18, 07:05:47, 07:06:37, 07:07:36.[2]

---

[1] Plaintiff's MPSJ on Excessive Force erroneously states that Jager arrived at the Peppermill at approximately 4:00 to 4:30 a.m. *MPSJ on Excessive Force* at pg. 5, ¶ 7. The body cam footage clearly shows Jager arriving at 05:46.

[2] Officer Jager's Body Cam Video was manually filed by Plaintiff as Exhibit 4 to Plaintiff's MPSJ on Excessive Force (ECF No. 18). To avoid duplication of exhibits, Defendant Jager will simply refer to the Body Cam Video submitted by Plaintiff by noting the relevant time stamp.

  

There was a vertical tape measure on the wall of Peppermill's security office. When Jager and Peppermill Security stood John Doe up against the tape measure to determine his height, John Doe measured at somewhere between 5'9" and 5'10", which was a closer match to Ellis' driver's license (indicating a height of 5'9") than to Killinger's driver's license (indicating a height of 6'1"). *Exh. 1* at ¶ 9; *Body Cam Video* at 06:19:55 – 06:20:25. Jager conducted a routine wants and warrants check on both Ellis and Killinger, which was negative, and neither Ellis nor Killinger had any prior arrest history that would offer additional information to assist in positive identification. *Exh. 1* at ¶ 10.

In the years prior to September 17, 2023, Jager had responded to numerous trespass calls from the Peppermill, ranging anywhere from two to six calls per week. *Exh. 1* at ¶ 11. It was a very common occurrence, and in most of those instances, the suspect would claim they were *not* the person identified by Peppermill's facial recognition software. *Exh. 1* at ¶ 11. Jager's understanding of Peppermill's procedure is that when a person is barred from the casino, the Peppermill would take a photograph of that person and scan it into their AI software at the time the barring notice is issued. *Exh. 1* at ¶ 12. Accordingly, the photo taken by the Peppermill and scanned into their software may be more current than what appears on a person's driver's license. *Exh. 1* at ¶ 12. For this reason, Jager believed that the photograph of the suspect in Peppermill's AI software may be more reliable than the photograph on the driver's license, which could be many years out of date. *Exh. 1* at ¶ 12.

Prior to September 17, 2023, Jager had never encountered or even heard of a situation

where Peppermill's facial recognition software turned out to be wrong (despite suspects always claiming they got the wrong person). *Exh. 1* at ¶ 13. Indeed, Peppermill's facial recognition software was believed to be so reliable that RPD would, at times, request Peppermill's assistance in locating criminal suspects. *Id.* RPD would provide Peppermill with photos of suspects to input into their AI software and ask the Peppermill to contact RPD if a suspect is spotted in the casino. *Exh. 1* at ¶ 13. Based on Jager's prior experience and knowledge of Peppermill's AI software as of September 17, 2023, he had no reason to doubt the accuracy of the system. *Exh. 1* at ¶ 13.

Peppermill Security showed Jager that their AI software had captured John Doe's face at five (5) different times at five (5) different angles while he was in the casino on September 17, 2023. *Exh. 1* at ¶ 14; *Exhibit 6 - Peppermill's AI Facial Recognition Software Results*. Two of the photos matched the prior trespasser with 99.8% certainty. Two more photos matched the prior trespasser with 99.9% certainty. The fifth and final photo matched the prior trespasser with 100% certainty. *Exh. 1* at ¶ 14; *Exh. 6*.

As Officer Jager was trying to reconcile the information in front of him, several possibilities came to mind (some of which he voiced out loud, as captured on his body worn camera):

    (a)    John Doe (the person identified by Peppermill's AI software) is, in fact, Killinger, but he could have presented Michael Ellis' ID when he was previously trespassed on March 26, 2023;

    (b)    John Doe is, in fact, Michael Ellis, but he could have presented Killinger's ID on September 17, 2023;

    (c)    John Doe is neither Ellis nor Killinger, but had a hookup at the DMV who provided him with two Real IDs in other people's name; or

    (d)    Killinger was telling the truth, and Peppermill's AI software erroneously identified him as Michael Ellis. *Exh. 1* at ¶ 15.

In Jager's experience as a police officer, he has encountered situations where "Real IDs" were fake or obtained by fraudulent means. *Exh. 1* at ¶ 16. A person who has obtained a fake ID will often have other documents or additional forms of identification that match the fake ID. *Id.*

1    Accordingly, the fact that a person may have multiple forms of ID bearing the same name does

2    not necessarily mean that the IDs are legitimate. *Id.* Officer Jager deals with criminal elements and

3    people who lie to him on a daily basis. *Id.* Therefore, he has been trained to carefully scrutinize

4    information that is presented to him by a suspect. *Id.*

5         In Officer Jager's experience, he has also encountered people using another person's valid

6    ID. *Exh. 1* at ¶ 17. It is not difficult to obtain a duplicate, valid Real ID. *Id.* The Nevada DMV will

7    issue a duplicate ID to a person who reports that his or her ID was lost or stolen. *Id.* That duplicate

8    ID can then be given to another person to use for improper purposes. *Id.* Additionally, if someone

9    is in possession of a stolen vehicle and/or a stolen wallet, that person could also possess multiple

10   forms of identification and documents with the same name. *Exh. 1* at ¶ 18.

