TERRI KEYSER-COOPER
Law Office of Terri Keyser-Cooper
Nevada Bar No. 3984
125 Edgewater Parkway
Reno, NV 89519
(775) 337-0323
Keysercooper@lawyer.com
*Attorney for Plaintiff Jason Killinger*

UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA

JASON KILLINGER,

        Plaintiff,

v.

RENO POLICE OFFICER R. JAGER,

        Defendant.

_____/

Case No. 3:25-cv-00388-MMD-CSD

**PLAINTIFF'S REPLY TO DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON EXCESSIVE FORCE**

**I.   DEFENDANT'S BORDERLINE FRIVOLOUS ARGUMENTS MAKE A MOCKERY OF THE LAW AND DEFY COMMON SENSE**

**A.   What Defendant Does Not Dispute**

Defendant does not dispute the following that:

1) Plaintiff Killinger was an innocent man who committed no crimes at the Peppermill;

2) Killinger had no criminal record, no prior arrests, no wants or warrants;

3) Killinger had no criminal record, no prior arrests, no wants or warrants;

4) Killinger went to the Peppermill, gambled, and when attempting to leave, was grabbed by Peppermill security, handcuffed for hours, and wrongly accused of being a former trespasser, Michael Ellis based on the Peppermill's faulty AI facial recognition software;

5)  Killinger never produced or had conflicting identification;

6) Killinger insisted he was not Michael Ellis, had 16 pieces of identification on him to prove conclusively his identity, all in his name, including a current, valid, active Nevada Real ID;

1

7) Defendant Jager refused to examine any of Killinger's identification, insisting Killinger was a liar and fake with false identification (even though he refused to look at it);

8) Jager's Body Worn Camera ("BWC") records an interaction with Killinger lasting one hour and 20 minutes, or 80 minutes; [1]

9) During that 80 minutes, Killinger complained **22 times** of severe pain from the handcuffs that was "killing" arms and shoulders which translates into a complaint of pain **once every 3.5 minutes** (dividing 80 minutes by 22);

10) Killinger weighs 285 pounds. His shoulders were pulled far more when handcuffed behind his back than would the shoulders of a more normal sized man;

11) After Killinger's release from jail he went immediately to seek medical attention; he was examined at Renown Urgent Care with findings of bruising and severe tenderness in shoulders area;

12) Killinger works at UPS as a feeder driver, responsible for driving double and triple trailers, lifting, squatting, bending, and lifting daily heavy equipment in the maintenance and loading of his trucks which caused him pain because of his shoulder injuries;

10) The job of a feeder driver is physically very difficult. In the best of circumstances, the physical activity required can easily compromise a driver's shoulders.

11) It took Killinger three months to recover from his shoulder injuries;[2]

12) All of the *Graham* factors strongly favor Killinger—the crime of trespassing was minor, Killinger never presented a safety risk, was not belligerent or combative, and never tried to flee;[3]

## II. DEFENDANT'S CAUSATION ARGUMENT FAILS BECAUSE JAGER CAUSED ACTUAL HARM AND IT WAS FORSEEABLE HE WOULD CAUSE HARM

Jager claims there is no proof that he caused Killinger harm, because the Peppermill also caused Killinger harm. Therefore, Killinger cannot prove causation. Jager is wrong on the law.

"In a § 1983 action, the plaintiff must establish both causation-in-fact and proximate causation." *Bearchild v. Cobban,* 947 F.3d 1130, 1150 (9th Cir. 2020). "A defendant's conduct is an

---

[1] Defendant states he arrived at the Peppermill at 0546 (Df. Bf., ECF No. 39, 3:2). Defendant states he relinquished custody of Killinger at the jail at 0707 (Df. Bf., ECF No. 39, 9:8). Simple math clarifies Jager was in Killinger's presence for approximately 80 minutes. During those 80 minutes Jager's BWC recorded Killinger begging and pleading for handcuff relief 22 times.

[2] See Declaration of Larry Powers, Killinger's UPS supervisor (Exh, 12)

[3] Defendant fails to even address the *Graham* factors; Defendant ignores them completely.

