EXHIBIT 5

# DEFEFNDANT'S FIRST SUPPLEMENTAL DISCLOSURES

EXHIBIT 5

1   KARL S. HALL
Reno City Attorney
2   ALICE K. HERBOLSHEIMER
Deputy City Attorney
3   Nevada State Bar No. 6389
4   Post Office Box 1900
Reno, Nevada 89505
5   Tel: (775) 334-2050
6   Email: Herbolsheimera@reno.gov
*Attorneys for Defendant Reno Police*
7   *Officer R. Jager*

8

9                **UNITED STATES DISTRICT COURT**

10                   **DISTRICT OF NEVADA**

11

12   JASON KILLINGER,             **CASE NO.: 3:25-cv-00388-MMD-CSD**

13          Plaintiff,

14      vs.                  **DEFENDANT JAGER'S FIRST**
                            **SUPPLEMENTAL DISCLOSURES**
15   RENO POLICE OFFICER R. JAGER,   **PURSUANT TO FRCP 26(a)(1)**

16          Defendant.

17

18       Defendant RENO POLICE OFFICER RICHARD JAGER ("Defendant"), by and through

19   his attorneys, Reno City Attorney Karl S. Hall and Deputy City Attorney Alice K. Herbolsheimer,

20   hereby discloses individuals with discoverable information and documents which may be used by

21   Defendant at the trial of this case (**NEW INFORMATION IN BOLD**):

22   **A.**     **LIST OF PERSONS LIKELY TO HAVE DISCOVERABLE INFORMATION**

23       1.     Jason Killinger
             c/o Terri Keyser-Cooper
24             Law Office of Terri Keyser-Cooper
             125 Edgewater Parkway
25             Reno, Nevada 89519

26

27       Mr. Killinger is the plaintiff in this action and is expected to testify regarding all facts and

28   information within his knowledge relating to the claims and allegations in his Complaint, including
  his claimed injuries and damages.

2.    Richard Jager, Badge No. 16010
c/o Reno City Attorney's Office
Alice K. Herbolsheimer, Esq.
P.O. Box 1900
Reno, NV 89505
(775) 334-2050

Officer Jager is the defendant in this action and is expected to testify regarding all facts and information within his knowledge relating to the claims and allegations in Plaintiff's Complaint, including but not limited to, his education, training, knowledge, and experience relevant to arrest, detention, and transport of suspects, A.I. facial recognition software in general, Peppermill's facial recognitions software, his motivation/intent/state of mind with respect to Plaintiff's arrest, and the Plaintiff's alleged constitutional violations.

3.    Officers, employees, representatives, and agents, past and present, of:
City of Reno
c/o Reno City Attorney's Office
Alice K. Herbolsheimer, Esq.
P.O. Box 1900
Reno, NV 89505
(775) 334-2050

Including but not limited to:
Sergeant Carl DeSantis, Badge No. 14394

These persons are expected to testify regarding all facts and information within their knowledge relating to the claims and allegations in Plaintiff's Complaint, the facts and circumstances surrounding Plaintiff's arrest, as well as RPD's policies and procedures for making an arrest and transporting a suspect.

4.    Officers, employees, representatives, and agents, past and present, of:
Peppermill Casinos, Inc.
2707 S. Virginia St.
Reno, NV 89502
(775) 530-7373

Including but not limited to
Luke Ely
Jeffery Marlow
Samuel Angus
Yvette Ramirez
Lanner (sp?) Silander
Sara Ramirez

These witnesses are believed to have knowledge and information regarding the incident on 09/17/2023 as reflected in RPD Report No. 23-17041, including but not limited to, Peppermill's prior banning notice against Michael Ellis on 3/26/2023, Peppermill's A.I. facial recognition software, and the Peppermill's settlement with Plaintiff.

**B.**    **DOCUMENTS/TANGIBLE ITEMS:**

The following documents are produced in accordance with FRCP 26(a)(1)(ii):

**Jager's Initial Disclosures**

| No. | Document | Bates-labels |
|-----|----------|--------------|
| 1 | Police Report Case No. 23-17041 | JAGER 000001 - JAGER 000004 |
| 2 | Arrest Report and Declaration of Probable Cause and Declaration Supplement | JAGER 000005 - JAGER 000006 |
| 3 | Criminal Complaint and Reno Police Department Statement by Luke Ely | JAGER 000007 - JAGER 000008 |
| 4 | Peppermill Barring Notice for Michael Ellis issued on 3/26/2023 | JAGER 000009 - JAGER 000010 |
| 5 | Washoe County Sheriff WINS Request and Response Documents | JAGER 000011 - JAGER 000022 |
| 6 | Photos of Jason Killinger taken on 9/17/2023 | JAGER 000023 - JAGER 000025 |
| 7 | Driver's License of Jason Killinger | JAGER 000026 - JAGER 000028 |
| 8 | Driver's License of Michael Ellis | JAGER 000029 - JAGER 000030 |
| 9 | Screenshots of Peppermill's Facial Recognition Software Results | JAGER 000031 - JAGER 000033 |
| 10 | Trespass Warning for Jason Killinger issued on 9/17/2023 | JAGER 000034 |
| 11 | State of Nevada, City of Reno Police Department Complaint (unsigned) | JAGER 000035 |
| 12 | Letter from Peppermill to Attorney Salvatore and Release of All Claims | JAGER 000036 - JAGER 000037 |
| 13 | RPD General Order No. P-280-17 Re: Citations | JAGER 000038 - JAGER 000041 |
| 14 | RPD General Order No. P-312-04 Re: Prisoner Transport | JAGER 000042 - JAGER 000045 |
| 15 | Reno Municipal Court ("RMC") Documents | JAGER 000046 - JAGER 000050 |

| No. | Document | Bates-labels |
|-----|----------|--------------|
| 16 | RMC Authorization to Represent filed by Killinger | JAGER 000051 |
| 17 | RMC Notice to Set Hearing | JAGER 000052 - JAGER 000053 |

**Jager's First Supplemental Disclosures:**

| No. | Document | Bates-labels |
|-----|----------|--------------|
| 18 | Officer Jager's Patrol Car Video - RPD 23-17041 | JAGER 000054 |
| 19 | Officer Sexton's Body Cam Video (Redacted) RPD 23-17041 | JAGER 000055 |
| 20 | Email between Peppermill and Jager | JAGER 000056- JAGER 000057 |
| 21 | Email from Peppermill to Jager re facial recognition match | JAGER 000058 |
| 22 | Emails between Jager and Drake | JAGER 000059- JAGER 000061 |
| 23 | Emails between Jager and Sheehan | JAGER 000062- JAGER 000063 |
| 24 | General Order No. P-400-20 – Use of Force (Rev. 7-15-2023) | JAGER 000064- JAGER 000069 |
| 25 | Lexipol Policy 300 – Use of Force (12-16-2025) | JAGER 000070- JAGER 000075 |
| 26 | Lexipol Policy 303 – Control Devices and Techniques (12-16-2025) | JAGER 000076- JAGER 000078 |
| 27 | Evidence (PowerPoint Presentation) | JAGER 000079- JAGER 000102 |
| 28 | Facial Recognition Training_(PowerPoint Presentation) | JAGER 000103- JAGER 000131 |
| 29 | General Order No. E-130-18 – Digital Records and Evidence (1-03-2018) | JAGER 000132- JAGER 000134 |
| 30 | General Order No. E-252-04 - Truthfulness in Duty (9-08-2004) | JAGER 000135- JAGER 000136 |
| 31 | General Order No. P-340-05 – Code of Conduct and Values and Ethics (Rev. 7-03-2007) | JAGER 000137- JAGER 000141 |
| 32 | General Order No. S-190-17 – Evidence and Property (Rev. 4-14-2023) | JAGER 000142- JAGER 000145 |

| No. | Document | Bates-labels |
|---|---|---|
| 33 | General Order No. T-450-17 – Impartial Policing (Rev. 4-14-2022) | JAGER 000146-JAGER 000148 |
| 34 | Lexipol Policy 302 – Handcuffing and Restraints (12-16-2025) | JAGER 000149-JAGER 000152 |
| 35 | Lexipol Policy 407 – Patrol Procedures (10-13-2025) | JAGER 000153-JAGER 000159 |
| 36 | Patrol Follow Up Investigation (PowerPoint Presentation) | JAGER 000160-JAGER 000174 |
| 37 | Principles of Investigation (PowerPoint Presentation) | JAGER 000175-JAGER 000222 |
| 38 | Fourth Amendment PowerPoint Presentation (June 2013) | JAGER 000223-JAGER 000238 |
| 39 | Jager, Richard 16010 - Training Certificates | JAGER 000239-JAGER 000263 |
| 40 | General Order No. E-210-05 - Investigation of Employees (Rev. 12-09-2021) | JAGER 000264-JAGER 000273 |
| 41 | Jager, Richard 16010 - Reno PD Training Report | JAGER 000274-JAGER 000290 |

Defendant reserves the right to use any and all documents/tangible items identified by any other party in this case. Defendant further reserves the right to supplement this list as discovery continues.

**C.    COMPUTATION OF DAMAGES**

Not applicable at this time. However, Defendant reserves the right to seek costs and fees if permitted under Nevada or Federal law and rules.

**D.    INSURANCE**

For purposes of this action and based on the information available at this time, Defendant is self-insured.

/ / /

/ / /

/ / /

/ / /

1    DATED this 12th day of January, 2026.

2                                    KARL S. HALL
                                     Reno City Attorney
3

4
                             By:  /s/ Alice K. Herbolsheimer
5                                 ALICE K. HERBOLSHEIMER
                                  Deputy City Attorney
6                                 Nevada State Bar No. 6389
                                  Post Office Box 1900
7                                 Reno, Nevada 89505

8                                 *Attorneys for Defendant Officer Richard Jager*

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## <u>CERTIFICATE OF SERVICE</u>

2

     Pursuant to FRCP 5(b), I certify that I am an employee of the RENO CITY ATTORNEY'S

3

OFFICE, and that on this date, I served a copy of the foregoing document(s) on the party(s) set

4

forth below by:

5

6

    <u>  X    </u>          Federal Express or other overnight delivery.

7

          Terri Keyser-Cooper
          1548 Kachina Ridge Dr.

8

          Santa Fe, NM 87507
          *Counsel for Plaintiff*

9

10

     DATED this 12th day of January, 2026.

11

12

                              */s/ Jeanette Sparks*

13

                              Jeanette Sparks
                              Legal Assistant

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Reno City Attorney
P.O. Box 1900
Reno, NV 89505

Exhibit 6

# JAGER DEPOSITION EXCERPTS

EXHIBIT 6

**Page 6**

1  say to you is if you don't understand my question, just
2  tell me. Say, I don't understand. You're unclear.
3  What the hell are you talking about? Whatever it
4  translates to me that you don't understand the
5  question. And I will be happy to rephrase it, restate
6  it in a different way, or maybe drop it entirely. But
7  if you don't understand the question, I do need for you
8  to tell me that, so that gives me an opportunity to
9  re-ask the question, and when you answer it, you will
10  be answering it appropriately.
11  Does that sound fair?
12      A.  Yes, ma'am.
13      Q.  During this deposition, you cannot talk to
14  your lawyer in any way. You can't ask her any
15  questions. You can't point to a document. You can't
16  communicate with your lawyer in any way.
17  Do you understand that?
18      A.  Yes, ma'am.
19      Q.  During the course of the deposition, we're
20  going to take breaks, bathroom breaks, lunch break,
21  whatever. If there's a question pending, you need to
22  answer that question before we go on the break. You
23  can't leave a question and then go out and then come
24  back and answer it, okay?
25      A.  Yes, ma'am.

**Page 7**

1      Q.  Do you understand? You must answer all
2  questions, even if your lawyer objects, unless she
3  instructs you not to answer. If she instructs you not
4  to answer, you don't have to answer. But I imagine she
5  may make several objections during the course of the
6  deposition, and you still have to answer the question.
7  Do you understand that?
8      A.  Yes, I do.
9      Q.  Okay. And even though we're seated -- we're
10  seated informally in a conference room, the questions I
11  -- I ask and the question -- the answers that you give
12  will have the same force and effect as if this were in
13  a court of law.
14  Do you understand that?
15      A.  Yes, ma'am.
16      Q.  Okay. And we can't talk over each other.
17  And it's very easy to do because it's almost like we're
18  having a conversation. But even if you know where I'm
19  going with the question, please allow me to finish my
20  question before you begin your answer.
21  Do you understand?
22      A.  Yes, ma'am.
23      Q.  Okay. All right, very good. We will begin.
24  In reflecting over your conduct with
25  Mr. Killinger, was everything that you did with Mr.

**Page 8**

1  Killinger on the night you interacted with him,
2  according to Reno Police Department policy?
3          MS. HERBOLSHEIMER: Objection. Vague and
4  ambiguous. Overbroad.
5  Go ahead. You can answer.
6          THE WITNESS: Yes.
7  BY MS. KEYSER-COOPER:
8      Q.  Was everything that you did on the night
9  that you interacted with Mr. Killinger according to
10  your understanding of the custom and policy of the Reno
11  Police Department?
12      A.  Yes.
13      Q.  Would you do everything that you did with
14  Mr. Killinger on September 18, 2023, exactly the same
15  way, if the circumstances were to present themselves to
16  you again?
17          MS. HERBOLSHEIMER: Objection as to the
18  date. I believe it was the 17th of September.
19          MS. KEYSER-COOPER: The 17th through the
20  18th. He arrived on the 17th. He was arrested on the
21  18th.
22          MS. HERBOLSHEIMER: I -- I have different
23  understanding, but that -- that's okay. That, I --
24  BY MS. KEYSER-COOPER:
25      Q.  Go ahead.

**Page 9**

1          MS. HERBOLSHEIMER: The objection is noted.
2          THE WITNESS: Can you repeat the question?
3  BY MS. KEYSER-COOPER:
4      Q.  Sure. Would you do everything that you did
5  with Mr. Killinger on the night in question exactly the
6  same way if the same circumstances were to repeat
7  themselves?
8          MS. HERBOLSHEIMER: Objection. Vague as to
9  time.
10  BY MS. KEYSER-COOPER:
11      Q.  Go ahead.
12      A.  That depends.
13      Q.  What does it depend on?
14      A.  Well, hindsight being what it is and having
15  knowledge gathered after said incident, no.
16      Q.  What would you do differently?
17      A.  Training has been provided by the Reno
18  Police Department kind of informing and educating
19  officers about artificial intelligence and facial
20  recognition. And based off of that training that I've
21  received recently, I would not.
22      Q.  When was the training provided?
23      A.  In the past six months.
24      Q.  And specifically, we're talking about this
25  training, facial recognition training; is that correct?

