TERRI KEYSER-COOPER
NEVADA BAR NO. 3984
Law Office of Terri Keyser-Cooper
125 Edgewater Parkway
Reno, NV 89519
775-337-0323
keysercooper@lawyer.com
*Attorney for Plaintiff*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| JASON KILLINGER, | Case No. 3:25-cv-388-MMD-CSD |
| Plaintiff, | **MOTION TO WITHDRAW OPPOSED MOTIONS FOR PARTIAL SUMMARY JUDGMENT MOTIONS (ECF NO. 7 AND ECF NO. 17) BASED ON NEW UNDISPUTED EVIDENCE, NEW CLAIMS AND A PENDING MOTION TO AMEND THE NEW CLAIMS** |
| v. | |
| RENO POLICE OFFICER R. JAGER | |
| Defendant. | |
| _____/ | |

## I.    <u>PRELIMINARY STATEMENT</u>

Plaintiff Jason Killinger ("Killinger") filed a Motion for Partial Summary Judgment on August 12, 2025 (ECF No. 7).  Defendant Jager ("Jager") opposed the Motion on September 26, 2025 (ECF No. 26).  A Reply was filed by Mr. Killinger on October 6, 2025 (ECF No. 36). This motion is currently pending.

Mr. Killinger filed a Second Motion for Partial Summary Judgment on excessive force, a claim not addressed in ECF No. 7 on September 20, 2025 (ECF. No. 17). Officer Jager opposed the Motion on October 21, 2025 (ECF No. 39). A Reply was filed by Mr. Killinger on October 27, 2025 (ECF No. 40). This motion is currently pending.

Mr. Killinger filed a Motion for Leave to File First Amended Complaint on January 25,

1

2026 (ECF No. 45). Officer Jager opposed the Motion on February 12, 2026 (ECF No. 50). A Reply was filed by Mr. Killinger on February 21, 2026 (ECF No. 52). This motion is currently pending.

On March 19, 2026, counsel for Killinger, Terri Keyser-Cooper, personally met with counsel for Officer Jager, Adam Cate, and asked for a stipulation to allow Mr. Killinger's two Motions for Partial Summary Judgment to be withdrawn based on new undisputed evidence, new claims, and a pending Motion to Amend/Supplement to add the new claims. Mr. Cate stated he would have to confer with his co-counsel Alice Herbolsheimer. On the evening of March 19, 2026, Mr. Cate emailed Ms. Keyser-Cooper explaining no stipulation would be granted—the Motion to Withdraw would be opposed. (Decl. of Keyser-Cooper and email from Mr. Cate, Exh. 1)

The purpose of this Motion is to advise the court that new undisputed, unforeseen, unanticipated evidence has been obtained which necessitates a new motion for partial summary judgment. Plaintiff Killinger wishes to withdraw his prior motions and wait until a ruling on the pending Motion to Amend before filing a revised Motion for Partial Summary Judgment (with all claims and parties addressed in a single document). Since the pending motions have not been ruled upon, it would seem to preserve judicial economy and save the Court's time. Plaintiff has no desire to waste the Court's time deciding motions that were made before the critical new and undisputed evidence was provided and before the new party and new claims were added.

## II.    **IMPORTANCE OF THIS CASE**

Officer Jager did exactly what he should have known he was not supposed to do: he received a citizen's arrest from the Peppermill Casino based exclusively on facial recognition software ("FRS") and within less than an hour, without undertaking a single reliable confirmatory investigative step, declared he had probable cause to arrest Killinger as an alleged prior casino trespasser, and took him to jail. Then Jager submitted an arrest report and declaration riddled with fabrications, omissions and misrepresentations to a magistrate. As a result, Killinger spent eleven hours in jail, hired a lawyer, and attended a trial setting wherein the case against him was dismissed because it was conclusively established Mr. Killinger was not the prior trespasser the Peppermill

believed him to be.[1]  The Peppermill admitted its FRS made an error and apologized to him. Even after the dismissal of the case, there were efforts to continue to prosecute Mr. Killinger. Dean Hill, Director of Security for the Peppermill, testified that a Reno City Attorney telephoned him that even though the trespassing charge against Mr. Killinger had been dismissed, the City believed there was probable cause to charge Mr. Killinger with "identity theft." Thankfully, this final odious step to find some way to prosecute Mr. Killinger , an innocent man, was not taken.[2]

