TERRI KEYSER-COOPER No. 3984
Law Office of Terri Keyser-Cooper
125 Edgewater Parkway
Reno, NV 89519
775-337-0323
keysercooper@gmail.com
Luke Busby, Esq.
Nevada State Bar #10319
316 California Avenue
Reno, Nevada 89509
(775) 453-0112
luke@lukeandrewbusbyltd.com
*Attorneys for Plaintiff Jason Killinger*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

JASON KILLINGER,

v.

RENO POLICE OFFICER R. JAGER and CITY OF RENO,

Defendants.
______________________________/

Case No. 3:25-cv-388-MMD-CSD

**PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT BASED ON MUNICIPAL LIABILITY**

## I. NATURE OF THE CASE

This case is about the Reno Police Department's ("RPD") reliance upon a technology known to be inaccurate to make arrests. The Reno city prosecutor and municipal courts also rely upon the same technology, accepting its findings without corroboration or question. This must stop.

On September 17, 2023, Jason Killinger ("Killinger") went to the Peppermill Casino to play craps. He was a regular at the Peppermill, known to the casino as a "valuable customer."[1] Killinger won about $200, cashed in his chips, and went to the exit where he was grabbed, handcuffed, and told he was Michael Ellis ("Ellis") a man he had never heard of. Security told Killinger its facial recognition software ("FRT") matched his face to the face of a prior trespasser, Michael Ellis, with

---

[1] Exh. 1. Dean Hill, 27:13-25; 28:1-2

100% confidence. Killinger, stunned, denied he was Ellis, insisted he was Killinger and produced an active, valid, current Nevada real ID driver's license in his name.[2] Casino security called RPD and Officer Jager responded. Jager looked at Killinger's license, compared it with Ellis's, and within a minute, without evidence, wrongly decided Killinger was Ellis and his valid license was a fake. Jager conducted no investigation, declared he was "confused," and took Killinger to jail. The jail's fingerprint test confirmed Killinger was Killinger, not Ellis. Reno City prosecutor, Jill Drake, dismissed the trespass charge against Killinger but was unwilling to accept that a FRT match of 100% could be inaccurate. Drake referred the case to an RPD fraud detective to see if Killinger had committed identity theft. The RPD detective investigated and concluded the Peppermill's FRT was wrong, Killinger and Ellis were two separate people, and Jager had arrested an innocent man.[3]

Jager did not know that FRT could be inaccurate. "Prior to my arrest of Killinger, I had no knowledge that FRT could be inaccurate."[4] Jager testified if he had received FRT training before Killinger's arrest he would not have made the arrest.[5]

## II. IN 2023 IT WAS WELL KNOWN BY LAW ENFORCEMENT THAT FRT ALONE WAS INSUFFICIENT PROBABLE CAUSE TO ARREST

RPD knew or should have known long before Killinger's wrongful arrest, that FRT could be inaccurate. The problems with FRT misuse had been well documented since 2017, well before Killinger's 2023 arrest. RPD Chief Nance ("Nance") testified she was aware FRT could be inaccurate, aware it should not be allowed by itself to furnish probable cause for an arrest, and aware of cases where FRT had been found to be inaccurate. (Exh. 5, Nance I, 26:13-15; 25:24-25; 26:1-2). Yet Nance also testified that FRT training was not "essential" for officers and took no steps to instigate FRT training or to provide a policy, general order, or guidance to officers like Jager who routinely made arrests based solely on FRT without corroboration. (Exh. 5, Nance I, 17:9-12).

---

[2] Exh. 2, Jager, 152:18-25; 153:1
[3] Exh. 3, Sheahan 57:5-7
[4] Exh. 4, Jager, Response to Second Set of Interrogatory No. 8, 4:10
[5] Exh. 2, Jager, 169:14-24

Police practices expert Christopher Darcy ("Darcy") served 31 years with the Las Vegas Metropolitan Police Department ("LVMPD") holding progressive leadership roles and rising through the ranks to Undersheriff, the second-in-command of an agency with more than 5,500 commissioned and civilian personnel and a budget exceeding $1 billion. (Exh. 7, Darcy, p.2) While at LVMPD, Darcy was director of the Southern Nevada Counterterrorism Center ("SNCTC"), one of 78 federally recognized fusion centers in the United State regularly dealing with FRT issues. (Exh. 7, Darcy, p.3). Darcy opines, "It was well known long before the Killinger incident that FRT alone is not probable cause to arrest. The professional literature and news reporting on FRT-related wrongful arrests constitute an independent and cumulative source of constructive notice. I know from my experience in law enforcement that these incidents were widely reported in sources routinely reviewed by law enforcement executives and training personnel." (Exh. 7, Darcy, p.22).

As Director of SNCTC, Darcy had direct first-hand experience with the use of facial recognition and its limitations in making arrests. Darcy explains: "I supervised policy development and technology implementation at SNCTC and Fusion Watch as one of my responsibilities." After his promotion in 2020 to the Deputy Chief of Homeland Security at LVMPD, Darcy then supervised the SNCTC director. (Exh. 7, Darcy, p.4).

In **December 2017**, the U.S. Department of Homeland Security and the Bureau of Justice issued a "Face Recognition Policy Development Template." In its training section it stated that a facial recognition search is as an investigative lead and is not to be considered a positive identification. "Any possible connection of any subject to the investigation must be determined through further investigation and investigative resources." (Exh. 8, Bureau of Justice, pp. 35-36).

In **June 2019**, the FBI approved requiring law enforcement to have completed training prior to conducting facial recognition searches. FBI policy provided to law enforcement instructions that photos **cannot** serve as the sole basis for a law enforcement action. The FBI promulgated policies and procedures that place legal, policy, training, and security requirements on the law enforcement users. (Exh. 9, *FBI Facial Recognition Technology: Ensuring Transparency in Government Use,*

pp. 1-3 Kimberly J. Del Greco, Deputy Asst. Dir., FBI, June 4, 2019).

In **July 2019**, the International Association of Chiefs of Police (IACP), the world's largest and most influential professional association for police leaders, produced the "Guiding Principles for Law Enforcement Use of Facial Recognition Technology." (Exh 7, Darcy, pp. 16-17). The IACP presented this guidance in conference sessions expressly titled "Ethical Use of Facial Recognition Technology in Law Enforcement: Policy and Process Before Technology."

> Presenters stated without qualification that FRT, by itself, does not produce probable cause to arrest." Facial recognition is NOT a positive identification of an individual. In the law enforcement context facial recognition is a tool that potentially develops an investigative lead. Once the potential lead has been generated, human intervention is required to determine if the person in the photograph is actually the person whose identity is in question. (Exh 5, Darcy Rpt., p. 18). Before access to any facial recognition system is authorized, a law enforcement agency should require individual users to participate in training on how the facial recognition system functions, its limitations, the importance of using high resolution equipment and images, and the interpretation of results, as well as the implementation and adherence to the agency's facial recognition policy. (Exh 7, Darcy, p.19).

In **October 2020**, the Congressional Research Service issued, "Federal Law Enforcement Use of Facial Recognition Technology. It stated "A facial recognition search alone does not provide law enforcement with a positive identification; the results need to be manually reviewed and compared by an officer trained in facial comparison. Law enforcement agencies are prohibited from relying solely on the results of a facial recognition search to take a law enforcement action (Exh. 10, *Use of Facial Recognition Technology,* October 27, 2020).

