TERRI KEYSER-COOPER
Nevada State Bar No. 3984
Law Office of Terri Keyser-Cooper
125 Edgewater Parkway
Reno, NV 89519
(775) 337-0323
keysercooper@lawyer.com

LUKE BUSBY, ESQ.
Nevada State Bar No. 10319
316 California Avenue
Reno, Nevada 89509
(775) 453-0112
luke@lukeandrewbusbyltd.com

LAUREN GORMAN, ESQ.
Nevada State Bar No. 11580
777 Forest Street, Suite A
Reno, Nevada 89509
(775) 742-6129
lgorman@laurengormanlaw.com

Attorneys for Plaintiff Jason Killinger

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| JASON KILLINGER,<br><br>Plaintiff,<br><br>v.<br><br>RENO POLICE OFFICER R. JAGER and CITY OF RENO,<br><br>Defendants. | Case No. 3:25-cv-00388-MMD-CSD<br><br>**PLAINTIFF'S SECOND AMENDED COMPLAINT**<br><br>(Jury Demand) |

Plaintiff JASON KILLINGER, by and through counsel, and pursuant to the Court's Order of October 19, 2026 (ECF No. 121), files this Second Amended Complaint and alleges as follows:

## JURISDICTION AND VENUE

1. This action arises under Title 42 of the United States Code, Sections 1983 and 1988, and Article 1, Section 18 of the Nevada Constitution. Plaintiff provided notice to the City of Reno of his claim and thus met the requirements of NRS 41.036. Jurisdiction is conferred upon this Court by Title 28 of the United States Code, Sections 1331 and 1343. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

2. Venue is proper in the District of Nevada pursuant to 28 U.S.C. § 1391(b) because the unlawful acts and practices alleged herein occurred in Reno, Nevada, which is within this judicial district.

## PARTIES

3. Plaintiff KILLINGER is a citizen of the United States residing in Washoe County, Nevada.

4. Defendant R. JAGER was at all times relevant employed by the Reno Police Department as Officer # 16010. JAGER became a police officer in January 2020. JAGER was personally involved in acts that deprived KILLINGER of his constitutional rights and was at all times acting under color of state law.

5. Defendant CITY OF RENO is a municipal governmental entity duly incorporated under the laws of the State of Nevada. Under its authority, Defendant Reno operates the Reno Police Department ("RPD"), and is, and was, at all relevant times mentioned herein, responsible for the actions and/or inactions and the policies, procedures and practices/customs of the employees of the RPD.

## FACTUAL ALLEGATIONS

6. KILLINGER, prior to his wrongful arrest, had a clean criminal record. He had never been accused of a crime, arrested, or taken to jail. He has been gainfully employed for over 20 years with United Parcel Service ("UPS"), an international company, as a highly trained "feeder driver" responsible for driving double and triple trailers across the western United States. He is a taxpayer, and a citizen of Washoe County, Nevada.

**September 17, 2023**

7. On September 17, 2023, KILLINGER, a regular customer of the Peppermill Casino in Reno, Nevada, was at the Peppermill playing dice, his favorite leisure time activity. KILLINGER was a regular customer of the Peppermill, a valued customer, who received complimentary hotel stays and meals because of his playing activity.

8. KILLINGER played dice for a few hours, managing to win about $200 before he decided to leave. On his way out, KILLINGER stopped to play a blackjack machine. As he was playing, he was approached by a security guard who said, "Hi Mike, how are you?" KILLINGER told the security guard he was "not Mike." The guard said, "I need to see your ID." KILLINGER produced his Nevada Real ID Class A Commercial Driver's License. The guard apologized.

9. Within moments, KILLINGER was surrounded by security guards and handcuffed. Peppermill officers told him he had been identified by the casino's facial recognition software ("FRS") as Michael Ellis ("Ellis"), he had been trespassed by the casino nearly six months earlier, and was now under a citizen's arrest for illegally returning to the casino when he had been barred from returning. KILLINGER was shocked. He vehemently protested; he told security he was not Ellis and did not know "anything" about anyone named Ellis, his name was Jason Killinger.

**Peppermill's Facial Recognition Software**

10. The Peppermill had installed its FRS in 2023 when hundreds or likely thousands of photos of prior casino trespassers were put into the FRS system and installed in cameras across the casino. The FRS system alerts to a casino security officer's cell phone when a prior trespasser is located inside the casino. The system regularly gets ten percent false positives. In the years between 2023 and 2025 no records were kept of the false positives. The FRS system is only as good as the pictures put into it; if the quality of the pictures put into it is low, there is a greater likelihood of error.

11. When the Peppermill's system pings an alert that a prior trespasser is in the casino, the person is always taken into custody and the police are always called. The person is either issued a citation to appear in court for trespass or is taken to jail.

12. When the FRS system pings an alert, no investigation by the Peppermill takes place; the Peppermill relies one hundred percent on the FRS identification. Individuals protesting they are not the person identified by the system receive a citation or are taken to jail immediately.

13. On information and belief, hundreds of persons are taken to jail pursuant to an identification as a prior trespasser unlawfully returning, and many more, perhaps thousands, are given citations to appear in court and face trespass charges.

14. KILLINGER had sufficient identification to prove his identity. He had in his pocket his Nevada Real ID Class A Commercial Driver's License;[1] a Peppermill player's card; and a bank debit card. All bore the name "Jason Killinger."

15. KILLINGER also had in his vehicle in the Peppermill parking lot: a U.S. Department of Transportation Medical Examiner's Certificate (required for commercial drivers); a Nevada DMV vehicle registration; an insurance card showing his proof of vehicle insurance; a photo ID badge from his UPS employer; his private insurance cards; his recent pay stub from UPS; his Anthem Blue Cross insurance card; his Teamsters Union ID card; and eleven (11) players cards from numerous Nevada casinos. All of his ID was in the name KILLINGER. He had no identification in any name other than KILLINGER.

16. KILLINGER was taken in handcuffs to Peppermill's security office. He was told to wait as a Reno Police Department ("RPD") officer was on the way.

17. KILLINGER, a large man, weighing 285 pounds, found the handcuffs behind his back too tight and extremely painful to his wrists, arms, and shoulders and protested to the security guards about his pain.

[1] To obtain a Nevada Real ID driver's license a person must present themselves at the DMV with proof of identity. Documents accepted by the DMV as proof of identity include a birth certificate or a current U.S. passport or U.S. passport card, a social security card, and two documents proving Nevada residence.

**Jager Arrives At Peppermill**

18. JAGER arrived at the Peppermill at approximately 5:46 a.m. KILLINGER had been in handcuffs for approximately one and one-half hours before JAGER arrived.[2]

19. JAGER had been responding to calls at the Peppermill for years, ranging from two to six calls per week. JAGER estimated it could be 100s of times. It was a "very common" occurrence that JAGER would go to the Peppermill on calls relating to an alleged prior trespasser.

20. On information and belief, it is alleged that many RPD officers took individuals away from the Peppermill in the years 2023 through 2025 based on FRS alerts alone without corroboration. It is unknown how many misidentifications occurred.

21. On information and belief, hundreds and possibly thousands of citations were issued to those individuals during the years 2023 through 2025. It is unknown how many innocent persons, taken to jail, simply pled guilty to avoid waiting in jail. Discovery is continuing as to the numbers of persons taken to jail pursuant to an FRS alert by the Peppermill.

22. On information and belief, it is alleged that the majority of those thousands of arrests and detentions were wrongful, based on a failure of untrained RPD officers to understand the limitations of FRS, that it is an investigative lead only, and that such arrests cannot be made on the basis of FRS alone and must be accompanied by independent corroboration of identity.

23. On information and belief, it is alleged that the failure to train RPD officers on the limitations of FRS, that it is an investigative tool only, led to thousands of unlawful arrests. It was at all times possible for such training to be instigated but RPD Chief Nance saw no reason to have such training or to implement a policy on FRS. Chief Nance testified it was always possible to implement such training but she did not believe it to be necessary.