11        Because Officer Jager was not able to reconcile the conflicting evidence, he called his

12   supervisor, Sergeant Carl DeSantis, to seek additional guidance. *Exh. 1* at ¶ 19. Sgt. DeSantis told

13   Jager his thought process was that they would have to arrest John Doe and do a WINS check. *Id.*

14   Officer Jager concurred with Sgt. DeSantis' suggestion, because if John Doe's fingerprints were

15   on file, a WINS check would confirm his identity. *Id.*

16        Officer Jager did not feel he could issue a citation to John Doe for trespass, because he

17   could not determine John Doe's identity (i.e., Jager could not determine whether the person in

18   custody was Jason Killinger or Michael Ellis). *Exh. 1* at ¶ 20. RPD has a General Order which

19   provides that a person can be issued a citation in lieu of an arrest if he presents satisfactory evidence

20   of his identity. *Id. and Exhibit 7 - RPD General Order P-280-17 Re: Citations, Section II(B)(c).*

21   Although John Doe presented a valid driver's license under the name of Jason Killinger with a

22   photo that resembled him, he was three to four inches shorter than the height indicated on the

23   driver's license. *Exh. 1* at ¶ 20. This significant discrepancy in height created uncertainty as to

24   whether John Doe was, in fact, Jason Killinger, particularly since his height closely matched the

25   height of Michael Ellis, whom he also resembled. *Exh. 1* at ¶ 20.

26        Additionally, Officer Jager was aware that if he issued a citation to the wrong person, and

27   that person does not appear in court, a warrant would be issued for his arrest for failure to appear.

28   *Exh. 1* at ¶ 21.  In other words, if Jager had issued a citation in Killinger's name, but the person he

**Reno City Attorney**
**P.O. Box 1900**
**Reno, NV 89505**

1    was dealing with on 9/17/2023 was actually Ellis (according to Peppermill's AI software), and

2    Ellis subsequently failed to appear in court as required by the citation, the court would then issue

3    a warrant for Killinger's arrest, even though Killinger would have had no knowledge of the trespass

4    or citation. *Id.* The converse is also true. If Jager was dealing with Killinger on 9/17/2023, who

5    may have misidentified himself as Ellis when he was initially trespassed on 3/26/23, the issuance

6    of a citation in Ellis' name would result in the issuance of a warrant for Ellis' arrest if Killinger

7    failed to appear in court for the citation, even though Ellis may not have been aware that he was

8    ever trespassed by the Peppermill. *Id.* Therefore, the issuance of a citation in either name on

9    9/17/2023 would have: (a) violated RPD policy, (b) failed to resolve the conflicting evidence Jager

10    was confronted with at that moment, and (c) potentially created a new problem for a person who

11    was completely unaware of what occurred on 9/17/2023. *Id.*

12        Based on all of the foregoing, Officer Jager determined the proper course of action was to

13    arrest John Doe, have him fingerprinted, and do a WINS check to confirm his identity as soon as

14    reasonably possible. *Exh. 1* at ¶ 22. Jager's expectation was that if John Doe was telling the truth

15    and is confirmed to be Jason Killinger after a WINS check, he would be released from jail in a

16    relatively short period of time, and it would ultimately be up to the Court to determine whether

17    Peppermill's AI software was wrong, or whether Killinger may have misidentified himself as Ellis

18    when he was previously trespassed on 3/26/2023. *Id.*

19        Officer Jager took John Doe into custody at approximately 0620 hours, when he removed

20    the handcuffs Peppermill security had placed on him and replaced them with Jager's handcuffs.

21    *Exh. 1* at ¶ 20; *Exhibit 15 – Supplemental Declaration of Richard Jager,* at ¶ 3. Jager granted John

22    Doe's request to keep the handcuffs loose by "double-cuffing" him, meaning he used two pairs of

23    handcuffs—one on each wrist, and then connected the handcuffs to each other. *Exh. 1* at ¶ 20.