2

'actual cause,' or 'cause-in-fact,' of a plaintiff's injury only if the injury would not have occurred but for that conduct." *Chaudhry v. Aragon,* 68 F.4th 1161, 1170 n.11 (9th Cir. 2023). "Proximate cause is often explicated in terms of foreseeability, such that the proximate cause requirement precludes liability in situations where the causal link between conduct and result is so attenuated that the consequence is more aptly described as mere fortuity." *Id.* "A person deprives another of a constitutional right within the meaning of § 1983, "if he does an affirmative act, or participates in another's affirmative act." *Lacey v. Maricopa Cnty*, 693 F.3d 896, 915 (9th Cir. 2012). "A police officer's liability under §1983 is predicated on his integral participation in the alleged violation." *Nicholson v. City of Los Angeles,* 935 F.3d 685, 691 (9th Cir. 2019). "Thus, an officer could be held liable where he is just **one participant** in a sequence of events that gives rise to the alleged constitutional violation." *Nicholson,* at 692 (Emphasis added).

1. **Jager's Wrongful Causation Analysis**

Jager argues it is unclear who caused Killinger injuries—was it the Peppermill or was it Jager? Because this is unclear argues Jager, Killinger cannot establish causation.

> One of the biggest problems with Plaintiff's case is that he conflates Officer Jager's conduct and the conduct of Peppermill security personnel, seeking to hold Officer Jager responsible for everything that happened on September 17, 2023" (Df. Bf., ECF No. 39, 16:5-17).

> There are disputed issues of material fact as to whether the injuries Plaintiff Killinger complains of were caused by Peppermill security personnel or Officer Jager." (Df. Bf., ECF No. 39, 17:17-18).

Jager misconstrues the law. Jager is liable not just because of what he personally did but also because he **participated** in the affirmative acts of painful handcuffing along with the Peppermill. The handcuffing injuries would not have occurred **but for** the conduct of both the Peppermill and Jager. Killinger was in pain when Jager arrived. Killinger immediately address the pain he was experiencing from the handcuffs by asking Jager, the moment he arrived: "Can you please get me

3

out of these cuffs now, please? Can you get me out of these cuffs for a minute?" (Exh. 4, BWC 05:49:12). Killinger was plainly putting Jager on notice he was in pain and the pain was caused by the handcuffs. Jager ignored Killinger. Jager had time and opportunity to question Killinger about the painful handcuffing, how long he had been handcuffed and where he was experiencing pain, but did not. Jager **participated** in the Peppermill's wrongdoing by acting **in concert with the Peppermill**. Jager, as a law enforcement officer, had the authority to order the Peppermill to loosen, or release Killinger from the painful handcuffing. But he refused, deliberately ignoring Killinger's pain. By acting in concert with the Peppermill, Jager permitted Killinger's pain to continue. When Jager took Killinger into custody, replacing Killinger's Peppermill handcuffs with RPD handcuffs, he again had the opportunity to loosen the cuffs, give Killinger a break from the cuffs, or take the cuffs off to allow Killinger opportunity to massage his painful shoulders, arms, and wrists but Jager refused. Killinger's injuries would not have occurred **but for** the conduct of the Peppermill and Jager acting in concert.

## 2. Jager Has Joint and Several Liability For All of Killinger's Injury

NRS 41.141 (b)(d), Nevada's comparative negligence law, recognizes joint and several liability for intentional torts as well as for acts "in concert" made by multiple defendants. Killinger may receive his **full damages from Jager**. He is not obligated to name the Peppermill in his lawsuit. When plaintiffs sue a tortfeasor who is jointly and severally liable, cotortfeasors are not necessary parties under Nevada Rules of Civil Procedure 19(a). *Humphries v, The Eighth Judicial District Court*, 129 Nev. 788, 792-93 (2013). "Cotortfeasors are not necessary parties under NRCP 19(a) because complete relief can be afforded to a plaintiff from a jointly and severally liable defendant, without the presence of other possible cotortfeasors.[4]