JASON KILLINGER vs RENO POLICE OFFICER R. JAGER
JAGER RICHARD  01/22/2026

Pages 10..13

Page 10

```
1     A.   Yes, ma'am.
2     Q.   You've reviewed this training, correct?
3     A.   Yes, ma'am.
4     Q.   And --
5          MS. HERBOLSHEIMER:  Can you just note the
6  Bates label for the record, please?
7          MS. KEYSER-COOPER:  Oh, thank you.
8          MS. HERBOLSHEIMER:  Thank you.
9  BY MS. KEYSER-COOPER:
10    Q.   Yes.  Counsel has asked me to identify this
11 is Jager 103.  And we're going to go over it in detail.
12 But I just wanted to clarify for the time being,
13 sometime within the last six months, you've received
14 training on facial recognition --
15    A.   Yes, ma'am.
16    Q.   -- correct?  That's a yes?
17    A.   Yes, ma'am.
18    Q.   And the Reno Police Department put on the
19 training?
20    A.   Yes.
21    Q.   Who in the Reno Police Department put on the
22 training?
23    A.   Vanessa -- can't pronounce her last name.
24    Q.   How do you spell the last name?
25    A.   Starts with a K.
```

Page 11

```
1     Q.   Okay.
2     A.   I don't -- I don't know how to pronounce it.
3     Q.   What specifically would you do differently
4  as a result of the training that you received on facial
5  recognition?
6     A.   I would not have made an arrest based off
7  facial recognition.
8     Q.   So you concede that there was no probable
9  cause for the arrest; is that correct?
10         MS. HERBOLSHEIMER:  Objection.  Misstates
11 the law.  Calls for a legal opinion.  Mischaracterizes
12 the evidence.
13 BY MS. KEYSER-COOPER:
14    Q.   Go ahead.
15    A.   Based off of the information I had at the
16 time and the policies in place and my understanding of
17 the law -- can you rephrase the question?
18    Q.   Sure.  Is it your understanding today that
19 you would not have made the arrest that you made with
20 Mr. Killinger after you've had a chance to have the
21 training on facial recognition put on by the Reno
22 Police Department?
23    A.   Yes.  I believe I already answered that one.
24    Q.   And your training indicated that facial
25 recognition is not probable cause for an arrest; isn't
```

Page 12

```
1  that true?
2          MS. HERBOLSHEIMER:  Objection.  Misstates
3  the evidence.  Calls for a legal conclusion.
4  BY MS. KEYSER-COOPER:
5     Q.   Go ahead.
6     A.   Can you repeat the question?
7     Q.   Sure.
8          MS. KEYSER-COOPER:  Would you, would you
9  repeat it?  Nevermind.
10         DEPOSITION OFFICER:  I was going to say,
11 just give me a second because it's on Zoom.  But I can
12 if you need me to.
13         MS. KEYSER-COOPER:  No.  Let's -- let's not.
14 BY MS. KEYSER-COOPER:
15    Q.   I'm referring to Jager 113, Legal
16 Boundaries.  Have you seen this document before?
17    A.   Yes.
18    Q.   Okay.  And what does the first line say?
19    A.   "Facial recognition alone is not probable
20 cause."
21    Q.   Do you agree with that statement?
22         MS. HERBOLSHEIMER:  Objection.  Calls for an
23 improper lay opinion.
24 BY MS. KEYSER-COOPER:
25    Q.   Go ahead.
```

Page 13

```
1          MS. HERBOLSHEIMER:  Irrelevant.
2          THE WITNESS:  I do now.
3  BY MS. KEYSER-COOPER:
4     Q.   Okay.  You understand now that when you go
5  somewhere, the Peppermill or some other place that
6  utilizes facial recognition, you are not to rely on
7  that exclusively for probable cause to arrest; is that
8  correct?
9     A.   Yes.
10    Q.   Okay.  Now, you met with some people at the
11 Peppermill security on 9-17 -- that's right, it is 9-17
12 --
13         MS. HERBOLSHEIMER:  Yes.
14 BY MS. KEYSER-COOPER:
15    Q.   -- 2023 at 5:46, according to a declaration
16 that you provided.  Do you remember writing that
17 declaration for Counsel?
18    A.   Yes.
19    Q.   Okay.  And you were told that the man seated
20 in the Peppermill security office with the -- with his
21 hands tied -- handcuffed behind his back, matched the
22 face of a former trespasser by the name of Michael
23 Ellis; is that correct?
24    A.   Yes.
25    Q.   And Michael Ellis had been previously barred
```

JASON KILLINGER vs RENO POLICE OFFICER R. JAGER
JAGER RICHARD  01/22/2026
Pages 14..17

Page 14

1  from the casino; is that correct?
2      A.   Yes.
3      Q.   And the Peppermill told you they had 100
4  percent confidence in their facial recognition, correct?
5      A.   Yes.
6      Q.   At the time, you also had 100 percent
7  confidence in the -- in facial recognition. You talked
8  about it being a fancy software system, and you've
9  indicated, I believe, in your declaration, that you had
10 never had any cause to doubt facial recognition before;
11 is that correct?
12     A.   Yes.
13     Q.   Okay. So you believed the Peppermill, when
14 they told you that their facial recognition software
15 was 100 percent accurate?
16     A.   Yes.
17     Q.   And now you know the Peppermill's facial
18 recognition software with regard to Mr. Killinger,
19 seated to my right, was incorrect, right?
20     A.   Yes.
21     Q.   Peppermill was wrong, right?
22     A.   Yes.
23     Q.   Peppermill made a mistake, right?
24     A.   Yes.
25     Q.   And you made a mistake?

Page 15

1      MS. HERBOLSHEIMER: Objection. Calls for a
2  legal conclusion.
3  BY MS. KEYSER-COOPER:
4      Q.   Go ahead.
5      A.   With the information that I had at the time
6  and the guidance I received from supervisors, I made
7  the best decision with the information I had at the
8  time.
9      Q.   At the time, you believed you were following
10 the custom and practice of the Reno Police Department
11 when you took the word of the Peppermill security that
12 their facial recognition software was accurate, correct?
13     MS. HERBOLSHEIMER: Objection. Incomplete
14 hypothetical --
15 BY MS. KEYSER-COOPER:
16     Q.   Go ahead.
17     MS. HERBOLSHEIMER: Misstates the evidence.
18     THE WITNESS: Yes.
19 BY MS. KEYSER-COOPER:
20     Q.   Okay. You believed what the Peppermill told
21 you because that's what was the custom and policy at
22 the Reno Police Department, as you understood it at
23 that time?
24     MS. HERBOLSHEIMER: Objection. Vague and
25 ambiguous. Custom and policy is undefined.

Page 16

1  BY MS. KEYSER-COOPER:
2      Q.   Go ahead.
3      A.   Yes.
4      Q.   And the custom and policy was to accept
5  facial recognition by entities or businesses that were
6  reputable, correct?
7      MS. HERBOLSHEIMER: Objection. Misstates
8  the evidence.
9      THE WITNESS: Yes.
10 BY MS. KEYSER-COOPER:
11     Q.   And now you know that that was wrong, right?
12     A.   Yes.
13     Q.   And you've been trained that that was wrong,
14 that facial recognition software is not probable cause
15 for an arrest, correct?
16     MS. HERBOLSHEIMER: Objection. Misstates
17 his testimony --
18 BY MS. KEYSER-COOPER:
19     Q.   Go ahead.
20     MS. HERBOLSHEIMER: Misstates the evidence.
21     THE WITNESS: Yes. Within the last six
22 months.
23 BY MS. KEYSER-COOPER:
24     Q.   Pardon?
25     A.   Within the last six months.

Page 17

1      Q.   Right. And everybody at the police
2  department, as far as you knew, operated exactly the
3  way you did at the time. In other words, everybody
4  that you knew, when they received a facial --
5  artificial intelligence facial recognition software
6  from an entity that identified a wrongdoer, everybody
7  was accepting that, weren't they.
8      MS. HERBOLSHEIMER: Objection. Calls for
9  speculation.
10 BY MS. KEYSER-COOPER:
11     Q.   Go ahead.
12     MS. HERBOLSHEIMER: Lack of foundation.
13     THE WITNESS: Can -- can you repeat the
14 question?
15 BY MS. KEYSER-COOPER:
16     Q.   Sure. As far as you understood, at the
17 time, other officers similar to yourself were also
18 accepting facial recognition software as accurate for
19 identification purposes, correct?
20     MS. HERBOLSHEIMER: Objection. Calls for
21 speculation. You can go ahead and answer.
22     THE WITNESS: Yes.
23 BY MS. KEYSER-COOPER:
24     Q.   Okay.
25     A.   To the best of my knowledge.

JASON KILLINGER vs RENO POLICE OFFICER R. JAGER
JAGER RICHARD   01/22/2026

Page 18

1    Q.   Yes.  It was the custom and practice of
2   officers at the Reno Police Department when they went
3   somewhere that had artificial intelligence and were
4   told that an identification had been made with 100
5   percent accuracy, it would be accepted?
6           MS. HERBOLSHEIMER:  Objection.  Calls for
7   speculation.  Incomplete hypothetical.
8   BY MS. KEYSER-COOPER:
9    Q.   Go ahead.
10   A.   Yes.
11   Q.   You weren't the only one at the Reno Police
12   Department who would have made that -- the call that
13   you made, right?
14          MS. HERBOLSHEIMER:  Objection.  Calls for
15   speculation.
16          THE WITNESS:  I don't know what other
17   officers would have done or would not have done.
18   BY MS. KEYSER-COOPER:
19   Q.   Well, did you think you were doing something
20   unusual?
21   A.   No.
22   Q.   It was your understanding at the time that
23   what you were doing was correct and that other officers
24   were doing the same thing.  That was your understanding
25   at the time, wasn't it?

Page 19

1           MS. HERBOLSHEIMER:  Objection.  Compound.
2           THE WITNESS:  Can you repeat the question?
3           MS. KEYSER-COOPER:  Can -- can we find it?
4   (The requested question was read back.)
5           MS. HERBOLSHEIMER:  Same objection.
6   Compound.
7   BY MS. KEYSER-COOPER:
8    Q.   Go ahead.
9    A.   Yes.
10   Q.   Now, there's no doubt in your mind that the
11   man seated in the Peppermill office when you interacted
12   with him on September 17th, 2023, was not Michael Ellis?
13   A.   Can you repeat the question?
14   Q.   Sure.  The man you encountered in the
15   office, we now know is Jason Killinger, correct?
16   A.   We now know, yes.
17   Q.   Okay.  And at the time -- yeah.  You now
18   know that the man seated in the Peppermill was not
19   Michael Ellis, who the Peppermill told you inaccurately
20   was Michael Ellis?
21   A.   I now know, yes.
22   Q.   Okay.  Mr. Killinger was at all times,
23   truthful with you, wasn't he?
24   A.   Yes.
25   Q.   He was polite to you?

Page 20

1    A.   Yes.
2    Q.   He was respectful to you?
3    A.   Yes.
4    Q.   And I treated you with courtesy, didn't he?
5    A.   Yes.
6    Q.   In fact, you remember that when you came
7   into the Peppermill security office, the first words he
8   said to you were, "Thank God you're here."
9   You remember that?
10   A.   Yes, I do.
11   Q.   Do you remember him saying that to you?
12   A.   Yes, ma'am.
13   Q.   And what did that indicate to you?
14   A.   That he was grateful that I was there.
15   Q.   Why do you think a -- a -- someone who was
16   sitting there in handcuffs would possibly be grateful
17   that a police officer came?
18          MS. HERBOLSHEIMER:  Objection.  Calls for
19   speculation.
20   BY MS. KEYSER-COOPER:
21   Q.   Go ahead.
22   A.   It could be multiple reasons.
23   Q.   Give me the multiple reasons?
24   A.   It could be that he feels that he's there
25   wrongfully, right?  Or it could be that he's just ready

Page 21

1   to get out of Peppermill custody and get on with
2   whatever legal proceedings are to follow.
3    Q.   He was happy to see you, wasn't he?
4           MS. HERBOLSHEIMER:  Objection.  Calls for
5   speculation --
6   BY MS. KEYSER-COOPER:
7    Q.   Go ahead.
8           MS. HERBOLSHEIMER:  Relevance.
9           THE WITNESS:  His statement implied that.
10   BY MS. KEYSER-COOPER:
11   Q.   His statement implied, "Thank God you're
12   here," that he was relieved that you were there,
13   correct?
14   A.   Yeah.
15   Q.   And that -- is that correct?
16   A.   Yes.
17   Q.   And that from one of the answers that you
18   gave of the multitude of questions that my previous
19   question seemed to indicate and your answer, that he
20   believed, rightfully or wrongfully, that you were going
21   to help him?
22          MS. HERBOLSHEIMER:  Objection.  Calls for
23   speculation.
24   BY MS. KEYSER-COOPER:
25   Q.   Go ahead.

JASON KILLINGER vs RENO POLICE OFFICER R. JAGER
JAGER RICHARD  01/22/2026

**Page 22**

1    A.    Can you repeat the question?

2    Q.    Sure.  Very bad question.

3    A.    Sorry.  I understand you got a lot going on,

4 so.

5    Q.    No, no.  And my questions can -- can wander

6 and they're not always clear.  Mr. Killinger, seated

7 there in the office, he saw you and he said, "Thank God

8 you're here," with relief in his voice, correct?

9    A.    Yes.

10    Q.    Okay.  He didn't say, oh my God, what's

11 going on?  The police are here.  He was thrilled.  He

12 was pleased that you were there, right?

13    A.    Yes.

14    Q.    And one of the possible reasons for that was

15 he though you were going to straighten out this mess

16 that he was in of misidentification, right?

17    MS. HERBOLSHEIMER:  Objection.  Calls for

18 speculation.

19    THE WITNESS:  I don't know what he was

20 thinking.

21 BY MS. KEYSER-COOPER:

22    Q.    Okay.  Fair enough.  And you don't have any

23 doubt, as you sit here today, that Mr. Killinger was a

24 completely innocent man?

25    A.    As of now, yes.

**Page 23**

1    Q.    And the Peppermill was wrong, right?

2    A.    As of now.  Yes.

3    Q.    And you arrested Mr. Killinger wrongfully,

4 correct?

5    MS. HERBOLSHEIMER:  Objection.  Calls for a

6 legal conclusion --

7 BY MS. KEYSER-COOPER:

8    Q.    Go ahead.

9    MS. HERBOLSHEIMER:  Mischaracterizes the

10 evidence.  Incomplete hypothetical.