Mr. Killinger's case is just the tip of the iceberg. There may be hundreds of such cases as Officer Jager has testified that what he did in arresting Killinger based exclusively on FRS was the custom and practice of RPD officers and the standard operating practice of RPD officers. Jager testified it had for **years** been his practice to go to the Peppermill based on the FRS identification of an alleged "prior trespasser" and take that person directly to jail without undertaking a single confirmatory investigative step—his reliance on the software was 100 percent. Jager felt confidence in relying one hundred percent because he knew no different. He had received no training on FRS and RPD had no policy on FRS. Mr. Killinger's case represents the unfortunate and increasingly common story of how the police's uncritical reliance on results of unreliable FRS can deprive the innocent of their liberty and directly violate constitutional rights. Very likely there are many RPD officers who have done, and continue to do, what Officer Jager did with Mr. Killinger. The travesty of justice in this case is squarely attributable to grossly deficient investigative practices of Reno Police Department ("RPD") and its failure to train its officers on the limitations of the software.— something well known within the police industry since 2016.

Jager testified he had received no training whatsoever on FRS or its limitations prior to his arrest of Killinger in 2023. (Exh. 2, Jager depo, 85:9-25; 86:1-5). He continued to make similar arrests based on his belief FRS was completely reliable until he attended a short training on FRS in 2025 and learned, for the first time, that FRS is an investigative tool only and it is **not** to be used by itself, ever, to provide proof of identity or probable cause for arrest. (Exh. 2, Jager depo, 89:1-13;

---

[1] During Mr. Killinger's ordeal he was in handcuffs for nearly four hours, sustained injuries, visited a doctor, and had difficulty performing his truck driving duties for three months.

[2] Mr. Hill's deposition was taken on March 19, 2026 and has not yet been transcribed by the court reporter.

13:4-9). But this was two years **after** his arrest of Mr. Killinger and Officer Jager testified he continued to take persons to jail based on FRS alone for a minimum of two additional years. At his recent January 22, 2026 deposition, Jager testified he knew his arrest of Mr. Killinger was wrongful, admitted Mr. Killinger went to jail when he should not have gone to jail, admitted he had taken a completely innocent man to jail, and apologized to Mr. Killinger in the deposition room. (Exh. 2, Jager depo, 42:3-9; 23:21-25; 24:1-20).

Since then, the deposition of RPD Chief Nance was also taken on January 27, 2026. In her undisputed testimony she made clear that she had not been aware of any FRS training given to officers prior to the night before her deposition in 2026. (Exh. 3, Nance depo, 10:17-24). Chief Nance was not aware of who made the decision to implement the training, who provided the training, or who approved the training. (Exh. 3, Nance depo, 13:2-9). Chief Nance was clear; she is in charge of making sure officers receive the training they require and she has the authority to make sure training is implemented if she believes training is deficient in anyway. (Exh. 3, Nance depo, 7:14-18). She could have required the training much earlier if she had wanted to.

Chief Nance testified she was uncertain whether all RPD officers should have the FRS training or whether the training was even necessary for all officers. (Exh. 3, Nance depo, 17:9-12; 18:9-20). While she was aware of the wrongful arrest of Killinger, she testified she had never inquired as to whether any training was ever given to officers. She testified it was "not a concern to her" if the only training given to officers was in 2025. (Exh. 3, Nance depo, 15:24-25; 16:1-2). She testified there was nothing that would have prevented RPD from offering the training before 2025, it just wasn't done. (Exh. 3, Nance depo, 19:5-8). She testified it was "not a problem" that Officer Jager did not receive the FRS training before 2025.[3] (Exh. 3, Nance depo, 18:25; 19:1-5). She staunchly defended Officer Jager, and testified that even if he had relied exclusively on FRS to

---

[3] Officer Jager contradicted Chief Nance by testifying that it would have been "helpful" if he had had the training before 2025, as he would not then have arrested Mr. Killinger. (Exh. 2, Jager depo, 90:9-16; 223:18-25).