In **Spring 2021**, the Major Cities Chiefs' Association ("MCCA"), an organization of police executives from the largest cities in the United States and Canada, developed an FRT program development guide to address the issue of FRT and to provide notice to law enforcement on "Facial Recognition Technology in Modern Policing." (Exh 7, Darcy, pp.19-20). The MCCA report states that the "results of FRT investigations should be treated only as tips and leads, given the limitations

of FRT and the potential consequences of its misuse." (Exh. 11, MCCA Report, p. 5). The MCCA expressly acknowledged documented cases of misuses in its 2021 report and directed agencies to treat them as cautionary examples. The report advised, "Comprehensive training should be provided to any investigator/officer who will be taking any action on the results of facial recognition investigations. The limitations of FRT and the potential consequences of its misuse, as outlined in this document, are the main reasons that results of facial recognition examinations should only be used as a tip or lead by investigators." (Exh. 11, MCCA Report, p.13).

Darcy states: "The MCCA first published Facial Recognition Technology in Modern Policy in 2021, more than two years before Mr. Killinger's arrest. It drew on the work of a national working group that included personnel from the Las Vegas Metropolitan Police Department and cited standards and research from the National Institute of Standards and Technology, the International Scientific Working Group, ASTM International, the United States Government Accountability Office and the Congressional Research Service among others. The publication recommends treating facial recognition results as investigative leads only and notes that many agencies state in policy that facial recognition results do not substantiate a positive identification, do not independently establish probable cause, and do not warrant a conclusion of guilt. The MCCA document recommends that comprehensive training be provided not only to facial recognition examiners but also to any investigator or officers who will act on the results of facial recognition so that the officer understands the technology's major capabilities and limitations before relying on it." (Exh 12, Darcy Rebuttal, p.6). In Darcy's opinion, any law enforcement agency, such as RPD, that deployed FRT or relied on it after October 2021 without adopting these recommendations had direct notice of FRT's inherent inaccuracies and **chose** not to act. (Exh 7, Darcy, p. 21).

In **July 2022,** the IACP in its White Paper on "Recommended Investigator Training for

Verifying Facial Recognition Leads" provided further direct guidance to law enforcement that FRT is not evidence to establish probable cause. "Crucially, police agencies must ensure that FRT is used for lead generation, not positive identification. A facial recognition match alone does not produce probable cause to arrest." The article states, "Accordingly, all FRS users should be required to complete training on how the systems functions, its technical and ethical limitations, the importance of high-quality images and capture equipment." And further, "Failures occur when investigators gave undue weight to an FRT lead, skipped corroborating checks, ignored exculpatory evidence, and failed to establish probable cause. These issues often stem from inadequate training." (Exh. 13, *IAPC Recommended Investigator Training for Verifying Facial Recognition Leads*, pp.3-4 ).

In **May 2022**, President Biden issued Executive Order 14074. Section 13(e) directed the Dept. of Justice and Homeland Security to develop guidance on law enforcement use of FRT. According to Darcy, "The issuance of a federal executive order on FRT placed every law enforcement agency in the United States on **<u>actual notice</u>** that FRT accuracy disparities were a recognized national concern." [6] (Exh 7, Darcy, p. 21-22

On **December 6, 2022**, the Georgetown Law Center on Privacy & Technology published a journal titled *A Forensic Without the Science: Face Recognition in U.S. Criminal Investigations.* Citing the wrongful FRT arrest of Robert Williams in Michigan, the article explained how the landmark settlement required the Detroit Police Department to: (1) corroborate FRT results with independent, reliable evidence before any arrest; (2) provide mandatory training on FRT limitations, and (3) audit all cases since 2017 in which FRT was used to obtain arrests. While the Williams case was not fully resolved until after the Killinger incident, news reports provided notice that reasonable police leaders would consider and act upon to update policy and training. (Exh 7, Darcy, p.23).

---

[6] Executive Order 14074 was revoked on January 20, 2025, by President Trump. Its revocation does not eliminate the notice it provided to law enforcement. (Exh 7, Darcy, p. 22).

The list is long regarding police agencies that have implemented FRT policies to avoid wrongful FRT identification matches. In **2020** the New York Police Department's FRT policy made clear: "The facial recognition process does not by itself establish probable cause to arrest or obtain a search warrant, but it may generate investigative leads through a combination of automated biometric comparisons and human analysis." (Exh 7, Darcy, p.23). The Orlando Police Department's **2021** Policy No. 1147.3 states, "The result of a facial recognition search shall only be considered as an investigative lead and is not to be considered a positive identification of any subject or probable cause to arrest." (Exh. 14, Orlando Police Department 2021 Policy).

## III. SUMMARY JUDGMENT STANDARD

"The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the facts before the court." *Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.,* 18 F.3d 1468, 1471 (9th Cir. 1994); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *see also Brizuela v. City of Sparks*, Case No. 3:19-cv-00692 -MMD-VPC, ECF No. 111, pp. 19-20 (Aug. 8, 2022).

Here, Jager admits he relied solely on the Peppermill's FRT to arrest Killinger. He admits he was not trained that FRT could be inaccurate or that he needed to investigate and corroborate a FRT identification. Jager squarely puts the **blame** on RPD for failure to train him that FRT could be inaccurate and for failing to correct the longstanding historical custom practice of accepting whatever results the Peppermill's FRT provided at "face value."

## IV. NON-DISPUTED FACTS AND ADMISSIONS BY DEFENDANTS

1. Kathryn Nance was RPS's chief at the time of Killinger's 2023 arrest.. She was RPD's policymaker in charge of ensuring officers received all their required training. (Exh. 5, Nance I, 57:20; 7:14-25).

2. Nance was aware FRT could be inaccurate. (Exh. 5, Nance I, 26:13-15).

3. In 2023, RPD did not train its officers on FRT. (Exh. 5, Nance, I, 12:6-10). Nance had authority to implement FRS but chose not to. (Exh. 5, Nance I, 9:16-18).

4. In 2023, RPD did not have a general order or a policy on FRT. (Exh. 5, Nance I, 21:5-11; 31:22-25; 33:16-18). Nance admitted nothing prevented FRT training—it was feasible, but she did not consider FRT training "essential" for officers. (Exh 5, Nance I, 19:5-24; 17:8-12).

5. Nance knew that a FRT match to someone who had committed a prior crime was not by itself sufficient probable cause for an arrest. She admitted that looking like someone who's committed a crime is not grounds for an arrest. (Exh. 6, Nance II, 19:25; 20:1-5; 28:1-6).

6. Nance testified she did not consider it a "problem" in any way that Jager had arrested Killinger based on FRT without first having any FRT training. (Exh. 5, Nance I, 18:25; 19:1-4).

**Jager Did Not Know FRT Could Be Inaccurate**

7. Jager did not know FRT could be inaccurate because no one at RPD specifically told him that FRT could be inaccurate. (Exh. 4, Jager, Rog 7, 3:7-23-2). "Prior to my arrest of Plaintiff Killinger, I had no knowledge that FRT could be inaccurate." (Exh. 4, Jager Rog 8, 4:10).

8. Jager's supervisor Carl Desantis also had received no training on FRT and was unaware FRS could be inaccurate. (Exh. 15, Desantis, 98:25; 99:1-2; 96:11-13).

**The Peppermill's FRT**

9. The Peppermill keeps records of its customers with an office available to police or casino security 24/7 to confirm a customer's identity. (Exh. 1, Hill, 28:12; 29:9-24; 30:16).

10. In August 2023, the Peppermill installed FRT. The purpose of installing FRT was to "keep people who've been banned out of the casino." (Exh. 1, Hill, 36:14-19). Its FRT system alerts to the cellphones of its security officers when an alleged prior trespasser is located, giving a percentage of "confidence" in the match. (Exh. 1, Hill, 42:25; 43:1-23). In in a month, FRT puts out "thousands" of alerts. (Exh. 1, Hill, 61:1-9). Many people are taken into custody because of FRT alerts. "We might have half a dozen in a shift taken to security based on FRT alerts." (Exh. 1, Hill,

68:6-9).