24. After September of 2025, a PowerPoint FRS training was initiated by an RPD civilian employee. It was not required, not mandatory, and no attendance records of officers receiving the training were kept. On information and belief, most RPD officers did not take the

[2] JAGER was wearing a body worn camera ("BWC"). All interactions were recorded.

training as it was offered sporadically, at the start of a shift, and only by the civilian employee who kept regular hours and to officers who wanted to listen to the training.

25. As of September 17, 2023, JAGER had received no training in FRS. He was unaware that FRS could not furnish proof of identification or probable cause to arrest. JAGER at all times, because of his lack of training and RPD's lack of a policy, believed FRS was completely accurate and any match made by FRS at the Peppermill furnished probable cause to arrest.

26. JAGER believed it was the custom and policy of RPD officers to rely completely on identifications made by FRS. He believed other officers, similarly situated to him, were making identical arrests based exclusively on FRS and it was standard operating procedure for RPD officers to rely completely on FRS for identifications and probable cause to arrest.

27. KILLINGER was relieved to see JAGER, thinking JAGER would straighten out the nightmare caused by the Peppermill's FRS misidentification. KILLINGER asked JAGER if he could "please" get him "out of these cuffs." JAGER ignored him. JAGER did not inquire how long KILLINGER had been in the cuffs. JAGER was at all times aware and had been trained that prolonged handcuffing can cause injury.

28. Peppermill security explained to JAGER that KILLINGER had presented a real Nevada driver's license with the name Jason KILLINGER but he looked exactly like a former trespasser named Michael Ellis, barred from the casino for "sleeping" nearly six months earlier. KILLINGER asked JAGER again, "Can you please get me out of these cuffs." JAGER responded by saying, "One second pal." KILLINGER interrupted saying, "I'm a driver for UPS, I am not Ellis, I don't know who Michael Ellis is, I don't know nothing about Ellis, I'm a taxpayer here." KILLINGER added, "I need a break, my shoulder is killing me, can you please take off these cuffs?" JAGER ignored him. KILLINGER repeated his request, "I need a break, my shoulder is killing me." JAGER ignored KILLINGER.

29. In offering his real Nevada driver's license KILLINGER was providing the gold standard in identification to JAGER. RPD's General Order on Citations, P-280-17, verifies the importance RPD places on a driver's license for proof of identity. The RPD General Order

specifies, "Whenever practicable, the officer may use police and DMV records to establish one's identity."

30. JAGER stared at the driver's licenses of both KILLINGER and Ellis. JAGER concluded that KILLINGER and Ellis were the same person and KILLINGER was using fake identification.

31. JAGER did not inquire of the Peppermill whether its FRS had been checked for accuracy, whether it was regularly maintained, how it worked, or its history of false positives.

32. KILLINGER's driver's license differed from Ellis's driver's license in many significant ways that would have alerted a reasonable officer that KILLINGER and Ellis were two separate people. KILLINGER alerted JAGER he was a UPS driver and had a unique Class A driver's license with unique endorsements allowing him to pull double and triple trailers and oil tankers. The differences between the licenses were:

a) KILLINGER had a Class A commercial driver's license while Ellis had an ordinary Class C driver's license;

b) KILLINGER had special endorsements on his driver's license allowing him to drive double and triple trailers, tankers, and other things;

c) KILLINGER and Ellis had different birthdays; KILLINGER was born in 1983 and Ellis was born in 1976, making them seven years apart in age;

d) KILLINGER and Ellis had different weights; KILLINGER weighed 285 pounds and Ellis weighed 235 pounds, making KILLINGER 50 pounds heavier than Ellis;

e) KILLINGER had blue eyes and Ellis had hazel eyes;

f) KILLINGER stood 6'1" and Ellis stood 5'9";

g) KILLINGER and Ellis had different signatures; and

h) KILLINGER and Ellis had different addresses.

33. Photographs taken of Ellis by the Peppermill, available to JAGER, show that Ellis was missing a tooth when he opened his mouth. Looking at those pictures, KILLINGER did not resemble Ellis in any regard.

34. JAGER accepted the Peppermill's conclusion that KILLINGER was either Ellis or a fraudster using a fake driver's license and using a fake ID to identify himself as KILLINGER, or that Ellis was actually KILLINGER and had used a fake ID to identify himself as Ellis.

35. JAGER did not ask KILLINGER what other forms of identification he had to prove his identity. JAGER relied one hundred percent on the Peppermill's FRS and did not feel the need to inquire as to what other forms of identification KILLINGER possessed—he relied exclusively on the Peppermill's FRS match to prove that KILLINGER was Ellis. He eyeballed the driver's licenses of KILLINGER and Ellis, thought they looked the same and was convinced the highest likelihood was that KILLINGER was Ellis using a fake ID.

36. JAGER refused to conduct any investigation or to examine KILLINGER's abundant proof of identity. JAGER believed all suspects he comes into contact with are liars. JAGER believes that even if KILLINGER had multiple documents in his name identifying him as who he claimed to be, those documents could all likely be fake or stolen.

37. JAGER believed that because the Peppermill had made a citizen's arrest, he was obligated to take KILLINGER directly to jail and not required to conduct any investigation into whether there were sufficient grounds to take KILLINGER to jail.

38. The Peppermill told JAGER it had made a citizen's arrest of KILLINGER. Under NRS 171.126, arrest by a private person is valid in Nevada for a public misdemeanor offense committed or attempted in the private person's presence. JAGER was not informed by Peppermill security that any private person had observed KILLINGER commit or attempt to commit a public offense. No one had observed KILLINGER misbehave in any way at the Peppermill. Immediately before being taken into custody by Peppermill security, KILLINGER had been playing dice at the casino.

39. JAGER believed it was the custom and practice of all RPD officers to take persons arrested via a citizen's arrest from the Peppermill directly to jail without investigation.

40. JAGER and all RPD witnesses and officials agree that having a face that resembles the face of a prior trespasser does not make KILLINGER a prior trespasser. It makes

him guilty of no crime whatsoever. Having a facial resemblance to a prior trespasser does not convert KILLINGER into that prior trespasser and does not make him guilty of anything.

**KILLINGER's License Is Current, Valid, and Active**

41. JAGER called RPD for a records check. JAGER learned that KILLINGER's license was current, valid, and active and neither KILLINGER nor Ellis had any criminal history. JAGER told the RPD records clerk: "I have a feeling these are both the same guy, but he has different IDs." JAGER added, "The software came back as a 100 percent match, definitely a weird one, I have the feeling he is somehow making some fake identification."

42. JAGER next telephoned his supervisor Sgt. Carl DeSantis. JAGER said, "Hey boss, very peculiar. Peppermill has this pretty sophisticated artificial intelligence software that analyzes faces of previous trespassers. They did a 100% match of this guy who presented an ID with a different name, checked ID of Ellis, it's a valid ID and this guy now detained presented different ID with different name. Photos are different photos but they look like the same exact same guy."

43. JAGER failed to inform DeSantis of the significant differences between the licenses of KILLINGER and Ellis. JAGER failed to inform DeSantis that he had refused to check, consider, look at, or investigate what other forms of identification or proof KILLINGER had in his possession that KILLINGER was requesting that he look at. DeSantis, who also has never received any FRS training, agreed immediately that KILLINGER should be taken directly to jail to determine who he actually was.

44. JAGER also told DeSantis, "I just have a feeling he's got a hookup with the DMV where he's got two different driver's licenses that are registered with DMV with different names and different dates of birth, so I'll arrest him on that and list him as a John Doe and have him booked in for a WINS check."

**Killinger Is Arrested**

45. On JAGER's return to the Peppermill security office he clarified with Peppermill security officers that they had a formal written complaint ready. The security officers confirmed that they had. JAGER asked them, "Can you indicate in the statement that you had a 100%

match on our software?" A Peppermill security officer said, "We usually don't." JAGER made clear however that he wanted the Peppermill to add more to its typed complaint that there was a 100% match on their software, a request the Peppermill honored by handwriting in additional information.[3]

46. The Peppermill's statement confirmed that the sole reason KILLINGER had been taken into custody was based on the Peppermill's FRS. No other evidence against him existed.

47. JAGER informed KILLINGER that he could not identify him, not that he had committed any crime, and because he could not identify him he had to be arrested and taken to jail.