24    Officer Jager did this to provide maximum comfort and range of motion for John Doe, while still

25    complying with RPD's General Order regarding prisoner transport, which directs that arrestees

26    will be handcuffed behind the back before transport. *Exh. 1* at ¶ 23; *Exhibit 8 – RPD General

27    Order P-312-04 Re: Prisoner Transport,* at JAGER 000043. Additionally, Officer Jager made sure

28    the handcuffs were not too tight around his wrists by slipping one finger between the cuff and his

1  wrists, as he was trained to do. *Exh. 15* at ¶ 4. Jager also made sure that the cuffs were "double

2  locked," which prevents the cuffs from further or accidentally tightening during transport. *Exh. 15,*

3  at ¶ 5. Although he expressed *wanting* to be out of the cuffs, at no time while Mr. Killinger was in

4  Officer Jager's custody did he ever complain that the handcuffs were too tight around his wrists,

5  that they were cutting into his wrists, that his hands/wrists were going numb, or that his

6  hands/wrists were otherwise in pain. *Exh. 15,* at ¶ 7.

7        Officer Jager and John Doe arrived at the Washoe County Jail at approximately 0649 hours,

8  and Jager completely relinquished custody of John Doe at approximately 0707, after completing

9  the arrest report. *Exh. 1* at ¶ 24; *Body Cam Video* at 07:07. The physical identifying information

10  Officer Jager put on the arrest report was based on his personal observation and what John Doe

11  told him. *Exh. 1* at ¶ 25. Jager noted that his height was 5'10" because that was the approximate

12  measurement he obtained at the Peppermill security office when we stood him up against the

13  measuring tape. Jager asked him for his weight at the jail, and he told Jager he was 280 lbs. *Exh.*

14  *1* at ¶ 25; *Body Cam Video* at 06:58:08. His eyes looked like they were either blue or hazel. *Exh.*

15  *1* at ¶ 25. Officer Jager initially did not put a date of birth on the arrest report, because he had two

16  different IDs with two different dates of birth. *Id.* However, the woman at the jail who took the

17  report told Officer Jager he had to put down a date of birth and to just estimate it if he did not know

18  the correct date. *Id.* and *Body Cam Video* at 07:01:51 – 07:02:08. It was common practice to use

19  January 1 when booking John Does, so that was the date Officer Jager used, and he estimated 1980

20  as the birth year. *Exh. 1* at ¶ 25.

21        A WINS check was conducted at the Washoe County Jail, which confirmed John Doe's

22  identity as Jason Killinger. *Exhibit 9 – Pretrial Assessment Report.* Mr. Killinger was released on

23  his own recognizance later that same day. *Exhibit 10 – WCSO Own Recognizance Release Form.*

24        A criminal complaint for trespass was filed with the Reno Municipal Court on September

25  18, 2023, entitled City of Reno v. John Doe; RPD Case No. 23-17041. *Exhibit 11 – Criminal*

26  *Complaint; Exhibit 12 – Declaration of Jill Drake* at ¶ 5. The criminal complaint was signed by a

27  representative of the Peppermill, Luke Ely, and accompanied by a separate written statement

28  signed by Luke Ely. *Id.* When a misdemeanor criminal complaint is filed with the Reno Municipal

Court, the case is automatically set for an arraignment hearing. *Exh. 12,* at ¶ 4. Unlike felony cases in Reno Justice Court or Second Judicial District Court, no prosecutorial review or decision is made by a prosecutor before a misdemeanor case is set for arraignment in Reno Municipal Court. *Id.* In this case, John Doe's arraignment was set on October 17, 2023, at 2:00 p.m. *Exh. 12,* at ¶ 6.

On September 26, 2023, attorney Richard Salvatore, Esq. filed an *Authorization to Represent* Jason James Killinger (previously identified as John Doe), in Reno Municipal Court Case No. 23CR-11488, entitled City of Reno, Plaintiff vs. Jason James Killinger, Defendant. *Exh. 12,* at ¶ 7; *Exhibit 13 – Authorization to Represent.* In the *Authorization to Represent*, Killinger waived his arraignment and requested that the charges against him be set for trial. *Exh. 12,* at ¶ 8; *Exh. 13*. As a result, a trial date was set for November 9, 2023, at 1:00 p.m. *Exh. 12,* at ¶ 9; *Exhibit 14 – Notice to Set Hearing.* Again, no prosecutorial review or decision was made before the court set this case for trial. *Exh. 12,* at ¶ 9.

The trial of this case was assigned to a criminal prosecutor, Deputy Reno City Attorney Jill Drake, for handling on or about October 2, 2023. *Exh. 12,* at ¶ 10. Prior to the trial date, Ms. Drake reviewed the evidence, including but not limited to Officer Jager's body cam footage, the arrest report and supplement, the information from Peppermill's facial recognition software, and the driver's licenses for Jason Killinger and Michael Ellis. *Id.* at ¶ 11. Ms. Drake was not able to reach a conclusion as to whether Mr. Killinger was the person who was previously barred by the Peppermill, as indicated by Peppermill's AI software. *Id.*

As part of her investigation, she spoke with Officer Jager, who told her he had no idea whether Killinger was telling the truth, or whether he has a doppelganger. *Exh. 12,* at ¶ 12. Ms. Drake also spoke with Mr. Salvatore on or about November 8, 2023, who informed her that Mr. Killinger was not the person previously barred by the Peppermill and asked her to dismiss the case. *Exh. 12,* at ¶ 13. Ms. Drake told Mr. Salvatore she would need to discuss the case with Peppermill witnesses prior to making a decision, since the criminal complaint was signed by the Peppermill. *Exh. 12,* at ¶ 13. Ms. Drake then spoke with Jeffrey Marlow, a representative of the Peppermill, who informed her that he conducted the original barring notice on March 26, 2023, but he was not present for the trespass arrest on September 17, 2023. *Exh. 12,* at ¶ 14.