---

[4] "Since liability required that each tortfeasor be a proximate cause of a plaintiff's injury, each tortfeasor was entirely liable for the full measure of damages. Thus, under the traditional rule, no injustice occurred when only one of several possible defendants was held liable for a plaintiff's damages; the plaintiff was fully compensated, and the defendant held liable could seek contribution

4

Under NRCP 19(a)(1), a plaintiff may still be afforded complete relief against the liable defendant(s) he sues, regardless of the existence of other cotortfeasors. See *Potts v. Vokits,* 101 Nev. 90, 92 (1985) (holding that absent parties would not preclude complete relief from being accorded to the plaintiff and defendant). That a defendant may have a cause of action for contribution against a cotortfeasor does not preclude complete relief between the plaintiff and defendant. *Humphries v. the Eighth Judicial District Court*, 129 Nev. at 796.

Defendants act "in concert" when there exists an agreement to cooperate in a particular line of conduct. "If multiple defendants jointly cause harm, each defendant is held liable for the **entire** amount of the harm." *Federal Trade Commission v. Day Pacer LLC*, 125 F.4th 791, 812 (7th Cir. 2025). The same result occurs in section 1983 cases.

In the §1983 case of *Hazle v. Crofoot,* 727 F.3d 983, 994-995 (9th Cir. 2013), the Court found that the state defendants were liable for a First Amendment violation when Hazle, an atheist on parole, was forced to attend a religion-based treatment program that required him to acknowledge a higher power. Refusing to do so, Hazle was removed from the treatment program, re-arrested; his parole was revoked, and he was imprisoned for an additional 100 days. The lower court held that some state defendants were liable for the violation that but dismissed other defendants who also participated in causing the harm. The jury was instructed it could decide if there was joint and several liability between the defendants, both those before the court and those who already dismissed from the lawsuit. The Ninth Circuit reverse, holding the lower court erred in instructing the jury it could apportion damages between defendants in the lawsuit and those dismissed. The Court held all defendants were equally liable, Hazle's injury was "clearly indivisible," and the actions of all defendants made each of them wholly liable. *Id.* at 995.

---

if any was to be had, from his cotortfeasors. Courts have acknowledged the nature of joint and several liability in the context of NRCP 19 by recognizing that cotortfeasors are not necessary parties under NRCP(a) because complete relief can be afforded to a plaintiff from a jointly and severally liable defendant, or a severally liable defendant with the presence of other tortfeasors." *Humphries* at 793.

5

In *Federal Trade Commission,* the defendants argued that joint and several liability should not be imposed and the court should instead perform an individualized assessment for each defendant. The Seventh Circuit disagreed:

> The defendants' argument runs headlong into our precedent. This court has repeatedly held individuals jointly and severally liable without undertaking individual analyses for each defendant. See *World Media Brokers,* 415 F.3d 758, 763-66 (7th Cir. 2005). Joint and several liability is appropriate whenever a plaintiff can 'establish that each defendant acted in concert to produce a single, indivisible injury'" *Federal Trade Commission v. Day Pacer LLC,* 125 F4th at 812.

Here, it is undisputed that the Peppermill and Jager acted in concert. But for the conduct of both parties, the injury would not have occurred. Further, to illustrate how much the Peppermill and Jager acted "in concert," the Peppermill's "Written Statement" was typewritten, by Peppermill's security official "Luke Ely." But Jager specifically requested that Mr. Ely add in additional information concerning the software match. Mr. Ely complied and hand wrote in on his statement: "Through surveillance software, ok 100% positive match was to Ellis/Killinger." (Exh. 13).

### III.   DEFENDANT'S HANDCUFF ARGUMENT IS BLATANTLY FRIVOLOUS

Defendant absurdly argues that there is no evidence that the Killinger's handcuffs were "too tight" and Jager had no way to understand Killinger was in pain from the cuffs.

> At no time while Mr. Killinger was in Officer Jager custody did he ever complain that the handcuffs were too tight around his wrists, that they were cutting into his wrists, that his hands/wrists were going numb, or that his hands/wrists were otherwise in pain." (Df. Bf., ECF No. 39. 15:22-26).