11 BY MS. KEYSER-COOPER:

12    Q.    Go ahead.

13    A.    Can you repeat the question?  Sorry.

14    Q.    Sure.  You arrested Mr. Killinger wrongfully?

15    MS. HERBOLSHEIMER:  Vague as to time.

16 Incomplete hypothetical.  Calls for a legal conclusion.

17    THE WITNESS:  I was the arresting officer

18 facilitating a citizen's arrest.  So technically, they

19 arrested -- they signed the criminal complaint.

20 BY MS. KEYSER-COOPER:

21    Q.    Mr. Killinger went to jail when he should

22 not have gone to jail; isn't that true?

23    MS. HERBOLSHEIMER:  Objection.  Incomplete

24 hypothetical.  Calls for a legal conclusion.

25    THE WITNESS:  Based on hindsight and the

**Page 24**

1 information I have now, yes.

2 BY MS. KEYSER-COOPER:

3    Q.    Are you sorry about it?

4    MS. HERBOLSHEIMER:  Objection.  Relevance.

5 Argumentative.

6    THE WITNESS:  Yes.

7 BY MS. KEYSER-COOPER:

8    Q.    Are you sorry enough to extend an apology to

9 Mr. Killinger right now?

10    MS. HERBOLSHEIMER:  Objection.  This is a

11 factual deposition.

12 BY MS. KEYSER-COOPER:

13    Q.    Go ahead.

14    MS. HERBOLSHEIMER:  This is not the

15 appropriate forum for this.

16    THE WITNESS:  Okay.

17    MS. HERBOLSHEIMER:  But you can go ahead and

18 answer whether you would be willing to extend an

19 apology.

20    THE WITNESS:  Yes, I would.  Absolutely.

21 BY MS. KEYSER-COOPER:

22    Q.    Then I would ask you now to apologize to Mr.

23 Killinger.

24    MS. HERBOLSHEIMER:  Objection.  This is

25 improper.  I'm going to instruct him not to answer.

**Page 25**

1 It's improper.  It's not a question.

2    MS. KEYSER-COOPER:  We'll move on.

3    MS. HERBOLSHEIMER:  Please do.

4    MS. HERBOLSHEIMER:  Okay.

5    MS. HERBOLSHEIMER:  This is inappropriate.

6 Highly.

7 BY MS. KEYSER-COOPER:

8    Q.    Other than the Peppermill's false facial

9 recognition software identification, what evidence was

10 there to take Mr. Killinger to jail?

11    A.    The crime in question is trespassing.  And

12 based off of the information I had at the time, they

13 had an individual in custody who they reported to

14 matched the description of a prior trespasser and they

15 provided their 100 percent assurance their facial

16 recognition that he was that prior trespasser.  Based

17 on that, him being back on the property, and that

18 evidence, that is sufficient enough to establish

19 probable cause.  It's a matter of determining identity.

20    Q.    My question was, other than the Peppermill

21 falsely providing an identification that was wrong

22 concerning Mr. Killinger, what evidence existed other

23 than their false identification of Mr. Killinger as a

24 trespasser to take him to jail?

25    A.    The taking him to jail, the arrest is made

JASON KILLINGER vs RENO POLICE OFFICER R. JAGER
JAGER RICHARD   01/22/2026

**Page 26**

```
 1  for trespassing.  The crime in question would then be
 2  trespassing.  The -- and to support your question,
 3  taking out the AI facial recognition component of it,
 4  if a security guard without that stops him and says,
 5  hey, you're a prior trespasser.  And they want him
 6  arrested for trespassing, and they're willing to sign a
 7  complaint.  And that person is on property and they
 8  call the police, then I take them to jail so they can
 9  be facilitated to see a magistrate in accordance with
10  Nevada by statute or facilitate the issuance of a
11  citation if appropriate.
12       Q.   Okay.
13       A.   So the evidence of the crime is trespassing.
14       Q.   Well, the crime is trespassing, correct?
15       A.   Yes, ma'am.
16       Q.   I'm asking you what evidence was there to
17  support it, and you've explained, and I -- the bulk of
18  your explanation as I understood it, was someone at the
19  Peppermill was making a citizen's arrest; is that
20  correct?
21       A.   Yes.
22       Q.   And you considered that evidence of
23  trespassing because someone on the property, a private
24  person, was making a citizen's arrest of trespassing;
25  is that correct?
```

**Page 27**

```
 1       A.   Yes.
 2       Q.   Okay.  But you didn't know what the evidence
 3  was of that other than they're making a complaint; is
 4  that correct?
 5       A.   That -- yes.
 6       Q.   Okay.  So there was no evidence other than
 7  somebody -- a private person at the Peppermill was
 8  making a citizen's arrest based on inaccurate facial
 9  recognition software, correct?
10            MS. HERBOLSHEIMER:  Objection.  Objection.
11  It assumes facts that were not known at the time of the
12  incident.  All these questions being that the evidence
13  was false or incorrect was not known at the time.  So
14  these were really unfair questions.
15            MS. KEYSER-COOPER:  I'll thank you just to
16  make an -- make your objection, not make a speaking
17  objection.  You know as well as I do, they're totally
18  improper.
19  BY MS. KEYSER-COOPER:
20       Q.   Go ahead and answer the question.
21       A.   Can you say it one more time?  Sorry.
22            MS. KEYSER-COOPER:  Could you read back the
23  question?
24  (The requested question was read back.)
25            MS. HERBOLSHEIMER:  Objection.  Assumes
```

**Page 28**

```
 1  facts not in evidence at the time.
 2  BY MS. KEYSER-COOPER:
 3       Q.   Go ahead.
 4       A.   One more time.  Sorry.
 5            MS. KEYSER-COOPER:  Read it again.
 6  (The requested question was read back.)
 7            THE WITNESS:  At the time, it was
 8  unbeknownst to me that the facial recognition software
 9  was incorrect.  And the evidence is that you have the
10  person on the property that matches the description
11  described by the complainant for a misdemeanor that did
12  not occur in my presence.
13  BY MS. KEYSER-COOPER:
14       Q.   So is the answer, yes, you had no evidence
15  other than a private person made -- made -- made a -- a
16  citizen's arrest based on inaccurate facial recognition
17  software?
18       A.   Yes.
19            MS. HERBOLSHEIMER:  Objection.  Misstates
20  his testimony.
21  BY MS. KEYSER-COOPER:
22       Q.   Your answer is yes?
23       A.   Yes.
24            MS. HERBOLSHEIMER:  Objection.  Misstates
25  his testimony.
```

**Page 29**

```
 1            THE WITNESS:  Yes.
 2  BY MS. KEYSER-COOPER:
 3       Q.   Your answer is yes?
 4       A.   My -- for a misdemeanor that did not occur
 5  in my presence.  Yes.
 6       Q.   You had no idea when you came there whether
 7  or not Mr. Killinger had committed trespass, did you?
 8       A.   No.
 9       Q.   You had no evidence that he was Michael
10  Ellis when you arrived there, correct?
11            MS. HERBOLSHEIMER:  Objection.  Misstates
12  the evidence.
13  BY MS. KEYSER-COOPER:
14       Q.   Go ahead.
15       A.   I -- when I arrive on an I scene, I don't
16  know what I've got until I get there.
17       Q.   It was a completely unknown scene to you,
18  wasn't it?
19       A.   Yes.
20       Q.   Okay.  And there was nobody there that said
21  to you when you arrived in the Peppermill office that
22  Mr. Killinger had done anything wrong, correct?
23            MS. HERBOLSHEIMER:  Objection.  Misstates
24  the evidence.
25            THE WITNESS:  At the time, they didn't know
```

JASON KILLINGER vs RENO POLICE OFFICER R. JAGER
JAGER RICHARD  01/22/2026

Pages 42..45

**Page 42**

```
1        THE WITNESS:  Yes.
2  BY MS. KEYSER-COOPER:
3      Q.   And as you sit here now, you took a
4  completely innocent man to jail, a man who violated no
5  law, and was wrongfully arrested, correct?
6        MS. HERBOLSHEIMER:  Objection.  Calls for a
7  legal conclusion.
8        THE WITNESS:  Based on the information I
9  have now, yes.
10 BY MS. KEYSER-COOPER:
11     Q.   And as you've indicated earlier, since
12 you've had the training and you understand things
13 differently now, you take some responsibility for that
14 wrongful arrest, correct?
15       MS. HERBOLSHEIMER:  Objection.  Calls for a
16 legal conclusion.  Misstates the evidence.
17       THE WITNESS:  Responsibility would imply
18 that at the time I had information that would -- would
19 include -- responsibility would imply that I -- at the
20 time of the arrest, I had information that I did follow
21 through on or act on in accordance with policy and
22 procedure and -- so I -- so no.
23 BY MS. KEYSER-COOPER:
24     Q.   Well, you've apologized to Mr. Killinger;
25 isn't that true?
```

**Page 43**

```
1        MS. HERBOLSHEIMER:  Objection.  He has not.
2  BY MS. KEYSER-COOPER:
3      Q.   Go ahead.
4      A.   Based off --
5        MS. HERBOLSHEIMER:  Misstates the evidence.
6        THE WITNESS:  Based off of the information
7  that I have now, yes, it is -- I would feel bad for him
8  and what happened.
9  BY MS. KEYSER-COOPER:
10     Q.   And based on that, you accept some
11 responsibility for an error that you made based on
12 faulty information that was provided to you, correct?
13       MS. HERBOLSHEIMER:  Objection.  Calls for a
14 legal conclusion.
15       THE WITNESS:  One can feel bad for
16 somebody's predicament or circumstances without being
17 guilty or, you know, feeling like they were the person
18 who was an instrument in a wrongdoing of what happened.
19 BY MS. KEYSER-COOPER:
20     Q.   But there was wrongdoing that was done to
21 Mr. Killinger.  You don't doubt that?
22     A.   Sorry.
23       MS. HERBOLSHEIMER:  Objection.  Vague.
24 BY MS. KEYSER-COOPER:
25     Q.   Go ahead.
```

**Page 44**

```
1        MS. HERBOLSHEIMER:  Ambiguous.  Calls for a
2  legal conclusion.
3        THE WITNESS:  Can you say it again?  Sorry.
4  BY MS. KEYSER-COOPER:
5      Q.   Mr. Killinger, based on what you know now --
6      A.   Uh-huh.
7      Q.   -- should never have been taken to jail,
8  correct?
9      A.   Yeah.
10       MS. HERBOLSHEIMER:  Objection.  Calls for a
11 legal conclusion.
12 BY MS. KEYSER-COOPER:
13     Q.   Was that a yes?
14     A.   Based off of what I know now with facial
15 recognition training and all that, yeah.
16     Q.   He should never have been taken to jail,
17 correct?
18       MS. HERBOLSHEIMER:  Objection.  Asked and
19 answered.
20       THE WITNESS:  I believe I already answered
21 the question, yes.
22 BY MS. KEYSER-COOPER:
23     Q.   And you -- and you answered it in the
24 affirmative, right?
25     A.   Twice now.
```

**Page 45**

```
1      Q.   Good.  All right.  Now we're going to talk a
2  little about the citizen's arrest.  The Peppermill
3  security office, someone there and someone I believe
4  named Luke Ely signed a complaint, correct?
5      A.   Yes.
6      Q.   And your lawyer has represented in this
7  lawsuit that you didn't have discretion to refuse to
8  take Mr. Killinger to jail once the Peppermill made a
9  citizen's arrest.  Do you recall that?
10     A.   Yes.
11     Q.   Okay.  Do you agree with your lawyer?
12       MS. HERBOLSHEIMER:  Objection.  Calls for a
13 legal conclusion.
14 BY MS. KEYSER-COOPER:
15     Q.   Go ahead.
16     A.   Yes.
17     Q.   Okay.  And this is what your lawyer stated,
18 and it was stated in Opposition to Plaintiff's Motion
19 for Partial Summary Judgment on Excessive Force.  And I
20 apologize, I only have my marked up copy here, but
21 you've seen it before, and I'll ask for that one back.
22 I'm only going to ask you about Footnote 5 here, and
23 I'm handing you Footnote 5 of Plaintiff's Motion for
24 Summary Judgment on Excessive Force, Page 17, Footnote
25 5.  You see that?
```

833-383-3376
750 sandhill road, suite 120, reno, nevada 89521

Page 46

1    A.   Yeah.
2    Q.   And I'll start off with, "Nevada Citizens
3    Arrest Statute NRS 171.126 is identical to the language
4    in California Citizen's Arrest Statute, California
5    Penal Code Section 837.  Furthermore, Nevada law
6    requires a private person making an arrest to deliver
7    the arrested person without unnecessary delay to a
8    peace officer, and the peace officer shall take the
9    arrested person without unnecessary delay to the
10   nearest available magistrate empowered to commit person
11   charged with offenses against the laws of the State of
12   Nevada."
13   NRS 171.178(2), "Similar to the facts
14   and the law presented, the word 'shall' in NRS 171.178
15   indicates that Officer Jager did not have the
16   discretion to refuse taking Plaintiff into custody when
17   transporting him to jail after he was arrested by a
18   private citizen."
19   Is that what that footnote says?
20   A.   Yes.  That's what it says verbatim.
21   Q.   Okay.  And at the time, that was your
22   understanding, wasn't it, Officer Jager?  That you had
23   to take someone arrested pursuant to a citizen's arrest
24   to jail, right?
25   A.   Yes.

Page 47

1    Q.   Okay.  Let's look at the statute.
2    DEPOSITION OFFICER:  Did you want to mark
3    that as an exhibit?
4    MS. KEYSER-COOPER:  No.  I -- I'll let you
5    know.
6    DEPOSITION OFFICER:  Okay.
7    MS. HERBOLSHEIMER:  For the record, just to
8    make a clear record, Counsel was referring to a
9    document filed as ECF39 in the case of Killinger v.
10   Reno Police Officer Jager, Opposition to Plaintiff's
11   Motion for Partial Summary Judgment on Excessive Force,
12   Page 17, Footnote 5.
13   MS. KEYSER-COOPER:  Thank you.
14   BY MS. KEYSER-COOPER:
15   Q.   All right.  We're going to look at two
16   statutes right now.  Here's NRS 171.178.  Oh, yes.
17   Here it is.  And I'm handing -- actually, I think
18   you're going to need to share that with Counsel.
19   MS. HERBOLSHEIMER:  Okay.
20   BY MS. KEYSER-COOPER:
21   Q.   Now, Counsel discussed and referenced part
22   of that statute.  If you'll look to Section 6 of that
23   statute, would you read what that says?
24   MS. HERBOLSHEIMER:  Out loud?
25   MS. KEYSER-COOPER:  Yes.