4

make an arrest, he had not violated any RPD policies or procedures. (Exh. 3, Nance depo, 76:11-16).[4]

On March 19, 2026 the deposition of Vanessa Kosinski was taken.[5] She is a civilian RPD employee who on her own time but together an FRS training for officers in late 2025. She testified she knows nothing about probable cause, or legal detentions, or any legal matters but on her own became interested in FRS and its limitations. She testified she has gone to briefings held before shifts for sworn officers on a scattered random basis and presented a training in five, or ten or at most fifteen minute intervals. She kept no records of which officers attending the trainings as it was not required and not mandatory. The depositions of RPD Officers Carl DeSantis, Monique Sheahan, and Joseph Hodges were also taken in February 2026. None of these officers had taken the FRS training or even knew about the training. Sgt. DeSantis was very skeptical of the training, felt Ms. Kosinski likely had no idea what she was doing, that the training was unprofessional and likely lacking in merit. He indicated he saw no reason for the training. In light of what happened to Mr. Killinger in 2023, two years earlier, this was indeed surprising and unforeseen testimony.

Had the RPD provided any training to its personnel about how unreliable FRS results are and the necessity of following them with reliable independent investigation in 2023, Officer Jager would not have believed the arrest of Mr. Killinger could possibly establish probable cause. And had Jager accurately described the FRS result and his lack of confirmatory investigative steps in his arrest report, avoiding fabrications, omissions, and misrepresentations, it is highly likely the Reno Municipal Court Magistrate would not have found probable cause to sustain the arrest.

Not only did Officer Jager mislead the magistrate by overstating the reliability of the FRS lead, but his counsel have misrepresented how FRS works and the strength of the investigative lead to this Court in prior pleadings. The defense posture of this case is that Officer Jager's conduct was perfect, he had probable cause to arrest, and this case is without merit.

---

[4] While Chief Nance testified Officer Jager did not violate any RPD policies, she also admitted she was not aware of any RPD policy on artificial intelligence and was unsure whether there should even be such a policy  (Exh. 3, Nance depo, 31:22-25; 32:1-11).

[5] Ms. Kosinski's deposition, taken on March 19, 2026, has not yet been transcribed by the court reporter.

The undisputed deposition of Dean Hill establishes the casino is still using FRS to arrest and take persons identified by its FRS system into custody. He also testified to the number of false positives the system generates and how unreliable it may be depending on the accuracy of the original photo image placed in the system. If an individual is matched to a prior trespasser, the match will only be as good as the quality of the original photo placed in the system.

Mr. Killinger was matched to a prior Peppermill trespasser named Michael Ellis. Mr. Killinger presented an active, valid, and current Real Nevada driver's license, had no wants and warrants, and no criminal history whatsoever. Officer Jager compared Mr. Killinger's driver's license to Mr. Ellis's driver license and noted the ages were different, the birthdates were different, the heights were different, the eye color was different, the weights were different and Mr. Killinger had a Class A commercial driver's license while Mr. Ellis had an ordinary Class C license. Officer Jager ignored these many significant differences, insisted Mr. Killinger was Mr. Ellis, and took him directly to jail based exclusively on the casino's FRS and made fabrications, omissions, and misrepresentations in his arrest report.

## III.    **<u>NEW EVIDENCE</u>**

Until the depositions of these various individuals was taken Plaintiff Killinger had no idea how widespread the use of FRS by RPD was in arresting persons based on FRS alone without any investigation whatsoever. Plaintiff is presently conducting discovery to ascertain the numbers of people arrested by RPD officers from the Peppermill and other casinos who utilize FRS based on FRS alone. A preliminary injunction may be filed once discovery is complete on these issues. As Officer Jager testified he alone has taken hundreds of people to jail in the past based on facial recognition alone. His testimony is undisputed.

Officer Jager argued in all his oppositions in this case (and still argues) that there was probable cause to arrest Killinger based on FRS. Jager argues that the faces of Mr. Killinger and the prior trespasser Michael Ellis were identical and he was justified in relying upon the FRS match. However, Jager himself testified, surprisingly, that two years after his wrongful arrest of Mr. Killinger he had attended a brief training and learned he did not have probable cause for the arrest,

the arrest was wrongful and his failure to take any investigative steps was also wrongful. Since Jager's attorneys argued there was probable cause, and continue to maintain there was probable cause, despite the admissions of their client, Officer Jager, Mr. Killinger had no way of know critical facts such as Jager's recognition he needed the training, and would never have made the arrest of Killinger had he received FRS training before he took Killinger to jail. This undisputed evidence supports Killinger's claim that he was arrested in violation of his Fourth Amendment rights and his claim of malicious prosecution.