11. According to Hill, in 2023 through 2025, there was no way for the Peppermill to track FRT false positives. In those years the casino believed a FRT match of 100% was accurate and suspects were taken into custody based on FRT alone. (Exh. 1, Hill, 123:12-19, 70:5-9; 70:71:20-25). RPD was notified "every time." (Exh.1, Hill, 75:2-4). The RPD officer decides whether the person identified by an alert goes to jail, not the Peppermill security officer. (Exh. 1, Hill, 75:22-25). Security "does not tell a police officer what to do." (Exh. 1, Hill, 76:3-25).

12. Towards the end of 2025 the Peppermill discovered that FRT false positives occur 10% of the time. (Exh. 1, Hill, 45:17-20). Since it began keeping track of false positives, the Peppermill determined its FRT was "not infallible" and "precautions" are necessary before taking action. (Exh. 1, Hill, 56:11-14). The FRT identification is "only as good as the pictures put into it; if the quality of the pictures put into it [FRT] is low, the greater possibility for error." (Exh. 1, Hill, 56:11-20). Peppermill spreadsheets from August 2023 through December 2024, indicate **849** people were either transported or cited and released on trespass charges based on FRT alone. (Exh. 16, Heward Decl., re FRT transports and Exh. 17, Heward Decl. re cite and release arrests).

- Aug. 2023 thru Dec. 2023 RPD transported 70 alleged trespassers (Exh. 16)
- Jan 2024 thru Dec.2024 RPD transported 90 alleged trespassers (Exh. 16)
- Aug. 2023 thru Dec. 2023 Peppermill cited 225 alleged trespassers (Exh. 17)
- Jan 2024 thru Dec. 2024 Peppermill cited 464 alleged trespassers (Exh. 17)

13. In 2023 the Peppermill believed that a FRT match **alone** was probable cause to arrest. (Exh. 1, Hill, 82:9-12). By 2026 the Peppermill was aware its FRT could be "inaccurate" and a FRT match alone was not by itself probable cause to arrest. (Exh. 1, Hill, 85:18-24; 82:13-17). However, in 2026, Hill testified casino security still take persons into custody on a "regular basis" when identified by FRT as a prior trespasser without proof of identity. (Exh. 1, Hill, 103:4-15).

**Peppermill Security Officer Gamino States There Is**
**No Training for Peppermill Security and Arrests Are Based Solely On FRT Alerts**

14. Aaron Gamino, a former Peppermill security officer, was employed by the Peppermill from about October 2024 to July 2026. Gamino states that as of July 2026, the Peppermill continued to make arrests based exclusively on FRT identifications even when the FRT matches were clearly wrong. Gamino did not receive FRT training by the Peppermill; he was told the FRT, "just works." Gamino was never informed that FRT is an investigative tool, not proof of identity or not probable cause to arrest. (Exh. 18, Gamino, ¶¶1-3).

15. According to Gamino, if FRT alerted with 100% certainty he was instructed to arrest even if the person produced legal identification that he was not the prior trespasser. Gamino testified there was a "fly by" procedure—if the person alerted with a lower percentage security would walk near the person and visually compare them with photos from the data base. "We were instructed to use our discretion in determining whether we believed it was actually the same person." (Exh. 18, Gamino, ¶¶6-7).

16. According to Gamino there was no training in face comparison. "We were not given any face comparison charts or instructions on how to use the FRT alert system. If an alert was made, it was taken as reliable and permissible to arrest. An image of a person currently being detected would be on the cellphone alongside an image associated with the prior trespassed person. Problems arose because the photos in the database were often "older pictures" and the accompanying information was incorrect. Gamino's supervisor Louis Moreno made it very clear to him arrests were to be made regardless. "He [Moreno] did not like it when I told him there appeared to be problems with the identifications, if an alert matched someone to a prior trespasser but the person did not look like the prior trespasser Gamino was told to rely on the FRT and make arrests when alerts were made. I remember seeing so many questionable matches often enough that I became uncomfortable relying solely on the FRT." (Exh. 18, Gamino, ¶¶10-11).

17. Gamino testified that it did not matter if the person had identification that was deemed acceptable. He would look at their identification but if it did not match the name of the person in the database, he was told to rely on the alerts not on their identification. FRT would ping an alert of 100% on someone who was clearly not the person in the database. Gamino states he had that happen sometimes 12 times on a single shift. It was not unusual that the percentage match as found by FRT would appear as 100% and still be wrong. (Exh. 18, Gamino, ¶¶12-14).

18. The Peppermill made very little attempt to confirm a purported FRT match. RPD would be notified but would rarely come out; they were always too busy. (Exh. 18, Gamino, ¶15). RPD would give the "okay" to cite and release. RPD did not ask questions, they approved the citation based on the FRT alert and the percentage of confidence." (Exh. 18, Gamino, ¶15). "As security guards we had the power to arrest. It was my understanding there was a policy or an agreement between the Peppermill and RPD giving us the right to arrest. I do not recall ever when RPD told us there was insufficient probable cause. RPD sanctioned every call about a trespasser with the okay to issue a citation for the person to appear in court." (Exh. 18, Gamino, ¶20).

19. The citations issued by Peppermill security do not reference probable cause. The citations are virtually identical, they state: "Defendant did unlawfully return to Peppermill property after having been trespassed from Peppermill property by Peppermill security within the last 24 months." (Exh. 30). When security telephones RPD, RPD provides the date and time for the suspect's court date. (Exh. 18, Gamino, ¶ 21).

**<u>Killinger's Arrest</u>**

20. Jager routinely went to the Peppermill related to trespassers in 2023, going two to six times a week, totaling hundreds of calls. (Exh. 19, Jager Decl., No. 11, 2:5-8).

21. Responding to a call from the Peppermill, Jager arrived on scene on September 17,

2023. Killinger was handcuffed in the Peppermill security office. Security told Jager FRT had provided a "100 percent match" of Killinger to Ellis. (Exh. 2, Jager, 68:17-25; 69:1-18; Exh. 32, Peppermill FRT results; Exh. 33, Arrest Report & Decl. of Probable Cause). Jager "accepted" what Peppermill security told him about its FRC match at "face value" assuming it was accurate. (Exh. 2, Jager 212:2-8). Jager did not question the accuracy of the casino's FRT, its system maintenance, or its history, he just accepted it. (Exh. 2, Jager 110:15-20). Jager "had no idea" whether the FRT system "was accurate or not accurate" he just "assumed" it was accurate. (Exh. 2, Jager, 111:17-21).

22. Jager was provided with pictures of Ellis taken by the Peppermill when Ellis was barred from the casino months six months earlier. Ellis's 2023 pictures showed he had a missing front tooth. (Exh. 20). Killinger did not have a missing front tooth.

23. Jager was also provided with both Killinger's and Ellis's driver's licenses for comparison. Jager noticed that Killinger had a Class A commercial driver's license with endorsements allowing him to tow tankers, drive school buses, and double and triple trailers. Ellis had only an ordinary Class C license. Jager noticed that Killinger had a different height, 6'1" to Ellis' 5'9", Killinger had a different weight, 285 lbs. to Ellis' 235 lbs., Killinger had a different eye color, blue to Ellis' hazel, Killinger had a different birthday and thus a different age—Killinger was seven years younger than Ellis. Both licenses had different license numbers and addresses. (Exh. 21, Killinger license; Exh. 22, Ellis driver's license).