48. JAGER had no probable cause to arrest KILLINGER because no one had observed KILLINGER commit or attempt to commit a crime—the arrest was based solely on FRS.

49. KILLINGER was shocked, "I'm going to jail? Are you kidding me?" KILLINGER's astonishment is heard in his voice captured by JAGER's BWC. More shocking was he was being arrested not because he had committed a crime, but because JAGER could not identify him. JAGER said plainly, he would have only cited KILLINGER and not arrested him if KILLINGER admitted to being Ellis, but because KILLINGER, an honest citizen, refused to admit he was Ellis, he could not be cited but required formal arrest.

50. "I'm not a joker man," JAGER said. "You'll get arrested, you'll get fingerprinted up at the jail and they'll be able to discern your identity and see what this mix-up is with this stuff."

51. But there was no mix-up. KILLINGER consistently denied he was anyone other than who he was and had abundant evidence to support his identity. That JAGER refused to conduct any basic and rudimentary police investigation, or look at or consider KILLINGER's evidence of identity, does not mean there was a "mix-up." It means it was far from clear that KILLINGER was Ellis and before an arrest took place more investigation was required.

[3] JAGER and the Peppermill were working in concert together for the joint purpose of ensuring that the strongest case against KILLINGER could be presented and a conviction obtained.

**Killinger Pleads With Jager to Investigate His Identity**

52. KILLINGER pleaded with JAGER, "Can you look at the endorsements on the two driver's licenses." KILLINGER knew that as a feeder driver for UPS he had unique endorsements on his driver's license permitting him to drive double and triple trailers and tanker trailers. JAGER looked at both licenses and confirmed that KILLINGER had those special endorsements and Ellis did not. Yet, JAGER disregarded it, believing KILLINGER and Ellis were the same person based on his lack of training and belief that FRS was always accurate.

53. JAGER said, "It's one of those things, I'll be 100 percent honest you may have a doppelganger, but driver's license pictures are strikingly similar and weird enough, the Peppermill's fancy AI technology says its 100 percent match."

54. KILLINGER pleaded with JAGER, "What is it going to take to prove to you that is not me?" JAGER told him he had to go to jail; that was the only alternative. JAGER said, "Unfortunately you got to go to jail, they'll pull your fingerprints, that's the way to determine it."

55. KILLINGER pleaded with JAGER, "Did you look at the back of the IDs, because I have all of the endorsements except for motorcycle and HazMat." JAGER said, "Either someone else is using your stuff or you're using somebody else's stuff, and unfortunately you look too much like the guy in that picture, so much so that the fancy computer that does all the fancy software makes the same determinations that my feeble human brain does."

56. KILLINGER then remembered he had a check stub from his employer in his vehicle. He told JAGER, "I have a check stub from my work would that prove it to you guys?" KILLINGER gave JAGER the location in the Peppermill parking lot where his vehicle could be found and its make, model, and color. JAGER disregarded that too. JAGER refused to look at the check stub even though UPS is a reputable international corporation. JAGER said, "No. Honestly man, the only way is going to get the fingerprints done."

57. JAGER refused to give KILLINGER any opportunity to present his legitimate forms of identity. JAGER legitimized his refusal to look at any of KILLINGER's proof of identity or inquire what other identification he had to prove his identity by asserting it did not matter what proof KILLINGER had; his mind was made up. JAGER stated he has encountered

situations where "Real IDs" were fake and individuals with fake IDs will often have other documents that match the fake IDs. JAGER believes that the fact that a person may have multiple forms of ID bearing the same name does not necessarily mean that the IDs are legitimate. He claims he "deals with criminal elements and people who lie to him on a daily basis" and he has been trained to be skeptical.

**<u>Easily Available Investigative Options</u>**

58. JAGER refused to conduct any investigation into whether KILLINGER was legitimately who he claimed to be.

a) JAGER could have gone to the Peppermill office, open 24/7, and easily available to a police officer to inquire as to whether anyone named KILLINGER was a customer of the Peppermill or if he had a player's card. If JAGER had done that he would have learned that KILLINGER was a regular Peppermill player and a valued customer. This would immediately have put JAGER on notice that something was wrong with the Peppermill's FRS. KILLINGER could not be a trespasser if the Peppermill recognized him as a valued customer;

b) JAGER could have asked Peppermill security to inquire at the Peppermill office whether anyone named KILLINGER was known to be a regular customer of the casino;

c) JAGER could have inquired at the Peppermill office whether anyone named Killinger had ever been barred or trespassed from the casino. If JAGER had done that he would have quickly learned that no one named KILLINGER had ever been barred from the casino;

d) JAGER could have asked KILLINGER what he was doing in the casino prior to being grabbed and handcuffed by security. JAGER would have learned that KILLINGER was playing dice and friendly with the dice dealers who would have vouched for KILLINGER as a regular dice player;

e) JAGER could have spoken to the pit boss near the dice tables to inquire if KILLINGER was a player there and known to be a regular at the casino. JAGER

would have learned that KILLINGER was well known in the casino and a regular there. Such information would have gone a long way in establishing KILLINGER was not some low life who had been barred from the casino;

f) JAGER could have called the 24-hour number on KILLINGER's VISA debit card to inquire if the account was valid and current. This would have alerted JAGER that not only did KILLINGER have an active, valid, and current driver's license but he also had an active debit card he used on a regular basis. JAGER could have asked the bank to forward him a copy of KILLINGER's signature on his debit card application to see if it matched the signature on his driver's license;

g) JAGER could have gone to the Peppermill parking lot to look at KILLINGER's UPS employee paystub and look at his vehicle registration and vehicle insurance cards as well as other documents KILLINGER had, including government issued identification and photo badges, Teamsters cards, etc. that were some proof of identity;

h) JAGER could have made calls to KILLINGER's employer, available 24/7, to determine if KILLINGER was a legitimate employee, his description, and his signature;

i) JAGER could have asked the Peppermill for other pictures they might have of Ellis, but he did not. The Peppermill did have other pictures available to show JAGER. The pictures show Ellis to look nothing like KILLINGER. Ellis has a missing tooth obvious when he opens his mouth. A comparison of the two pictures would easily establish to any reasonable person that KILLINGER and Ellis were not the same person.

59. JAGER explained his refusal to conduct any type of investigation on the basis that the Peppermill's FRS identified KILLINGER as Ellis and most of the suspects he interviews are all liars. It did not matter to JAGER how many proofs of identification KILLINGER had in his name; it could all be fake or stolen and he was not obligated to look at any of it.

60. JAGER had time and opportunity to investigate KILLINGER's evidence. There was no emergency in progress at the Peppermill, and no exigent circumstances. JAGER was at the end of his shift, with no other calls waiting for his attention. He had time and opportunity to investigate but was anxious to conclude the matter, take KILLINGER to jail, and be on his way home.

61. RPD's general order on "Code of Conduct" states one of RPD's "core values" is fairness. It was unfair for JAGER to refuse KILLINGER any opportunity to prove he was not the prior trespasser the Peppermill's FRS had wrongfully identified him to be.

**Killinger Pleads For Handcuff Break**

62. JAGER removed the Peppermill handcuffs and put on his RPD handcuffs. KILLINGER again mentioned the pain of the handcuffs, "Can I have a little bit of a break when you get them off?" "Unfortunately, can't, it's against policy, sorry pal." JAGER said, "Unfortunately man, that's the process man, not one of those things I'm able to flex on."

63. KILLINGER mentioned his handcuff pain 22 times during his interaction with JAGER. According to RPD handcuffing policy, officers have discretion on handcuffing. JAGER was untruthful when telling KILLINGER he was not able to flex on giving KILLINGER a break from the handcuffing.

64. KILLINGER was polite, courteous and respectful to JAGER. KILLINGER was surrounded by multiple Peppermill security, had been searched for weapons, and was at all times polite, respectful and courteous. JAGER at no time perceived KILLINGER as a threat to his safety. Trespassing is a minor non-violent crime. Accordingly, JAGER had discretion to give KILLINGER a momentary handcuff break if he so chose.