1    After reviewing the available evidence, Ms. Drake declined to prosecute Mr. Killinger, and

2    instead, dismissed the case without prejudice prior to commencement of trial, as she was not

3    certain that the burden of proof in a criminal case could be met without an AI expert to establish

4    the accuracy of Peppermill's AI software. *Exh. 12,* at ¶ 15. She then referred the case to an RPD

5    fraud detective to further investigate the possibility of whether Mr. Killinger may have used

6    someone else's information at the DMV to obtain an ID with his photograph. *Exh. 12,* at ¶ 16. If

7    such evidence were to be found, there was a possibility the City could refile the case. *Id.* However,

8    she never received any additional information from RPD to further support the trespass claim

9    against Mr. Killinger. *Exh. 12,* at ¶ 17. Accordingly, the City never refiled the case against Mr.

10   Killinger. *Id.*

11   In the two years since the subject incident on September 17, 2023, Plaintiff has only sought

12   medical treatment on one isolated occasion, on September 18, 2023 (the day after he was released

13   from jail). *Exhibit 16 – Renown Urgent Care records.* The diagnosis was "strain" of the left and

14   right shoulders and "contusion" of the left and right wrists. There was no reported "popping" of

15   his left shoulder on the Renown records. Plaintiff's claimed injuries were so minor that no imaging

16   (x-ray or CT) was deemed to be necessary and, thus, was not taken at the Urgent Care center. By

17   Plaintiff's own admission, the pain in his wrists subsided after only a few days. *MPSJ* at pg. 11,

18   ¶36. The shoulder pain reportedly lasted three months. Plaintiff has never sought or received any

19   follow-up medical treatment for the claimed injuries related to this incident. Plaintiff suggests that

20   he did not seek additional treatment because he "learned that other than icing his wrists and taking

21   over the counter pain medication there was not much he could do." *MPSJ* at pg. 11, ¶ 34. However,

22   the Renown Urgent Care records do not indicate that ice and OTC pain medication were the only

23   treatment options. This was simply the initial recommended treatment.

24   **III.    STATEMENT OF DISPUTED ISSUES OF FACT PRECLUDING SUMMARY
          JUDGMENT IN PLAINTIFF'S FAVOR ON THE EXCESSIVE FORCE CLAIM**

25

26   1.    Whether Officer Jager's decision to handcuff Plaintiff during transport to jail was

27         consistent with RPD policy and reasonable under the facts and circumstances of this case.

28

Reno City Attorney
P.O. Box 1900
Reno, NV 89505

2.      Whether the bruising/pain in Plaintiff's wrists was caused by Peppermill security personnel when they handcuffed him and took him into custody, or whether it was caused by Officer Jager.

3.      Whether Plaintiff's alleged shoulder pain was caused by Peppermill security personnel when they handcuffed him and held him in custody for whatever duration of time he was held before Officer Jager took him into custody, or whether it was caused by being in Officer Jager's custody for approximately 47 minutes. *Exh. 1,* ¶ 23 – ¶ 24 (from 0620 hours to 0707 hours).

4.      Whether the handcuffs that Officer Jager placed on Plaintiff were, in fact, "too tight." *Exh. 16,* ¶¶ 4 – 7.

5.      Whether any conduct by Officer Jager on September 17, 2023 constituted "excessive force."

6.      Considering the physical demands of his job, whether Plaintiff had any preexisting condition(s) or pain in his shoulders prior to the subject incident.

7.      Considering the physical demands of his job, whether Plaintiff's current pain complaints are caused or aggravated by his job.

8.      Whether Plaintiff reasonably mitigated his damages by seeking appropriate treatment after the subject incident.

9.      Whether Plaintiff failed to reasonably mitigate his damages by not seeking appropriate follow-up treatment if his shoulder pain did not resolve after his initial urgent care visit.

10.     Whether Plaintiff failed to mitigate his damages by choosing to work through his pain instead of taking a reasonable amount of time off work to recuperate.

11.     Whether Officer Jager's conduct was the cause-in-fact of Plaintiff's claimed injuries.

12.     Whether Officer Jager's conduct was a proximate cause of Plaintiff's claimed injuries.

13.     Whether the reported "popping" in Plaintiff's left shoulder (*MPSJ* at pg. 11, ¶ 36) is related to the 9/17/2023 arrest, when no such complaint was reflected in the Renown Urgent Care records.