> There is simply no evidence in this case that the handcuffs that Officer Jager placed on Plaintiff were too tight." (Df. Bf., ECF No. 39, 16:2-3).

Yet Defendant does not dispute that Killinger complained more than **22** times in Jager's presence about severe pain from his handcuffs. Or that on the drive to the jail, and at the jail, Jager's BWC recorded Killinger pleading, begging, piteously imploring Jager to "give him a break from the handcuffs," more than **14** times. (Exh. 4, BWC 06:36:18; Exh. 4, BWC 06:36:56). Defendant does

6

not dispute that Killinger complained numerous times the handcuffs were "killing" his shoulders." "My shoulders are killing me." (Exh. 4, BWC 05:50:54); "I need a break my shoulder is killing me." (Exh. 4, BWC 05:52:39); "My arm is killing me." (Exh. 4, 06:34:210); "Can you please get me out of these cuffs now, please. Can you get me out of these cuffs for a minute?" (Exh. 4, BWC 05:49:12); or "I can't fucking stand these god damned cuffs." (Exh. 4, BWC 06:50:58).

It is unclear what Jager saying. Is he saying that he did not hear Killinger assert he was in pain? Or that the words Killinger used to describe his pain did not register in his consciousness? Or that Killinger's begging for the cuffs to be loosened or that he be given a break from the handcuffs were garbled? No. None of that. Instead, Defendant focuses on Killinger's failure to use the precise magic words that the "handcuffs were too tight." Defendant claims that the 22 times Killinger begged for the handcuffs to be loosened, once every 3.5 minutes, or that he needed a break from the handcuffs, or that his arm was "killing him" or that his shoulder was "killing him" didn't matter.[5]

This is a silly argument. It is disrespectful to Killinger, an entirely innocent man, and to his counsel, and the Court. It ignores the pleas of Killinger or the validity of the medical findings on Killinger the next day. All Killinger was required to do was put Jager on notice of his pain. Killinger was not required to use any specific words, he was required to put Jager on notice the handcuffs were causing him severe pain and he did that, 22 times, with begging and pleading for relief. It is undisputed that Killinger went to Renown Urgent Care for his wrists, arms, and shoulders to be examined the morning after his jail release. Killinger's medical records, confirm Killinger bruising and tenderness. (Exh. 7).[6]

---

[5] For a complete list of the 22 times Killinger begged and pleaded Jager to loosen the cuffs, give him a break from the cuffs, and put him on notice of the pain he was in please see Plaintiff's Motion for Partial Summary Judgment Re Excessive Force (ECF No. 17, pages 16-18).

[6] Dr. Hill noted: "Onset 4 a.m. yesterday handcuffed behind his back for four hours. He was arrested due to mistaken identify. Bilateral wrist pain 7/10 severity. Left wrist is worse. Bilateral should pain 7/10 severity. Right shoulder is worse. No prior injury or surgery." Dr. Hill noted: "**Right shoulder**: diffusely tender without deformity. Pain reproduced abduction and internal

7

IV. **DEFENDANT WRONGFULLY IGNORES THE GRAHAM FACTORS AS INAPPLICCABLE AND IRRELEVANT TO QUALIFIED IMMUNITY ANALYSIS**

**A. Defendant Cites Qualified Immunity Law That Has No Relevance to the Facts**

Defendant provides a detailed analysis of qualified immunity. (Df. Bf., ECF No. 39, Pgs. 12-15). Unfortunately, Defendant fails to apply the facts of this case to the law that he cites. Defendant cites *Saucier v. Katz,* 533 U.S. 194, 201 (2001) for the proposition that "police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation, the reasonableness of the officer's belief should be judged from that on-scene perspective." (Df. Bf., ECF No. 39, 14:9-15). This is a true statement, but it has **no application to the facts of this case** or to Jager's conduct. Jager offers *Saucier* as a way to explain the reasonableness of his conduct. That his conduct should be excused by qualified immunity because police officers like himself have to make split-second judgments, therefore, if a mistake is made, the mistake should be excused by qualified immunity. But it is clear from the facts, Jager was not locked into a rapidly evolving situation where he was forced to make a split second decision.