Page 48

1    THE WITNESS:  Nevada Revised Statute
2    171.178, Paragraph 6, "A peace officer may immediately
3    release from custody without any further proceeding any
4    person the peace officer arrests without a warrant if
5    the peace officer is satisfied that there is -- that
6    there are insufficient grounds for issuing a criminal
7    complaint against the person arrested.  Any record of
8    the arrest of a person released pursuant to this
9    subsection must also include a record of the release.
10   A person so released shall be deemed not to have been
11   arrested but only detained."
12   BY MS. KEYSER-COOPER:
13   Q.   Now, as a police officer, you read Nevada
14   statutes, Reno ordinances, and probably occasionally
15   federal law; is that correct?
16   A.   Yes.
17   Q.   And you're familiar with many of -- of
18   Nevada ordinances -- Nevada statutes, correct?
19   A.   Yes.
20   Q.   As part of your job, you routinely cite
21   people for violations of Nevada statutes and Reno
22   ordinances and sometimes constitutional law, correct?
23   A.   Yes.
24   Q.   Does it mean -- do you -- what do you
25   understand Paragraph 6 to mean?

Page 49

1    A.   I understand it to mean that if there's
2    insufficient grounds for issuing a criminal complaint
3    against a person being arrested, that a officer does
4    not have to follow through with the arrest, and the
5    person shall be released and deemed to have been
6    detained.
7    Q.   That's right.  A police officer who arrives
8    at a scene where someone has made a citizen's arrest
9    does not necessarily have to take that person to jail,
10   does he?
11   MS. HERBOLSHEIMER:  Objection.  Calls for a
12   legal conclusion --
13   BY MS. KEYSER-COOPER:
14   Q.   Go ahead.
15   MS. HERBOLSHEIMER:  -- conclusion.
16   THE WITNESS:  That's if there's insufficient
17   grounds for issuing a criminal complaint.
18   BY MS. KEYSER-COOPER:
19   Q.   So if there are insufficient grounds for
20   issuing a criminal complaint, the officer is not
21   obligated to take someone to jail based on a citizen's
22   arrest; isn't that true?
23   MS. HERBOLSHEIMER:  Objection.  Calls for a
24   legal conclusion.
25   THE WITNESS:  Yes.

JASON KILLINGER vs RENO POLICE OFFICER R. JAGER
JAGER RICHARD   01/22/2026

Pages 58..61

---

**Page 58**

1     A.   Okay.
2     Q.   Mr. Ellis had been barred for sleeping on
3  the premises, right?
4     A.   Yes, according to the barring notice.
5     Q.   And you've already admitted no one saw Mr.
6  Killinger or the man in handcuffs sleeping on the
7  premises.  No one said that to you, did they?
8     A.   To the best of my knowledge.
9     Q.   No one said that Mr. Killinger was cheating,
10  anyone at the -- at the Peppermill, with the slot
11  machines or dice table or anything else, right?
12     A.   No.
13     Q.   Okay.  They told you that he matched the
14  description through their facial recognition software
15  who -- of someone who had been kicked out of the
16  Peppermill.  That's what they told you, didn't they?
17     A.   Yes.
18     Q.   And you now know what they told you was
19  completely wrong, right?
20     A.   I now know that, yes.
21     Q.   Would you trust the Peppermill facial
22  recognition software again?
23     A.   Not for probable cause.
24     Q.   In fact, facial recognition can be good for
25  many things.  It can be an investigative tool, correct?

---

**Page 59**

1     A.   Yes.
2     Q.   Okay.  And if someone is identified by
3  facial recognition software, that would certainly -- as
4  a wrongdoer, that would certainly be possible grounds
5  to ask them some questions, right?
6     A.   Yes.
7     Q.   And to do some investigation, correct?
8     A.   Yes.
9     Q.   Perhaps look at their identification,
10  correct?
11     A.   Yes.
12     Q.   And to see whether their investigation --
13  their identification matched the name of the person who
14  had been barred, correct?
15     A.   Yes.
16     Q.   And in this case, the Peppermill told you
17  that Mr. Killinger had identification, didn't they?
18     A.   Yes.
19     Q.   In fact, he had a -- a real Nevada ID
20  driver's license, correct?
21     A.   Yes.
22     Q.   Okay.  And that -- the name on that was what?
23     A.   Jason Killinger.
24     Q.   And that was not the name of the
25  person that they trespassed, correct?

---

**Page 60**

1     A.   Yes.
2     Q.   And that would raise a red flag to a
3  reasonable police officer that maybe there was a
4  question about this person's identity, correct?
5     A.   Yes.
6     Q.   And at the time you had not had your -- your
7  facial recognition training by the Reno Police
8  Department, right?
9     A.   Correct.
10     Q.   And at the time, you thought that the
11  identification, which you now know is wrongful, made by
12  the Peppermill was sufficient to furnish probable
13  cause, correct?
14     A.   Yes.
15     Q.   And you now know that facial recognition
16  software is nowhere near sufficient for probable cause
17  for an arrest, right?
18     A.   Yes.
19     Q.   So what you did that night by arresting Mr.
20  Killinger based solely on facial recognition software,
21  you would not do in the future to anyone else without
22  further identification and corroboration, correct?
23     A.   Correct.
24     Q.   Looking like someone who's committed a crime
25  is not grounds for an arrest, right?

---

**Page 61**

1          MS. HERBOLSHEIMER:  Objection.  Incomplete
2  hypothetical.
3          THE WITNESS:  No.
4  BY MS. KEYSER-COOPER:
5     Q.   And that's all that the Peppermill had on
6  Mr. Killinger is he looked like Michael Ellis, right?
7          MS. HERBOLSHEIMER:  Objection.  Misstates
8  the evidence.  Incomplete hypothetical.
9          THE WITNESS:  Can you repeat the question?
10  Sorry.
11          MS. KEYSER-COOPER:  Can you read it back?
12          DEPOSITION OFFICER:  Okay.
13          MS. KEYSER-COOPER:  I think I can restate it.
14  BY MS. KEYSER-COOPER:
15     Q.   That is all that the Peppermill had, the
16  grounds that they had to furnish you with a citizen's
17  arrest was that he looked like Michael Ellis, right?
18          MS. HERBOLSHEIMER:  Objection.  Misstates
19  the evidence.
20          THE WITNESS:  Their grounds were their
21  facial recognition software had a 100 percent match for
22  a prior trespasser, and the gentleman in handcuffs in
23  their office resembled both the photograph on the
24  barring notice, as well as the ID that was originally
25  presented that looked like Michael Ellis or that was

---

Page 70

1 sense?
2    Q.  All right.  But I'm not talking about
3 issuing a citation.
4    A.  I think --
5    Q.  We're going to talk about that also later.
6 My question to you is: the grounds that
7 you had to take Mr. Killinger to jail based on a
8 citizen's arrest, was all off of the facial recognition
9 software.  Mr. Killinger, the man seated, had his own
10 identification, which happened to be correct, right?
11    A.  I now know this to be correct, yes.
12    Q.  Mr. Killinger never gave you any
13 identification that was not Jason Killinger, right?
14    A.  Yes.
15    Q.  And he repeatedly stated many times he was
16 Jason Killinger, didn't he?
17    A.  Yes.
18    Q.  And he told you emphatically that he
19 couldn't believe what was happening, because he was
20 Jason Killinger.  And he offered to show you more
21 identification, didn't he?
22        MS. HERBOLSHEIMER:  Objection.  Misstates
23 the evidence.
24 BY MS. KEYSER-COOPER:
25    Q.  Go ahead.

Page 71

1    A.  Yes.
2    Q.  In fact, he told you that he had a pay stub
3 from his employer in his car, in his name, and his
4 employer was United Parcel Service, UPS, correct?
5    A.  Yes.
6    Q.  Okay.  And you told him at the time you
7 couldn't look at that.  He had to go to jail, correct?
8        MS. HERBOLSHEIMER:  Objection.  Misstates
9 the evidence.
10        THE WITNESS:  Yes.
11 BY MS. KEYSER-COOPER:
12    Q.  And just to be absolutely clear, you believe
13 you were following RPD policy at the time in 2023, that
14 was your belief?
15    A.  Yes.
16    Q.  And you believed you were following RPD
17 custom and practice at the time, correct?
18    A.  Yes.  I believe I answered that question.
19    Q.  All right.  Of the actions were done, as far
20 as you can recall, sitting here over two years later,
21 that everything you did was what other officers were
22 doing and was custom and practice from --
23        MS. HERBOLSHEIMER:  Objection.  Calls for --
24 BY MS. KEYSER-COOPER:
25    Q.  -- RPD, right?

Page 72

1        MS. HERBOLSHEIMER:  Objection.  Calls for
2 speculation.  Go ahead.
3        THE WITNESS:  Yes.  I believe I've answered
4 that question as well.
5 BY MS. KEYSER-COOPER:
6    Q.  Okay.  And you're familiar with the custom
7 and practice of RPD, right?
8    A.  Yes.  For the time that I've been there,
9 yeah.
10    Q.  Yeah.  The -- there are many different
11 general orders, different directives that you get from
12 time to time, many things that you're trained to do and
13 they upgrade your training on; isn't that true?
14    A.  Yes.
15    Q.  And at the time, just questioning at the
16 time, everything you did was based on what you knew
17 other officers were doing in the customs and policies
18 of RPD?
19    A.  Again, yes.  I believe I answered this
20 question.
21    Q.  And your answer was in the affirmative,
22 correct?
23    A.  Yeah, it is.
24    Q.  Is that a yes?
25    A.  Yes.

Page 73

1    Q.  You told the Peppermill what to put in their
2 complaint, didn't you?
3    A.  I did not tell them what to put in their
4 complaint.
5    Q.  I'm showing you now what's been marked as
6 identification Jager 08.  Probably just 8.
7        MS. HERBOLSHEIMER:  Thank you.
8 BY MS. KEYSER-COOPER:
9    Q.  And you have in front of you, Reno Police
10 Department statement.
11 The person making the statement is
12 someone named Luke Ely; you see that?
13    A.  Yes.
14    Q.  Okay.  And you see that it's all
15 typewritten, don't you?
16    A.  Yes.
17    Q.  Okay.  But there's something handwritten at
18 the bottom, isn't there?
19    A.  Yes.
20    Q.  How did that get to be handwritten?
21    A.  The security officer wrote it.
22    Q.  At whose direction did he write it?
23    A.  I asked a question and -- and asked if he
24 would write something.  I --
25    Q.  Yeah.  You asked him to clarify and to write

JASON KILLINGER vs RENO POLICE OFFICER R. JAGER
JAGER RICHARD  01/22/2026

**Page 98**

1  hundred calls; is that right?
2      A.    I'm not a mathematician, but roughly.
3      Q.    Okay.
4      A.    Taking any vacation or weeks that I'm not
5  working.
6      Q.    Okay.  Well you don't dispute it could
7  amount to as many as 100 to 200 calls?
8      A.    That sounds reasonable.
9      Q.    Okay.
10     A.    Like I said I don't have a calculator in
11 front of me to --
12     Q.    So it was a very common occurrence for you
13 to respond to a call from the Peppermill?
14     A.    Yes.
15     Q.    Does the Peppermill call more often than
16 other casinos?
17     A.    I am usually a south beat officer, so I
18 respond to the South District.  Being that the
19 Peppermill and the Atlantis are in the South District,
20 and they generate a higher amount of calls because they
21 draw in a lot more people, yeah, it probably does.  I
22 don't work in the Central District often to be able to
23 tell you definitively that Peppermill draws in more
24 calls than the Silver Legacy, or any of those casinos,
25 or the GSR in --

**Page 99**

1      Q.    Okay.  And all I want to know is what you
2  know.  I don't --
3      A.    Okay.
4      Q.    -- want you to speculate about other areas.
5  Just what you know.
6      A.    Okay.
7      Q.    Does the Atlantis also have a software
8  identification system?
9      A.    To the best of my knowledge.
10     Q.    They do or they don't?
11     A.    To the best of my knowledge I believe they
12 do.  Don't know for certain.  That would be a
13 speculation.
14     Q.    Were you -- since you had gone so often to
15 the Peppermill were you also familiar with the security
16 guards?
17     A.    Yes.
18     Q.    Okay.  Did you know them by name?
19     A.    A couple of them.
20     Q.    And you were friendly with them?
21     A.    Yes.
22     Q.    And had you been taking trespassers to jail
23 from the Peppermill for years?
24     A.    By that point, yes.
25     Q.    And was it frequent -- was it often that you

**Page 100**

1  would take them to jail based on facial recognition
2  software?
3      A.    It is my understanding that their entire
4  barring notice program is based off AI software.
5      Q.    Okay.  So would the question I asked you be
6  true, that you had been taking trespassers to jail,
7  from the Peppermill, based on their facial recognition
8  software for years?
9      A.    Yes.
10     Q.    You wrote up a narrative in this case and
11 I'd like to draw your attention to that narrative.  And
12 let's look at Jager 1 through 3.  Do you have that in
13 front of you?  It's the typewritten version of your
14 handwritten earlier one.
15 Do you have that in front of you?
16     A.    This one?
17     Q.    Yes.  Well it -- it's Jager 1 through 3?
18     A.    This one has the cover of the --
19         MS. HERBOLSHEIMER:  Oh, this is missing
20 pages 2, 4, and 5.  The copy you gave him is missing --
21         MS. KEYSER-COOPER:  Oh, okay.
22         MS. HERBOLSHEIMER:  I have a copy that's 1,
23 2, 3 --
24         MS. KEYSER-COOPER:  I have an extra copy.
25         MS. HERBOLSHEIMER:  Oh.

**Page 101**

1          MS. KEYSER-COOPER:  I have an extra copy.
2          MS. HERBOLSHEIMER:  Okay.  We'll give him
3  the clean copy.
4          THE WITNESS:  Okay.  This is the --
5          MS. KEYSER-COOPER:  One of them.  Looking at
6  the one that I highlighted.  Just a moment.  I usually
7  put it on here.  Actually, it is.  Okay.  Focusing your
8  attention now on Page 2 of -- on Page 3 of 3.  And it
9  would be your Jager 3.  Document 3.
10         MS. HERBOLSHEIMER:  Oh, you want to --
11         THE WITNESS:  Do you have a copy?
12         MS. HERBOLSHEIMER:  -- give him that copy or
13 --
14         MS. KEYSER-COOPER:  Oh, did I -- here you go.
15         THE WITNESS:  Awesome.
16         MS. KEYSER-COOPER:  Sorry.
17         THE WITNESS:  Thank you.
18         MS. KEYSER-COOPER:  Thank you.  Too many
19 papers.
20 BY MS. KEYSER-COOPER:
21     Q.    Okay.  You say in the first paragraph, on
22 Jager 3 of 3, "John Doe presented Peppermill security
23 with conflicting identification."  In -- in the
24 dictionary presented -- the word presented means
25 offered or gave.