Chief Nance testified that even if what Jager had done in arresting Killinger was wrongful, as she was forced to admit, the arrest was within RPD policy and Jager had violated no policy. There was no policy because RPD has failed to implement a policy regarding FRS. Chief Nance testified that training officers on the limitations of FRS was not mandatory within the department and was not required. She testified she did not know if such training should be mandatory or required by RPD. This testimony was unanticipated as at the time of her January deposition, Chief Nance knew that Officer Jager had wrongfully arrested Mr. Killinger based on FRS alone.

Dean Hill of the Peppermill testified the system of using FRS has changed slightly but arrests are still being made exclusively based on FRS. Mr. Hill undisputed testimony made clear the FRS generates a great number of "false positives" as the quality of the match depends on the quality of the original photo put into the system. If the photo is poor the match will be poor.

## IV.    FACIAL RECOGNITION TECHNOLOGY IS INHERENTLY UNRELIABLE AND CANNOT BE REPLIED ON AS A POSITIVE IDENTIFICATION OF A SUSPECT

Facial recognition algorithms used by police are not designed to (and do not) return a single definitive "match." Rather, they are probabilistic systems that return a number of *potential candidates* based on an "algorithmic best guess." [6] When police personnel run an FRT search, the algorithm extracts a "faceprint"[7] from the image of an unknown suspect (the "probe image") and

---

[6] Eyal Press, *Does A.I. Lead Police to Ignore Contradictory Evidence, The* New Yorker, Nov. 20, 2023, https://www.newyorker.com/magazine/2023

[7] A faceprint is a "map written in code that measures the distance between features, lines, and facial elements." *State v. Arteaga*, 296 a.3d 542, 555 (N.J. Super.Ct. App. Div. 2023 (quoting

compares it to a database of faceprints taken from images of known individuals (for example, arrest photos or drivers' license photos). The system generates similarity scores for each comparison, which are often represented (as in this case) as a number between 0 and 100.

Mr. Hill testified that FRS generates a number of false positives. Although FRT algorithms generate false positives even in controlled test conditions, they are especially prone to error when probe image quality is low. The quality of the probe photo and the ways in which it is manipulated necessarily affect the accuracy of the search results. Lighting, shadow, angle, pixel density, facial expression, and partial occlusion of the face all effect accuracy. And even images captured from a higher-quality source can be degraded if the image is scanned into a computer at a low resolution, compressed, resized, or reformatted. As Mr. Hill testified the blurriness, or lack of sufficient pixel density, of an image can have a huge effect on the ability of an FRT algorithm to produce an accurate match. According to the National Institute of Standards and Technology, "even the best algorithms can be wrong more than 20 percent of the time" in test conditions.[8] Automation bias lulls human users of automated technologies, such as FRT, into an over-reliance on the computers, leading the analysts to uncritically accept the computer's returns.[9] Automation bias means analysts , or police officers, will be less critical and discerning when selecting a possible match, by deferring to the similarity scores generated by the algorithm in place of the analyst's own judgment. Human analysts may also assume there is an accurate match in a computer's returns even when there is not.

For these and other reasons, research shows that human operators make errors on average 50 percent of the time "when deciding which faces in candidate lists match the search image. This is

Andrew Gutherie Ferguson, *Facial Recognition and the Fourth Amendment*, 105 Minn. L. Rev. 1105, 1111 (2021)).

[8] Khari Johnson, *The Hidden Role of Facial Recognition Tech in Many Arrests*, Wired, Mar. 7, 2022, https://perma.cc/ECB6-LM22.

[9] Raja Parasuraman & Dietrich Manzey, *Complacency and Bias in Human Use of Automation: An Attentional Integration,* 52 Hum. Factors 381, 391 (2010).

consistent with research on eye-witness identification—which is known to be unreliable, with well-meaning witnesses often mistakenly identifying innocent suspects."[10] Because of these and other sources of unreliability and error in the FRT search process, it is virtually universally understood and acknowledged that the results of a facial recognition search do not constitute a positive identification of a suspect, and that additional reliable investigation is needed to develop probable cause to arrest.