24. Jager telephoned RPD and confirmed the validity of Killinger's driver's license with RPD as active, valid, and current. (Exh. 2, Jager, 152:18-25; 153:1).

25. A driver's license and passport are the basic and best pieces of identification a person might have to prove identity. (Exh. 6, Nance II, 54:18-22). RPD's general order states officers may use DMV records to establish identity." (Exh. 23, General Order P-280-17 II (B)(C)).

26. Jager was on notice aware that Killinger also had in addition to a valid Nevada driver's license, a Peppermill gold player's card and a bank debit card.

27. Jager believed that FRT match was sufficient for probable cause to arrest. (Exh. 2, Jager, 86:20-22). Jager did not feel he needed any "additional" probable cause than the FRT match to arrest Killinger. (Exh. 2, Jager, 79:15-20). Jager did not believe even if Killinger had additional identification in his name it mattered because it could all likely be "fake, fraudulent, or stolen." (Exh. 19, Jager Decl., No. 16, 3:9-15).

28. Jager, convinced the FRT was accurate, called his supervisor, Sgt. Desantis, telling him he believed Killinger was using a fake ID and had a "DMV hookup" making false IDs for him. (Exh. 2, Jager, 195:22-25; 196:1-7). Jager testified he was "predisposed" to believe Killinger was using a false ID, or was conspiring with someone at DMV to make false IDs for him. (Exh. 2, Jager, 210:12-17). Jager admitted at his deposition he had no evidence that Killinger's license was fake or he had a DMV hookup manufacturing false IDs for him; Jager admitted what he told Desantis was all "speculation" not facts. (Exh. 2, Jager, 237:1-25).

29. When Jager told Killinger he was taking him to jail, Killinger was shocked. He said, "What's is it going to take to convince you I am who I am?" (Exh. 2, Jager, 157:21-25 ). Killinger told Jager he had a pay stub from his employer, UPS, an international company, in his car, and he wanted Jager to look at it to help prove his identity. (Exh. 2, Jager, 184:13-17). Killinger provided the car's location in the parking lot, its make, model, and color, but Jager refused to go to Killinger's car and look at the pay stub. (Exh. 2, Jager, 185:11-19). Instead, Jager told Killinger he "had" to go to jail. (Exh. 2, Jager, 71:2-7). Jager testified that he was "not going to Killinger's car to look at a pay stub." (Exh. 2, Jager, 185:11-19). In so doing, Jager believed he was following RPD custom and practice. (Exh. 2, 71:6-15).

30. Jager admitted he had time to investigate Killinger's identity and time to go to Killinger's car if he had chosen to do so. (Exh. 2, Jager, 188:21-25; 189:1-8).

**Jager's Confusion**

31. Jager was "confused" about Killinger's identity. (Exh.19, Jager Decl, No. 15, 2:27-28; 3:1-8). Jager told several people he was confused about Killinger and did not know what to think. Jager told another RPD officer arriving at the Peppermill, "This poor guy might legitimately be somebody else, I don't know. I don't know what to think." Jager added, "I'll be honest, I don't know what to think." Jager told Killinger, "I'll be 100% honest you may have a doppelganger." (Exh. 2, Jager, 204:11-25; 205:1-18). At the jail Jager told a jail employee, "It might be a legitimate doppelbanger situation, I kinda believe him." (Exh. 2, 21-25; 208:1-5). Jager believed Killinger "could be an entirely innocent person, or he could be guilty, he had no idea." (Exh. 2, Jager, 210:5-9). Jager told Reno city attorney Drake, tasked with prosecuting Killinger for trespass, that he had "no idea" whether Killinger was telling the truth, or whether he had a doppelganger." (Exh. 29 , Drake Decl, No. 12, pg. 2:4-5).

32. Jager told Killinger there was "nothing" Killinger could do to prove his identity other than have a fingerprint check at the jail. "Based off the AI," there was nothing that Killinger could do to persuade Jager he was who he claimed to be other than have a fingerprint check at the jail. (Exh. 2, Jager, 346:7-14) Nance testified Jager was wrong: "An officer cannot take someone to jail simply because he doesn't know who that person is." (Exh. 6, Nance II, 49:8-11).

**Custom and Practice**

33. Jager believes everything he did on the night he arrested Killinger was done according to RPD custom and policy." (Exh. 2, Jager, 8:8-12).

34. In arresting Killinger based solely on the word of the Peppermill that its FRT was

accurate, he was following the custom and practice of RPD. Taking the word of the Peppermill on the accuracy of its FRT was RPD's custom and practice. (Exh. 2, Jager, 15:9-25; 16:1-3).

35. Jager understood officers similar to him were also accepting FRS as accurate for identification. (Exh. 2, Jager, 17:16-22). Jager testified he was "not the only one" that accepted FRT with 100% confidence without question. (Exh. 2, Jager, 18:1-25; 19:1-9).

**Two Years Later Jager Receives Limited FRT Training**

36. Two years after Killinger's arrest, Jager attended an RPD "training" on FRT. After receiving the training, Jager testified "would not do what he did with Killinger the same way if circumstances were to repeat themselves." (Exh. 2, Jager, 9:4-22).

37. The training was put on by civilian RPD employee Vanessa Kosinski. It was not a formal training, it wasn't post certified, it was an "informal way" for Kosinski to familiarize officers with the limitations of FRT. (Exh 25, Kosinski, 30:7-17). It was like an "extra" that was "tossed in" if officers had the time to hear it. (Exh. 25, Kosinski, 55:16-21). It was not "mandatory," Kosinski testified, it was "just a courtesy informational lasting 10-15 minutes." (Exh. 25, Kosinski, 31:15-18; 34:20-22). Kosinski kept no attendance logs and had "no idea" what percentage of RPD officers attended her training, whether it was 10% or 100% of all officers. (Exh. 25, Kosinski, 33: 14-23).

38. Kosinski's training was based on a FRT training power point. (Exh. 26). The power point clarified FRT was not proof of identity, not probable cause to arrest, and must always be supported by independent evidence of identifications. (Exh. 26). Kosinski's FRT power point made a deep impression on Jager. Jager testified he had thought FRT was "completely reliable" and could be the "basis for probable cause to arrest." After Kosinski's training Jager understood that FRT cannot form the basis of probable cause to arrest. (Exh. 2, Jager, 89:1-13). Jager understood from Kosinski's training that he had wrongfully arrested Killinger based solely on the Peppermill's

statements about its FRT accuracy and he would not have arrested Killinger if the same situation were to repeat. (Exh. 2, Jager, 9:4-21).

39. Jager testified he learned from Kosinski's training that an arrest based solely on an FRT alone is "nowhere near sufficient for probable cause to arrest" and he would not do in the future to anyone else what he had done to Killinger. (Exh. 2, Jager 60:15-18). Jager now knows when he goes someplace that utilizes FRT, he must not rely on it solely for probable cause. (Exh 2, Jager, 13:4-9). Jager admitted Killinger's arrest was based solely on FRT and he would not make such arrests in the future without further identification and corroboration. (Exh. 2, Jager, 60:19-23).

40. Jager testified it would have been "helpful" if he had received FRT training before his interaction with Killinger, as he would not then have made the arrest. (Exh. 2, Jager, 90:9-16).

41. Jager's supervisor Carl Desantis agreed it would be beneficial for RPD officers to have training so that they understand that FRT can be inaccurate. (Exh. 15, Desantis, 108:12-17).

42. RPD has not, three years after Killinger's wrongful arrest, instituted mandatory FRT training. As of July 2026, "Officers are not currently required to attend any formal facial recognition software training course, and there is currently **no plan to require such training**." (Exh. 27, City's Response to Rog No. 10, p.16 lines 8-10).