65. JAGER dismissed KILLINGER's complaints of pain as mere "discomfort." JAGER refused to consider that because KILLINGER was a very large man, it pulled significantly on his arms and shoulders to reach far behind his back to be handcuffed. A smaller man would not encounter the same difficulty.

**Jager's Uncertainty**

66. JAGER told a police colleague who arrived at the scene, "This poor guy might legitimately be somebody else, I don't know. It's a freaking weird call." KILLINGER popped into the conversation, "It's not me in that picture." JAGER continued: "I'll be honest, I don't know what to think, usually those systems are pretty good, we've used those systems in the past to catch homicide suspects, they are fairly reliable."

67. JAGER had the opportunity to obtain from the officer arriving at the scene another set of handcuffs. JAGER had double cuffed KILLINGER but because of KILLINGER's size it did not give the large man any relief. A third set of connecting handcuffs would have provided KILLINGER with some relief.

68. On the drive to the jail, KILLINGER repeatedly asked for a break with the handcuffs. JAGER said, "Unfortunately, I can't." "You seem like a stand-up guy, terrible case of mistaken identity, but end of the day, you're being cool, I'm going to be cool, there's an obligation to enforce that trespass, it's really a crappy situation."

69. JAGER was fully aware he could be arresting an innocent man and his insensitivity showed. He said to KILLINGER, "Hopefully it's like a really funny story, like I got arrested because they thought I was somebody else." JAGER told KILLINGER, "I'll be honest, it's someone who looks exactly like you with a different name and ID so hopefully this is an in and out process so you can get a cab and get back down to the Peppermill and get your car." To KILLINGER, a man with a completely clean record, it was not a funny story; there is nothing funny about having a criminal record or being wrongfully locked in a jail cell.

70. On the drive to the jail, KILLINGER continued to press JAGER as to when the cuffs would be off. KILLINGER expressed his desperation to have the cuffs removed, trying to get JAGER to pinpoint at what step in the process to come he could expect the cuffs to be taken off. KILLINGER remained preoccupied with the pain of the handcuffs. "I can't stand these goddamned cuffs." He pleaded with JAGER, "Can they take the goddamned cuffs off when I'm in the holding room?" "Unfortunately, no, if all goes well you should be out of the cuffs in the next eight to ten minutes." KILLINGER said, "Promise?"

71. JAGER and KILLINGER arrived at the jail at approximately 6:49 a.m. JAGER yelled out to jail staff, "He's cooperative." JAGER did not inform anyone at the jail that KILLINGER had been in handcuffs for hours and was in abject pain.

72. KILLINGER, in horrific pain, begged again, "Please take them off. Can you put in a good word for me?" "I need to get these goddamned cuffs off." JAGER opened the door to a small holding cell saying, "Go through this door that's where you'll get the cuffs off." But KILLINGER's cuffs were not removed.

73. JAGER is heard talking to a jail employee: "It might be a legitimate doppelganger situation, it's super weird. It's one of those situations where I genuinely kind of believe him, but then there's this software that's no, every picture they've got is 100 percent match for the guy they trespassed and both pictures look like the same guy."

74. KILLINGER remained in handcuffs when he was taken to a large room with multiple jail officers. As KILLINGER was taken away, still in handcuffs, JAGER shouted at KILLINGER, "Best of luck man."

75. KILLINGER was in handcuffs approximately three hours. After JAGER left, KILLINGER remained in handcuffs more than twenty minutes.

**Jail Experience**

76. KILLINGER was booked into the Washoe County Jail as "John Doe" charged with trespassing. While in booking, KILLINGER inquired as to when he was getting out. A deputy told him to "lose the fucking attitude." The entire experience was disgusting and traumatic.

77. While in custody, and before he was released on his own recognizance, the WINS check "positively identified" KILLINGER as KILLINGER, who he had claimed to be, but his nightmare continued.

78. The "Pretrial Assessment Report" prepared at the jail dropped the name "John Doe" from his records and substituted in its place KILLINGER. The case against KILLINGER continued; instead of being prosecuted for trespass under the name John Doe, KILLINGER would now be prosecuted for trespass under the name KILLINGER. There was no evidence to

support the crime of trespass against KILLINGER as no one named KILLINGER had ever been trespassed at the Peppermill—only someone named Michael Ellis.

79. KILLINGER was released on his own recognizance from the jail at approximately 4:10 p.m. on September 17, 2023. He was incarcerated at the jail for more than nine hours and in handcuffs for over three hours.

**Renown Urgent Care**

80. The next day, KILLINGER went to Renown Urgent Care Vista. He was seen by Brion R. Hill, M.D., who diagnosed a strain of both the right and left shoulder, and contusions (bruising) on both wrists. The doctor prescribed Motrin 200 MG every six hours as needed, and ice and NSAIDs as needed. Dr. Hill noted: "Onset 4 a.m. yesterday handcuffed behind his back for four hours. He was arrested due to mistaken identify. Bilateral wrist pain 7/10 severity. Left wrist is worse. Bilateral shoulder pain 7/10 severity. Right shoulder is worse. No prior injury or surgery."

81. KILLINGER's wrist pain subsided after a few days but it took two weeks or longer for the bruising to dissipate. His arm and shoulder pain lasted for about three months, causing pain and difficulty when performing his tasks as a heavy equipment driver for UPS. KILLINGER continues to experience left shoulder "popping" when he rotates his arm. He currently takes aspirin on a regular basis for the occasional shoulder pain.

82. Due to the unique nature of KILLINGER's UPS job, he has no regularly scheduled hours and must work when called by dispatch. He can go many days without work, and without getting paid, and frequently must take vacation days to ensure getting a paycheck. For that reason and others, he was required to work through his pain every day he was called to work.

**Jager's Arrest Report**

83. On September 18, 2023, JAGER submitted his "Arrest Report and Declaration Supplement." JAGER falsely stated that KILLINGER "presented" Peppermill Security with "conflicting identification." JAGER has since admitted that KILLINGER at no time "presented" to the Peppermill conflicting identification or possessed conflicting identification. JAGER's false

statement created the wrongful inference that KILLINGER had numerous forms of conflicting identification.

84. JAGER added in his report that KILLINGER was “last trespassed on 03/26/2023 where he identified himself as Ellis.” This statement is also false. KILLINGER has never, at any time, identified himself as Ellis. The inference from this statement is that KILLINGER admitted to identifying himself as the prior trespasser, something KILLINGER at no time did.

85. JAGER added in his report that “Due to John Doe having conflicting identification, he lacked satisfactory evidence to reasonably assure me that he was who he claimed to be thus in accordance with Reno Police Department General Order P-280-17 JOHN DOE did not qualify for a criminal citation....” This again is a false statement. JAGER knew KILLINGER did not “have” conflicting identification and knew that KILLINGER had pleaded with him to look at his evidence of identification. It was not that KILLINGER “lacked sufficient proof of identification”; it was that JAGER refused to look at KILLINGER’s identification.

86. JAGER deliberately omitted from his arrest documents all evidence that KILLINGER’s driver’s license differed substantially from Ellis’s driver’s license in class of license, endorsements, birthday, age, weight, eye color, height, handwriting and address. JAGER deliberately omitted from his report that KILLINGER had pleaded with him to go to his vehicle, look at his pay stub, and provided the location, make, model, and color of the vehicle. JAGER omitted from his report that KILLINGER had three forms of identification in his pocket and pleaded with JAGER to go out to his vehicle and review his other forms of identification in his vehicle. All reasonable police officers know they must include all relevant information in their police reports, including inculpatory and exculpatory evidence.

87. JAGER deliberately omitted from his arrest documents that KILLINGER and Ellis both had Nevada Real ID driver’s licenses. To obtain a real Nevada driver’s license each person must personally go to a Nevada DMV office with their individual social security cards, birth certificates, or passports in addition to two forms of proof of residence. Yet JAGER omitted this from his arrest report. Inclusion of this evidence would have tended to show that KILLINGER had established his identification to the satisfaction of DMV.

88. On September 18, 2023, a criminal complaint was filed against "John Doe" for trespassing at the Peppermill.

89. On September 18, 2023, JAGER's police report containing fabricated evidence was submitted to the Hon. Magistrate Christopher Hazlett-Stevens of the Reno Municipal Court, Department 4, for a finding of probable cause.