/ / /

IV.    **STANDARD FOR SUMMARY JUDGMENT**

"The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the facts before the court." *Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994) (citation omitted). Summary judgment is appropriate when the pleadings, the discovery and disclosure materials on file, and any affidavits "show there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). An issue is "genuine" if there is a sufficient evidentiary basis on which a reasonable factfinder could find for the nonmoving party and a dispute is "material" if it could affect the outcome of the suit under the governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). "The amount of evidence necessary to raise a genuine issue of material fact is enough 'to require a jury or judge to resolve the parties' differing versions of the truth at trial.'" *Aydin Corp. v. Loral Corp.*, 718 F.2d 897, 902 (9th Cir. 1983) (quoting *First Nat'l Bank v. Cities Service Co.*, 391 U.S. 253, 288-89 (1968)). In evaluating a summary judgment motion, a court must view all facts and draw all inferences in the light most favorable to the nonmoving party. *Kaiser Cement Corp. v. Fishbach & Moore, Inc.*, 793 F.2d 1100, 1103 (9th Cir. 1986) (citation omitted).

The moving party bears the burden of showing that there are no genuine issues of material fact. *See Zoslaw v. MCA Distrib. Corp.*, 693 F.2d 870, 883 (9th Cir. 1982). Once the moving party satisfies Rule 56's requirements, the burden shifts to the party resisting the motion to "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248 (internal quotations and citation omitted). The nonmoving party "may not rely on denials in the pleadings but must produce specific evidence, through affidavits or admissible discovery material, to show that the dispute exists," *Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1409 (9th Cir. 1991), and "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

V.    **LEGAL AUTHORITIES AND ARGUMENT**

Plaintiff is not entitled to judgment as a matter of law on his Section 1983 claim of excessive force because: (1) the facts of this case, when viewed in a light most favorable to Officer

1    Jager, demonstrate that no constitutional violation occurred because Officer's use of force was

2    reasonable and not excessive; (2) the facts of this case, when viewed in a light most favorable to

3    Officer Jager, fail to establish that his conduct was the cause-in-fact or proximate cause of

4    Plaintiff's claimed injuries; and (3) even if Plaintiff could establish a constitutional violation and

5    causation of injury, Officer Jager is nevertheless entitled to qualified immunity because Plaintiff

6    cannot establish that Jager's decision to handcuff Plaintiff for the purpose of transporting him to

7    jail was clearly unlawful under the facts and circumstances that confronted him.

8    When analyzing a Fourth Amendment excessive force claim, the initial inquiry is whether

9    the facts alleged show that the officer's conduct violated a constitutional right. *Saucier v. Katz*,

10    533 U.S. 194, 201, 121 S. Ct. 2151, 2156, 150 L. Ed. 2d 272 (2001). In order to prevail on his

11    claim, a plaintiff must also "demonstrate that the defendant's conduct was the actionable cause of

12    the claimed injury." *Harper v. City of Los Angeles*, 533 F.3d 1010, 1026 (9th Cir. 2008). Both

13    causation-in-fact and proximate causation must be established. *Id.*; *see Mendez v. County of Los*

14    *Angeles*, 897 F.3d 1067, 1074 (9th Cir. 2018). To prove that an alleged constitutional violation is

15    the cause-in-fact of an injury, a plaintiff must show that but for an officer's conduct, the injury

16    would not have occurred. *Mendez v. County of Los Angeles*, 897 F.3d at 1076. For proximate cause,

17    the question is "whether the unlawful conduct is closely enough tied to the injury that it makes

18    sense to hold the defendant legally responsible for the injury," *id.*, and often depends on whether

19    the officer's actions would have foreseeably caused the injuries, *see White v. Roper*, 901 F.2d 1501,

20    1506 (9th Cir. 1990).

21    "If no constitutional right would have been violated were the allegations established, there

22    is no necessity for further inquiries concerning qualified immunity." *Saucier v. Katz*, 533 U.S. at

23    201. "On the other hand, if a violation could be made out on a favorable view of the parties'

24    submissions, the next, sequential step is to ask whether the right was clearly established." *Id.* This

25    inquiry must be undertaken in light of the case's specific context, not as a broad general

26    proposition. *Id.* "[T]he contours of the right must be sufficiently clear that a reasonable official

27    would understand that what he is doing violates that right." *Anderson v. Creighton,* 483 U.S. 635,

28    640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). The relevant, dispositive inquiry in determining

**Reno City Attorney**
**P.O. Box 1900**
**Reno, NV 89505**

1   whether a right is clearly established is whether it would be clear to a reasonable officer that his

2   conduct was unlawful in the situation he confronted. See *Wilson v. Layne,* 526 U.S. 603, 615, 119

3   S.Ct. 1692, 143 L.Ed.2d 818 (1999) ("[A]s we explained in *Anderson,* the right allegedly violated

4   must be defined at the appropriate level of specificity before a court can determine if it was clearly

5   established").