Jager was not required to make a "split-second judgment" in his dealings with Killinger. The *Saucier* citation is irrelevant. It is undisputed there was no tense, uncertain, or rapidly evolving situation that greeted Jager in the early morning hours of September 17, 2023 at 5:46 a.m. at the Peppermill. Killinger was **seated** in the Peppermill security office, handcuffed, complaining of pain and surrounded by multiple security officers. The casino was quiet, there were no exigent circumstances, no emergency in progress, no weapons, no crowds, no protests, no noise, and no

---

resistance. **Left shoulder**: no point bony tenderness or deformity. Pain reproduced with abduction (movement) against resistance. **Left wrist**: soft tissue swelling. Ecchymosis dorsal aspect (the medical term for a bruise, which is a discoloration of the skin caused by blood leaking from ruptured blood vessels under the skin). Range of motion intact. **Pain reproduced with movement** in all planes. Distal neuro/vascular intact. **Right wrist:** soft tissue swelling. Range of motion intact. Pain reproduced with movement in all planes. Distal neuro/vascular intact." (See Exh. 7, pages 6-7).

dangerous people milling about. This was not a situation in which Jager had to make a quick split second decision about anything. Jager had all the time in the world thoroughly evaluate the situation and investigate. Jager knew Killinger was accused of a minor crime, a citable offense.[7] Jager knew Killinger had a valid, active, and current Nevada Real ID, knew Killinger had no criminal record and was not combative, intoxicated, or even disrespectful. Jager had abundant time and opportunity to give Killinger a break from the painful cuffs, give him an opportunity to massage his shoulders, arms, and wrists, and take reasonable measures to ensure Killinger did not suffer handcuff injury.

Defendant also relies on *Saucier* for the proposition that "reasonable mistakes" by police officers can excuse their conduct and grant them qualified immunity.

> The concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints of particular police conduct and it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts. (Df. Bf., ECF No. 39, 14:16-21 (citing *Saucier v. Katz*, 533 U.S. at 204-05).

Jager made no reasonable mistakes; all his mistakes were unreasonable. This is not a negligence case in which the conduct was accidental, inadvertent, and unintentional. Jager knew exactly what he was doing to cause, continue, and prolong Killinger's pain. Jager heard Killinger beg him for relief from the pain every 3.5 minutes. Jager knew Killinger was suffering. Jager knew his obligation as an officer was not to cause unnecessary pain. Jager cannot reasonably assert he was unaware of Killinger's acute distress, or that Killinger's crime of "looking like" Michael Ellis (who fell asleep months earlier at the Peppermill) was so dangerous that giving Killinger even

---

[7] The crime of trespassing, of looking like someone who had once been found sleeping on the casino premises was a mere citable offense. Jager confirmed this, admitting that if Killinger had simply admitted to being Michael Ellis he would not have been arrested but merely cited. Jager said, "So right now, because I can't identify you, it's weird, because it essentially looks like you have two names, I don't know man, so I can't identify you and unfortunately that means that they can't cite you, and you're going to be arrested." (Exh. 4, BWC 06:14:45)

9

momentary relief would be unsafe or risky. What the facts plainly show is Jager was fully aware of the harm he was causing Killinger and didn't care.[8] He was deliberately indifferent.

### B. The Interplay Between Qualified Immunity and the Graham Factors In An Excessive Force Violation

"Qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan,* 555 U.S. 223 (2009). The purpose of qualified immunity is to strike a balance between the competing 'need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from liability when they perform their duties reasonably." *Groh v. Ramirez,* 540 U.S. 551, 567 (2004).

"In determining whether an officer is entitled to qualified immunity, we employ a two-step test: first, we decide whether the officer violated plaintiff's constitutional right; [9] if the answer to that inquiry is 'yes,' we proceed to determine whether the constitutional right was 'clearly established at the time of the events in question."[10] *Robinson v. York,* 566 F.3d 817, 821 (9th Cir.