EXHIBIT 7

# **DRAKE DEPOSITION EXCERPTS**

EXHIBIT 7

Page 1 JASON KILLINGER vs RENO POLICE OFFICER R. JAGER
Drake, Jill on 01/29/2026

Pages 18..21

**Page 18**

1  Q. He goes on to state, "Through surveillance software, a 100
2  percent positive match was made to Ellis Killinger. Do you see that?
3      A. To Ellis/Killinger. So it's my understanding he was saying
4  the software said it was a match to both identifications.
5      Q. Right. So that the Peppermill would logically follow was
6  assuming that because there was 100 percent match on their facial
7  recognition software, that Ellis/Killinger were the same person?
8          MS. HERBOLSHEIMER: Objection. Calls for speculation.
9          MS. KEYSER-COOPER: Go ahead.
10     A. Yeah. Again, I .. this was a very confounding, confusing
11  case. I never came up with any conclusions.
12  BY MS. KEYSER-COOPER:
13     Q. I'm asking you, however, not about your conclusions, but I'm
14  asking you if it would be reasonable that the Peppermill had
15  concluded that Ellis was Killinger based on their facial recognition
16  software?
17     A. That makes sense. Yes.
18     Q. Okay. And you knew .. now know that the person the
19  Peppermill matched on 9/17 as Michael Ellis was .. was .. strike
20  that.
21         You now know that the person that the Peppermill assumed was
22  Michael Ellis, a prior trespasser, was actually Jason Killinger?
23     A. Yeah. I could assume that by the fact that we're here.
24     Q. Okay. Well, you know that the Peppermill's .. strike that.
25         Are you aware that the Peppermill has admitted that their facial

**Page 19**

1  recognition software matching Mr. Killinger to Michael Ellis was
2  incorrect?
3      A. Yes. I'm in receipt of that document.
4      Q. Okay. So there's no ambiguity or uncertainty as you sit
5  here today that the person the Peppermill matched to Michael Ellis
6  was really Jason Killinger?
7      A. Right. I wasn't made aware of that until I received this
8  document earlier this month.
9      Q. Okay. Do you now know that Officer Jager took Jason
10  Killinger to jail based on the Peppermill's incorrect facial
11  recognition software?
12         MS. HERBOLSHEIMER: Objection. Incomplete. Hypothetical.
13  Go ahead.
14         THE WITNESS: Can you restate the question?
15  BY MS. KEYSER-COOPER:
16     Q. You're aware that .. that Officer Jager took Jason Killinger
17  to jail? Are you aware of that?
18     A. Yes.
19     Q. And he took Jason .. strike that.
20         Officer Jager took Jason Killinger to jail based on the
21  Peppermill's incorrect facial recognition software?
22     A. I could agree that he took him to jail based on that
23  software in part.
24     Q. What other reason did Mr. Jager have to take Jason Killinger
25  to jail?

**Page 20**

1      A. I don't think that he could positively identify who he was
2  with the information he had.
3      Q. Well, one of the ways to positively identify him would have
4  been to conduct an investigation; isn't that true?
5          MS. HERBOLSHEIMER: Objection on the foundation.
6      A. To conduct an investigation on scene or afterwards or?
7  BY MS. KEYSER-COOPER:
8      Q. On scene.
9      A. Sure, if he had enough information.
10     Q. If Mr. Killinger was asking Officer Jager to look at the
11  abundant identification he had on his person, that would have been
12  some evidence as to his identity, wouldn't it?
13         MS. HERBOLSHEIMER: Objection. Misstates ..
14     A. Yes.
15         MS. HERBOLSHEIMER: Objection. Misstates the evidence.
16         MS. KEYSER-COOPER: Go ahead.
17     A. I think you were saying if. Then I would say if yes, then
18  yes.
19  BY MS. KEYSER-COOPER:
20     Q. All right. Well, let's .. let's get that answer a little ..
21  a little more succinct, if we can.
22     A. Sure.
23     Q. Police officer .. strike that.
24         You've been dealing with Reno Police Department personnel and
25  officers and the arrests they make for a .. for almost 20 years.

**Page 21**

1  Would that be a true statement?
2      A. Yes.
3      Q. And would it be a true statement that in general, as a rule,
4  officers, when they are faced with a misidentification, don't just
5  take an accused person to jail; they try to conduct somewhat of an
6  investigation if they're uncertain of their identity. Isn't that
7  true?
8          MS. HERBOLSHEIMER: Objection. Calls for speculation,
9  incomplete hypothetical. Lack of foundation. Go ahead.
10     A. So there are just so many variables that I have seen. I
11  don't think I could make a conclusory agreement to that statement.
12  BY MS. KEYSER-COOPER:
13     Q. Well, what I'm trying to get at, and perhaps my questions
14  haven't been clear enough, is whether .. that if a Reno Police
15  Department officer is basing an identification in part or in whole on
16  facial recognition software, you would have expected, wouldn't you,
17  that the officer would have conducted some sort of an investigation
18  as well on the scene?
19     A. Honestly, this is the only AI facial recognition case I've
20  ever seen.
21     Q. Okay. Do you have an understanding that facial recognition
22  software can be inaccurate?
23     A. Yes.
24     Q. How long have you had that understanding?
25     A. I think always.

EXHIBIT 8

# NANCE DEPOSITION EXCERPTS

EXHIBIT 8

Jason Killinger vs Reno Police Officer R. Jager
NANCE KATHRYN  01/27/2026

**Page 10**

1  you the one that decides --
2        MS. KEYSER-COOPER:  Strike that.
3  BY MS. KEYSER-COOPER:
4        Q.  Are you the one that considers whether or not it's feasible
5  to offer training that you think is important?
6        A.  Not always, no.
7        Q.  Who else decides?
8        A.  Lieutenants, the sergeants, the captain, the assistant
9  chiefs.
10        Q.  When they decide new training is necessary, do they bring it
11  to your attention?
12        A.  Sometimes.
13        Q.  Okay.  Do you have the authority, however, to make sure if
14  you think the Department is deficient in its training to implement
15  new training?
16        A.  Yes.
17        Q.  Ofc. Jager testified at his deposition recently that facial
18  recognition training was provided to officers in 2025.  Were you
19  aware of that training?
20        A.  No.
21        Q.  Were you aware of any training that has ever been given to
22  officers regarding facial recognition training?
23        A.  I'm aware now of training that was given to officers, but I
24  was not aware of it before last night.
25        Q.  Okay.  Are you aware of any training that has ever been

**Page 11**

1  given prior to --
2        MS. KEYSER-COOPER:  Strike that.
3  BY MS. KEYSER-COOPER:
4        Q.  Are you aware of any training ever given to Reno Police
5  Department officers regarding facial recognition software?
6        A.  Yes.
7        Q.  When was that?
8        MS. HERBOLSHEIMER:  Objection.  Vague and ambiguous.
9        MS. KEYSER-COOPER:  Go ahead.
10        A.  I was made aware last night of a PowerPoint about facial
11  recognition that was given to officers.  I don't know when -- you
12  just told me that training was given in September, but I -- without
13  verifying that I have no way of knowing.  Prior to that, I don't know
14  what training was given to officers.  They could have been given
15  training and they could there or not.  I don't know that answer.
16  BY MS. KEYSER-COOPER:
17        Q.  Okay.  That's fine.  And to clarify, I'm only representing
18  that this happened in 2025 because Ofc. Jager, at his deposition,
19  said he received this training about six months ago, and that would
20  make it sometime in 2025.  I don't know for a fact it was given in
21  2025.
22        MS. HERBOLSHEIMER:  Objection.
23        MS. KEYSER-COOPER:  Go ahead.
24        MS. HERBOLSHEIMER:  Objection.
25        MS. KEYSER-COOPER:  That was given for clarification.  Go

**Page 12**

1  ahead.
2        MS. HERBOLSHEIMER:  Objection.  Misstates Ofc. Jager's
3  testimony.
4        MS. KEYSER-COOPER:  Okay.
5  BY MS. KEYSER-COOPER:
6        Q.  Are you aware of any training, Chief Nance, given to
7  officers on how to use facial recognition software and make
8  identifications with facial recognition software prior to last night?
9        A.  No.  I don't know, specifically, if any training was ever
10  given.
11        Q.  Okay.  Do you believe this training --
12        MS. KEYSER-COOPER:  Strike that.
13  BY MS. KEYSER-COOPER:
14        Q.  Did you look at the training that you were informed about
15  yesterday?
16        A.  I looked at the PowerPoint.  Yes.
17        Q.  Okay.  Is that training that you think should have been
18  given prior to 2025, if indeed it was given in 2025?
19        MS. HERBOLSHEIMER:  Objection.  Incomplete hypothetical.
20  Calls for speculation.
21        MS. KEYSER-COOPER:  Go ahead.
22        A.  I don't know if it wasn't given prior to that or a version
23  of that wasn't given.  I couldn't answer whether or not it should
24  have been given prior, because I don't know if there was other
25  trainings that were provided prior to that.

**Page 13**

1  BY MS. KEYSER-COOPER:
2        Q.  So you're not aware, as you sit here today, of any training
3  on facial recognition software that Reno police officers would have
4  received prior to the PowerPoint that you looked at last night?
5        A.  No, I -- I don't know.
6        Q.  Okay.  Do you know who made the decision to implement that
7  facial recognition training -- that PowerPoint on facial recognition
8  software?
9        A.  No.
10        Q.  Who would likely have done that?  Do you have any idea?
11        MS. HERBOLSHEIMER:  Objection.  Calls for speculation.
12        MS. KEYSER-COOPER:  Go ahead.
13        A.  I don't know.
14  BY MS. KEYSER-COOPER:
15        Q.  Do you know why that new training was provided?
16        A.  I don't know.
17        Q.  Was there anything important about the training as far as
18  you could tell?
19        MS. HERBOLSHEIMER:  Objection.  Vague and ambiguous. .
20        MS. KEYSER-COOPER:  Go ahead.
21        A.  I thought the PowerPoint looked fine and relevant, so I have
22  no concerns with the training, but I don't know if that was the first
23  training we've ever given, if it's a follow up from other training,
24  if different units or teams have had additional training.  I couldn't
25  tell you that answer.

Page 14

1  BY MS. KEYSER-COOPER:
2      Q. Okay. After looking at the training, did it appear to you
3  that it was important that officers receive that training so that
4  they know what is appropriate in using facial recognition software to
5  make arrests?
6      A. It looked like a great PowerPoint and with a lot of
7  information in it. The need for it, again, I don't know if it was
8  needed or if they had had it before or if it was -- I, I don't know
9  anything about it. I literally got a PowerPoint emailed to me last
10  night. I couldn't even tell you if that training actually was ever
11  given. I've never seen it except for the fact that it was emailed to
12  me yesterday and to provide to me for this deposition. So answering
13  any questions about it is really challenging for me since I -- I
14  mean, anything I'm answering is an assumption that the information
15  you gave me was what the training material was. I don't know.
16      Q. Well, I'll represent to you that the Reno City Attorney's
17  office provided me with that training, and we're going to go over the
18  training. But I really want to know if you could have been aware of
19  the training, if you had wanted to, Chief Nance?
20          MS. HERBOLSHEIMER: Objection. Vague and ambiguous.
21      A. I guess I could be aware of anything if I asked a question
22  about it and somebody told me. I mean, anything, not just this
23  training, technically anything I'm not aware of.
24  BY MS. KEYSER-COOPER:
25      Q. And as far as you know, Chief Nance, you've never asked any

Page 15

1  questions as to whether or not training on facial recognition
2  software had been given to the officers. Is that correct?
3      A. I don't ever recall having that conversation.
4      Q. Was it -- do you know if the training was mandatory for all
5  officers?
6      A. I don't know anything about the training.
7      Q. After looking at the training, do you think it was important
8  that all officers should have received that training?
9      A. I think it's good training. I don't know if they should
10  have necessarily received that training or some training, but I have
11  no concerns with the training.
12      Q. Well, I'm not asking if you had concerns about the content
13  of the training. I'm asking you if the nature of the training was
14  something that -- that all officers, in your opinion, should have
15  received?
16      A. Yes. I have no concerns with the officers receiving that
17  training. I think it's great. I don't know if they should receive
18  that training or if they received other training. I can't say for
19  sure that they need to receive that training if they've received
20  other training.
21      Q. Would you agree that training on how to utilize facial
22  recognition software is important for Reno police officers?
23      A. Yes.
24      Q. And if that training was the only training that had ever
25  been given to Reno police officers, would that be of a concern to

Page 16

1  you?
2      A. No. It's great training.
3      Q. Was it -- would it be of concern to you that they had not
4  received any other training on facial recognition software?
5      A. I don't know how much training one person needs on that. So
6  if that training was sufficient, I don't think they need additional
7  training.
8      Q. Well, I'm not asking if they need additional training. What
9  I'm trying to understand is Ofc. Jager testified that he received
10  that training in 2025, and he had no recollection of any earlier
11  training. My question to you is, should officers have received
12  training on how to utilize facial recognition software prior to 2025?
13          MS. HERBOLSHEIMER: Objection. Incomplete hypothetical.
14  Vague and ambiguous. You can answer.
15      A. I have no concerns with them receiving training earlier if
16  they needed it. I don't know if Ofc. Jager needed that training
17  prior. I don't know that, if other people had or had not received
18  it. But yes, there's value to training constantly on all kinds of
19  topics. So I encourage them to all be lifelong learners and to have
20  training, whether it's department-issued training or on their own
21  training. So any training that they had before 2025 would have been
22  great.
23  BY MS. KEYSER-COOPER:
24      Q. Should they have had training on facial recognition software
25  prior to 2025?