In this case, Jager treated a single face recognition search result not as a dubious investigative lead requiring independent corroboration, but as a definitive match. Instead of conducting reliable confirmatory investigative steps, Jager eyeballed the photo returned by the FRS search process, and then made his arrest and immediately transported Killinger to jail. Central to the issue in this case is what Jager did after receiving the FRS match from the Peppermill. He did not gather any reliable confirmatory evidence and the resulting arrest lacked the requisite probable cause. Because Jager lacked probable cause to arrest, by his own admission, there was a violation of the Fourth amendment. Because Jager testified what he did was consistent with what he believed the and practice was within the RPD, to rely one hundred percent on FRS as probable cause for arrest, other officers within the department were doing the exact same things. (Exh. 2, Jager depo, 15:9-18; 16:4-9; 17:16-22). This undisputed evidence by Jager when coupled with the admissions of Chief Nance that there need not necessarily be mandated FRS training for officers and the testimony of Sgt. Carl DeSantis dismissing the value of FRS training—it is clear such arrests will be continuing into the future because RPD are under no requirement that they receive this vital FRS training.

---

[10] David White et al., *Human Oversight of Facial Recognition Technology in Forensic Applications* ¶ 5 (U.K. Parliament 2021); httpos://committees.parliament.uk/written evidence/38555/html/. See also David White et al., *Error Rates in Users of automatic Face Recognition Software,* 10 PloS ONE e0139827 at 1 (2015) (concluding that the subjective selection process "potentially reduce[es] benchmark estimates [of FRT accuracy] by 50% in operational settings").

## V.    <u>CONCLUSION</u>

This case was transformed in a dramatic way after the unanticipated deposition testimony. It was unforeseeable that Officer Jager would testify that he had arrested a completely innocent man and he would not have done it if he had FRS training prior to the arrest. It was unforeseeable that Jager would testify that what he did in relying on the Peppermill's FRS was the custom and practice of all other RPD officers and he had been doing it for years at the Peppermill. It was unforeseeable that Chief Nance would cavalierly dismiss the value of FRS training, testifying that not all officers necessarily needed it and the wrongful arrest of Killinger by Jager did not violate policies and was of little concern. It was unforeseeable that Sgt. DeSantis, would dismiss the value of FRS training as unnecessary and of little value. It was unforeseeable that Dean Hill would testify that FRS generates a great number of false positives and the casino is continuing to take people to jail based on FRS alone. It was unforeseeable that Ms. Kosinski would develop on her own an FRS training but it would not be mandated, or required, and no records were kept of who attended the training.

What is important however is the RPD's complete failure to train its officers on the limitations of facial recognition technology and how to use FRS results in instigations. This failure creates a severe and foreseeable risk that its officers will violate constitutional rights. That failure makes the city of Reno liable for Mr. Killinger's malicious prosecution and wrongful arrest. Chief Nance's cavalier attitude toward FRS training is shocking—even after Officer Jager wrongly arrested Mr. Killinger and forced him into a punishing and unnecessary ordeal, she is reluctant to admit all officers need this training and whether an artificial intelligence policy is even necessary.

A municipality can be held liable under Section 1983 where its failure to train is officers lead to the plaintiff's injuries. The question is one of "deliberate indifference": did the municipality disregard a need for training so obvious, and so likely to lead to constitutional violations, that its

failure can be said to be "deliberate" or "conscious. *City of Canton, Ohio v. Harris,* 489 U.S. 378, 389-90 (1989).

It is undisputed that RPD provided no training or instruction whatsoever on the proper use of FRS prior to Mr. Killinger's 2023 wrongful arrest. Since late 2025, FRS training as been provided by Ms. Kosinski, a civilian RPD employee, on an ad hoc basis, with no assurance that all RPD sworn officers will receive the training. The bulk of the RPD officers testified at their respective depositions that they had not attended any of the trainings and did not know of the existence of such training as it was not required and no attendance logs or rosters were prepared. It was, apparently, a fluke that Officer Jager managed to even attended the training and realize the mistake he had made in wrongfully arresting Mr. Killinger.