**RPD's "Cite and Release" Arrangement With The Peppermill**

43. The Peppermill has a "cite and release" policy arrangement with RPD that permits its private security officers to issue citations to alleged trespassers without the presence of sworn RPD officers. Gamino states: "As security guards we had the power to arrest. RPD delegated the arrest power to us." (Exh. 18, Gamino, ¶ 20). Kendra Jones was also told by a Peppermill security officer that "Peppermill has the power to arrest." (Exh. 28, Kendra Jones, ¶ 7).

44. From Aug. of 2023 through Dec. of 2024, the Peppermill cited and released **689**

alleged trespassers. These citations were based on FRT alone. (Exh. 1, Hill, 86:6-19).

45. Private security officers are not permitted under Nevada law to make arrests. The Nevada Attorney General has issued Advisory Opinions, 99-02 and 79-21 prohibiting non-police officers from performing the functions of law enforcement officers citing to Nevada law.

## ARGUMENT

## I. MUNICIPAL LIABILITY BASED ON FAILURE TO TRAIN

"To allege a failure to train, a plaintiff must include sufficient facts to support a reasonable inference (1) of a constitutional violation; (2) of a municipal training policy that amounts to deliberate indifference to constitutional rights; and (3) that the constitutional injury would not have resulted if the municipality properly trained their employees." *Benavidez v. Cnty of San Diego,,* 993 F.3d 1134, 1153-54 (9th Cir. 2021). A Plaintiff must establish a "direct causal link" between the municipal policy or custom and the alleged constitutional violation. *City of Canton v. Harris,* 489 U.S. 658, 691 (1978). A plaintiff must also prove that "policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights." *Connick v. Thompson,* 563 U.S. 51, 61 (2011).

### A. Constitutional Injury-An Arrest Without Probable Cause

An arrest without probable cause is a constitutional injury. Probable cause is determined on whether, at the moment of the arrest, officers had reasonably trustworthy information sufficient to warrant a prudent man in believing the suspect had committed or was committing an offense. *Beck v. Ohio,* 379 U.S. 89, 91 (1964). Jager wrongfully arrested Killinger and admits to it. (Exh. 2, Jager, 42:3-5). Jager admitted Killinger "should never have been taken to jail." (Exh. 2, Jager, 44:5-9). On November 9, 2023, criminal trespass charges against Killinger were dismissed after a jail fingerprint test confirmed Killinger was not Michael Ellis. Prosecutor Jill Drake, refusing to accept that a 100%

FRT match could be inaccurate, referred the case to RPD to further investigate whether Killinger had committed identity theft. (Exh. 29, Drake decl., No. 16, 2:17-20).

RPD detective Sheahan was tasked to investigate whether Killinger and Ellis were the "same person" and if Killinger had committed identity theft. (Exh. 3, Sheahan, 18:20-24). Sheahan concluded that Ellis and Killinger were different people, Killinger was not trying to steal Ellis's identity, Ellis was a separate person, and Jager had taken an innocent man to jail. (Exh. 3, Sheahan, 31:20-24; 36:18-25; 57:5-7).

**1. <u>An Arrest Based On Speculation</u>**

At the time Jager arrested Killinger, he had "no idea" who Killinger was—in his mind he could be Killinger, Ellis, or someone else entirely. (Exh. 19, Jager Decl., No. 15, 2:27-29; 3:1-8). Jager took Killinger to jail solely to let the jail determine his Killinger's identity. Such conduct is against RPD policy. Officers cannot take people to jail to have them identified. (Exh. 6, Nance II, 57:1-5). Killinger provided satisfactory proof of identity by presenting a valid Nevada Class A driver's license. There are no facts indicating the license was forged, altered, or otherwise invalid. Jager had only a hunch Killinger was Ellis and hunches are not probable cause. *Terry v. Ohio,* 392 U.S. 1, 27 (1968); *U.S. v. Thomas,* 211 F.3d 1186, 1192 (9th Cir. 2000).

> So right now…because I can't identify you man…it's uh, it's weird…because, uh, essentially it looks like you have two names…I don't know man… so I can't identify you…Unfortunately that means I can't cite you…you can't be cited, then you are arrested. (Exh. 24, Jager BWC, 06:14:44).

Jager testified that there was "nothing" Killinger could do to persuade him of his identity other than the absolute proof of a jail fingerprint check." (Exh. 2, Jager, 346:7-17). Yet, Jager knew Killinger's license was valid and he had no criminal record. Jager also knew Killinger's license had a valid commercial endorsement that Ellis did not have. According to Darcy, this "detracted from any reasonable suspicion or probable cause." (Exh. 12. Darcy rebuttal, p.12). With a valid license,

and numerous differences in the descriptors in their licenses there was no reasonable basis to believe Jager was Ellis. Darcy opines:

> A reasonable officer knows that just because two people look similar and have similar physical characteristics, yet have completely different birthdays, active driver's license numbers, and addresses, does not automatically constitute identity theft. A reasonable officer would reasonably believe they were possibly two different people." (Exh. 12, Darcy rebuttal, p.12).
>
> Officer Jager knew that Mr. Killinger's ID was valid and active, but he treated it as potentially fake or stolen, even though he had ample opportunity to review other evidence. When asked, "But you had no indication that Mr. Killinger's ID was fake. In fact, you knew it was legitimate, right? Officer Jager testified, "Yes." (Exh. 2, Jager, 162:2-5).
>
> Jager speculated that Killinger had a hookup at the DMV, even though there was no evidence of it. Jager admitted the "hookup" at DMV was pure "speculation."(Exh. 2, Jager, 237:1-10). There was no evidence that Killinger knew anyone at the DMV. (Exh. 2, Jager, 237:23-25). Jager told his supervisor that Killinger was acting "super suspicious." (Exh. 2, Jager, 238:13-15). Jager testified that getting up, cashing out, and running to the door was suspicious, yet Jager never reviewed the surveillance video to observe that behavior. (Exh. 2, Jager, 239:9-25; 240:1-13). A reasonable officer would have reviewed the surveillance to confirm if his actions [Killinger's] were suspicious. There is no evidence that Officer Jager reviewed surveillance footage. There is no evidence that Officer Jager contacted the Peppermill Players club to verify identity. A reasonable officer would have taken additional steps to verify Mr. Killinger's identification. Jager did not. (Exh. 12, Darcy rebuttal, p.17).

"Officers must be able to articulate more than an inchoate and unparticularized suspicion or hunch of criminal activity." See *Hopson v. Alexander,* 71 F.4th 693, 717, n. 10 (2023), citing *Illinois v. Wardlow,* 528 U.S. 119, 123-24, (2000). "Officer Jager's testimony speaks to the heart of the issue in this case. What else can a citizen in Nevada do to prove their identity to a police officer while detained in a casino security holding room when the officer fails or refuses to account for, or just avoids, all the identification differences and the available reasonable options because of a facial recognition match? A reasonable officer would have known that an independent investigation into the alleged trespass was required and completed one to ensure they were not making a wrongful arrest." (Exh. 12, Darcy rebuttal, p. 24).

**2. <u>An Officer Does Not Arrest When He Is "Confused"</u>**

Jager testified, "At the time he arrested Killinger he had "no idea" if Killinger was telling the truth because he was "confused" about him. (Exh. 2, Jager, 204:4-25; 205:1-18). ). Jager told Killinger, "I'll be 100% honest with you, you may have a doppelganger." (Exh. 2, Jager, 204:4-18). Jager told jail staff he "didn't know what to think." Jager told prosecutor Drake he had "no idea" whether Killinger was telling the truth or had a "doppelganger." (Exh. 29, Drake Decl. No. 12, 2:4-5). Reasonable officers do not make arrests when they have "**<u>no idea</u>**" if someone is guilty.