90. On September 18, 2023, at 7:51 a.m., Magistrate Hazlett-Stevens found probable cause for the crime of trespass against KILLINGER. The Magistrate based his finding on the basis of the FRS and the arrest report containing false statements. If JAGER had provided a truthful arrest report, stating he was "unclear" as to whether KILLINGER had committed any crime and that KILLINGER had multiple forms of ID in his name or that much of the indicia of identity on the driver's licenses of KILLINGER and Ellis were substantially different, it is unlikely the Magistrate would have found probable cause.

91. On September 18, 2023, the Reno Municipal Court opened its "Register of Actions" now formally charging KILLINGER with criminal trespass and setting court appearances for him.[4] Since KILLINGER had been positively identified as KILLINGER, not John Doe and not Ellis, his arrest and court papers now charged him as KILLINGER.

92. KILLINGER retained an attorney to represent him. On November 9, 2023, a bench trial was called before the Hon. Justin Champagne. Reno city prosecutor Jill Drake was assigned to the case. Even though there was no evidence that anyone named KILLINGER had ever been trespassed at the Peppermill, and no evidence that KILLINGER had ever presented himself as anyone other than KILLINGER, Ms. Drake was unwilling to dismiss the case with prejudice. Ms. Drake wrote emails indicating that she had received a call from KILLINGER's lawyer asking her to dismiss the case because KILLINGER at all times was who he claimed to be and not Ellis. Ms. Drake wrote she considered him "cocky" and would "love" to find a way to prove the case against KILLINGER because his lawyer was "cocky!"

93. Ms. Drake finally did agree to dismiss the case but without prejudice, stating that she was "referring" the case to an RPD "fraud detective" for investigation into whether

[4] Since KILLINGER had been identified as KILLINGER, the fictional name John Doe was dropped.

KILLINGER had committed identity theft. The judge indicated the City had one year to bring additional charges or re-open the case. Thus, the nightmare for KILLINGER continued.

94. In November 2023, RPD fraud detective Monique Sheahan investigated whether KILLINGER had committed felony identity theft. At the conclusion of her investigation, she determined the Peppermill had "screwed up." She wrote an email stating there was no "identity theft" and KILLINGER was an innocent person. She made clear that RPD could not charge KILLINGER with the serious charge of identity theft to cover up a wrongful arrest.

95. In March of 2024, RPD Sgt. Hodges received a telephone call from Peppermill Security Director Dean Hill informing him that he (Mr. Hill) had received an email from a Reno city attorney saying that KILLINGER was looking to sue the Peppermill and there was probable cause to believe KILLINGER had committed identity theft. Sgt. Hodges then emailed JAGER informing him there was probable cause to go forward against KILLINGER for identity theft. JAGER declined to pursue identity theft.

96. In March of 2024, the Peppermill admitted its FRS had been inaccurate.

**RPD Facial Recognition Training**

97. In September 2025, civilian RPD crime analyst Vanessa Kosinski began presenting PowerPoint training presentations on FRS for RPD officers. The training made clear that FRS can be used only as an "investigative lead"; it is not proof of identity and cannot be used to furnish probable cause for an arrest. The training informed officers they must not use FRS to take any "actions" without corroborative proof as FRS by itself cannot function as proof of identity or probable cause. The training was presented when Ms. Kosinski had time to present it. It was presented immediately following the general briefing conducted before shift to a limited number of officers. Since it was not required, no attendance was kept and no roster of officers taking the training was made. It is unknown how many officers took the training.

98. Ms. Kosinski's FRS training was not required by RPD officials. Chief Nance was unaware of the training. Chief Nance did not know about the training or that anyone at RPD had authorized such training. In reviewing the training, she felt it was a "good training" but did not believe it should be required for all officers or was even necessary. She also clarified RPD had

no policy on AI or on FRS and no RPD training on either subject had been authorized or made. She stated she is the ultimate decision maker on training and if she wanted training to occur, it would occur. Nothing prevented her from authorizing the training if she chose to do so—she had just never chosen to do so.

99. Ms. Kosinski's training to RPD officers occurred only when she was on shift. It was sporadic, and only available when officers were beginning their shifts. No records were kept on who attended these trainings and it is unknown how many officers attended these trainings.

100. Based on information and belief, only a small percentage of RPD officers took this training as it was not required and only available when Ms. Kosinski was able to provide the training.

101. Based on information and belief, the majority of RPD officers have not received any training whatsoever on FRS and its limitations on making arrests.

102. JAGER took this training sometime between September 2025 and January 2026. Depositions of many RPD officers have been taken—none knew about FRS and not one had taken the training. Sgt. DeSantis was skeptical about the training and Ms. Kosinski, inferring the training was worthless and unnecessary.

103. At some point following the FRS training JAGER came to understand his action in taking KILLINGER to jail more than two years earlier was wrongful and without probable cause. At his deposition on January 22, 2026, he testified he had learned he had wrongfully taken an innocent man to jail and had he had the training before taking KILLINGER to jail, he would not have done so. He would never have arrested KILLINGER.

104. After the training JAGER understood he had wrongfully relied entirely on the FRS and did not understand at the time it was an investigative lead only and not sufficient to prove identity or probable cause.

105. JAGER testified he had taken a completely innocent man to jail without probable cause. He testified it would have been "helpful" for him to have had the FRS training before coming into contact with KILLINGER because if he had had the training he would not have taken KILLINGER to jail.

**FIRST CAUSE OF ACTION**

**MUNICIPAL LIABILITY**

**A Violation of Section 1983 – As Against City of Reno Only**

106. KILLINGER alleges and incorporates by reference herein the allegations above contained.

107. KILLINGER at all times possessed a constitutional right not to be arrested without probable cause. RPD had a widespread policy, custom and practice that permitted the arrest of KILLINGER, and likely hundreds of similarly situated others, to be made without probable cause by untrained officers unaware of the limitations of FRS. These arrests were the highly predictable consequence of RPD's failure to train its officers that FRS is only an investigative tool, not proof of identity or probable cause to arrest. This failure to train amounts to deliberate indifference to KILLINGER's right not to be arrested without probable cause. City's failure to ensure its municipal employees were properly trained was the moving force behind KILLINGER's constitutional injury.

108. RPD has no policy regarding identification of witnesses or suspects by artificial intelligence and never has. RPD has no policy on FRS and never has. At the time of KILLINGER's arrest, RPD's failure to train related to all its officers, not just to JAGER.

109. RPD Chief Nance, policymaker for RPD, was responsible for ensuring that all RPD officers received training on FRS and understood the constitutional limitations of arresting persons without probable cause. She had actual and constructive notice that FRS could be inaccurate and arrests made based on FRS alone could result in constitutional injuries yet was deliberately indifferent to establishing a policy on FRS or ensuring officers received any training when there was nothing to prevent her from doing so.

110. RPD Chief Nance was ultimately responsible for the training at RPD. She had the ability to institute any and all trainings and policies. There was nothing to prevent Chief Nance from instigating required training for all RPD officers on the limitations of FRS or drafting a policy instructing all officers that FRS cannot be used as proof of identity and must not be used alone to furnish probable cause for arrest.

111. RPD Chief Nance knew of JAGER's actions in wrongfully taking KILLINGER to jail and specifically approved and condoned his actions and the basis for his actions, thus ratifying his actions. Chief Nance, on actual or constructive notice, disregarded the known or obvious consequence that a particular omission in RPD's training program would cause municipal employees to violate citizens' constitutional rights. Chief Nance made a deliberate choice not to have such training even though she knew such training would prevent unlawful arrests without probable cause.

112. RPD Chief Nance had actual and/or constructive knowledge of the arrests by RPD officers from the Peppermill based solely on FRS.

113. RPD Chief Nance's failure to put forth a policy and required training on the limitations of FRS resulted from a deliberate choice to follow a particular course of action despite overwhelming evidence that hundreds, maybe thousands, of such arrests were occurring on a regular basis. RPD's deliberate failure to institute a policy on FRS or to require training for all officers on FRS amounted to a deliberate policy, custom and practice that was the moving force behind the constitutional violation suffered by KILLINGER.