6       Notably, the U.S. Supreme Court has recognized a clear distinction between the excessive

7   force analysis under the *Graham* factors and the qualified immunity analysis under *Anderson v.*

8   *Creighton*. See, *Saucier v. Katz*, 533 U.S. at 203-207.

9       "In *Graham,* we held that claims of excessive force in the context of arrests or
10      investigatory stops should be analyzed under the Fourth Amendment's 'objective
        reasonableness standard,' not under substantive due process principles. Because
11      'police officers are often forced to make split-second judgments—in circumstances
        that are tense, uncertain, and rapidly evolving—about the amount of force that is
12      necessary in a particular situation,' the reasonableness of the officer's belief as to
        the appropriate level of force should be judged from that on-scene perspective. We
13      set out a test that cautioned against the '20/20 vision of hindsight' in favor of
14      deference to the judgment of reasonable officers on the scene."

15  *Saucier v. Katz*, 533 U.S. at 204–05 (internal citations omitted).

16      "The qualified immunity inquiry, on the other hand, has a further dimension. The
17      concern of the immunity inquiry is to acknowledge that reasonable mistakes can be
        made as to the legal constraints on particular police conduct. It is sometimes
18      difficult for an officer to determine how the relevant legal doctrine, here excessive
        force, will apply to the factual situation the officer confronts. An officer might
19      correctly perceive all of the relevant facts but have a mistaken understanding as to
        whether a particular amount of force is legal in those circumstances. If the officer's
20      mistake as to what the law requires is reasonable, however, the officer is entitled to
21      the immunity defense."

22  *Saucier v. Katz*, 533 U.S. at 205.

23      "[E]ven if a court were to hold that [an] officer violated the Fourth Amendment by

24  conducting an unreasonable, warrantless search, *Anderson* still operates to grant officers immunity

25  for reasonable mistakes as to the legality of their actions. The same analysis is applicable in

26  excessive force cases, where in addition to the deference officers receive on the underlying

27  constitutional claim, qualified immunity can apply in the event the mistaken belief was

28  reasonable." *Saucier v. Katz*, 533 U.S. at 206.

**Reno City Attorney**
**P.O. Box 1900**
**Reno, NV 89505**

Thus, in order for Plaintiff to prevail on his excessive force claim, he must not only prove by a preponderance of the evidence that Officer Jager's conduct was objectively unreasonable, thereby resulting in a constitutional violation, and that his conduct was the cause-in-fact *and* proximate cause of his claimed injuries, but he must also establish that his right to be free from any form of restraint while being transported to jail was so clearly established under existing law that a reasonable officer would have known that gently handcuffing an arrestee with double cuffs to allow for maximum range of motion during transport was unlawful under the facts and circumstances of this case. Plaintiff simply cannot establish all of the essential elements of his case under a summary judgment standard, where the Court must view all evidence in a light most favorable to Officer Jager. At best, Plaintiff may be entitled to a jury trial on any disputed issues of fact. However, Officer Jager may be entitled to summary judgment as a matter of law based on qualified immunity.[3]

**A.    <u>Officer Jager's use of force was objectively reasonable</u>.**

The facts of this case demonstrate that Officer Jager used the absolute least amount of force necessary to restrain Plaintiff while transporting him to jail in compliance with RPD's General Order relating to prisoner transport, which provides as follows: "Arrestees and individuals taken into protective custody by department personnel will be handcuffed behind the back prior to transport. Exceptions to this procedure will be on an individual basis and based on extenuating circumstances." *Exh. 8,* at JAGER 000043. The RPD General Order does not define "extenuating circumstances." Regardless, the facts clearly show that Officer Jager responded to Plaintiff's complaints about being handcuffed by double cuffing him to allow for greater range of motion and making sure that the cuffs were not too tight around his wrists. *Exh. 15,* at ¶ 3-6. It is important to note that although Plaintiff repeatedly requested removal of the cuffs, at no time while Mr. Killinger was in Officer Jager's custody did he ever complain that the handcuffs were too tight around his wrists, that they were cutting into his wrists, that his hands/wrists were going numb, or that his hands/wrists were otherwise in pain. *Exh. 15,* at ¶ 7. Despite the long list of cases cited by

---

[3]  Officer Jager intends to file his own Motion for Summary Judgment at the appropriate time.

Plaintiff to support the general proposition that overly tight handcuffs **can** be a constitutional violation, there is simply no evidence in this case that the handcuffs that Officer Jager placed on Plaintiff was "too tight." Furthermore, an arrestee's general complaints about not wanting to be in handcuffs does not necessarily indicate to an officer that he is in pain. Understandably, nobody wants to be in handcuffs, and although the cuffs may not be comfortable, Plaintiff has not cited any case law to support the proposition that general discomfort rises to the level of a constitutional violation.