---

[8] Jager is no innocent. Recall that in Killinger Motion for Partial Summary Judgment concerning fabrication of evidence, (ECF No. 7), Jager fabricated evidence by falsely writing in his police report that Killinger had "**presented**" Peppermill Security with conflicting identification" (Exh, 11, p. 3, ¶ 1). And again, on that same page in his police report, he wrote that Killinger "**had**" conflicting identification (Exh, 11, p. 3, ¶ 4). This was not a "reasonable mistake" it was an intentional misrepresentation of fact, a lie, made by Jager to bolster his shaky arrest of Killinger.

[9] Multiple courts have agreed that painful handcuffing may create the constitutional violation of excessive force. Accordingly, Jager will be denied qualified immunity because court have held that excessive painful handcuffing may violate a constitutional right. See *Hansen v. Black*, 885 F.2d 642, 645 (9th Cir. 1989); *Wall v. County of Orange,* 364 F.3d 1107, 1112 (9th Cir. 2004); *LaLonde v. County of Riverside,* 204 F.3d 947, 960 (9th Cir. 2000); *Arias v. Amador,* 61 F.Supp.3d 960, 976 (2014), *Thompson v. Lake*, 607 F. App'x 624, 625-26 (9th Cir. 2015); *Howard v. Kansas City Police Dep't,* 570 F.3d 984, 990 (8th Cir. 2009).

[10] Moving on to the second prong of the qualified immunity analysis, whether the constitutional violation was "clearly established" at the time of the alleged misconduct, it is clear that Jager is not entitled to qualified immunity. While, many appellate circuit courts have discussed the use of painful handcuffing, the case of *Meredith v. Erath,* 342 F3d 1057, 1063 (9th Cir. 2003) made clear that painful handcuffing is a constitutional violation. The *Meredith* case occurred in 2003. Killinger's case occurred in 2023, twenty years later. Accordingly, it was "clearly

10

2009). "For the first step—whether the official violated a constitutional right, we look to the Supreme Court's guidance on excessive force in *Graham v. Connor,* 490 U.S. 386 (1989)." *Mattos v. Agarano,* 661 F.3d 433, 441 (9th Cir. 2011). "The Court has emphasized that there are no per se rules in the Fourth Amendment excessive force context; rather, courts 'must slosh their way through the fact bound morass of 'reasonableness.'" *Scott v. Harris*, 550 U.S. 372, 383 (2007).

The first factor, the severity of the crime, strongly favors Killinger. He was accused of looking like a trespasser found months earlier sleeping in the Peppermill. This is an extremely minimal crime, if it was a crime at all. Killinger was never found sleeping loitering, or behaving in any way inappropriately at the Peppermill. The AI software identified him as "looking like" someone who loitered, slept and behaved inappropriately, not that he did.

The second factor, and the most important, is whether the suspect posed an immediate threat to the safety of the officer or others. *Deorle v. Rutherford,* 272 F.3d 1272, 1280 (9th Cir. 2001). This also favors Killinger, who posed no threat whatsoever. When Jager arrived Killinger was seated, handcuffed, in the Peppermill office. There was no allegation from security that he was violent, threatening, intoxicated, or belligerent. He did not pose a threat to Peppermill security or Jager.

The third factor is whether the suspect was actively resisting arrest or attempting to evade arrest by flight mediates also in Killinger's favor. *Deorle v. Rutherford,* 272 F.3d at 1279-80. The most that can be said about Killinger's conduct is that he was begging for relief imploring Jager to give him a break from his handcuff pain. Jager commented on Killinger's behavior saying, "You seem like a stand-up guy, [this may be] a terrible case of mistaken identity, but the end of the day, you're being cool." (Exh. 4, BWC 06:39:54). Arriving at the jail, Jager yelled out, "He's

established" at the time of Jager's interaction with Killinger that allowing the Peppermill's painful handcuffing to continue, prolonging Killinger's pain unnecessarily, and refusing to allow Killinger even a momentary handcuff break when Killinger was neither a dangerous criminal or a safety risk was clearly established as a constitutional violation. Every reasonable officer faced with the situation Jager faced should have known that.