Page 17

1          MS. HERBOLSHEIMER: Objection. Incomplete hypothetical,
2  vague and ambiguous.
3      A. I really can't answer that question that they should have or
4  shouldn't have. It wasn't anything that -- I mean, again, I -- yes,
5  if they, they could have gotten it, it would have been great. I
6  don't know that they didn't. So "should they have" is very vague for
7  me to say yes or no.
8  BY MS. KEYSER-COOPER:
9      Q. Okay. Well, the word "should" is asking for your opinion,
10  Chief Nance. Did you consider that training essential for officers?
11  Yes or no?
12      A. It wasn't essential training for officers.
13      Q. Okay. So in your view, facial recognition training is not
14  essential for officers. Nice if they have it, but if they don't have
15  it, it's not a big deal. Is that right?
16          MS. HERBOLSHEIMER: Objection. Vague as to time.
17          MS. KEYSER-COOPER: Go ahead.
18      A. I'm saying that it is not mandatory training. It was not at
19  the time. I don't believe that it still is. If it becomes mandatory
20  training, that would be something that we would take up with the
21  Post-Commission to make a mandatory training.
22  BY MS. KEYSER-COOPER:
23      Q. And as you sit here today, you don't consider, on your own,
24  as chief of police, that training on how to utilize facial
25

Jason Killinger vs Reno Police Officer R. Jager
NANCE KATHRYN  01/27/2026

Pages 18..21

Page 18

1  recognition software should be mandatory?
2           MS. HERBOLSHEIMER: Objection. Asked and answered.
3           MS. KEYSER-COOPER: Go ahead.
4       A. I think that it's important training, but mandatory training
5  is Post defined. I'm not saying that it shouldn't be part of that,
6  but that would be somebody else's decision outside of my purview to
7  make a certain type of training mandatory.
8  BY MS. KEYSER-COOPER:
9       Q. Well, perhaps I'm using the word "mandatory" improperly if
10 it only signifies to you Post required. I'm asking you, as the chief
11 officer of the Reno Police Department, do you think that your
12 officers should be required -- and I'm asking for your opinion, to
13 have training on facial recognition software?
14          MS. HERBOLSHEIMER: Objection. Vague and ambiguous.
15 Incomplete hypothetical. Asked and answered.
16          MS. KEYSER-COOPER: Go ahead.
17      A. I think it's important training. I'm happy that they had
18 it. I'm happy they put it on. I think it's important. Should it be
19 mandatory or required? I think it's important training. I don't
20 know that it should be required for every single officer.
21 BY MS. KEYSER-COOPER:
22      Q. Okay. Thank you.
23      A. I like them having it, but I don't know that it should be a
24 required training for every officer.
25      Q. And does it raise a problem in your mind that Ofc. Jager, to

Page 19

1  the best of his recollection, testified he had never received any
2  training on facial recognition software prior to it being offered to
3  him sometime in 2025? Does that raise an issue of concern to you?
4       A. No.
5       Q. Okay. Would there have been anything, to your knowledge,
6  that would have prevented the Reno Police Department from offering
7  that training, facial recognition training, before 2025?
8       A. No.
9       Q. And as far as you know, it would have been feasible to
10 conduct that training before 2025, correct?
11          MS. HERBOLSHEIMER: Objection. Vague and ambiguous.
12          MS. KEYSER-COOPER: Go ahead.
13      A. Can you repeat that?
14 BY MS. KEYSER-COOPER:
15      Q. Sure. As far as you know, would it have been feasible to
16 connect -- to conduct the facial recognition training before 2025?
17      A. I don't think I can answer that question.
18      Q. Why not?
19      A. There probably -- there could be -- it could be feasible,
20 but I don't know the day-to-day schedule of training, so to say for
21 sure when I would have done it, I don't -- I don't know. Yeah,
22 probably could have been feasible to get training, but I don't run
23 the day-to-day operations of training, so I don't actually have an
24 answer to that.
25      Q. But you also, Chief Nance, are the chief officer, and you

Page 20

1  make all the important decisions or most of the important decisions
2  for the running of the Department. Isn't that true?
3       A. I'm -- yes.
4       Q. Okay. And as your -- as the chief of police for the Reno
5  Police Department, if you thought that training was important to be
6  done before 2025, it could have been done, correct?
7       A. If we had a pattern of issues in the Department of things
8  that were related that needed training, I would absolutely ask for
9  training to have been on it. And I can use examples of other things
10 that pattern of issues happen, so we ensure that we can provide
11 training. But in this, it -- I don't -- I'm not aware of any pattern
12 of issues for the Reno Police Department on this. So it could have
13 been feasible to do. Could I have made it mandatory? Yes, if I saw
14 a pattern of issues, but I didn't, and so I didn't make it mandatory.
15 And "feasible" is a very big word, because I also don't know what
16 training was provided to people, so people could have had this
17 training before 2025. Because Ofc. Jager didn't doesn't mean that
18 nobody else in the Reno Police Department did.
19      Q. That's right. And it doesn't mean that they didn't either.
20 Let me ask you about the Reno Police Department General Order. I
21 think you should have it in front of you. It should be the top
22 document. It's General Order P-600-19. Do you have that in front
23 of you? It's entitled Witness Identification of Suspects, and it was
24 issued July 2nd, 2019.
25      A. Yes.

Page 21

1       Q. Okay. Would you take a moment and look through that? And
2  I'm going to ask you whether or not there is any mention of using
3  facial recognition for witness identification of suspects?
4       A. No, there is not in here.
5       Q. Okay. So as of 2019, are you aware of any subsequent
6  general order with regard to utilization of facial recognition
7  software?
8       A. No, I'm not.
9       Q. And if there was, you would likely be aware of it, wouldn't
10 you?
11      A. Yes.
12      Q. Now let's go through the training for a moment. Do you have
13 that in front of you, please?
14      A. Yes.
15      Q. I'd like to direct your attention to -- and the training,
16 just for purposes of identification, is entitled "Facial Recognition
17 and Other Identification Techniques". And in the lower right corner,
18 there's a badge; Reno police -- Reno, Nevada police. And I will
19 represent to you that the training that's been provided to me, states
20 Jager, 103 through 131. Do you see that?
21      A. Yes.
22      Q. Okay. Very good. I'd like to direct your attention now,
23 please, to Jager 104, which I believe is the second page into that.
24 Do you see that?
25      A. Yes.

Page 26

1  cause for an arrest?

2      A. Well, there is cases where it has been inaccurate.

3      Q. Okay. And because it is -- it has been found inaccurate,

4  the use of it as the sole basis for an arrest would be improper?

5      MS. HERBOLSHEIMER: Objection. Calls for a legal

6  conclusion.

7      MS. KEYSER-COOPER: Go ahead.

8      MS. HERBOLSHEIMER: And vague as to time.

9      MS. KEYSER-COOPER: Go ahead.

10     A. I think it should be corroborated, which is what this

11  training states.

12  BY MS. KEYSER-COOPER:

13     Q. Okay. And you -- and the basis for your knowledge about

14  that is that facial recognition software can be inaccurate, correct?

15     A. Yes.

16     Q. Now let's turn, please, to Jager 126. And just let me know

17  when you have that in front of you.

18     A. I have it.

19     Q. And again, it states what we've already been discussing. In

20  fact, it restates "This facial image comparison is not a positive

21  identification". And you agree with that, correct?

22     A. Yes.

23     Q. And, "This is an investigative lead only and should not be

24  used as the sole basis for any decisions". You see that?

25     A. So I do see that that's written here, but I think that what

Page 27

1  I'm reading right now is -- this was related to Jager 000125, which

2  that's just the small print of the disclaimer on this investigative

3  lead flier that they've printed out. This isn't policy or practice.

4  It's the disclaimer on this other page.

5      Q. All right. But there's nothing about that that you disagree

6  with, is there?

7      A. Well, this is based on a flier that you wrote, not on how

8  to use facial recognition. So I guess, I don't disagree with the

9  fact that it's on that flier, based on that investigative flier that

10  they made. But now I'm confused as to what you asked me.

11     Q. All right. Well, let's start it again and see if we can be

12  clear. It states at the top, "Disclaimer", correct?

13     A. Un-hum. Yes.

14     Q. And I want to know if you agree with the statements on this,

15  so we'll go over them one by one and see whether or not you agree

16  with them. "This facial image comparison is not a positive

17  identification." And that's a disclaimer. And you would agree with

18  that, correct?

19     A. I would agree that that's the disclaimer on the prior flier

20  that's written out on page 125.

21     Q. Okay. Do you have any basis to disagree with that

22  statement?

23     A. About the flier on the prior page? No.

24     Q. No. About the content of that sentence as read.

25     A. But that that content of that sentence is in relationship to

Page 28

1  a flier. So if you're asking about what my opinion of that

2  disclaimer is in relationship to a flier that was made for training

3  purposes. No, I have no concerns with it.

4      Q. Okay. That's great. Do you have any concerns with the idea

5  posed here that -- and it absolutely relates to a flier on page 125.

6  There's no disagreement about that. It states, "Image comparisons do

7  not represent a definitive confirmation of an identity". And you

8  would agree with that as a general premise of facial recognition

9  software, correct?

10     A. I agree with it as it relates to the flier on page 125.

11     Q. Do you have a -- do you have a problem with what -- the

12  content of that statement?

13     A. In relationship to the flier? No. In relationship to just

14  the world, I can't state that because I don't know what image it's

15  relating to or what comparison it's relating to. This is in

16  relationship to a flier that was made for training purposes, and I

17  agree with it for that.

18     Q. Okay. Now let's go to 127 -- Jager 127. It's the next

19  page. You see that?

20     A. Yes.

21     Q. And it's your -- the training given to RPD officers states,

22  "Do not use facial recognition to verify an identity". Do you agree

23  with that?

24     A. Yes.

25     Q. And it states facial recognition can be used as a "starting

Page 29

1  point". Would you agree with that?

2      A. Yes.

3      Q. Okay. And then it goes on to say something -- oh, no.

4  We're going to go page to 128. Put that in front of you, please.

5      A. Yes.

6      Q. And it has an interesting lead title, "Good vs. Bad

7  Example". And under "bad" it states, "Facial recognition says it is

8  John Doe -- arrest John Doe". What do you understand that to mean?

9      A. There's a lack of corroboration there.

10     Q. Right. And under "good" it states, "Facial recognition gave

11  a lead of John Doe -- check if registered vehicle matches

12  surveillance -- confirmation matches video -- witness picks John Doe

13  from a lineup". Those are suggestions for corroboration. Isn't that

14  true?

15     A. Yes.

16     Q. Okay. And under -- directing your attention to the next

17  PowerPoint in order, 129, it states, "Key Takeaways". Do you see

18  that there?

19     A. Yes.

20     Q. And apparently, "key takeaways" would imply to me the --

21  probably the most important parts. Would that be something that you

22  would assume is correct, that they're saying here the "key takeaways"

23  from this training.

24     A. That's what that slide implies. Yes.

25     Q. Okay. Great. And it states facial recognition is a tool,

Jason Killinger vs Reno Police Officer R. Jager
NANCE KATHRYN   01/27/2026

Page 30

1  not the entire case.  And you would agree with that, correct?
2      A. Yes.
3      Q. And it states, "Always corroborate with independent
4  evidence".  And you would agree with that?
5      A. Yes.
6      Q. And you would underscore, would you not, that no facial
7  recognition -- that no arrest based on facial recognition alone,
8  without corroboration, should be made to furnish probable cause for
9  an arrest, correct?
10         MS. HERBOLSHEIMER:  Objection as to -- vague as to time.
11  Go ahead.
12      A. I think that somewhat misstates what I said.  I said that
13  arrests should have corroboration with them.
14  MS. KEYSER-COOPER:
15      Q. Okay.  And that would have been true in 2020, 2021 through
16  2025 through the current date -- the current year of 2026, correct?
17         MS. HERBOLSHEIMER:  Objection.  Objection.  Incomplete
18  hypothetical.  Vague and ambiguous.
19         MS. KEYSER-COOPER:  Go ahead.
20      A. Yes, I think it's good police practice.
21  BY MS. KEYSER-COOPER:
22      Q. It's good police practice, whether a facial recognition
23  software identification is made regardless of when.  In other words,
24  these practices should have been followed from -- by all officers
25  from at least 2020 until 2026 --

Page 31

1      A. Yes.
2      Q. -- and going forward.  And that's a yes.
3      A. Yes.
4      Q. And as part of the corroboration, officers are encouraged to
5  document thoroughly their corroboration.  Isn't that true?
6      A. Yes.
7      Q. Okay.  And to do that -- and the reason for doing that is to
8  protect their cases, correct?
9      A. Yes.
10      Q. Because facial recognition alone can be inaccurate, right?
11      A. Yes.
12      Q. Okay.  We can put this exhibit aside.  Now, assuming that
13  Ofc. Jager received this PowerPoint training in 2025, as he
14  testified, do you think it's important that this training be provided
15  to city prosecutors?
16      A. I would not be able to answer that question.  I don't know
17  what training prosecutors should receive.
18      Q. Okay.  Well, if the Reno Police Department has a policy or -
19  -
20         MS. KEYSER-COOPER:  Strike that.
21  BY MS. KEYSER-COOPER:
22      Q. Are these PowerPoint documents that we've looked at any part
23  of Reno Police Department policy?
24      A. I don't believe so.  I don't know if we have an AI policy
25  currently.

Page 32

1      Q. Okay.  Should there be an AI policy?
2         MS. HERBOLSHEIMER:  Objection.  Calls for a legal
3  conclusion.  Incomplete hypothetical.  Vague and ambiguous.  You can
4  answer.
5      A. I don't -- I don't know.  There could be one that could
6  incorporate it, but a lot of the other laws of arrest and policies
7  also can be used on this.  Having additional policies doesn't hurt,
8  so I'm not opposed to an additional policy.  I -- currently, we could
9  have one.  I'm not one hundred percent sure if we do or not.  We just
10  rewrote all of our policies.  And I do not recall if that is one that
11  was already put in there or if it's in the process.
12  BY MS. KEYSER-COOPER:
13      Q. Well, if officers are arresting people based on their belief
14  that facial recognition software is reliable and accurate and in
15  fact, it is known to be inaccurate, at least on occasion, wouldn't it
16  be important for officers to be aware of that?
17      A. I have no knowledge of officers arresting somebody on facial
18  recognition software alone or that that is an issue in the
19  organization.
20      Q. Okay.  Well, if officers are arresting people based on
21  facial recognition alone, you would consider that very important,
22  wouldn't you?
23      A. If I was having an issue with people arresting people on
24  facial software recognition alone, I would consider that to be
25  something that we would need to address and deal with in the

Page 33

1  organization.  Yes.
2      Q. You would consider that very important, would you not?
3      A. If an officer was illegally arresting people, I would have
4  concerns with that.  Yes.
5      Q. Well, that's not my question.  My question is, would you
6  have concerns, if it were brought to your attention that officers
7  were arresting individuals based on facial recognition software
8  alone, without any corroboration?
9      A. Yes.  If they -- if that was a pattern of practice here,
10  yes, I would have concern with that.
11      Q. And you would have concern to do more than simply talk with
12  the officer.  You would have concerns to implement a policy as soon
13  as possible on that, wouldn't you?
14      A. If a policy was needed to correct the problem and another
15  policy did not handle that, then yes.
16      Q. Well, you're not aware of any policy, any general order, by
17  the Reno Police Department on facial recognition software, correct?
18      A. I'm unsure if we have one currently at this time.
19      Q. And if it were important within the Department, there likely
20  would have been such a policy.  Isn't that true?
21         MS. HERBOLSHEIMER:  Objection.  Incomplete hypothetical.
22  Vague and ambiguous.
23      A. If I was aware that there was a pattern of arresting people
24  improperly for any reason, then I would evaluate the policy to see if
25  they were acting outside of the policy, if the policy needed to be

EXHIBIT 9

# JAGER DECLARATION

EXHIBIT 9

1
2

## DECLARATION OF RICHARD JAGER IN OPPOSITION TO
## PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

3    I, RICHARD JAGER, declare:

4    1.    I am over the age of eighteen (18) and am competent to testify to the matters set

5    forth in this Declaration and will do so if called upon to testify.