When law enforcement officers begin using a new technology that risks harming the public if misused, there is an obvious need to provide training to avoid those harms. Widespread computerization carries with it the ability and responsibility to institute more effective safeguards against human error than existed in the past. *Edrei v. City of N.Y.,* 254 F.Supp. 3d 565, 581 (S.D.N.Y. 2017) (denying motion to dismiss Monell claim because "[e]ven in the absence of prior similar violations, the NYC knew that officers with [new, potentially dangerous technology] in the field were likely to face difficult scenarios…where the risk and harm of improperly using [the technology] are great-problems that could have been avoided with proper training.")

The need for training is no less stark here. By 2016, years before the arrest of Killinger by Jager in 2023,[11] the dangers of unconstrained use of FRT were well known, including the inability

---

[11] Bureau of Justice Assistance, U.S. Department of Justice, Face Recognition: Policy Development Template 22 (2017), https://bja.ojp.gov/sites/g/files/xyckuh_186/files/_Publications Face-Recognition-Policy-Development-Template-508-compliant.pdf; see also, e.g., Georgetown Ctr. on Priv. & Tech., *Model Face Recognition Use Policy* (Oct. 18, 2016). Plaintiff Killinger does not address here the adequacy of any particular provisions in these model policies, nor suggests that a policy without associated training would be sufficient. The salient point in this case is that by the end of 2025 RPD provided no policy or training guidance to its officers whatsoever, despite the

11

of FRS to make positive identifications, the correlation between low-quality probe images and low reliability FRT results, and the disparate rates of false matches. RPD would have had no trouble finding templates to guide its formation of a policy—the U.S. Department of Justice, for example, had already released policy development templates for local law enforcement agencies on the use of FRS, as had other organization.

For all of these reasons, this case has evolved into something unforeseeable at the outset. Mr. Killinger's motions were made based on an analysis of Officer Jager's body worn camera footage which clearly revealed Officer Jager's complete and blind acceptance of the Peppermill's FTS system and refusal to conduct any investigation whatsoever even though Mr. Killinger was begging for him to look at his proof of identification.

Plaintiff Killinger respectfully requests his prior two motions for partial summary judgment, ECF No. 7 and ECF No. 17, be withdrawn, as they are still pending without rulings, and Mr. Killinger have the ability to submit one final motion for partial summary judgment at the appropriate time.

DATED:   This 23rd day of March 2026

/s/ Terri Keyser-Cooper
TERRI KEYSER-COOPER
*Attorney for Jason Killinger*

obvious need to do so. RPD has no policy regarding FRS and its use and limitations and has indicated no intention to provide one any time soon.

12

## CERTIFICATE OF SERVICE

I, Terri Keyser-Cooper, declare as follows:

On this date, I served a copy of the following documents on the parties as follows:

**PLAINTIFF'S MOTION TO WITHDRAW OPPOSED MOTIONS FOR PARTIAL SUMMARY JUDGMENT MOTIONS (ECF NO. 7 AND ECF NO. 17 BASED ON NEW UNDISPUTED EVIDENCE, NEW CLAIMS AND A PENDING MOTION TO AMEND THE NEW CLAIMS**

[ ]     BY FED EX.  By placing a true copy of the above-referenced document(s) with FedEx in a sealed envelope with postage prepaid to the addressee(s) listed below.

[ ]     BY FACSIMILE TRANSMISSION.  By transmitting a true copy of the document(s) by facsimile transmission

[ ]     BY HAND-DELIVERY.  By delivering a true copy enclosed in a sealed envelope to the address(es) shown below.

[X]     BY ELECTRONIC SERVICE.  By electronically mailing a true copy of the document(s) to defendants at the following email addresses via the Court's electronic filing procedure:

KARL HALL
ALICE K. HERBOLSHEIMER
ADAM CATE
JENNY SPARKS
Reno City Attorney's Office
P.O. Box 1900
Reno, NV 89505

DATED this 23rd day of March 2026

 /s/ Terri Keyser-Cooper
TERRI KEYSER-COOPER
*Attorney for Plaintiff Jason Killinger*