Darcy opines: "In my opinion, held to a reasonable degree of professional certainty in the field of law enforcement practices, a reasonably competent and prudent officer face with the same or similar circumstances would not make an arrest solely to verify the identity of a person without probable cause to support the arrest." Darcy continued: "A reasonable police officer would not arrest a person based on a hunch or mere suspicion. A reasonable officer arrests based on probable cause, and not just because they do not know who the person is. Facial recognition is not probable cause." (Exh. 7, Darcy, p. 54).

**B. <u>Deliberate Indifference</u>**

When Jager arrested Killinger, RPD did not offer FRT training. RPD did not have a general order or a policy on FRT. RPD in 2026, still has no FRT training, policy, or general order. (Exh. 27, City's Resp. to Rog. No. 9, 15:6-9; Resp. to Rog. No. 10, 16:8-10). Nothing prevented such training, but Chief Nance did not believe it was necessary. (Exh. 5, Nance I, 19:5-8; 17:9-12). Knowledge of a wrongful arrest, coupled with notice of the potential for further such arrests, and a failure to take reasonable corrective steps is the essence deliberate indifference.

Nance had notice of Killinger's wrongful arrest shortly after it occurred. (Exh. 5, Nance I, 61:16-21). She reviewed the case in its entirety. (Exh. 5, Nance I, 76:11-16). She knew Jager had

arrested an innocent man based on the Peppermill's incorrect FRT. (Exh. 6, Nance II, 36:2-4; 59:13-17). She did not speak with Jager and was unaware if anyone at RPD spoke to Jager about his wrongful arrest. (Exh. 5, Nance I, 64:5-13; 62:6-7). Darcy opines:

> A reasonable police chief, after receiving notice that an officer had relied 100% upon FRT and made an arrest based on that information, would have taken immediate steps to prevent a recurrence. A reasonable police chief would have issued a directive and/or a training bulletin out to RPD officers immediately, providing guidance to prevent a recurrence. A reasonable police chief would have conducted an assessment or root cause analysis to understand how this happened. A reasonable chief would have quickly modified the policy to prevent this type of situation by prohibiting arrests based solely on FRT. The evidence I have reviewed so far indicates that this was not done, not by Chief Nance or any other person at RPD." (Exh. 12, Darcy Rebuttal, p. 32).

Nance testified she had no knowledge of arrests based on FRT alone. "I have no knowledge of officers arresting somebody on FRT alone or that is an issue in the organization." (Exh. 5, Nance I, 32:13-19). "If there was an issue of arresting people based on FRT alone, I would consider that something we would need to address and would have "concerns." (Exh. 5, Nance I, 32:20-25; 33:1-4). **<u>But Nance did know.</u>** She had read about Killinger's wrongful arrest shortly after it occurred in its entirety. Waiting until there is a series of wrongful arrests is not what a reasonable police chief would do. "A reasonable and prudent police department would not wait for a pattern of arrests stemming from misidentification before training its officers on the proper use of facial recognition identification technology. A reasonable and prudent police department would become aware, through its officers' regular interactions with casino security personnel, of the issues its officers would encounter in the field, including interactions with third-party FRT systems owned and operated by casinos such as the Peppermill." (Exh. 12, Darcy Rebuttal, p. 33).

**1. <u>Nance's Contradictions</u>**

Nance testified when there is an allegation of misconduct in a federal lawsuit it is important for RPD to make an inquiry with the officer as the substance of the lawsuit. (Exh. 5, Nance I, 66:18-

22). Nance added that if RPD is aware that an innocent person is wrongfully taken to jail, RPD "looks into it." (Exh. 5, Nance I, 61:8-12). But Nance didn't do this. Nance knew the FRT identification of Killinger to Ellis was incorrect and Jager had taken an innocent person to jail. (Exh. 5, Nance I, 79:17-20; Nance II, 78:2-18). Yet Nance made the deliberate choice not to talk to Jager about it or ensure anyone at RPD spoke to Jager about it. (Exh. 5, Nance I, 64:5-13; 62:6-7). This demonstrates deliberate indifference as Nance testified that the normal RPD protocol was to "make an inquiry" when an innocent person is taken to jail. Nance intentionally deviated from the normal protocol in Killinger's case, refusing to make the inquiry she normally made.

Nance knew FRT can be inaccurate. Nance knew officers must not use FRT to verify an identity or make an arrest absent any corroboration or independent evidence. (Exh. 5, Nance I, 24:19-24). But Nance was indifferent to the entire Killinger matter. She didn't bother with an inquiry, she didn't talk to Jager, she was unaware whether anyone had talked to Jager, and she rejected the idea of anyone talking to Jager about it as "unnecessary." (Exh. 5, Nance I, 62:6-7; 63:3-6). She did the exact opposite of what police practices expert Darcy explained she should have done: "Issued a directive and/or a training bulletin to RPD officers immediately, providing guidance to prevent a reoccurrence and conducted a root cause analysis." (Exh. 12, Darcy rebuttal, p. 32).

**2. <u>Nance's Indifference To The Importance of a Wrongful Arrest</u>**

Nance testified, "I don't have any concerns that Jager violated any policies or procedures of RPD." (Exh. 5, Nance I, 76:11-16). But she also testified that wrongfully arresting someone can be a "policy violation" and a "terrible thing to do." (Exh. 6, Nance II, 75:8-11; 80:4-6). If Nance had sat down with Jager to discuss how a wrongful arrest could be made with a FRT confidence score of 100% she would have learned that Jager had believed that FRT was completely reliable and probable cause to arrest because he had not been taught any differently. (Exh. 2, Jager, 86:20-24;

89:1-13). She would also have learned that an arrest based solely on FRT at the Peppermill was common, occurred frequently, and what Jager believed to be acceptable RPD practice.

More troubling is Nance's admission that she did not consider it a "problem" that Jager had arrested Killinger based solely on FRT without having received training that FRT was only an investigative tool, not proof of identity, or probable cause to arrest. (Exh. 5, Nance I, 18:25; 19:1-4). Nance admitted that not only was it not a problem that Jager had not received FRT training, but she also believed that FRT training should not be "required for every officer." (Exh. 6, Nance II, 98:3-11). Why not? If Jager had arrested Killinger based solely on reliance of an inaccurate FRT match, and believed it to be the custom and practice at RPD, it was by definition a "problem" as it had resulted in Killinger's wrongful arrest. When confronted with Jager's testimony that it would have been "helpful" to him to have received FRT before his arrest of Killinger, Nance was again indifferent, she testified that "if Jager felt it would have been helpful for him to have received FRT training before arresting Killinger then he "should have gotten the training." (Exh. 6, Nance II, 94:18-23; 95:1-2). But RPD did not offer the training. Where was Jager to go to get the training? There was no guidance issued by RPD, no policy, and no general order on FRT and there still isn't.

**C. <u>Actual/Constructive Knowledge</u>**

Nance testified she knew FRT could be inaccurate. (Exh. 5, Nance I, 26:13-15). She testified she knew of cases where FRT "has been inaccurate." (Exh. 5, Nance I, 26:2). Nance likely received this information from the professional journals and reports cited by Darcy. The 2021 MCCA report documented cases based on the misuse of FRT and urged law enforcement to be cautious in using FRT. If Nance read the MCCA report, as she likely did, she knew that FRT was only an investigative lead, not probable cause to arrest. There were numerous law enforcement articles disseminated as to the limitations of FRT—all of which Nance should have been aware of.