114. It was well known within the police industry in 2023 that FRS could be inaccurate and was only as good as the original images put into the FRS system—otherwise the risk of false positives was high. The Department of Justice had issued warnings as early as 2016 that FRS must be used with skepticism and required corroboration.

115. JAGER, hired in 2020, received no training in FRS or its limitations until sometime late in 2025, well after his wrongful arrest of KILLINGER. Because of his lack of training, he did not know that FRS can be inaccurate and unreliable or that it can furnish false positives and arrests based on FRS identifications alone were prohibited. He did not know that FRS alone cannot be proof of identity or probable cause to arrest. After taking a brief training, JAGER now admits that had he received such training before his interaction with KILLINGER it would have been "helpful" as he would never have arrested KILLINGER. JAGER admits he arrested KILLINGER without probable cause because he received no training to the contrary and believed it was RPD's standard operating procedure to make such arrests.

116. JAGER believed, prior to his late 2025 training, that FRS software was completely accurate and could be trusted to furnish proof of identity and probable cause to arrest.

117. JAGER believed, from the inception of his hiring in 2020 until he received training in late 2025, that it was the custom and practice of all RPD officers to act as he acted and to have complete belief in the accuracy of FRS as a sole basis to establish proof of identity and probable cause to arrest.

118. JAGER further believed that he was not required to investigate any persons arrested by the Peppermill pursuant to a citizen's arrest. JAGER understood that pursuant to custom and practice it was his obligation to take such persons directly to jail without even a minimal investigation into whether there existed sufficient grounds for the arrest.

119. Discovery is continuing on the exact number of persons arrested and/or detained based on FRS alone at the Peppermill and other business entities. However, RPD was at all times aware that hundreds, and perhaps thousands, of arrests were being made at the Peppermill and other local business entities each year based exclusively on FRS. RPD made the deliberate choice not to institute a policy or to require training or to take reasonable steps to ensure that the many RPD officers making such arrests understood the limitations of FRS.

120. JAGER's conduct was not a sporadic incident involving the wrongful actions of a rogue employee but the result of a widespread custom and practice involving hundreds of municipal employees making thousands of arrests in the same manner over a period of years.

121. The constitutional consequences of failing to train on FRS are patently obvious. Innocent people, like KILLINGER, can be arrested without probable cause. Wrongful arrests can be and have been made and are the obvious results of the deliberate indifference of RPD to the risks of constitutional violations based on a technology widely known to yield false positives—yet RPD and Chief Nance were deliberately indifferent to this known risk of harm.

122. When city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program.

123. As of the date of this writing, in 2026, RPD has failed to implement a policy on FRS or to require its officers be trained in the limitations of FRS and the requirement that it must be used only as an investigative lead.

124. RPD's policy of inaction and omission in failing to train its officers to implement procedural safeguards to prevent constitutional violations was the cause in fact and proximate cause of KILLINGER's constitutional injury.

125. But for the lack of a policy on FRS and its limited use without corroboration, the constitutional violation of KILLINGER would not have occurred. As such, there is a direct causal link between RPD's municipal policy, custom and practice and the constitutional violation, and the but-for and proximate causation required are established.

126. As a direct and proximate result of RPD's failures, KILLINGER suffered deprivation of liberty, substantial physical pain and emotional distress, injury to his sense of self-worth and personal integrity, as well as humiliation, shame and embarrassment. Accordingly, KILLINGER is entitled to compensatory and special damages for his past, present, and future pain and suffering and special and economic damages due to the prolonged prosecution of the case and his need to retain criminal counsel all in an amount to be determined at trial as well as equitable relief.

127. RPD's failure to train JAGER and failure to stop the customs and practices alleged herein resulted in the intentional, reckless, and callous disregard for KILLINGER's right not to be subjected to a wrongful arrest without probable cause and all damages that flow from such a wrongful arrest.

**SECOND CAUSE OF ACTION**

**MALICIOUS PROSECUTION**

**As Against Defendant Jager Only**

128. KILLINGER alleges and incorporates by reference herein the allegations above contained.

129. An individual is liable for malicious prosecution in Nevada if he initiated, procured the institution of, or actively or maliciously participated in the continuation of a criminal proceeding against the plaintiff without probable cause.

130. On September 17, 2023, KILLINGER, while still at the Washoe County Jail, was determined positively by a WINS fingerprint identification to be KILLINGER. There was no probable cause to continue KILLINGER's prosecution for trespass as his name was KILLINGER, not Ellis. There was no evidence to support a trespass allegation against KILLINGER as KILLINGER was a lawful customer of the Peppermill. No one at the Peppermill had seen KILLINGER commit or attempt to commit a criminal act at the Peppermill. No one named KILLINGER had ever been trespassed from the casino. JAGER's failure to conduct any type of investigation, coupled with his wrongful belief that he was required to take KILLINGER directly to jail because the Peppermill had made a citizen's arrest, resulted in KILLINGER's arrest without probable cause.

131. KILLINGER had been identified by the Peppermill's FRS as having a face that resembled the face of a prior trespasser. That facial resemblance does not furnish probable cause for an arrest. It is widely accepted by RPD officials, including Chief Nance, Sgt. DeSantis, Sgt. Hodges, and even Officer JAGER, that having a face that "looks like" the face of a prior trespasser does not make for probable cause to arrest such a person. A person who merely resembles a prior trespasser is not guilty of trespass absent corroboration to the contrary. It is common knowledge among the general public that having a face that resembles the face of a criminal, without more, does not make anyone guilty of anything.

132. There were no witnesses who observed KILLINGER either commit a crime or attempt to commit a crime and for that reason there was no probable cause for a misdemeanor citizen's arrest to be made or for KILLINGER to go to jail.

133. JAGER's arrest report, provided to Reno Municipal Court Magistrate Hazlett-Stevens, contained fabricated statements known to be untrue. It was written in such a way that a reasonable person would believe that KILLINGER had "presented" the Peppermill with

conflicting identification and "had" conflicting identification on his person. These are categorically false statements.

134. JAGER's arrest report also stated that KILLINGER lacked sufficient proof of his identity to convince JAGER he was who he claimed to be. This too is false. KILLINGER had abundant reputable legitimate proof of his identity which JAGER refused to look at or to investigate. JAGER deliberately crafted his police report to wrongfully create the false impression that KILLINGER was a fraudster who deserved to be prosecuted because he lacked sufficient proof of identity and had "conflicting" identification. JAGER knew that his arrest report would be submitted to a city magistrate to obtain a finding of probable cause. JAGER's report, as written, would have convinced anyone that KILLINGER deserved arrest. Based on the fabricated statements, Magistrate Hazlett-Stevens had no difficulty in finding that KILLINGER, an innocent man, deserved to be arrested. Absent the false statements, Magistrate Hazlett-Stevens would not have found probable cause to arrest.

135. Malice may be inferred from lack of probable cause to arrest KILLINGER solely for having a face that resembled the face of prior trespasser Michael Ellis. Malice may also be inferred for continuing the prosecution of KILLINGER based solely on having a face that looked like the face of a prior trespasser. Proof of malice need not be direct; it may be inferred from the lack of probable cause. Malice may also be implied if a defendant acted in willful disregard of the plaintiff's rights.

136. Reno prosecutor Jill Drake, knowing full well at the time she received KILLINGER's case that KILLINGER was not the prior trespasser, elected to continue to prosecute KILLINGER. She spoke to JAGER who told her he had "no idea" if KILLINGER was guilty of trespass or not.

137. Ms. Drake was aware that FRS could be inaccurate. Ms. Drake had only JAGER's arrest report which contained no evidence of any crime KILLINGER had committed or any person observing KILLINGER commit any crime. The sole evidence against KILLINGER was he had a face that resembled a prior trespasser based on a technology known by Ms. Drake to be inaccurate. Ms. Drake was at all times aware that having a face that resembled the face of a

wrongdoer did not make for a criminal prosecution. Ms. Drake dismissed the case of trespassing against KILLINGER but refused to dismiss the case with prejudice. Instead, Ms. Drake referred KILLINGER's case to RPD's "fraud" unit for investigation into whether KILLINGER had committed identity theft.[5]

138. Ms. Drake unreasonably expressed a desire to prove a case against KILLINGER because she believed KILLINGER's lawyer had been "cocky" to her.