If there is any dispute as to whether Officer Jager's use of force was objective reasonable, the Court must view the evidence in a light most favorable to the non-moving party and deny Plaintiff's MPSJ. The Ninth Circuit has held that "[t]he issue of tight handcuffing is usually fact-specific and is likely to turn on the credibility of the witnesses." <u>LaLonde v. Cnty. of Riverside</u>, 204 F.3d 947, 960 (9th Cir. 2000). Therefore, this issue should be resolved by a jury.

**B.**     **<u>Genuine issues of disputed fact regarding causation of injury precludes entry of summary judgment in Plaintiff's favor.</u>**

One of the biggest problems with Plaintiff's case is that he conflates Officer Jager's conduct and the conduct of Peppermill security personnel, seeking to hold Officer Jager responsible for everything that happened on September 17, 2023. Plaintiff wholly fails to recognize that Peppermill security had a valid, legal right to make a citizen's arrest separate and independent of Officer Jager's subsequent decision to take him into custody.

NRS 171.126 provides as follows:

"A private person may arrest another:
1. For a public offense committed or attempted in the person's presence.
2. When the person arrested has committed a felony, although not in the person's presence.
3. When a felony has been in fact committed, and the private person has reasonable cause for believing the person arrested to have committed it."

In this case, Peppermill security arrested Killinger for trespass, placed him in handcuffs, and held him in custody for an unknown period of time before Officer Jager arrived on scene. In

*Arpin v. Santa Clara Valley Transp. Agency*,[4] 261 F.3d 912 (9th Cir. 2001), the Ninth Circuit affirmed the district court's order granting summary judgment in favor of sheriff deputies where a bus driver had made a citizen's arrest of a passenger for battery and then called the Sheriff's department to take the passenger into custody. In so holding, the Ninth Circuit relied on *Kinney v. County of Contra Costa,* 8 Cal.App.3d 761, 767–69, 87 Cal.Rptr. 638, 642–43 (1970), in which the California Court of Appeal held that a peace officer who accepts delivery of a person following a citizen's arrest is not liable for false arrest or false imprisonment even if the officer determines that there is no grounds for making a criminal complaint. The court reasoned that because a peace offer, pursuant to Cal.Penal Code § 142, could be liable for a felony if he refuses to receive a person charged with a crime, the peace officer is relieved of the responsibility of adjudging whether the citizen had probable cause.[5] "Because the undisputed facts indicate that Officers Stone and Barnes accepted delivery of Arpin after Ruiz made a citizen's arrest, the district court did not err in granting summary judgment to Stone and Barnes on the state law claims of false arrest and unlawful imprisonment." *Arpin,* 261 F.3d at 920-921.

Considering that Peppermill had an independent right to make a citizen's arrest and did so by handcuffing Plaintiff and holding him in custody for several hours before Officer Jager arrived, there are disputed issues of material fact as to whether the injuries Plaintiff Killinger complains of were caused by Peppermill security personnel or Officer Jager. The Ninth Circuit's decision in *Arpin* made clear that peace officers are not liable for the conduct of private parties who make a citizen's arrest. According to Officer Jager, the only "force" he used on Plaintiff, which was objectively reasonable for purposes of transporting an arrestee, was to place Plaintiff in double cuffs to allow for more range of motion than a single set of cuffs, before transporting Plaintiff to

---

[4] This was a case cited in Plaintiff's MPSJ on Excessive Force at pg. 23.

[5] Nevada' citizen's arrest statute (NRS 171.126) is *identical* to the language in California's citizen's arrest statute (Cal. Penal Code § 837). Furthermore, Nevada law requires a private person making an arrest "to deliver the arrested person without unnecessary delay to a peace officer," and "the peace officer **shall** take the arrested person without unnecessary delay before the nearest available magistrate empowered to commit person charged with offenses against the laws of the State of Nevada." NRS 171.178(2)(emphasis added). Similar to the facts and the law presented in *Arpin*, the word "shall" in NRS 171.178 indicates that Officer Jager did not have discretion to refuse taking Plaintiff into custody and transporting him to jail after he was arrested by a private citizen.

1   jail. *Exh. 1* at ¶ 20; *Exh. 8,* at JAGER 000043. Additionally, Officer Jager made sure the handcuffs

2   were not too tight around Plaintiff's wrists by slipping one finger between the cuff and his wrists,

3   as he was trained to do. *Exh. 15* at ¶ 4. Jager also made sure that the cuffs were "double locked,"

4   which prevents the cuffs from further or accidentally tightening during transport. *Exh. 15,* at ¶ 5.

5   Although he expressed *wanting* to be out of the cuffs, at no time while Mr. Killinger was in Officer

6   Jager's custody did he ever complain that the handcuffs were too tight around his wrists, that they

7   were cutting into his wrists, that his hands/wrists were going numb, or that his hands/wrists were

8   otherwise in pain. *Exh. 15,* at ¶ 7.