11

cooperative!" (Exh. 4, BWC 06:47:28). Killinger could not be considered a "threat" to Jager's safety or to be actively trying to resist arrest when Jager admitted Killinger was a "stand-up guy" and "cooperative." The *Graham* factor of "resisting arrest" also strongly tilts in Killinger's favor.

### C. Jager's Conduct Was Unreasonable

Jager asserts he deserves qualified immunity because his conduct was "objectively reasonable" and he used the "least amount" on Plaintiff in compliance with RPD's General Order. (Df. Bf., ECF No. 39, 15:14-19) RPD's General Order anticipates arrestees will be handcuffed behind their back but states "exceptions" can be made on an individual basis with extenuating circumstances. (Exh. 2, pgs. 2-3). Those arrested for extremely minor crimes, behaving appropriately, without criminal records, who protest of severe pain from the handcuffing for hours would be candidates for extenuating circumstances. RPD's use of force policy requires officers to use **only** the amount of force "reasonably necessary." (Exh. 9, RPD Policy on Use of Force, pg. 1). Handcuffing is force. It is not RPD's policy to ignore an arrestee's pain, or to deliberately cause, prolong or ignore the repeated cries of severe pain, from arrestees who pose no safety risk and are accused of minor, citable, offenses.

First, it was unreasonable for Jager **to fail to ignore the obvious reason for Killinger's acute pain.** It was not a mystery. Any reasonable officer would see Killinger was a very large man who would have far more difficulty stretching his arms and shoulder far behind his back to accommodate handcuffs. The arms and shoulders would have a greater distance to go to reach the handcuffs than with a more normal sized man. It was unreasonable for Jager to treat Killinger as if he was an ordinary sized man who could easily be handcuffed behind his back when he wasn't. Jager states he was appropriate because he "double cuffed" Killinger to allow for greater comfort. (Df. Bf., ECF No. 39, 15:20-22). But the double cuffing gave Killinger no relief, nor could it

12

because of Killinger's size.

Second, it was unreasonable for Jager to **ignore Killinger's repeated pleading and begging for pain relief from the handcuffs for hours.** Any reasonable officer hearing an arrestee pleading and begging for pain relief would address the issue, not ignore it. Killinger made 22 comments about his severe pain in the 80 minutes he interacted with Jager, on average, one comment every 3.5 minutes. Killinger's crime was minimal, "looking like" someone who had once been trespassed for sleeping. Killinger's comments about pain were constant; it was unreasonable for Jager to ignore this or to give Killinger the relief he was pleading for from the painful cuffs.

Third, it was unreasonable for Jager **to fail to advise jail personnel that Killinger was in severe pain from the handcuffing**. Any reasonable officer hearing for hours an arrestee was in severe pain from the handcuffing would advise the next responsible agency of that fact so that pain accommodation could be provided as quickly as possible because the arrestee was in acute distress.

Fourth, it was unreasonable for Jager **to fail to inquire of the Peppermill how long Killinger had been in handcuffs prior to his arrival**. The Peppermill had kept Killinger in handcuffs for two hours. Any reasonable officer would know that a very large suspect kept in handcuffs for two hours, prior to his arrival, who was now pleading for acute handcuff pain relief, would have, at minimum, asked how long the suspect had been kept in handcuffs—especially when the alleged crime was extremely minor and the suspect was courteous and appropriate.

Fifth, it was unreasonable for Jager **to fail to seek information on what Killinger had been doing prior to his apprehension by Peppermill security**. Any reasonable officer would want to know what Killinger had been doing in the casino—was he loitering, sleeping, causing problems, or was he a legitimate customer? If Jager had inquired, he would have learned that Killinger had been playing craps and betting large amounts.

Fifth, it was unreasonable for Jager **to refuse to investigate Killinger's identity.** Any reasonable officer brought to the scene would want to ensure that the Peppermill's AI software was accurate because the criminal allegation against Killinger rested entirely on the AI software, not anything Killinger had done. The Ninth Circuit has held that officers may **not** solely rely on the claim of a citizen witness [Peppermill security officers] that a crime has been committed, but must independently investigate the basis of the witness' knowledge or interview other witnesses. *Hopkins v. Bonvicino,* 573 F.3d 752, 767 (9th Cir. 2009). "Police officers have a duty to conduct an investigation into… a witness'[s] report.). *Arpin v. Santa Clara Valley Transp. Agency* plainly holds: "In establishing probable cause, officers may not solely rely on the claim of a citizen witness that he was a victim of a crime, but must independently investigate the basis of the witness' knowledge or interview other witnesses." *Arpin* at 925.