6    2.    I am an officer of the Reno Police Department, employed by the City of Reno. I

7    joined the Reno Police Department on January 13, 2020.

8    3.    I have never been the subject of any disciplinary action as a police officer.

9    4.    On September 17, 2023, at approximately 0546 hours, I responded to the

10   Peppermill Casino ("Peppermill") on the report of a repeat trespasser who had been taken into

11   custody by Peppermill Security as a citizen's arrest.

12   5.    Upon arrival, I observed a male suspect ("John Doe") seated in the Peppermill

13   security office with his hands cuffed behind his back. I did not know what time John Doe was

14   taken into custody or how long he had been in handcuffs.

15   6.    I met with Peppermill Security, who told me that John Doe's face was detected by

16   their surveillance facial recognition software matching a person who had previously been barred

17   from the Peppermill, with 100% confidence. Peppermill Security informed me that the suspect was

18   last trespassed on 03/26/2023, at which time, he identified himself as Michael Phillip Ryan Ellis

19   ("Ellis") by presenting a Nevada Driver's License with that name.

20   7.    When John Doe was detained by Peppermill Security on September 17, 2023,

21   however, he identified himself as Jason James Killinger and presented a Nevada Commercial

22   Driver's License with that name. He also stated that he had never been barred from the Peppermill,

23   and he had no idea who Michael Ellis is.

24   8.    I looked at John Doe's face and compared it to the photo on Killinger's driver's

25   license, as well as the photo on Ellis' driver's license. I honestly thought they all looked like the

26   same person, except that the photo on Killinger's driver's license shows a man with a goatee.

27   9.    There was a vertical tape measure on the wall of Peppermill's security office. When

28   we stood John Doe up against the tape measure to determine his height, John Doe measured at

somewhere between 5'9" and 5'10", which was a closer match to Ellis' driver's license (indicating

-1-

1   a height of 5'9") than to Killinger's driver's license (indicating a height of 6'1").

2       10.    A routine wants and warrants check on both Ellis and Killinger was negative, and

3   neither Ellis nor Killinger had any prior arrest history with additional information to assist in

4   positive identification.

5       11.    In the years prior to September 17, 2023, I had responded to numerous trespass

6   calls from the Peppermill, ranging anywhere from two to six calls per week. It was a very common

7   occurrence, and in most instances, the suspect would claim they were *not* the person identified by

8   Peppermill's facial recognition software.

9       12.    My understanding of Peppermill's procedure is that when a person is barred from

10   the casino, the Peppermill would take a photograph of that person and scan it into their AI software

11   at the time the barring notice is issued. Accordingly, the photo taken by the Peppermill and scanned

12   into their software may be more current than what appears on a person's driver's license. For this

13   reason, I believed that the photograph of the suspect in Peppermill's AI software may be more

14   reliable than the photograph on the driver's license, which could be many years out of date.

15       13.    Prior to September 17, 2023, I had never encountered or even heard of a situation

16   where Peppermill's facial recognition software turned out to be wrong. Indeed, Peppermill's facial

17   recognition software was believed to be so reliable that RPD would, at times, request Peppermill's

18   assistance in locating criminal suspects. RPD would provide Peppermill with photos of suspects

19   to input into their AI software and ask the Peppermill to contact RPD if a suspect is spotted in the

20   casino. Based on my prior experience and knowledge of Peppermill's AI software as of September

21   17, 2023, I had no reason to doubt the accuracy of the system.

22       14.    Peppermill Security showed me that their AI software had captured John Doe's face

23   at five (5) different times at five (5) different angles while he was in the casino on September 17,

24   2023. Two of the photos matched the prior trespasser with 99.8% certainty. Two more photos

25   matched the prior trespasser with 99.9% certainty. The fifth and final photo matched the prior

26   trespasser with 100% certainty.

27       15.    As I was trying to reconcile the information in front of me, several possibilities

28   came to mind (some of which I voiced out loud, as captured on my body worn camera):

          (a)    John Doe (the person identified by Peppermill's AI software) is, in fact,

Reno City Attorney
P.O. Box 1900
Reno, NV 89505

1    Killinger, but he could have presented Michael Ellis' ID when he was
2    previously trespassed on March 26, 2023;

3    (b)    John Doe is, in fact, Michael Ellis, but he could have presented Killinger's
4    ID on September 17, 2023;

5    (c)    John Doe is neither Ellis nor Killinger, but had a hookup at the DMV who
6    provided him with two Real ID's in other people's name; or

7    (d)    Killinger was telling the truth, and Peppermill's AI software erroneously
8    identified him as Michael Ellis.

9    16.    In my experience, I have encountered situations where "Real IDs" were fake or
10   obtained by fraudulent means. A person who has obtained a fake ID will often have other
11   documents or additional forms of identification that match the fake ID. Accordingly, the fact that
12   a person may have multiple forms of ID bearing the same name does not necessarily mean that the
13   IDs are legitimate. I deal with criminal elements and people who lie to me on a daily basis.
14   Therefore, I have been trained to carefully scrutinize information that is presented to me by a
15   suspect.

16   17.    In my experience, I have also encountered people using another person's valid ID.
17   It is not difficult to obtain a duplicate, valid Real ID. The Nevada DMV will issue a duplicate ID
18   to a person who reports that his or her ID was lost or stolen. That duplicate ID can then be given
19   to another person to use for improper purposes.

20   18.    Additionally, if someone is in possession of a stolen vehicle and/or a stolen wallet,
21   that person could also possess multiple forms of identification and documents with the same name.

22   19.    Because I was not able to reconcile the conflicting evidence, I called my supervisor,
23   Sergeant Carl DeSantis, to seek additional guidance. Sgt. DeSantis told me his thought process
24   was that we would have to arrest John Doe and do a WINS check. I concurred with Sgt. DeSantis'
25   suggestion, because if John Doe's fingerprints were on file, a WINS check would confirm his
26   identity.

27   20.    I did not feel I could issue a citation to John Doe for trespass, because I could not
28   determine his identity (i.e., I could not determine whether he was Jason Killinger or Michael Ellis).

**Reno City Attorney**
**P.O. Box 1900**
**Reno, NV 89505**

RPD has a General Order which provides that a person can be issued a citation in lieu of an arrest

1  if he presents satisfactory evidence of his identity. Although John Doe presented a valid driver's

2  license under the name of Jason Killinger with a photo that resembled him, he was three to four

3  inches shorter than the height indicated on the driver's license. This significant discrepancy in

4  height created uncertainty as to whether John Doe was, in fact, Jason Killinger, particularly since

5  his height closely matched the height of Michael Ellis, whom he also resembled.

6      21.    Additionally, I was aware that if I issued a citation to the wrong person, and that

7  person does not appear in court, a warrant would be issued for his arrest for failure to appear. In

8  other words, if I had issued a citation in Killinger's name, but the person I was dealing with on

9  9/17/2023 was actually Ellis (according to Peppermill's AI software), and Ellis subsequently failed

10  to appear in court as required by the citation, the court would then issue a warrant for Killinger's

11  arrest, even though he would have had no knowledge of the trespass or citation. The converse is

12  also true. If I was dealing with Killinger on 9/17/2023, who may have misidentified himself as

13  Ellis when he was initially trespassed on 3/26/23, the issuance of a citation in Ellis' name would

14  result in the issuance of a warrant for Ellis' arrest if Killinger failed to appear in court for the

15  citation, even though Ellis may not have been aware that he was ever trespassed by the Peppermill.

16  Therefore, the issuance of a citation in either name on 9/17/2023 would have: (a) violated RPD

17  policy, (b) failed to resolve the conflicting evidence I was confronted with at that moment, and (c)

18  potentially created a new problem for person who was completely unaware of what occurred on

19  9/17/2023.

20      22.    Based on all of the foregoing, I determined the proper course of action was to arrest

21  John Doe, have him fingerprinted, and do a WINS check to confirm his identity as soon as

22  reasonably possible. My expectation was that if John Doe was telling the truth and is confirmed to

23  be Jason Killinger after a WINS check, he would be released from jail in a relatively short period

24  of time, and it would ultimately be up to the Court to determine whether Peppermill's AI software

25  was wrong, or whether Killinger may have misidentified himself as Ellis when he was previously

26  trespassed on 3/26/2023.

27      23.    I took John Doe into custody at approximately 0620 hours, when I removed the

28  handcuffs Peppermill security had placed on him and replace them with my handcuffs. I granted

John Doe's request to keep the handcuffs loose by "double-cuffing" him, meaning I used two pairs

-4-

1  of handcuffs—one on each wrist, and then connected the handcuffs to each other. I did this to

2  provide maximum comfort and range of motion for John Doe, while still complying with RPD's

3  General Order regarding prisoner transport, which directs that arrestees will be handcuffed behind

4  the back before transport.

5      24.    We arrived at the Washoe County Jail at approximately 0649 hours, and I

6  completely relinquished custody of John Doe at approximately 0707, after completing the arrest

7  report.

8      25.    The physical identifying information I put on the arrest report was based on my

9  personal observation and what John Doe told me. I noted that his height was 5'10" because that

10  was the measurement I obtained at the Peppermill security office when we stood him up against

11  the measuring tape. I asked him for his weight at the jail, and he told me 280 lbs. His eyes looked

12  like they were either blue or hazel. I initially did not put a date of birth on the arrest report, because

13  I had two different ID's with two different dates of birth. However, the woman at the jail who took

14  the report told me I had to put down a date of birth and to just estimate it if I did not know the

15  correct date. It was common practice to use January 1 when booking John Does, so that was the

16  date I used and estimated 1980 as the birth year.

17      26.    Contrary to Plaintiff's allegations, I did not lie and would never lie about a suspect

18  to justify an arrest or cause him to be wrongfully prosecuted.

19      27.    Contrary to Plaintiff's allegations, I did not fabricate any evidence in this case. The

20  evidence upon which I based the arrest was provided by Peppermill security, including the AI

21  facial recognition software results and the criminal complaint signed by a Peppermill

22  representative, which I believe established probable cause for the arrest.

23      28.    Contrary to Plaintiff's allegations, I harbored no ill will or malice against Mr.

24  Killinger and had absolutely no motive to "frame" him.

25      29.    Contrary to Plaintiff's allegations, I never wanted a reviewing prosecutor or

26  magistrate to believe that Plaintiff was "an evildoer, a bad person, a lawless scum who deserved

27  conviction for having multiple false identifications." I never felt this way about John Doe, who

28  was later confirmed to be Mr. Killinger following the WINS check.

      30.    Contrary to Plaintiff's allegations, I never subjected Mr. Killinger to any excessive

Reno City Attorney
P.O. Box 1900
Reno, NV 89505

1  force. I gently handcuffed him using double cuffs and escorted him to my patrol vehicle, where I
2  allowed him to seat himself inside the vehicle. He was in my physical custody for less than 50
3  minutes on September 17, 2023.

4        31.      I acted in utmost good faith with respect to my handling of the trespass call on
5  9/17/2023, consistent with my understanding of RPD policy and my duties as a police officer under
6  the facts, circumstances, and irreconcilable evidence that confronted me on that date. I had
7  absolutely no intention of causing any harm to Mr. Killinger.

8        I declare under penalty of perjury under the laws of the State of Nevada that the foregoing
9  is true and correct.

10  Executed on this __25th__ day of __SEPTEMBER__, 2025, in Reno, Washoe County, Nevada.

11

12        By    _____

13                  RICHARD JAGER

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Reno City Attorney**
**P.O. Box 1900**
**Reno, NV 89505**

EXHIBIT 10

.

# SUPPLEMENTAL DECLARATION OF COUNSEL

Exhibit 10

## SUPPLEMENTAL DECLARATION of TERRI KEYSER-COOPER

I, TERRI KEYSER-COOPER, declare under penalty of perjury, the following assertions are true and correct and made with personal knowledge.

1.      I am the attorney of record in the case of *Killinger v. Jager.* I represent Plaintiff Jason Killinger. I am licensed to practice law before all the Courts for the State of Nevada and the State of California, the United States District Court for the District of Nevada and California, the Ninth Circuit Court of Appeals, and the United States Supreme Court. I have direct and personal knowledge of the facts set forth in the following paragraphs and, if called and sworn as a witness, I would competently testify to those facts.

2.      I am a civil rights lawyer. As such, I have often sued police officers on a variety of police misconduct issues including wrongful death cases. My cases have generated a fair amount of publicity because the public is interested in matters relating to police misconduct. I take these cases because I believe they are of great importance. I take these cases because I have personally witnessed horrific misconduct by police officers. The public needs police officers who are well trained, well paid, and fair minded. But as I have often seen, officers grow arrogant with the passage of time, all too aware of their great power, the power to deprive individuals of their liberty and the power to physically harm them. Often they act with impunity as the majority of people cannot afford to sue police for their misconduct and the law can be all too quick to grant qualified immunity.

3.      I have been a lawyer in California since 1986 and a lawyer in Nevada since 1991. In all of those 40 years I have never been sued, threatened with suit, or disciplined.

4.      Very few lawyers are willing to take police misconduct cases. The clients cannot afford to pay an hourly fee and the cases can last for years. I take these case on a contingency basis. I do not charge my clients an hourly rate and I do not send bills to my clients. I get paid when a case

1

settles, or there is a trial victory, or the work accomplished necessitates the filing of a fee petition and the Court awards fees. I sometimes go for years on a single case, without payment, while it ping pongs between the Federal District Court, the Ninth Circuit, and the United States Supreme Court. I have been fortunate; I choose my cases carefully and have been successful enough that I can afford to work in the fashion that I do and to wait for what maybe a significant amount of time to be paid.

5.    Ms. Herbolsheimer's makes many false accusations about me. That is very regrettable. At the deposition of Officer Jager, she appeared stricken with his testimony, especially when he admitted to taking an innocent man to jail. She covered her eyes and put her face down on the deposition table. I felt sorry for her. She was watching her case collapse. Officer Jager admitted multiple times to arresting an innocent man, a man he described as truthful, polite, respectful and a "stand up" guy. Officer Jager at no time testified to anything Mr. Killinger had done wrong or any law he had violated.