A reasonable law enforcement agency knew or should have known by September of

> 2023, years before 2023, that national professional police organizations representing the law enforcement community had already issued explicit guidance prohibiting arrest based solely on FRT results, the FBI had issued guidance, and the President of the United States issued an order pertaining to the use of facial recognition. Also, well before 2023 police agencies were issuing policies on FRT, and cases on FRT misuse were widely reported. Reasonable police agency leaders would know that FRT was not proof of identity and confirmation was required to establish identity and probable cause. (Exh. 7, Darcy, p. 24).

Nance also had actual or constructive knowledge of the massive quantity of Peppermill trespass arrests. She knew RPD officers were daily going to the Peppermill to pick up trespass citations. (Exh. 4, Jager Resp to Rog 14, 7:15-17). From August 2023 through December of 2024, **17 months,** RPD processed **849** Peppermill trespass arrests based on FRT just from the Peppermill casino. (Exh. 15 and 16). Of these approximately **169** were similarly situated to Killinger as they were described either “John Doe” or “Jane Doe.” These arrests are delineated by the Peppermill in excel spreadsheets as either “RPD transports” or “cite and release.” (Exh. 15 and 16). According to Peppermill security director Dean Hill, all of these arrests and citations were based **solely** on FRT alerts and identifications, nothing more. (Exh. 1, Hill, 71:20-25; 87:12-16). Any claim by Nance that she was unaware of 849 trespass arrests stemming from just one Reno business, the Peppermill, is not plausible or credible.

> Through my experience developing and implementing department wide policy, I know that a law enforcement agency that fields hundreds of facial recognition referrals from a single private business and that takes persons into custody on those referrals without a policy requiring independent identity verification creates a foreseeable risk of errors and a highly predictable risk that an innocent person will be misidentified. (Exh. 7, Darcy, p.43).

RPD also had actual and/or constructive knowledge of the wrongful arrest from the investigation and conclusions of RPD fraud detective Sheahan. In November 2023 Sheahan investigated Killinger’s arrest and concluded, within days, that Killinger and Ellis were different people, no fraud had occurred, and Jager had taken an innocent man to jail. (Exh. 3, Sheahan,

36:15-25; 57:5-7). Nance accepted Sheahan's conclusion that Jager had taken an innocent man to jail. (Exh. 6, Nance II, 11:23-25; 12:1). What was indeed strange was that Sheahan's supervisor, Juan Lopez, specifically told Sheahan not to write a report on her conclusions on Killinger's arrest. This deviated from Sheahan's normal procedure. (Exh. 3, Sheahan, 33:6-14; 34:3-13). Even without Sheahan writing a formal report, her findings were known to her supervisor and to RPD.

> RPD's own internal investigation was sufficient notice, from a police-practices standpoint, to warrant prompt development of policy and training. Instead of immediately recognizing the results of Det. Sheahan's investigation, they instructed her **not** to write a report." (Exh. 12, Darcy rebuttal, p.37).

This internal investigative finding, reached within RPD in late 2023, also served to place RPD on direct, actual notice of the precise risk that later prompted Ms. Kosinski's training: that reliance on an FRS match without independent corroboration can, and in this case did, result in the wrongful arrest of an innocent person. Darcy states, "The department's decision to wait nearly two years, until September 2025, to begin any training—even the non-mandatory 'informational' offered by Kosinski, was unreasonable. A reasonable and prudent police department would not wait two years to institute training on the proper use of FRT systems, knowing it had a case of misidentification that led to an arrest. A reasonable police leader ensures that the policy is changed as soon as possible." (Exh. 12, Darcy rebuttal, p.37).

Finally, Nance testified that she knew nothing about the informal FRT training developed by Kosinski or the power point she put together. (Exh. 5, Nance I, 10:17-20). But Kosinski knew of the problems with FRT as early as 2023. Kosinski's supervisor, RPD Sgt. Steve Mayfield, authorized Kosinski' to develop the training on the FRT limitations in late 2025, two years after RPD was already on notice of Killinger's 2023 wrongful arrest. (Exh. 25, Kosinski, 29:10-21). Kosinski's training was capable of adoption and instruction for patrol officers in 2023, when Kosinski was aware of the need, but it was not disseminated for two additional years.

**D. <u>Moving Force</u>**

> Training failures create a foreseeable risk that detectives will misunderstand probable cause. This in turn, leads to misuse and overreliance on facial recognition technology in criminal investigations. Inadequate investigations are precursor to identifying the wrong suspects. RPD fell short of reasonable professional policy and procedure standards by failing to provide training regarding the proper use of FRT during investigations. Here, officers should have been trained on FRT and its use and lack of reliability in determining probable cause. (Exp. 7, Darcy, 34).

Killinger's constitutional injury would not have occurred if RPD had trained Jager on the limitations of FRT and its potential for inaccuracies. Nance, on notice of Killinger's wrongful arrest based on inaccurate FRT, disregarded a known and obvious consequence—that a failure to ensure training, a failure to instruct that FRT can be inaccurate, and a failure to teach that FRT matches must always be corroborated, guaranteed the risk of future arrests like Killinger's. Further, Nance was aware of the massive number of trespass arrests stemming from the Peppermill via citations—yet she made no effort to ensure those citations conformed to the requirements of probable cause, had police oversight, and RPD was not in fact delegating arrest power to private security officers.

Jager admits that but for his lack of training he would not have arrested Killinger. Jager acknowledged it would have been "helpful" if he had had FRT training because if he had had training he would not have made the arrest. (Exh. 2, Jager, 90:9-16; 11:18-22). Jager testified, "I would not have made an arrest based off facial recognition." Jager admitted he now knows that FRT is "nowhere near sufficient for probable cause to arrest." (Exh. 2, Jager, 60:15-18).

The Peppermill admits its FRT produces 10% false positives. Killinger's wrongful FRT match was a false positive, 10% percent of <u>**849**</u> people either transported by RPD or issued citations in the relevant time period is <u>**84**</u> people. The failure of RPD to train its employees on the risks of sole reliance on FRT leads directly to the obvious danger posed by FRT—that innocent people, like Killinger, will be wrongly identified by FRT and face arrest and prosecution.

Darcy states: "A reasonably competent and prudent police officer, when faced with these or similar circumstances, would have investigated Mr. Killinger's identity before depriving him of his liberty, given the absence of any exigency, the availability of time, and the multiple forms of corroborating identification possibilities Mr. Killinger offered. Officer Jager's failure to conduct a thorough investigation confirming identity was a substantial factor in causing Mr. Killinger's wrongful arrest. (Exh. 7, Darcy, p. 24).

**E. <u>The Consequence of Failure to Train—Innocent Citizens Are Arrested</u>**

Former security officer Gamino makes clear that Peppermill employees are not trained in FRT, have no idea what they are doing, and arrest solely on the basis of FRT alerts. There is no investigation and they are encouraged to arrest even when the FRT alerts are obviously wrong. Innocent suspects like Killinger, who present legal ID to prove who they are and not prior trespassers, face security officers who are instructed to arrest anyway. There is no police oversight. RPD has illegally and improperly delegated Peppermill security officers with the power to arrest. These Peppermill security officers fill out citations with conclusory accusations, like "the suspect returned after being trespassed." (Exh. 30). These simplistic conclusory descriptions are devoid of details. It is akin to an officer giving a speeding citation by writing, "He drove too fast." RPD is not concerned with probable cause, As Gamino points out, "I do not remember ever when RPD told us there was insufficient probable cause to arrest." (Exh.18, Gamino, ¶ 20).