139. RPD Sgt. Hodges received an email from Dean Hill who stated a Reno city attorney, whose name he did not recall, was attempting to prosecute KILLINGER for identity theft.

140. The criminal case initiated against KILLINGER was dismissed in KILLINGER's favor.

141. As a direct and proximate result of the aforedescribed willful and unlawful conduct by JAGER, committed under color of law and under his police authority, KILLINGER suffered deprivation of liberty, substantial physical pain and emotional distress, injury to his sense of self-worth and personal integrity, as well as humiliation, shame and embarrassment. Accordingly, KILLINGER is entitled to compensatory and special damages for his past, present, and future pain and suffering and special and economic damages due to the prolonged prosecution of the case and his need to retain criminal counsel all in an amount to be determined at trial as well as equitable relief.

142. The acts of JAGER were intentional, wanton, malicious and oppressive and made with reckless and deliberate indifference to KILLINGER's right to be free from a continued prosecution on the charge of trespassing when there was no probable cause to believe he was guilty of such an offense, thus entitling KILLINGER to an award of punitive damages against JAGER.

[5] The fraud unit investigator, Monique Sheahan, concluded the Peppermill had made a mistake, had "screwed up," and it would be wrongful for RPD to attempt to cover up a wrongful arrest by initiating a felony identity theft charge.

**THIRD CAUSE OF ACTION**

**FABRICATION OF EVIDENCE**

**A Violation of Section 1983 – Fourteenth Amendment Due Process**

**As Against Defendant Jager Only**

143. It is well established that criminal suspects have a due process right not to be subjected to criminal charges on the basis of false evidence deliberately fabricated by police officers. There is a clearly established constitutional due process right not to be subjected to criminal charges on the basis of false evidence that was deliberately fabricated.

144. JAGER deliberately fabricated evidence and the deliberate fabrication caused KILLINGER's deprivation of liberty.

145. The fabricated statements contained in JAGER's police report were presented to Magistrate Hazlett-Stevens for a determination on probable cause.

146. The fabricated statements contained in JAGER's police report were the cause in fact and the proximate cause of Magistrate Hazlett-Stevens finding probable cause to hold KILLINGER to answer for the crime of trespass even though it was known at the time, or immediately thereafter, that KILLINGER was not the prior trespasser, had not provided a fake identification and did not have conflicting identifications.[6]

147. Absent the fabricated evidence contained in JAGER's police report, Magistrate Hazlett-Stevens would not have found probable cause for KILLINGER's arrest and the charges against him would have been dismissed without prosecution. KILLINGER would not have been charged or probable cause found against him absent the false statements in JAGER's police report.

148. The false statements in JAGER's police report were the proximate cause of KILLINGER's constitutional injury and deprivation of liberty.

149. JAGER's false statements were not the result of inaccuracies or mistakes in tone. They were not trivial.

[6] It is not necessary for KILLINGER to prove that he was convicted on the basis of fabricated evidence to have suffered a deprivation of liberty; being criminally charged is enough. *See Caldwell v. City & County of San Francisco*, 889 F.3d 1105, 1115 (9th Cir. 2018).

150. JAGER's fabricated statements in his police report claimed that KILLINGER had "presented" conflicting identification to the Peppermill. This allegation of "conflicting identification" made it falsely appear that KILLINGER's driver's license was fake.

151. JAGER's fabricated evidence in his police report claimed that KILLINGER "had" conflicting identification. This creates the false impression that KILLINGER had conflicting pieces of identity in his possession, and that he was a fraudster and guilty of crimes.

152. The false statements made in JAGER's police report are direct evidence of fabrication of evidence. JAGER wholly fabricated that KILLINGER presented and had conflicting identification, which JAGER at all times knew to be untrue.

153. JAGER omitted from his arrest documents exculpatory evidence that KILLINGER consistently maintained he was KILLINGER and not Ellis. JAGER omitted from his police report the exculpatory evidence that the driver's licenses of KILLINGER and Ellis were different in every respect other than they had similar faces and were both blond. JAGER fabricated in his arrest documents that KILLINGER "lacked satisfactory evidence to reasonably assure him that he was who he claimed to be." This is false and JAGER knew it to be false because KILLINGER had 22 pieces of identification in his name in his pocket and in his vehicle parked in the nearby Peppermill parking facility that JAGER refused to look at, insisting he would not consider anything that KILLINGER offered because it could all be fake or stolen.

154. JAGER's fabricated evidence, intentional omissions, and reckless indifference to KILLINGER's rights caused the Magistrate to find probable cause for KILLINGER's arrest and caused the prosecutor to continue with the case long after KILLINGER's identity had been positively confirmed.

155. JAGER's fabricated evidence, intentional omissions, and reckless indifference to KILLINGER's rights deprived KILLINGER of having his story accurately presented to prosecutor Jill Drake—absent such false statements Ms. Drake would not have attempted to continue KILLINGER's prosecution.

156. By reporting less than the total story, JAGER manipulated the inferences both a prosecutor and a magistrate would draw, causing both to be misled in such a manner as to

denude the probable cause requirement of all real meaning. Because it was clearly established in 2001 that KILLINGER had a right not to be subjected to criminal charges based on fabricated evidence and willful omissions, qualified immunity will not apply.

157. JAGER was recklessly indifferent to KILLINGER's due process right not to be deprived of his liberty on the basis of fabricated evidence JAGER knew to be untrue.

158. As a direct and proximate result of the aforedescribed willful and unlawful conduct by JAGER, committed under color of law and under his police authority, KILLINGER suffered deprivation of liberty, substantial physical pain and emotional distress, injury to his sense of self-worth and personal integrity, as well as humiliation, shame and embarrassment. Further, KILLINGER required medical treatment and endured three months of acute shoulder pain making his work more difficult and painful. Accordingly, KILLINGER is entitled to compensatory and special damages for his past, present, and future pain and suffering and special and economic damages due to the wrongful finding of probable cause based on fabricated evidence and the prolonged prosecution of the case and his need to retain criminal counsel all in an amount to be determined at trial as well as equitable relief.

159. The acts of JAGER were intentional, wanton, malicious and oppressive and made with reckless and deliberate indifference to KILLINGER's right to be free from fabrication of evidence against him, thus entitling KILLINGER to an award of punitive damages against JAGER.

**FOURTH CAUSE OF ACTION**

**JUDICIAL DECEPTION**

**A Violation of Section 1983 – Fourteenth Amendment Due Process**

**As Against Defendant Jager Only**

160. KILLINGER alleges and incorporates by reference herein the allegations above contained.

161. A detention based on mistaken identity violates due process if "the circumstances indicated to the defendant that further investigation was warranted." In this case there was substantial evidence that further investigation was required.

162. JAGER arrested KILLINGER even though a reasonable officer would have known there were substantial differences between him and the prior trespasser such that further investigation was necessary.

163. JAGER knew or should have known that he was required to corroborate any identification based exclusively on FRS.

164. JAGER knew or should have known that it was impermissible to take KILLINGER to jail based on a citizen's arrest based on nothing more than that KILLINGER's face bore a resemblance to a prior trespasser.

165. JAGER knew or should have known he had an obligation to investigate when investigation was obviously required. JAGER knew that there were significant differences between the driver's licenses of KILLINGER and Ellis. JAGER knew that KILLINGER presented an active, valid and current Nevada Real ID.

166. JAGER knew or should have known that his refusal to investigate or to even consider any of KILLINGER's abundant evidence of his identity because it could all be "fake or stolen" was deliberately indifferent to KILLINGER's rights.

167. JAGER knew that KILLINGER pleaded with him to look at the differences in their licenses and repeatedly inquired as to what he could do to convince JAGER he was who he claimed to be. At no time did JAGER make any effort to even minimally investigate when there were easy options readily available to JAGER to investigate—all of which he ignored.