9       Plaintiff was only in Officer Jager's custody for approximately 47 minutes, the amount of

10  time it took to drive him to the jail and fill out the necessary forms for booking. The facts simply

11  do not support a conclusion as a matter of law that Officer Jager's conduct caused any injury to

12  Plaintiff. At a minimum, the issue of causation is one of fact that must be decided by a jury, thereby

13  precluding summary judgment in Plaintiff's favor.

14      ## C.   Officer Jager is entitled to qualified immunity.

15      Even if Plaintiff can establish a constitutional violation and causation of injury, Officer

16  Jager is nevertheless entitled to qualified immunity because Plaintiff has not demonstrated the

17  violation of a right that was clearly established at the time of the alleged violation. As previously

18  discussed above, Plaintiff has offered no evidence that the handcuffs Officer Jager placed around

19  his wrists were "too tight." The only evidence that has been presented is that Plaintiff repeatedly

20  objected to being handcuffed and asked for them to be taken off entirely. However, Plaintiff has

21  offered absolutely no case law to support the proposition that an arrestee is legally entitled to be

22  completely free of any restraint while being transported to jail, or that a peace officer is required

23  to completely remove handcuffs from a detainee simply because he is uncomfortable or repeatedly

24  asks for them to be removed. The transport of an arrestee in the back seat of a police car without

25  any restraint whatsoever or even allowing him to be handcuffed in front of the body poses a clear

26  danger to an officer sitting in the driver's seat. Plaintiff simply does not have such a constitutional

27  right, and he has not offered any legal authority to support it. It is undisputed that Officer Jager

28  responded to Plaintiff's complaint of shoulder pain by using an extra set of handcuffs to allow him

greater range of motion. Under the facts and circumstances of this case, no reasonable officer would think that he was using excessive force by gently placing a detainee in double cuffs, leading him to a patrol car, allowing him to sit down by himself, and driving him to jail.

## VI.    <u>CONCLUSION</u>

Based on the foregoing, Officer Jager respectfully requests that Plaintiff's Motion for Partial Summary Judgment on Excessive Force be denied.

DATED this __21st__ day of October, 2025.

                                    KARL S. HALL
                                    Reno City Attorney

                        By:  */s/ Alice K. Herbolsheimer*
                                    ALICE K. HERBOLSHEIMER
                                    Deputy City Attorney
                                    Nevada State Bar No. 6389
                                    Post Office Box 1900
                                    Reno, Nevada 89505

                                    *Attorneys for Defendant Officer Richard Jager*

## CERTIFICATE OF SERVICE

Pursuant to FRCP 5(b), I certify that I am an employee of the RENO CITY ATTORNEY'S OFFICE, and that on October 21, 2025, I served a copy of the foregoing document(s) on the party(s) set forth below by:

_____    Placing an original or true copy thereof in a sealed envelope placed for collection and mailing in the United States Mail, at Reno, Nevada, postage prepaid, following ordinary business practices, and:

_____    Personal delivery.

_____    Electronic Mail

\_\_X\_\_    CMECF electronic service.

_____    Federal Express or other overnight delivery.

_____    Reno/Carson Messenger Service.

addressed as follows:

Terri Keyser-Cooper
Law Office of Terri Keyser-Cooper
125 Edgewater Parkway
Reno, Nevada 89519
Keysercooper@lawyer.com
*Counsel for Plaintiff*

DATED this __21st__ day of October, 2025.

_/s/ Jenny Sparks_
Jenny Sparks
Legal Assistant

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**List of Exhibits**

| Exh. | Document | Pages |
|---|---|---|
| 1 | Declaration of Richard Jager | 7 |
| 2 | Peppermill Barring Notice dated 3/26/2023 | 2 |
| 3 | Ellis Driver's License | 2 |
| 4 | Killinger Driver's License | 2 |
| 5 | Photo of John Doe taken on 9/17/2023 | 2 |
| 6 | Peppermill's AI Facial Recognition Software Results | 4 |
| 7 | RPD General Order P-280-17 Re: Citations | 5 |
| 8 | RPD General Order P-312-04 Re: Prisoner Transport | 5 |
| 9 | Pretrial Assessment Report | 2 |
| 10 | WCSO Own Recognizance Release Form | 3 |
| 11 | Criminal Complaint | 3 |
| 12 | Declaration of Jill Drake | 4 |
| 13 | Authorization to Represent | 2 |
| 14 | Notice to Set Hearing | 3 |
| 15 | Supplemental Declaration of Richard Jager | 2 |
| 16 | Renown Urgent Care records | 6 |
| 17 | Declaration of Alice K. Herbolsheimer | 3 |

**Reno City Attorney**
**P.O. Box 1900**
**Reno, NV 89505**