Sixth, it was unreasonable for Jager **to fail to verify Killinger's status as a gaming customer** when it was easy for him to do so. Any reasonable officer would have conducted this most minimal inquiry. Killinger had a Peppermill Player's Card. When a casino patron gambles, he gives his player's card to dealer. It would have been easy for Jager to verify that Killinger was a regular Peppermill customer who gambled frequently, not a trespasser.

Seventh, it was unreasonable for **Jager to refuse to give Killinger a break from the painful handcuffing or to fail to investigate when he admitted he was not certain if Killinger was the trespasser,** Michael Ellis. Any reasonable officer would have given Killinger a break from the handcuffs as he investigated Killinger's identity, looked at his identification, or talked to Peppermill officials regarding whether Killinger had gambled frequently. Especially when Jager was so unclear if Killinger was Mr. Ellis. Jager said, "This poor guy might legitimately be somebody else, **I don't know**." Jager added, "I'll be honest, **I don't know what to think**." (Exh. 4,

BWC 6:33:51). Obviously, a reasonable officer who did not know what to think, would opt to investigate further and give Killinger a break from the painful handcuffs while he did so.

Eighth, it was unreasonable for Jager **to refuse to give Killinger a break from the painful handcuffing when there was nothing preventing him from doing so**. Any reasonable officer, hearing the acute distress Killinger voiced, would have understood Killinger's pain was something requiring immediate attention. Especially so when there were no exigent circumstances, no weapons, no threats, no violence, no serious crime, no emergency, and nothing happening in the casino at 5:46 am that would have prevented Jager from doing so. Jager had time and opportunity to address Killinger's handcuff pain, but his deliberate indifference to that pain caused the pain to continue, to be prolonged, and to ultimately cause Killinger serious harm.[11]

Ninth, it was unreasonable for Jager **to fabricate evidence in his police report indicating that Killinger "had presented" or "had" conflicting identification.** Any reasonable officer knows he never to lie in a police report to make an arrested look guilty. Jager knew Killinger at no time presented or had conflicting identification. Jager knew he was making a false statement. No reasonable police officer makes false statements in a police report.

## VI. CONCLUSON

For all of the above reasons, Plaintiff respectfully requests partial summary judgment be granted in his favor on his excessive force claim and the matter set for trial on damages.

DATED this 27th day of October 2025

/s/ *Terri Keyser-Cooper*
TERRI KEYSER-COOPER

---

[11] For a complete list of the options available to Jager, please see Plaintiff's Motion for Partial Summary Judgment (ECF No. 17, pg. 25).

15

# CERTIFICATE OF SERVICE

I, Terri Keyser-Cooper, declare as follows:

On this date, I served a copy of the following documents on the parties as follows:

PLAINTIFF's REPLY TO DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON EXCESSIVE FORCE

[ ]     BY FED EX.  By placing a true copy of the above-referenced document(s) with FedEx in a sealed envelope with postage prepaid to the addressee(s) listed below.

[ ]     BY FACSIMILE TRANSMISSION.  By transmitting a true copy of the document(s) by facsimile transmission

[ ]     BY HAND-DELIVERY.  By delivering a true copy enclosed in a sealed envelope to the address(es) shown below.

[X]     BY ELECTRONIC SERVICE.  By electronically mailing a true copy of the document(s) to defendants at the following email addresses via the Court's electronic filing procedure:

KARL HALL
ALICE K. HERBOLSHEIMER
Reno City Attorney's Office
P.O. Box 1900
Reno, NV 89505
Herbolsheimera@reno.go

DATED this  27th day of October, 2025

    /s/ Terri Keyser-Cooper
TERRI KEYSER-COOPER
*Attorney for Plaintiff Jason Killinger*