6.    Immediately after the deposition, Ms. Herbolsheimer accused me of plotting to have Officer Jager smeared. She told me he had been harassed and implied it was "my fault." Nothing could be further from the truth. She emailed me about my communications with Bob Conrad, a journalist for an online publication known as "This is Reno." She accused me of conspiring with Mr. Conrad to smear Officer Jager and to prevent his ability to have a fair trial.

7.    I do not know Mr. Conrad. Until he began writing about Mr. Killinger's case, I did not even know that Mr. Conrad existed. I had never heard of his publication "This is Reno." I find in reading his articles he is an honest journalist and has done an excellent job in reporting the facts. But that has nothing to do with me. It has everything to do with his meticulous reading of the record. He has called me, just as he has called Ms. Herbolsheimer, because that is what a journalist does. Ms. Herbolsheimer has no proof of her allegations I have spoken to Mr. Conrad about

2

anything whatsoever that could remotely smear Officer Jager.

8.      Ms. Herbolsheimer has nothing to establish any bad faith on my part, no documents from Mr. Conrad asserting improper communications, no documents from me asserting improper communications, no documents from any witnesses asserting improper communications, nothing.

9.      Ms. Herbolsheimer fails to provide a single statement from any person that I have made improper or personal statements about Officer Jager. She has no such statements because none exist.

10.     Let me be perfectly clear: I have not spoken to Mr. Conrad or to any other journalist about this case or Officer Jager. No journalists have quoted me because I have granted no interviews and have issued no press releases. No journalists, including Mr. Conrad, have come forward to claim I have spoken to them improperly about Officer Jager.

11.     In the interests of propriety and professionalism, I will refrain from saying what I think of an attorney who makes false accusations about an opposing counsel and seeks to have the opposing counsel investigated by the state bar based on absolutely nothing. Apparently her displeasure her case may have taken a downward turn. I understand Ms. Herbolsheimer is frustrated with her client, Officer Jager, admitting to wrongdoing. But an attempt to smear me, her opposing counsel, who has shown her nothing but courtesy is beyond the pale.

12.     It is true Mr. Killinger's case has been all over the internet. I have no idea how it got all over the internet other than the case was publicly filed and anyone can read about it. None of the many dozens of references on the internet quote me in any way—because I have given no interviews.

13.     Officer Jager's body worn camera footage of the incident with Mr. Killinger has also been all over the internet. I have no idea how it was released because I have not given a copy of the

body worn camera footage to anyone. I have referenced portions of Officer Jager's body worn camera footage, appropriately, in documents publicly filed with the court. This is necessary and the purpose of body worn cameras—they are an aid to both individuals seeking to accuse officers and a boon to officers seeking to defend themselves from wrongful accusations.

14.    I believe the case has generated so much publicity is because it is frightening to people that an innocent person, like Mr. Killinger, a person never arrested before in his life, could be in innocently in a public place, accused wrongfully of having a face that matched a repeat trespasser, arrested, and taken to jail. **The facts resonate with the public because what happened to Mr. Killinger could happen to anyone.** At deposition, Officer Jager admitted it could happen to anyone. He testified if it had happened to him, he'd be "righteously indignant."

15.    It is beyond frightening that Officer Jager would make an arrest based **solely** on faulty, inaccurate facial recognition software and refuse to even look at Mr. Killinger's abundant proof of identity. Mr. Killinger had government issued identification, a current and valid Nevada driver's license, photo ID from his employer, photo ID from his Teamster union, health cards, Teamster cards, vehicle registration, vehicle insurance, and much more—all in his name and yet Officer Jager took him to jail and refused to look at any of his proof of identity. That is truly horrifying. And it could happen to anyone.

16.    At his deposition Officer Jager confessed that he had received training and learned that reliance solely on facial recognition software without corroboration is not proof of anything and it cannot be used to furnish probable cause for an arrest. Officer Jager apologized to Mr. Killinger because he now knew he had arrested him without probable cause. Officer Jager testified he "felt bad" about it. I admired Officer Jager for his honesty and told him so after the deposition was complete.

4

17.    Ms. Herbolsheimer states in her brief that "Instead of assuaging defendant's concerns by simply responding that no improper communications have occurred, Plaintiff's counsel became upset and accused defense counsel of getting nasty and person and attacking her." This is false. Ms. Herbolsheimer told me she was going to have me investigated for improperly talking to the press. I asked Ms. Herbolsheimer if she "was out of her mind?" At first I thought she was joking because the thought of having me "investigated" was beyond absurd. I denied in every possible way that I had done anything improper. I was shocked by her false accusation.

18.    I volunteered to Ms. Herbolsheimer that Mr. Conrad had telephoned me about the case and I told him that I would be filing a new pleading in the case. This is entirely proper. Journalists have a right to review pleadings in cases. Journalists have a right to make calls. The public has a right to know what is happening in police misconduct cases. I did not tell him what was contained in the pleading. He read it and wrote what he wanted to write.

19.    I also volunteered to Ms. Herbolsheimer that Mr. Conrad had mentioned to me that he had "talked to someone at DMV" who told him there is no record of DMV employees having hookups with criminals to manufacture false driver's licenses[1]. Over the years I have had many people call me with "tips" about my cases and witnesses who want to make statements. That is not unusual. I asked Mr. Conrad who this person might be and he replied that he did not provide his sources. If Mr. Conrad had told me who this person was, I would have called the person and attempted to learn if he or she had any relevant information about the case. That Mr. Conrad called me to tell me he had talked to someone at DMV did not result in any improper communication on

---

[1] Officer Jager is heard on his body worn camera telling his supervisor that Mr. Killinger was manufacturing false driver's licenses and likely had a "hookup" at DMV who was in on the scam. For what purpose, who knows—so that Mr. Killinger could be a trespasser at the Peppermill with impunity? This is absurd on its face. Officer Jager had no evidence whatsoever that Mr. Killinger was working with anyone at DMV. Mr. Killinger has been a legitimate customer at the Peppermill for years, earning free comps on hotel rooms, café meals, and gift shop purchases. He has been upgraded by the Peppermill from a Bronze Player's card to a Gold Player's card.

5

my part. I had no idea he would call me with a tip; he has a right just like anyone else to call me with whatever he may perceive as a legitimate tip.

20.    Ms. Herbolsheimer writes in her brief that I had explained to her that Mr. Conrad had called me out of the blue and when pressed to explain why Mr. Conrad had telephoned me out of the blue to tell me about a proposed DMV employee, I said "I have no idea." This is true. I have no idea. I cannot be accused of any misconduct because a reputable journalist calls me with what he believes might be a tip in a case. Am I to send out a bulletin advising all persons not to call me about a case and not to send me tips?

21.    Ms. Herbolsheimer writes:

> While it is not entirely clear at this time how much communication Conrad has had with Plaintiff's counsel, when such communication started with respect to this case, or whether any improper communication occurred in violation of NRCP 3.6, the information available to date raises serious and legitimate concerns, especially since there has been no explanation as to how Conrad learned about Jill Drake's email.

This is beyond ridiculous. Ms. Herbolsheimer has no facts, no evidence, no reported press releases I have made, no admissions from Mr. Conrad and nothing whatsoever upon which to base her false allegations. She admits it is "**not entirely clear how much communication Conrad has had with Plaintiff's counsel...**" That's right it's not clear, because there has been next to none. Ms. Herbolsheimer makes false accusations against me of bad faith while acknowledging the facts are "not clear." It would be better if Ms. Herbolsheimer refrained from putting bad faith accusations against me in a publicly filed document until she had facts and evidence. Why not refrain from making false accusations to the Court until the facts are clear? What possible reason is there to falsely accuse an opposing counsel of bad faith without any facts whatsoever?

22.    Ms. Herbolsheimer's mention of Ms. Drake's comment is frightening. Ms. Herbolsheimer is a government employee, working as a civil rights lawyer, representing a police

6

officer, yet she stoops to making the false allegations that I have communicated something to a journalist that was not in the public record. It would have been helpful if Ms. Herbolsheimer had read the public record before making her false statement. All Ms. Herbolsheimer had to do was read the public record. Right in Mr. Killinger's First Amended Complaint, publicly filed, is the mention of Ms. Drake's comment at ECF 45-3, at ¶ 152, page 34, lines 19-21. Mr. Conrad read the First Amended Complaint, he learned of Ms. Drake's comment from the publicly filed document, not from me.

23.    It is my fervent hope that Ms. Herbolsheimer will cease her false accusations, represent her client to the best of her ability, and work with me in a courteous and professional manner without making false accusations of bad faith to gain an advantage in a lawsuit.

24.    Attached to Plaintiff's Reply In Support of Motion to Amend Filed February 20, 2026, are the following exhibits which I have personally compiled.

(a) Exhibit 5 is a true and accurate copy of Defendant's First Supplemental Disclosures;

(b) Exhibit 6 is a true and accurate copy of Jager deposition excerpts;

(c) Exhibit 7 is a true and accurate copy of Drake deposition excerpts;

(d) Exhibit 8 is a true and accurate copy of Nance deposition excerpts;

(e) Exhibit 9 is a true and accurate copy of Jager's Declaration;

(f) Exhibit 10 Exhibit 8 is a true and accurate copy of my Supplemental Declaration;

(g) Exhibit 11 is a true and accurate copy of the Reno Carson Records re Service;

(h) Exhibit 12 is a true and accurate copy of the job description of City Attorney Karl Hall.


Dated this 20th day of February, 2026

*Terri Keyser-Cooper*
TERRI KEYSER-COOPER
Attorney for Plaintiff Killinger

7

EXHIBIT 11

# RENO CARSON MESSENGER SERVICE RECORDS RE SERVICE

Exhibit 11

Process Serving & Legal Courier
**RENO / CARSON / LAS VEGAS**
Serving all of Nevada Since 1981

TAX ID: 88-0306306

| ACCOUNT NO: | INVOICE DATE: | INVOICE NO: |
|---|---|---|
| 623 | August 1, 2025 | R203560-01 |

185 Martin St. Reno, NV 89509
Phone: (775) 322-2424  Fax: (775) 322-3408
License: 211

File No: Jason Killinger
Servee: **Reno Police Officer R. Jager #R16010**
Case No: **3:25-cv-00388-MMD-CSD**
Court: **UNITED STATES DISTRICT COURT**
Plaintiff:

Bill To:
**TERRI KEYSER -COOPER**
**ATTN: TERRI KEYSER-COOPER**
**1548 Kachina Ridge Dr**
**Santa Fe, NM 87507-5074**

Defendant:

Documents: Summons In a Civil Action ;complaint

| DESCRIPTION OF SERVICES RENDERED | QUANTITY | UNIT PRICE | AMOUNT |
|---|---|---|---|
| Print/Copy Fees | 33.00 | .14 | 4.62 |
| Routine   Process (775) | | | 95.00 |

SUMMARY: 7/31/2025 at 3:32 PM          Server: DENNIS MALLORY Reg: R-070227
Servee: Reno Police Officer R. Jager #R16010
Left With: Clerk Brawn - Administrator
Address: RENO POLICE DEPARTMENT- INTERNAL AFFAIRS RENO, 1 E 1st St Fl 11, #  Reno, NV 89501-1609
Result: Corporate Service

| | TOTAL DUE | $ 99.62 |
|---|---|---|

Thank you for choosing !

For proper credit please detach this section and return with your payment.  **Remittance Copy**

| ACCOUNT NO: | INVOICE DATE: | INVOICE NO: |
|---|---|---|
| 623 | August 1, 2025 | R203560-01 |

Remit To:

TOTAL DUE:    $  99.62

185 Martin St.
Reno, NV 89509

1. PLEASE INCLUDE INVOICE NUMBER ON PAYMENT.
2. MAKE CHECKS PAYABLE TO
**Reno Carson Messenger Service, Inc**

Order#:R203560  /INVOICEP

Exhibit 12

# RENO CITY ATTORNEY

# JOB DESCRIPTION

Exhibit 12

# City Attorney's Office

The City Attorney's Office serves as the legal adviser to the Mayor, City Council, City departments, and the Reno Redevelopment Agency; represents and defends the City in legal matters; handles all suits on behalf of the City of Reno and any of its departments and agencies; prosecutes violations of City ordinances; and provides counsel to elected officials and client agencies.



## Karl Hall, Reno City Attorney

For the past 26 years Karl Hall has served the residents of Washoe County as Chief Deputy District Attorney. During his career, Karl has tried and prosecuted to the highest extent of the law complicated and high profiled cases including elder abuse, robbery and burglary, homicide and death penalty cases.

Karl was elected as Reno City Attorney in November 2014.  He holds a B.S. from the University of San Diego and a J.D. from California Western School of Law.

## Jonathan Shipman, Assistant City Attorney

Jonathan Shipman has been a civil deputy city attorney with the Reno City Attorney's Office for over 10 years, practicing primarily in the areas of land use, real estate, redevelopment/economic development, finance and public works law.  As Assistant City Attorney, Jon oversees all aspects of the Civil Division. Jon is admitted to practice in Nevada and California, and has represented the City in litigation before federal and state courts and administrative agencies.  Jon received his Bachelor of Arts Degree in Government from Georgetown University and a Juris Doctorate from California Western School of Law in San Diego.

## About the City Attorney's Office

The Office consists of a Civil Division and a Criminal Division. Each division is supervised by a Chief Deputy City Attorney.

The City Attorney's Office serves citizens of Reno directly from programs such as domestic violence awareness and cell phone drives for seniors. Explore the links on the side menu to learn more about the role of the City Attorney's Office.

The Reno City Attorney's Office consists of 17 attorneys, 8 legal secretaries, and three victim advocates. The following chart delineates the office:

# Reno City Attorney's Office

- City Attorney, Karl S. Hall
- Assistant City Attorney, Jonathan Shipman

## Civil Division Deputy City Attorneys

- Rob Bony
- William Cooper
- Mark Dunagan
- Mark Hughs
- Jasmine Mehta
- Holly Parker
- Susan Ball Rothe
- Brian Sooudi

## Civil Division Staff

- Management Assistant, Christine Felch
- Legal Secretary, Jenny Sparks
- Legal Secretary, Terri Strickland
- Senior Legal Secretary, Jill Zarker

## Criminal Division Deputy City Attorneys

- Tyler Altom
- Jill Drake
- Carolina Fragoso
- Angela Gianoli
- Pamela Schultz Souza
- Leann Schumann
- Irma Aboytes Tanner
- Iris Yowell

## Criminal Division Staff

- Management Assistant, Penelope Colter