The process is simple: RPD is called, RPD provides the okay to arrest, and RPD provides a date and time for the suspect to appear in court which security officers dutifully write on City of Reno citation forms. City prosecutors like Drake, are not trained that FRT can be inaccurate and prosecute based solely on FRT. Municipal judges are not trained in FRT and rely solely on untrained prosecutors and private security to convict. The risk of harm to innocent persons is

obvious—they may look like a prior trespasser to the Peppermill's FRT database, and if so ,they are arrested and must go to court. Chief Nance admitted what happened to Killinger could happen to anyone; she was emphatic; she would be "very angry" if it happened to her. (Exh. 6, Nance II, 116:4-13; 117:3-20).

## II. MUNICIPAL LIABILITY BASED ON RATIFICATION

A municipality can be liable for an isolated constitutional violation if a final policymaker "ratified" a subordinate's actions. *Sabra v. Maricopa Cnty. Cmty. Coll. Dist.,* 44 F. 4th 867, 885 (9th Cir. 2022). "Ratification requires both knowledge of the alleged constitutional violation, and proof that the policymaker specifically approved of the subordinate's act."). *Christie v. Iopa,* 176 F.3d 1231, 12239 (9th Cir. 1999). Ratification requires the policymaker to have actual or constructive knowledge of the violation and approve of it. *Lytle v. Carl,* 382 F.3d 978, 987-88 (9th Cir. 2004).

Nance was crystal clear: She ratified all actions by Jager at the time she reviewed the case. (Exh. 5, Nance I, 74:16-18).[7] Nance's approval is further evident by RPD's refusal to mandate required FRT for its officers even after Jager testified had not understood that FRT could be "inaccurate." (Exh. 4, Jager Resp. Rog 7, 3:22-27; Rog 8:10). Nance and City have rejected requiring future FRT training to ensure that wrongful arrests like Killinger's do not occur in the future. In July 2026, City confirmed in discovery that officers are still not required to attend any formal FRT training course and there is no plan to require such training. There is also no policy or general order regarding the use of FRT. (Exh. 27, City Resp Rog 9, 15:6-11; Rog 10, 16:8-10).

As to whether Nance had actual or constructive knowledge of Killinger's wrongful arrest that issue has been fully briefed above. The facts establish that Nance knew Jager arrested an innocent man based solely on an inaccurate FRT match, approved his conduct and the basis for it,

---

[7] While Nance was quick to approve Jager's conduct as not violative of RPD policy, Nance contradicted herself when she testified it is against RPD policy to arrest an innocent person or to take someone to jail solely to identify them. (Exh. 6, Nance II, 80:4-6; 57:1-5).

and rejected taking meaningful corrective steps to prevent future reoccurrence of such wrongful arrests.

## III. MUNICIPAL LIABILITY BASED ON LONGSTANDING CUSTOM & PRACTICE

Municipal liability can also be established when liability is based on a widespread or longstanding practice or custom that is unlaw or directs employees to act in an unlawful manner. *Endy v. County of Los Angeles*, 975 F.3d 757, 769 (9th Cir. 2020); see also *Benavidez,* 993 F.3d at 1153. "Official nonfeasance can constitute a Monell violation when the municipality in effect 'has a policy of inaction and such inaction amounts to a failure to protect constitutional rights.'" *Scanlon v. County of Los Angeles*, 92 F.4th 781, 812 (9th Cir. 2024).

Jager wrongly arrested Killinger because he did not understand the basics of FRT—that it could be inaccurate and alone is not probable cause to arrest. So widespread was this belief at RPD that Jager's supervisor, Desantis, believed the same thing, that FRT was probable cause to arrest. (Exh. 15, Desantis, 153:13-19). Even City prosecutor Jill Drake did not understand that FRT could be inaccurate: "The Peppermill told Officer Jager that AI came back as 100% match**. "**I don't know what was going to refute that." (Exh. 31, Drake, 86:19-22). Drake regularly prosecutes trespass cases and believes the FRT is accurate, reliable, and not to be refuted. Drake testified to astonishment that a FRT match of 100% could possibly be "refuted." To Drake it had be accurate because it was 100%. Drake testified even if Killinger had "abundant pieces of ID in his name, it would not refute the 100% FRT match. How frightening is that? A person like Killinger with valid ID and multiple forms of identification available could be arrested based solely on a FRT match and, if Drake was the prosecutor, she would vigorously prosecute based solely on the FRT match.

Jager testified repeatedly that in relying on FRT alone to arrest Killinger he believed he was following RPD's custom and practice. Jager testified other officers were also accepting FRT as

accurate for identification.((Exh. 2 Jager, 15:9-18; 17:25). Jager believed it was the custom and practice of all RPD officers when they were told that an identification had been made with 100% accuracy, that it would be accepted without question. (Exh. 2, Jager 18:1-10). That it was the custom and practice is established also by Desantis, who like Jager believed FRT alone was sufficient for probable cause.

## IV. MUNICIPAL LIABILITY BASED ON ILLEGAL ARREST POLICY

RPD has illegally delegated arrest powers to Peppermill security employees who are not "peace officers." The power to arrest individuals is found within NRS 171. Specifically, NRS.126 sets forth when a private person may make an arrest. Peppermill security employees have not been anointed "peace officer" status as that term is defined under NRS 169.125. The statute refers to NRS 289.150-360 and delineates who in Nevada may arrests. Absent from the list are security officers employed by private businesses. See NRS 289.150. According to Gamino, Peppermill security make arrests without RPD oversight. They fill out the citations,[8] put in standard language, and call RPD for a court date and time and fill that in as well. RPD has nothing to do with the arrest other than provide a date and time for the person to appear in court. City admits when the Peppermill issues citations without an officer present to investigate, City has "no knowledge" of whether the Peppermill investigates the alleged trespass as required. (Exh. 27, City Resp. to Rog 5, 10:16-19). The language on all citations is the same. Peppermill security relies completely on FRT alerts and even when persons like Killinger have legally acceptable ID, they are still cited and arrested. (Exh. 18, Gamino, ¶12). In two opinions, in 1979 and again in 1999, the Nevada attorney general has opined private entities do not have arrest powers absent the express conferment by the legislature. See AGO 99-02 and AGO 79-21. (Exh. 24).

## IV. CONCLUSION

For all the above reasons, Plaintiff's claim of municipal liability should be granted.

DATED this 12th day of September 2026

/s/ TERRI KEYSER-COOPER
*Attorney for Plaintiff Jason Killinger*

---

[8] The citations are the same ones used by RPD for vehicular stops. See Exh. 30.

# CERTIFICATE OF SERVICE

I, Terri Keyser-Cooper, declare as follows:

On this date, I served a copy of the following documents on the parties as follows:

PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT BASED ON MUNICIPAL LIABILITY

[ ] BY FED EX. By placing a true copy of the above-referenced document(s) with FedEx in a sealed envelope with postage prepaid to the addressee(s) listed below.

[ ] BY FACSIMILE TRANSMISSION. By transmitting a true copy of the document(s) by facsimile transmission

[ ] BY HAND-DELIVERY. By delivering a true copy enclosed in a sealed envelope to the address(es) shown below.

[X] BY ELECTRONIC SERVICE. By electronically mailing a true copy of the document(s) to defendants at the following email addresses via the Court's electronic filing procedure:

ALICE K. HERBOLSHEIMER
ADAM CATE
JENNY SPARKS
HOLLY PARKER
Reno City Attorney's Office
P.O. Box 1900
Reno, NV 89505
Herbolsheimera@reno.go

DATED this 12th day of September, 2026

_/s/ Terri Keyser-Cooper
TERRI KEYSER-COOPER
*Attorney for Plaintiff Jason Killinger*