168. JAGER at all times maintained he was "confused" and "didn't know what to believe" as to whether KILLINGER was in fact the prior trespasser Ellis. JAGER expressed the belief that KILLINGER was merely a doppelganger or look-alike to Ellis. JAGER told prosecutor Drake that he had "no idea" if KILLINGER was guilty of anything. If JAGER was unclear, which he was, he had the duty and responsibility to investigate further.

169. JAGER at all times knew he could not take KILLINGER to jail strictly because he did not know KILLINGER's identity. For JAGER to take KILLINGER to jail, JAGER was required to have probable cause that KILLINGER had committed a crime—not that his face resembled the face of a prior trespasser.

170. JAGER knew further investigation was required but refused to do so, stating that investigation would be futile because all suspects lie and all the identification KILLINGER had, even if in his own name, was likely fake or stolen—the likely result of a mysterious DMV "hookup" that KILLINGER had on the side to manufacture false IDs for him.

171. It would have taken JAGER mere moments to go to the Peppermill office and review KILLINGER's player's card account. He would have discovered that Peppermill records show that KILLINGER had been in the Peppermill gaming less than two weeks before and 83 times before that since 2021. He would have discovered that KILLINGER was an honored customer at the Peppermill.

172. It would have taken mere moments for JAGER to review KILLINGER's bank debit card, player's card, and walk over to the nearby Peppermill parking lot to review KILLINGER's vehicle registration, vehicle insurance card, pay stub from his employer, Teamsters identification card, Department of Transportation medical certificate, and other player's cards from other casinos where he also frequently gambled—all of which were in KILLINGER's name.

173. It would have taken seconds for JAGER to compare KILLINGER's driver's license to Ellis's and see all the conflicting information. The only similarity was facial; they looked similar, but everything else was different, and KILLINGER had ample evidence of his identity sufficient to positively identify that KILLINGER was not Ellis.

174. As a direct and proximate result of the aforedescribed willful and unlawful conduct by JAGER, committed under color of law and under his police authority, KILLINGER suffered deprivation of liberty, substantial physical pain and emotional distress, injury to his sense of self-worth and personal integrity, as well as humiliation, shame and embarrassment. Accordingly, KILLINGER is entitled to compensatory and special damages for his past, present, and future pain and suffering and special and economic damages due to the prolonged prosecution of the case and his need to retain criminal counsel all in an amount to be determined at trial as well as equitable relief.

175. The acts of JAGER were intentional, wanton, malicious and oppressive and made with reckless and deliberate indifference to KILLINGER's right to be free from a detention without sufficient evidence when the evidence to establish he was innocent was easily available to JAGER with further investigation, thus entitling KILLINGER to an award of punitive damages against JAGER.

**FIFTH CAUSE OF ACTION**

**EXCESSIVE FORCE**

**A Violation of Section 1983 – Fourth Amendment**

**As Against Defendant Jager Only**

176. KILLINGER alleges and incorporates by reference herein the allegations above contained.

177. JAGER was trained to know that prolonged handcuffing can cause injury yet JAGER intentionally refused to ask either the Peppermill or KILLINGER how long KILLINGER had been in handcuffs.

178. In analyzing the objective reasonableness of a use of force, the relevant issues are: (1) the severity of the crime at issue; (2) whether the suspect posed an immediate threat to the safety of the officers; and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight.

179. KILLINGER's sole alleged crime was trespassing. He was accused of being Ellis who had been trespassed by the Peppermill in March 2023 for "sleeping." Trespassing is a minor non-violent crime.

180. KILLINGER at no time posed an immediate threat to the safety of JAGER or anyone else.

181. KILLINGER at no time attempted to evade arrest. KILLINGER expressed shock at his arrest but at no time did he try to flee or evade arrest. He was cooperative in every respect.

182. JAGER was recklessly indifferent to KILLINGER's rights when he refused to either loosen the handcuffs, remove the handcuffs for a "break" before transport, or find an alternative way to confine KILLINGER that did not cause him pain.

183. As a direct and proximate result of the aforedescribed willful and unlawful conduct by JAGER, committed under color of law and under his police authority, KILLINGER suffered deprivation of liberty, substantial physical pain and emotional distress, injury to his sense of self-worth and personal integrity, as well as humiliation, shame and embarrassment. Further, KILLINGER required medical treatment and endured three months of acute shoulder pain making his work more difficult and painful. Accordingly, KILLINGER is entitled to compensatory and special damages for his past, present, and future pain and suffering and special and economic damages due to the prolonged prosecution of the case and his need to retain criminal counsel all in an amount to be determined at trial as well as equitable relief.

184. The acts of JAGER were intentional, wanton, malicious and oppressive and made with reckless and deliberate indifference to KILLINGER's right to be free from excessive force, thus entitling KILLINGER to an award of punitive damages against JAGER.

**SIXTH CAUSE OF ACTION**

**FALSE ARREST**

**A Violation of Article 1, Section 18 of the Nevada Constitution**

**As Against Defendant Jager Only**

185. KILLINGER alleges and incorporates by reference herein the allegations above contained.

186. Article 1, Section 18 of the Nevada Constitution prohibits unreasonable searches and seizures. It is as broad as or broader than the Fourth Amendment on the issue of search and seizure. It prohibits arrests made without probable cause. Qualified immunity is not a defense to a claim for damages under Article 1, Section 18. *Mack v. Williams*, 138 Nev. 854, 522 P.3d 434, 450-52 (2022).

187. KILLINGER alleges that JAGER relied on a new and unreliable FRS technology which is widely known in the police industry to be only an investigative tool and not proof of identity or probable cause to arrest—accordingly, pursuant to Nevada law, JAGER did not have probable cause to arrest KILLINGER.

188. KILLINGER alleges that JAGER failed to investigate, failed to reasonably act as a just and prudent police officer, and arrested KILLINGER solely based on speculation and on a new technology that he knew or should have known was deemed inaccurate for purposes of probable cause.

189. As a direct and proximate result of the aforedescribed willful and unlawful conduct by JAGER, committed under color of law and under his police authority, KILLINGER suffered deprivation of liberty, substantial physical pain and emotional distress, injury to his sense of self-worth and personal integrity, as well as humiliation, shame and embarrassment. Further, KILLINGER required medical treatment and endured three months of acute shoulder pain making his work more difficult and painful. Accordingly, KILLINGER is entitled to compensatory and special damages for his past, present, and future pain and suffering and special and economic damages due to the prolonged prosecution of the case and his need to retain criminal counsel all in an amount to be determined at trial as well as equitable relief.

190. The acts of JAGER were intentional, wanton, malicious and oppressive and made with reckless and deliberate indifference to KILLINGER's right to be free from an unreasonable seizure and arrest without probable cause, thus entitling KILLINGER to an award of punitive damages against JAGER.

**RELIEF REQUESTED**

WHEREFORE, KILLINGER prays for judgment against Defendants as follows:

(a) For declaratory relief;

(b) For equitable and/or injunctive relief;

(c) For compensatory damages;

(d) For economic damages including special damages;

(e) For punitive damages as against Defendant JAGER;

(f) For attorneys' fees and costs incurred herein;

(g) For leave to amend this complaint should the same become necessary; and

(h) For such other and further relief as this Court may deem appropriate.

**DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff demands a trial by jury on all issues so triable.

DATED: This 21st day of October 2026.

/s/Terri Keyser-Cooper
TERRI KEYSER-COOPER
LUKE BUSBY, ESQ.
LAUREN GORMAN, ESQ.
Attorneys for Plaintiff Jason Killinger

**CERTIFICATE OF SERVICE**

I certify that on October 21, 2026, I electronically filed the foregoing PLAINTIFF'S SECOND AMENDED COMPLAINT with the Clerk of Court using the CM/ECF system, which will send notice of electronic filing to all counsel of record, including:

Alice K. Herbolsheimer, HerbolsheimerA@reno.gov
Holly S. Parker, ParkerH@reno.gov
Adam D. Cate, CateA@reno.gov
Reno City Attorney's Office, P.O. Box 1900, Reno, Nevada 89505
Attorneys for Defendants City of Reno and Officer R. Jager

/s/ Lauren Gorman
LAUREN GORMAN
ATTORNEY FOR JASON KILLINGER